# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

---

LUBBY HOLDINGS LLC, VAPOROUS TECHNOLOGIES, INC.,

*Plaintiffs-Appellees,*

*v.*

HENRY CHUNG,

*Defendant-Appellant*

---

Appeal from the United States District Court for the
Central District of California in No. 2:18-cv-00715, Judge R. Gary Klausner

---

**CORRECTED OPENING BRIEF FOR DEFENDANT-APPELLANT
HENRY CHUNG**

---

| | |
|---|---|
| Robert E. Aycock | Jen-Feng Lee |
| Joseph G. Pia | LT PACIFIC LAW GROUP, LLP |
| William B. Chadwick | 17800 Castleton Street, #560 |
| PIA ANDERSON MOSS HOYT | City of Industry, CA 91748 |
| 136 E. South Temple, 19th Floor | (626) 810-7200 |
| Salt Lake City, UT 84111 | |
| (801) 350-9000 | |

*Counsel for Defendant-Appellant Henry Chung*

November 21, 2019

**CERTIFICATE OF INTEREST**

Pursuant to Federal Circuit Rule 47.4, Counsel for Defendant-Appellant certifies the following:

1. The full name of every party represented by us is:

   • Henry Chung

2. The names of the real party in interest represented by us are:

   • Henry Chung

3. All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party represented by us are:

   • None

4. The names of all law firms and the partners or associates that appeared for the parties represented by us in the trial court, or are expected to appear in this Court (and who have not or will not enter an appearance in this case) are:

   • <u>LT Pacific Law Group</u>: Kenneth K. Tanji, Jr.

5. The title and number of any case known to counsel to be pending in this or any other court or agency that will directly affect or be directly affected by this court's decision in the pending appeal (*see* Fed. Cir. R. 47.4(a)(5) and 47.5(b)) are:

   • None

Dated: November 21, 2019

*/s/  Robert E. Aycock*
Robert E. Aycock
*Counsel for Defendant-Appellant*
*Henry Chung*

i

# TABLE OF CONTENTS

STATEMENT OF RELATED CASES ................................................................. vi

JURISDICTIONAL STATEMENT ................................................................. vii

STATEMENT OF THE ISSUES.......................................................................1

STATEMENT OF CASE ...................................................................................4

SUMMARY OF ARGUMENT ........................................................................13

STANDARD OF REVIEW ..............................................................................17

ARGUMENT ...................................................................................................19

    I.     The Jury's infringement verdict is improper as a matter of law ...............19

    II.    The Jury's damages verdict is improper as a matter of law. ......................31

CONCLUSION AND RELIEF SOUGHT .........................................................51

CERTIFICATE OF SERVICE

CERTIFICATE OF COMPLIANCE

**TABLE OF AUTHORITIES**

Cases

*Al-Site Corp. v. VSI Int'l, Inc.*,
  174 F.3d 1308 (Fed. Cir. 1999) ...................................................................30
*Arctic Cat Inc. v. Bombardier Recreational Prod. Inc.*,
  876 F.3d 1350 (Fed. Cir. 2017) ...................................................................49
*Bank of Montreal v. SK Foods, LLC*,
  476 B.R. 588 (N.D. Cal. 2012) ....................................................................28
*Brooktree Corp. v. Advanced Micro Devices, Inc.*,
  977 F.2d 1555 (Fed. Cir. 1992) ...................................................................39
*Chiron Corp. v. Genentech, Inc.*,
  363 F.3d 1247 (Fed. Cir. 2004) ........................................ 18, 20, 21, 23
*CODA Dev. S.R.O. v. Goodyear Tire & Rubber Co.*,
  916 F.3d 1350 (Fed. Cir. 2019) ...................................................................19
*Cooter & Gell v. Hartmarx Corp.*,
  496 U.S. 384, 110 S. Ct. 2447, 110 L. Ed. 2d 359 (1990) ...................................19
*Dow Chem. Co. v. Mee Indus., Inc.*,
  341 F.3d 1370 (Fed. Cir. 2003) ...................................................................35
*Dunlap v. Schofield*,
  152 U.S. 244, 248 (1894) ...........................................................................49
*Exmark Mfg. Co. Inc. v. Briggs & Stratton Power Prod. Grp., LLC*,
  879 F.3d 1332 (Fed. Cir. 2018) ...................................................................45
*Gemtron Corp. v. Saint-Gobain Corp.*,
  572 F.3d 1371 (Fed. Cir. 2009) ...................................................................39
*Georgia-Pac. Corp. v. U.S. Plywood Corp.*,
  318 F. Supp. 1116 (S.D.N.Y. 1970) ........................................ 40, 41, 44, 45
*Golden Bridge Tech., Inc. v. Nokia, Inc.*,
  527 F.3d 1318 (Fed. Cir. 2008) ...................................................................23
*Hagen v. City of Eugene*,
  736 F.3d 1251 (9th Cir. 2013) .....................................................................34
*Hiken v. Dep't of, Def.*,
  836 F.3d 1037 (9th Cir. 2016) .....................................................................19
*Hughes Tool Co. v. Dresser Indus., Inc.*,
  816 F.2d 1549 (Fed. Cir. 1987) ...................................................................45

*Icon Health & Fitness, Inc. v. Strava, Inc.*,
849 F.3d 1034 (Fed. Cir. 2017) ....................................................................39

*Indiana Michigan Power Co. v. United States*,
422 F.3d 1369 (Fed. Cir. 2005) ....................................................................43

*Insite Vision Inc. v. Sandoz, Inc.*,
783 F.3d 853 (Fed. Cir. 2015) ......................................................................19

*Int'l Mfg. Co. v. Landon, Inc.*,
336 F.2d 723 (9th Cir. 1964) ........................................................................25

*Lucent Techs., Inc. v. Gateway, Inc.*,
580 F.3d 1301 (Fed. Cir. 2009) .............................................................. 45, 46

*Lujan v. Defenders of Wildlife*,
504 U.S. 555 (1992)................................................................................ 31, 33

*Matter of Christian & Porter Aluminum Co.*,
584 F.2d 326 (9th Cir. 1978) ........................................................................27

*Mentor Graphics Corp. v. Quickturn Design Sys., Inc.*,
150 F.3d 1374 (Fed. Cir. 1998) ....................................................................19

*Orthokinetics, Inc. v. Safety Travel Chairs, Inc.*,
806 F.2d 1565 (Fed. Cir. 1986) ....................................................................27

*Pavao v. Pagay*,
307 F.3d 915 (9th Cir. 2002) ........................................................................18

*Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*,
904 F.3d 965 (Fed. Cir. 2018) ......................................................................46

*Radio Steel & Mfg. Co. v. MTD Prod., Inc.*,
788 F.2d 1554 (Fed. Cir. 1986) ....................................................................46

*ResQNet.com, Inc. v. Lansa, Inc.*,
594 F.3d 860 (Fed. Cir. 2010) ......................................................................44

*Rite-Hite Corp. v. Kelley Co.*,
56 F.3d 1538 (Fed. Cir. 1995) ............................................................... 48, 49

*Singleton v. Wulff*,
428 U.S. 106, 96 S. Ct. 2868, 49 L. Ed. 2d 826 (1976) ..............................22

*Sonora Diamond Corp. v. Superior Court*,
83 Cal. App. 4th 523, 99 Cal. Rptr. 2d 824 (2000) ............................... 27, 28

*Tatung Co., Ltd. v. Shu Tze Hsu*,
217 F. Supp. 3d 1138 (C.D. Cal. 2016) ........................................................28

*TVIIM, LLC v. McAfee, Inc.*,
851 F.3d 1356 (Fed. Cir. 2017) .............................................. 17, 18, 19, 45

*Uniloc USA, Inc. v. Microsoft Corp.*,
  632 F.3d 1292 (Fed. Cir. 2011) ....................................................................40
*Warfield v. Alaniz*,
  569 F.3d 1015 (9th Cir. 2009) ......................................................................29
*Wechsler v. Macke Int'l Trade, Inc.*,
  486 F.3d 1286 (Fed. Cir. 2007) ....................................................................27
*Whitserve, LLC v. Computer Packages, Inc.*,
  694 F.3d 10 (Fed. Cir. 2012) ................................................................ passim
*Wordtech Sys., Inc v. Integrated Networks Sols., Inc.*,
  609 F.3d 1308 (Fed. Cir. 2010) ............................................................ passim

**Statutes**

35 U.S.C. § 271(a) ........................................................... 22, 27, 30, 32
35 U.S.C. § 271(b) ...............................................................................25
35 U.S.C. § 284 ....................................................................................48
35 U.S.C. § 287 ............................................................................ passim
§ 287(a) ......................................................................................... 17, 49
§§ 271(a) and 271(b) ...........................................................................25

**Rules**

Fed. R. Civ. P. 26(a)(1)(A)(iii) .........................................................36
Fed. R. Civ. P. 59(a) ...........................................................................11
Fed. R. Civ. P. 59(e) ...........................................................................12
Fed. R. Civ. P. 51(d)(2) ................................................................ 29, 30

**STATEMENT OF RELATED CASES**

This appeal concerns U.S. Patent No. 9,750,284 and related district court litigation. No other appeal in or from the same civil action is or was previously before this or any other appellate court. Counsel is unaware of any case pending in any court which may be directly affected by this Court's decision in the pending appeal.

# JURISDICTIONAL STATEMENT

This is an appeal from the U.S. District Court for the Central District of California's order denying Appellant's Rule 50 motion for JMOL (Appx2-4) and order denying Appellant's motions for a new trial under Rule 59(a) and to amend the judgment under Rule 59(e) (Appx5-7). On August 12, 2019, Appellant Chung timely filed its notice of appeal under 28 U.S.C. § 2107(a) and Federal Rule of Appellate Procedure 4. Appx1210-1212. The District Court had original jurisdiction under 28 U.S.C. §§ 1331 and 1338(a) and this Court has appellate jurisdiction pursuant to 28 U.S.C. § 1295(a)(1).

# STATEMENT OF THE ISSUES

(1)     Whether substantial evidence supports the Jury's verdict that Appellant was liable for direct infringement, when the only evidence of sales of any accused products, or other potentially infringing acts, were made by a third-party, and when the Jury was not instructed as to induced infringement or alter ego liability.

(2)     Whether substantial evidence supports the Jury's verdict that a 60% royalty is the outcome of a non-speculative hypothetical negotiation when there was no *Georgia-Pacific* analysis, and the only allegedly commensurate license was not analyzed or presented to the Jury.

(3)     Whether substantial evidence supports the Jury's verdict that 36,453 units infringe, when the evidence of record is that only 8,689 units were sold after the asserted patent had issued.

(4)     Whether substantial evidence supports the Jury's verdict that reasonable royalties should be calculated using Appellees' alleged and unsubstantiated profit margin when lost profits remedies were unavailable.

(5)     Whether substantial evidence supports the Jury's damages verdict of $863,936.10 when the day before trial, Appellees disclosed their damages position to the Appellant and the District Court  for the first time, and claimed that they were only seeking $623,346.30 and when there were no intervening facts to change that damages position and no presented evidence to support the requested royalty.

(6) Whether the Jury's verdict of direct infringement by Appellant is against the clear weight of the evidence when the only evidence of sales of any accused products, or other potentially infringing acts, were made by a third-party, and where the Jury was not instructed as to induced infringement or alter ego liability.

(7) Whether the Jury's verdict that 36,453 units infringe is against the clear weight of the evidence, when the evidence of record is that only 8,689 units were sold after the asserted patent was issued.

(8) Whether the Jury's verdict of a 60% royalty is against the clear weight of the evidence when there was no *Georgia-Pacific* analysis, the only allegedly commensurate license was not analyzed or admitted into evidence, and there is no evidence of consumer royalty demand over the whole product.

(9) Whether the Jury's damages verdict of $863,936.10 is against the clear weight of the evidence when the damages calculations were based on Appellees' unsubstantiated profit margin and where lost profits remedies were unavailable.

(10) Whether the Jury's damages verdict of $863,936.10 is against the clear weight of the evidence when the day before trial, Appellees disclosed their damages position to the Appellant and the District Court for the first time, and claimed that they were only seeking $623,346.30 and when there were no intervening facts to

change that damages position and no presented evidence to support the requested royalty.

(11)   Whether the Jury's verdict that all sales of the accused products should be included in the damages award is against the clear weight of the evidence when there was no admitted evidence to show Plaintiff pled or complied with its marking requirements under 35 U.S.C. § 287 and when the alleged infringer identified patentee's unmarked products before trial.

(12)   Whether the district court abused its discretion by failing to amend the judgment where there was no admitted evidence to show Plaintiff pled or complied with its marking requirements under 35 U.S.C. § 287 and when the alleged infringer identified patentee's unmarked products before trial.

# STATEMENT OF CASE

## I.    THE PARTIES AND BACKGROUND

The parties to the underlying litigation are involved in the importing, design, manufacture, and sale of e-cigarette devices designed to be filled with liquid that is then vaporized and inhaled by the end user (commonly referred to as "vaping"). Appellant Henry Chung ("***Chung***") entered the vaporizer business in 2011 and began designing his own vaporizers around 2012. Appx814 at 138:2-12. Chung's work eventually him to apply for and receive several patents in the field. Appx814-815 at 138:15-139:24; Appx819-823 at 143:22-147:25; Appx1055-1056. In 2015, Chung formed Esquire Distribution Inc. (the "***Company***") that imports and sells vaping products.

Chung's involvement in the vaping field led him to industry events, including a trade show in 2015 where he met Christian Rado ("***Rado***"), the CEO and president of Appellee Vaporous Technologies, Inc. and the owner of Appellee Lubby Holdings, LLC which owns the patent at issue (the Appellees are collectively referred to herein as "***Appellees***" or "***Lubby***").

Rado became interested in vaping products in 2012 and later started designing and manufacturing vaping products. When Chung and Rado met at the 2015 trade show, they exchanged information and entered into a mutual nondisclosure agreement. This led to Rado and Chung's respective companies entering into another

4

nondisclosure agreement and the two companies going into business together to manufacture and sell vaping products that allegedly used Rado's technology and Chung's manufacturing contacts in China. There was ultimately a disagreement among the parties as to the terms of their business arrangement resulting in the litigation below regarding the sales of vaping products Conseal A and Conseal B (the "***Accused Products***").

## II.     THE '284 PATENT

On January 26, 2018, Lubby sued Chung for patent infringement of U.S. Patent 9,750,284 (the "***'284 Patent***"). The '284 patent application was filed on August 31, 2016 and claimed priority to patent application US2014/62098197. Rado is listed as the sole inventor of the '284 patent, with Lubby listed as the applicant. The '284 patent was issued on September 5, 2017. Appx8. The '284 patent (titled "Personal Vaporizer") is directed to one specific aspect of personal vaporizers, namely preventing vaping liquid from leaking during periods of nonuse. *Id.* and Appx643-644 at 146:23-147:1 (Rado testified that the anti-leaking is the important feature).

## III.     PROCEDURAL HISTORY

The complaint (served on February 20) named three defendants: Chung as an individual, Ming Chen, and Deepvapes, Inc. Lubby did not include the Company as a defendant. On March 30, 2018, Chung filed a motion to dismiss for failure to state

a claim under Fed. R. Civ. P. 12(b)(6). Lubby responded with its first amended complaint on April 10, 2010 and again did not add the Company as a defendant. Chung answered on April 26, 2018, and the parties participated in an unsuccessful mediation on February 20, 2019.

During discovery, the parties exchanged a handful of documents and some written discovery responses. Throughout all discovery, Lubby refused to present a computation or damages figure or identify any sales of the Accused Products made by any party. Chung filed a motion requesting disclosure and sanctions for Lubby's failure to present its damage position. Appx164-187. Lubby opposed the motion (Appx238-245), and the Court ultimately ordered Lubby to disclose its damages computation on May 6, 2019, the day before trial (Appx307).

On May 6, 2019, Lubby filed its computation of damages for the first time and claimed that it sought $623,346.30 in reasonable royalty damages, calculated as 60% of the difference between Lubby's own retail sale price ($45) and Lubby's own cost of goods ($16.50) all multiplied by 36,453, the total number of units sold by the Company, not Chung, between March 1, 2016 and February 1, 2018. Appx308-310.

The same day, Chung objected to the damages position for: containing damages for pre-issuance sales; Lubby's failure to comply with § 287's marking and notice requirements; and the lack of support for a lost profits or reasonable royalty

6

position. Appx312-315. In his objection, Chung identified Lubby's J-Pen Starter Kit as a patented article sold by Lubby that was not properly marked. Appx1258.

## IV. TRIAL

A three-day jury trial began on May 7, 2019 before the Honorable R. Gary Klausner in the Central District of California. For their case in chief, Lubby only called three witnesses: Mr. Christian Rado (the sole inventor of the '284 patent, Lubby's owner, and the CEO and President of Vaporous Technologies), its technical expert, Andreas Brekke, and Mr. Henry Chung. Chung called two witnesses, himself and his technical expert, George Wakalopulos. There were only 14 exhibits admitted at trial.

### A. Appellees' Trial Testimony

At trial, Rado testified regarding his experience in the vaporizer industry and his introduction to Chung. He also testified regarding how he entered into a supply agreement with the Company, of the various NDA's and agreements that the parties entered into personally and on behalf of their respective companies, and his view of how the business relationship deteriorated. Rado also testified regarding the background and content of the '284 patent. Rado testified regarding an alleged license with another company. Appx602-604 at 105:11-107:22.

Lubby's technical expert, Andreas Brekke, testified regarding the technology disclosed in the '284 patent and gave his analysis and opinion on whether the Accused Products are covered by the claims of the '284 patent.

Lubby's counsel argued during his closing argument that Lubby was seeking $863,936.10 in damages. Appx965-968 at 62:7-65:2. In showing how they arrived at that figure, Lubby's counsel walked the Jury through his calculation based on a 60% royalty between the difference between Lubby's retail sale price ($45) and a revised cost of Lubby's goods ($5.50) multiplied against the 36,453 allegedly infringing units. *Id.*

B. **Appellants' Trial Testimony**

Chung testified regarding his experience in the vaporizer industry including how he secured multiple patents in the field, and his formation and involvement in the Company to import and sell vaping products. Chung testified that he did not personally import, sale, or offer for sale any of the Accused Products. Appx769-770 at 93:24-94:13; Appx774 at 98:14-18. Chung testified consistently, including in response to questions from the District Court, that all accused imports, sales, and offers were only by and through the Company. *Id.* Chung explained his business relationship with Rado and Appellees, and he testified regarding his understanding of the '284 patent. Chung presented his experience with the consumer demand for products made with and without the anti-leaking design of the '284 patent.

Chung's technical expert, George Wakalopulos, testified regarding the technology disclosed in the '284 patent and gave his analysis and opinion of noninfringement and invalidity of the claims of the '284 patent.

## C. Trial Motions

During trial, Chung timely moved for JMOL under Rule 50(a). Appx810 at 134:15-20; Appx324-329. In the motion, Chung argued, *inter alia*, that relief was appropriate because there was insufficient evidence in the record to support the Jury's damages verdict of lost profits or a reasonable royalty of 60%. Appx324-329. The Court took the motion under submission without a ruling. Appx810 at 134:15-20.

After the presentation of the evidence, the District Court, on its own motion, limited the issues to be presented to the Jury. Appx932-933 at 29:12-30:6. Specifically, the District Court instructed the parties that there were only three issues for the Jury to decide: "whether or not there's direct infringement or not, what the reasonable royalties would be if there was direct infringement, and is the patent invalid based on prior art." Appx932-933 at 29:12-30:6. The District Court dismissed Lubby's claims of contributory infringement, induced infringement, willful infringement, doctrine of equivalence infringement, lost profits damages, and Chung's defense of obviousness. *Id.* The Court also dismissed Defendant Ming Chen on its own motion. Appx810 at 134:22-25.

### D. <u>Jury Verdict</u>

After deliberation, the Jury returned a verdict finding Defendants Chung and Deepvapes, Inc. liable for direct infringement and awarded Plaintiffs $863,936.10, the exact amount Lubby's counsel calculated in closing argument. Appx1; Appx967 at 64:12-22.

### V. POST-TRIAL

### E. <u>Chung's Motion for JMOL</u>

After trial, Chung timely moved for JMOL under Rule 50(b), seeking *inter alia*: judgment in its favor on lost profits; limitation of damages based on failure to comply with § 287; reasonable royalty rate and damages; damages based on pre-issuance sales; an infringement theory based on an alter-ego theory; and speculative damages. Appx367-375.

Lubby opposed the motion arguing: that the jury did not award lost profits damages because the District Court had previously dismissed that claim; that Lubby had complied with § 287 marking; that there was substantial evidence to support the Jury's verdict as to reasonable royalty; that the Jury was instructed correctly as to reasonable royalty; and that Chung's other Rule 50(b) arguments were waived as they were not raised in the Rule 50(a) motion. Appx377-389.

The District Court denied Chung's motion finding without analysis or oral argument, that "there was sufficient evidence to support the Jury's verdict at the close of trial." Appx2-4.

### F. Chung's Motion for New Trial

Chung timely moved for a new trial under Fed. R. Civ. P. 59(a) arguing, *inter alia*: that there was no evidence that Chung personally sold any accused product; that it was improper for the Jury to perform an alter ego analysis without an appropriate instruction; that there was no support for a royalty demand for the entire vaping product; that Lubby's reasonable royalty damages position was speculative; that the jury verdict was an impermissible lost profits award; and that Lubby and its counsel prejudiced Chung by misrepresenting its damage position days before to both Chung and the District Court, testifying about an unsubstantiated license, using an undefined term in front of the Jury, and by presenting to the Jury that pre-issuance sales can be found to infringe. Appx1079-1094; Appx1181-1186.

Lubby opposed the motion arguing: that Chung waived his right to argue the jury instructions as a basis for a new trial; that Chung allegedly testified to personally selling the Accused Products; that alter ego analysis was unnecessary because the Jury found Chung liable under an induced infringement theory (a claim the District Court had dismissed before the case went to the Jury); that royalty damages correctly apply to the whole product; and that the behavior of Lubby and its counsel did not

11

prejudice Chung. Appx1124-1142. Without referencing any evidence in the record and without oral argument, the District Court denied Chung's motion finding that there was sufficient evidence to support the Jury's verdict, that Lubby and its counsels' actions were not improper, and there were insufficient grounds for a new trial. Appx5-7.

### G. Chung's Motion to Amend Judgment

Chung also timely moved to amend the judgment under Fed. R. Civ. P. 59(e) arguing, *inter alia*: that there was no admitted evidence to show Lubby complied with § 287; the verdict based on § 287 damages was manifest error; that the verdict improperly contained damages for pre-issuance sales; and that Lubby's counsel acted improperly. Appx1098-1111; Appx1188-1191.

Lubby opposed the motion arguing that Chung's § 287 arguments should have been raised before entry of judgment; that the evidence at trial demonstrated that Chung had the requisite notice under § 287; and that Lubby's counsel did not act improperly. Appx1112-1123.

After minimal analysis, the District Court denied Chung's motion finding that Chung failed to meet his initial burden of articulating the products he believed were unmarked 'patented articles' subject to § 287. Appx5-7.

## SUMMARY OF ARGUMENT

After a three-day trial, the Jury found Chung directly liable for patent infringement and entered a verdict for $863,936.10. There is not substantial evidence to support the jury verdict, and indeed, the clear weight of the evidence shows that (1) Chung did not personally sell any infringing products; (2) Chung cannot be liable for inducement or alter ego liability; (3) a 60% royalty is not supported by a non-speculative hypothetical negotiation; (4) Appellees' profit margin should not be a part of the reasonable royalty damages calculation; (5) that only 8,689 Accused Products were sold after the issuance of the asserted '284 patent; and (6) Lubby did not comply with the marking and notice requirements of 35 U.S.C. § 287. The District Court's denial of Chung's motions for JMOL, new trial, and to amend the judgment are an abuse of discretion and must be reversed, thus vacating the Jury's verdict of infringement and reasonable royalty damages against Chung, or in the alternative, the case should be remanded for a new trial.

It is undisputed that Chung is the owner of a separate Company that made every accused sale. All evidence, including the Company's sales records and Chung's unrebutted testimony confirm that the Company made all sales of the Accused Products, not Chung. Lubby did not bring any claim of infringement against the Company.

13

At the conclusion of all testimony and evidence, but before the Jury was instructed, the District Court dismissed Lubby's inducement claim and struck the corresponding jury instruction because Lubby had failed to present sufficient evidence to the Jury on that claim. Lubby also did not present evidence or make a claim to support a theory that the Company's corporate veil should be pierced. In post-trial briefs, Lubby admits that it did not seek an alter ego theory of infringement. Accordingly, the District Court did not instruct the Jury as to alter ego or piercing the corporate veil. Without evidence of personal sales, and without claims for inducement or alter ego liability, there is no theory or evidence to support the Jury's verdict holding Chung liable for direct infringement.

The Jury's damages verdict is also unsupported by evidence. The Jury awarded a reasonable royalty in a lump sum amount of $863,936.10, the exact amount put forth by Lubby's counsel during closing argument. This lump sum implies that the Jury simply adopted Lubby's counsel's closing argument calculation to the penny and improperly included all of the 36,453 products in their damages award. However, the only evidence of record is that while the Company, not Chung, sold 36,453 products total, only 8,689 were sold after the '284 patent issued. Lubby's counsel insisted during closing argument that the Jury could include pre-issuance sales in its damages verdict. By adopting Lubby's counsel's exact calculations, the Jury necessarily accepted this erroneous proposition.

14

Because the Jury adopted Lubby's requested damages total, it also necessarily and improperly adopted Lubby's proposed royalty rate, which rate is based only on attorney argument and speculation. Lubby did not disclose any damages theory until the day before trial, and then, just three days later during closing argument, articulated a different damages position without explanation or foundation for the change. At trial, Lubby did not present testimony or documentary evidence to support a 60% royalty, and only mentioned a 60% royalty during its counsel's opening and closing argument. Lubby did not present any evidence or expert to support a hypothetical negotiation or the impact that any traditional analysis factors would have on the reasonable royalty.

To justify its proposed royalty, Lubby's owner Mr. Rado testified that Lubby had recently entered an alleged license for 45% with another company. However, Rado did not offer testimony or evidence about any of the specifics of the alleged license, and Lubby did not enter the license into evidence. Lubby did not present clear testimony as to how the 45% from the alleged license was calculated or what technology was being licensed. Without support, Lubby's counsel concluded to the Jury that a 60% royalty was reasonable for the hypothetical negotiation at issue because Chung would arguably produce smaller quantities than what was being produced under its alleged license. Lubby's counsel made this assertion without

regard or analysis of any of the other differences between the alleged license and the hypothetical negotiation.

Lubby's proposed 60% royalty is also not supported by the consumer demand for the technology disclosed by the '284 patent. The '284 patent teaches an incremental advance over the prior art, namely anti-leaking during periods of nonuse. The majority of the components of the vaping pens have existed for some time, however, and most of the products in the market do not contain the technology from the '284 patent. Further, both Rado and Chung acknowledged that consumers do not demand a leak-proof product. A 60% royalty over an incremental feature that does not drive consumer demand is unreasonable and not supported by the evidence.

It was also improper for the Jury to use Lubby's profit margin in determining the reasonable royalty damages to assess against the Company's sales. After hearing all of the presented evidence, the District Court ruled that there were not sufficient facts in the record to support Lubby's lost profits theory and removed lost profits from the jury instructions. As an end-run around this order, Lubby's counsel presented to the Jury lost profits calculations disguised as a reasonable royalty. The Jury then adopted Lubby's exact calculations. Specifically, Lubby's counsel presented Lubby's own sales price, cost of goods, and profit margin and then argued to the Jury that those were the relevant figures in calculating Chung's reasonable royalty damages.

Finally, in order to be entitled to damages, Lubby had the burden to plead and prove compliance with the marking and notice requirements under 35 U.S.C. § 287. Despite Chung's diligent efforts to raise the issue before, during, and after trial, Lubby did not present any evidence that it had plead or complied with the required marking and notice requirements. The Jury was not instructed on this limitation of damages under § 287(a), and the Jury erroneously awarded damages even though Lubby had not met its relevant burden. Had this limitation been enforced, the damages awarded should have been dramatically reduced.

As a matter of law, the Jury's verdict cannot stand. The issues were properly raised to the District Court and were denied with minimal analysis. These denials were an abuse of the District Court's discretion and should be reversed, thus vacating the Jury's verdict of infringement against Chung and the reasonable royalty damages award of $863,936.10. In the alternative, the case should be remanded for a new trial as to whether the Company is Chung's alter ego, which of the 36,453 accused sales were infringing, and what a non-speculative reasonable royalty rate should be.

**STANDARD OF REVIEW**

This Court reviews "denials of motions for JMOL and motions for new trial under the law of the regional circuit—here, the Ninth Circuit. The Ninth Circuit reviews denials of JMOL *de novo*." *TVIIM, LLC v. McAfee, Inc.*, 851 F.3d 1356, 1362 (Fed. Cir. 2017) (internal citations omitted).

"In the Ninth Circuit, the district court grants JMOL when the evidence, construed in the light most favorable to the nonmoving party, permits only one reasonable conclusion, and that conclusion is contrary to the Jury's verdict. A district court must uphold a Jury's verdict if it is supported by substantial evidence, which is evidence adequate to support the Jury's conclusion, even if it is possible to draw a contrary conclusion." *Id.* (citations and quotation marks omitted). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (quotation marks omitted).

"The Ninth Circuit reviews the denial of a motion for new trial for abuse of discretion. It reverses the denial only if the record lacks any evidence supporting the verdict or if the district court makes a mistake of law." *Id.* (internal citations omitted). "A trial court should grant a motion for a new trial if (1) the jury instructions were erroneous or inadequate, (2) the court made incorrect and prejudicial admissibility rulings, or (3) the verdict is contrary to the great weight of the evidence." *Chiron Corp. v. Genentech, Inc.*, 363 F.3d 1247, 1258 (Fed. Cir. 2004). A new trial is appropriate if "the verdict is against the clear weight of the evidence." *Pavao v. Pagay*, 307 F.3d 915, 918 (9th Cir. 2002).

"The abuse-of-discretion standard does not preclude an appellate court's correction of a district court's legal or factual error: 'A district court would necessarily abuse its discretion if it based its ruling on an erroneous view of the law

18

or on a clearly erroneous assessment of the evidence.'" *Id.* at 1748 n.2 (quoting *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 405, 110 S. Ct. 2447, 110 L. Ed. 2d 359 (1990)). "A factual finding is clearly erroneous if, despite some supporting evidence, we are left with the definite and firm conviction that a mistake has been made." *Insite Vision Inc. v. Sandoz, Inc.*, 783 F.3d 853, 858 (Fed. Cir. 2015). A district court also abuses its discretion when it makes a "clear error of judgment in weighing relevant factors." *Mentor Graphics Corp. v. Quickturn Design Sys., Inc.*, 150 F.3d 1374, 1377 (Fed. Cir. 1998)).

The Federal Circuit likewise "review[s] a district court's denial of a Rule 59(e) motion to amend a judgment and a motion to amend the complaint under the regional circuit's law." *CODA Dev. S.R.O. v. Goodyear Tire & Rubber Co.*, 916 F.3d 1350, 1357 (Fed. Cir. 2019). In the Ninth Circuit, a district court's denial of a motion to amend judgment is reviewed for abuse of discretion. *Hiken v. Dep't of Def.*, 836 F.3d 1037, 1042 (9th Cir. 2016).

## ARGUMENT

### I. THE JURY'S INFRINGEMENT VERDICT IS IMPROPER AS A MATTER OF LAW.

Lubby defended the Jury's verdict of Chung's infringement on two theories: (1) Chung directly infringed the patent by personally selling the accused devices; and (2) Chung induced infringement of the patent by controlling his business which sold the Accused Products. Because the Jury was not instructed as to inducement or

alter ego liability, and because both theories are contrary to the evidence presented at trial, it was an abuse of discretion for the District Court to uphold the jury verdict on either of these theories. *Chiron Corp.*, 363 F.3d at 1258.

**A. <u>The Jury's verdict of direct infringement based on Chung's personal actions was against the clear weight of the evidence and should not have been upheld.</u>**

There is not evidence in the trial record to support the Jury's verdict that Chung makes, uses, offers to sell, sells, or imports any invention covered by the '284 patent. At trial, Chung testified that he owns the separate Company Esquire Distribution Inc. Appx813 at 137:10-17. All evidence presented at, including the Company's sales record and Chung's express testimony, confirmed that if any sales of the Accused Products were made, they were made by the Company, not Chung. Lubby did not bring any claim against the Company.

The only evidence Lubby identified in its oppositions to Chung's post-verdict motions that allegedly supported the Jury's verdict of direct infringement is a handful of citations to Chung's trial testimony. However, Chung's testimony was clear, consistent, and unimpeached that all sales and offers were made by the Company and not Chung:

Q. Did you sell the Conseal A and Conseal B products?
A. **My company does.**
Q. You didn't sell them?
A. **All of the sales go through my Esquire Distribution.**
Q. Can you clarify your answer? I didn't understand it.
A. **I don't personally run that website. My company does.**

Q. I would like to introduce –

THE COURT: Let me just ask you a question. Your company, are you the sole owner of the company?

THE WITNESS: Correct.

THE COURT: So when the company sells it, you are selling it **through the company**?

THE WITNESS: Correct.

Appx769-770 at 93:24-94:13, emphasis added); *see also* Appx774 at 98:14-18 ("Q. Did you personally promote the sale of the Conseal A and Conseal B products? A. All of the promotion[] is done through the company.") This testimony simply cannot form the basis of the Jury's verdict that Chung sold the Accused Products.

Moreover, the only evidence Lubby presented at trial of any sales of the Accused Products by anyone was a single two-page exhibit of a sales summary for **the Company** titled "Esquire Distribution Inc. Sales by Item Summary March 1, 2016 through February 1, 2018." Appx1053-1054; Appx786-787 at 110:7-111:24 ("Q. What is this document? A. It's a sales summary for **Esquire Distribution** on Conseal A and Conseal B.") (emphasis added). The first page of the Company's two-page Sales Summary shows that the Company sold 36,453 units between March 1, 2016 through February 1, 2018. *Id*. The second page of that exhibit shows that only 8,689 of the sales were made after the '284 patent issued. The Company's Sales Summary is the only documentary evidence that Lubby presented at trial to support any sales of the Accused Products.

The only other evidence Lubby identified in support of its direct infringement theory against Chung are trial transcript citations that refer to Chung's testimony confirming the price of the Accused Products on the Company's website (Appx771-772 at 95:15-96:20), confirming his ownership of the Company (Appx795 at 119:15-19), and confirming his decision-making role at the Company (Appx796 at 120:17-18). *See* Appx1131-1134.

In its oppositions to Chung's post-trial motions, Lubby did not identify any evidence in the record that Chung personally "ma[de], use[d], offer[ed] to sell, or [sold] any patented invention" without Lubby's authorization. 35 U.S.C. § 271(a). Notably, Lubby did not present any purchase orders, invoices, sales records, or anything that could reasonably support the Jury's verdict that Chung personally offered or sold the Accused Products. And even if, *arguendo*, Chung were personally responsible for a portion of the sales made through the Company, Lubby failed to meet its burden as to what portion of those sales were attributable to Chung alone.

On appeal, Lubby cannot present any new argument in defense of the District Court's upholding of the direct infringement verdict. "[I]t is the general rule ... that a federal appellate court does not consider an issue not passed upon below." *Singleton v. Wulff*, 428 U.S. 106, 120, 96 S. Ct. 2868, 49 L. Ed. 2d 826 (1976). "[Federal Circuit] precedent generally counsels against entertaining arguments not

presented to the district court." *Golden Bridge Tech., Inc. v. Nokia, Inc.*, 527 F.3d 1318, 1322 (Fed. Cir. 2008).

At the close of evidence, and before the case went to the Jury, the District Court recognized that Lubby had serious evidentiary issues and had failed to present a coherent case. The District Court questioned offering the issue of direct infringement to the Jury: "I don't even know if this has been proved, to tell you the truth, because this has been so disjointed and the evidence being presented is not very specific at all and it's all over the place." *Id.* The District Court's assessment was correct; there is no evidence to support the Jury's verdict, and it was an abuse of discretion for the District Court to deny Chung's motion for a new trial on these grounds. *Chiron Corp.*, 363 F.3d at 1258.

### B. <u>The Jury's verdict of induced infringement was not presented in a jury instruction and should not have been upheld.</u>

Lubby also cannot rely on an inducement theory to find Chung liable, because the Court expressly rejected this theory at trial, and Lubby did not object or bring this issue up on appeal. In its complaint, Lubby made only barebones allegations of induced infringement. By the close of trial, however, it was apparent that there was no evidence or testimony to support an inducement claim. As a result, the District Court removed induced infringement from the final jury instructions:

> "There are certain things that I'm going to strike from the jury instructions because there are just not specific, articulable facts to justify. . . Induced infringement out. . . No evidence has – not any

credible articulable facts have been presented to justify an instruction on any of those elements or for the jury to come back with a finding on any of those elements."

Appx932 at 29:12-25. Lubby did not object to the removal of induced infringement from the jury instructions.[1]

The District Court made clear that there were only three factual inquiries for the Jury to decide: "whether or not there's direct infringement or not, what the reasonable royalties would be if there was direct infringement, and is the patent invalid based on prior art. Those are the only three areas that we are going to be arguing to [the Jury]." Appx933 at 30:2-6. The District Court provided final jury instructions as to "direct infringement by literal infringement," but not induced infringement. Appx974-975 at 71:10-72:9. Thus, the Jury's verdict cannot be based on any aspect of an inducement theory.

Still, in opposition to Chung's Rule 59(a) argument that there was not sufficient evidence to find him personally liable for direct infringement, Lubby argued that Chung was liable for induced infringement. Lubby based its entire argument on the theory that Chung was allegedly the "moving, active, conscious

---

[1] Lubby confirmed its understanding of the impact of the District Court's removal of certain jury instructions in its opposition to Chung's Rule 50(b) motion. In that opposition, Lubby argued "[a]s a result of the Court striking Lost Profits from jury instructions the Plaintiffs were not awarded damages in the form of lost profits." Appx380. The logic is the same here: as a result of the District Court striking induced infringement from the jury instructions, the Plaintiffs could not have been awarded damages under an induced infringement theory.

force" behind the Company" relying on *Int'l Mfg. Co. v. Landon, Inc.*, 336 F.2d 723, 728–729 (9th Cir. 1964). Appx1131-1134. *International*'s holding is limited and unrelated to Chung.

The *International* court found a "sole stockholder and alleged alter ego" personally liable for ***induced infringement*** because of his role in his company's direct infringement. *Id*. ("In our view this conclusion and this finding called for application of 35 U.S.C. § 271(b). . . ."). In doing so, *International* provides a limited exception to the general rule that the corporate veil must be pierced before finding a corporate officer personally liable for the actions of his company. However, that exception only opens the door for a finding of <u>induced infringement</u>. Nothing in *International* supports the proposition that the sole owner of a company can be liable for <u>direct infringement</u> without first piercing the corporate veil and finding alter ego liability. *See Wordtech Sys., Inc v. Integrated Networks Sols., Inc.*, 609 F.3d 1308, 1316, n.3 (Fed. Cir. 2010) (recognizing that "regional circuits have held officers liable for <u>inducement</u> without piercing the corporate veil," but that there are "differing rules for officer liability under §§ 271(a) and 271(b) (emphasis added)).

Because the Jury was not instructed on the legal test for induced infringement, "these mistakes of law precluded legitimate verdicts on inducement," and it was an abuse of discretion to uphold the jury verdict on this ground. *Wordtech Systems, Inc*, 609 F.3d at 1315.

25

**C. <u>The Jury's verdict of direct infringement based on an alter ego theory is not supported by substantial evidence and was not presented in a jury instruction and should not have been upheld.</u>**

  1. *<u>There is not substantial evidence to support an infringement verdict based on an alter ego/piercing the corporate veil theory.</u>*

Lubby did not present an alter ego theory at trial or in any pleading, and there was no jury instruction on piercing the corporate veil. Significantly, in opposition to Chung's post-trial motion, Lubby admitted that it did not raise the issue of alter ego or piercing the corporate veil at trial. Instead, Lubby argued"[t]he reason this was never raised is because this alter ego and piercing the corporate veil analysis is not even the correct standard by which personal liability from patent infringement was found in the context of this case." Appx1133.

The District Court's post trial orders find that there was sufficient evidence to support the Jury's verdict as to "Defendant's connection to the infringing products" (Appx3) and that "Defendant Chung sold the allegedly infringing products" (Appx6-7). Because Lubby failed to raise an alter ego theory, the record lacks substantial evidence that the Company is Chung's alter ego or that the Company's corporate veil should be pierced. It is still worth examining the lack of evidentiary support for an alter ego theory to the extent that the District Court's limited analysis could be interpreted to mean it relied on such a position in upholding the Jury's verdict of direct infringement.

The "corporate veil" shields a company's officers from personal liability for direct infringement that the officers commit in the name of the corporation unless the corporation is the officers' "alter ego." *See Wechsler v. Macke Int'l Trade, Inc.*, 486 F.3d 1286, 1295 (Fed. Cir. 2007). "To determine whether corporate officers are personally liable for the direct infringement of the corporation under § 271(a) requires invocation of those general principles relating to piercing the corporate veil." *Orthokinetics, Inc. v. Safety Travel Chairs, Inc.*, 806 F.2d 1565, 1579 (Fed. Cir. 1986). "California law provides that the party seeking to have the corporate entity disregarded has the burden of proving that the alter ego theory should be applied." *Matter of Christian & Porter Aluminum Co.*, 584 F.2d 326, 338 (9th Cir. 1978). Lubby failed to meet this burden and admitted that it did not raise the issue of alter ego or piercing the corporate veil at trial because it believed that such analysis was unnecessary. Appx1133-1134.

Since the alter ego issue is not unique to patent law, the Federal Circuit applies the law of the regional circuit. *Wechsler*, 486 F.3d at 1296. "The Ninth Circuit applies the law of the forum state, in this case California, to determine whether a corporation is the alter ego of an individual." *Id.*

Under California law, alter ego is an "extreme remedy" and is "sparingly used." *Sonora Diamond Corp. v. Superior Court*, 83 Cal. App. 4th 523, 99 Cal. Rptr. 2d 824, 836 (2000). Courts apply the doctrine "when the corporate form is used to

perpetrate a fraud, circumvent a statute, or accomplish some other wrongful or inequitable purpose." *Id.* "To establish a party as the alter ego of a corporation, the applicant must show '(1) that there [is] such unity of interest and ownership that the separate personalities of the corporation and the individual no longer exist and (2) that, if the acts are treated as those of the corporation alone, an inequitable result will follow.'" *Tatung Co., Ltd. v. Shu Tze Hsu*, 217 F. Supp. 3d 1138, 1176 (C.D. Cal. 2016) (quoting *Bank of Montreal v. SK Foods, LLC*, 476 B.R. 588, 597 (N.D. Cal. 2012). Both factors are necessary for the Court to impose alter ego liability. *Id.*

Because Lubby failed to raise these issues, no evidence was developed or presented to the Jury to support the analysis necessary to determine whether to pierce the corporate veil. Even if Lubby were to claim that the trial record supports an alter ego verdict, its failure to disclose an alter ego claim prejudicially deprived Chung of the notice to rebut such a claim. Even so, the trial record shows otherwise. Chung testified that the Company had multiple staff and employees who made sales and business decisions, at times without needing his authorization, and who provided accounting and financial support. Appx780-781 at 104:23-105:1; Appx796 at 120:5-24; Appx849-854 at 173:14-178:2. While Lubby presumably could have sued the Company for patent infringement, it purposefully elected not to, and it is not now entitled to obtain relief from Chung for the Company's actions.

28

2. *An infringement verdict based on an alter ego/piercing the corporate veil theory is plain error because there was not a related jury instruction.*

The direct infringement verdict based on an alter ego theory is also erroneous because the District Court did not provide an alter ego or piercing instruction to the Jury. The District Court recognized this dilemma during trial when Chung's counsel asked Rado regarding whether a corporation's judgments can be held against the individual running the corporation. Appx635-636 at 138:25-139:3. Before Rado responded, the Court sustained an objection noting: "it calls for what the law is on it, and the Court will instruct the jury what the law is." Appx636 at 139:6-8. The final instructions given to the Jury did not include any instruction as to alter ego or piercing the corporate veil. It therefore would have been error for the Jury to perform the legal analysis required to make that determination and an abuse of discretion for the District Court to uphold the verdict on that erroneous analysis.

In the Ninth Circuit, even if a party did not properly object to jury instructions at trial, the instructions are still reviewable for plain error. *See Wordtech Systems, Inc*, 609 F.3d at 1314; *see Warfield v. Alaniz*, 569 F.3d 1015, 1029 (9th Cir. 2009); Fed. R. Civ. P. 51(d)(2) (2007) ("A court may consider a plain error in the instructions that has not been preserved as required by Rule 51(d)(1) if the error affects substantial rights."); Notes of Advisory Committee on 2003 Amendments,

29

Fed. R. Civ. P. 51(d)(2) (2003) (explicitly authorizing "plain error" review for jury instructions when no party has objected).

This Court addressed this issue in *Wordtech Systems, Inc. v. Integrated Networks Solutions, Inc.*, 609 F.3d 1308 (Fed. Cir. 2010) and found that a jury verdict finding corporate officers liable for the actions of the corporate entity without a jury instruction on piercing the corporate veil "was plain error that requires a new trial." *Id.* at 1314. Even though the *Wordtech* defendants did not object to the incomplete jury instructions, the *Wordtech* district court's failure to instruct the jury was plainly erroneous because "[p]ersonal liability under § 271(a) ... requires sufficient evidence to justify piercing the corporate veil." *Id.* at 1314 (quoting *Al-Site Corp. v. VSI Int'l, Inc.*, 174 F.3d 1308, 1331 (Fed. Cir. 1999).

The *Wordtech* court held that because resolution of the corporate defendant's status was a legal prerequisite before finding its officers individually liable, the lack of jury instructions on the issue was "obvious, important, and seriously affected the trial's fairness." *Wordtech Systems, Inc*, 609 F.3d at 1315. The *Wordtech* court concluded that "Wordtech needed to prove either that [corporate defendant] was not a valid corporation when [its officers] committed infringing acts on its behalf, or that [the corporate defendant's] corporate veil should be disregarded under state law." *Id.*

Here, as in *Wordtech*, the District Court's error in failing to instruct the Jury regarding piercing the corporate veil is not harmless. *Id.* at 1315. Even though Lubby might have arguably presented some evidence that the Company was Chung's alter ego, "a correctly instructed jury could have concluded otherwise." *Id.* The Jury's verdict of infringement cannot be supported by an alter ego theory.

Because there is not evidence that Chung infringed the '284 patent or that the Company is his alter ego, and because induced infringement and alter ego liability were not before the Jury, there is no basis for the Jury's verdict that Chung is liable for direct patent infringement. Without a claim against Chung, it is unclear whether Lubby had standing against Chung in the original litigation or would have standing in a new trial. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560—61 (1992) (holding that to have standing, a plaintiff's injury "has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court.")

## II.  THE JURY'S DAMAGES VERDICT IS IMPROPER AS A MATTER OF LAW.

The record lacks substantial evidence to support the Jury's damages verdict (1) for sales of the Accused Product made before the issuance of the '284 patent; (2) for a proposed royalty of 60%; and (3) for sales made without Lubby's compliance with § 287. The jury verdict also cannot stand on a lost profits theory, because the District Court dismissed Lubby's lost profits argument during trial and did not

31

instruct the Jury on lost profits because no "credible articulable facts ha[d] been presented to justify an instruction on any of those elements or for the jury to come back with a finding on any of those elements." Appx932 at 29:12-25.

When viewed under the applicable standards, damages (if any)[2] should be reduced to reflect a true reasonable royalty and should be limited to infringing sales made after the issuance of the '284 patent and/or Lubby's compliance with § 287. In the alternative, the Court should remand and grant a new trial to allow a proper adjudication of the reasonable royalty and the correct damage base.

A.    **<u>There is not substantial evidence to support the Jury's verdict that sales made before the issuance of the '284 patent infringe the '284 patent.</u>**

Infringement is only possible "during the term of the patent therefor." 35 U.S.C. § 271(a). In this case, the '284 patent issued on September 5, 2017. Appx8. At trial, Lubby introduced an exhibit, that it mistakenly claimed demonstrated Chung's sales of the Accused Products over two different time periods. This exhibit, however, was a sales summary of the non-party Company's sales, not Chung's. Appx786-787 at 110:7-111:24 ("Q. What is this document? A. It's a sales summary for **Esquire Distribution** on Conseal A and Conseal B.") (emphasis added); Appx1053-1054. The first page of the exhibit shows the Company's total sales of

---

[2] Because all accused sales were made by a non-party, the Company, no damages should be awarded. However, if this Court finds Chung liable the damages should be reduced or eliminated as explained herein.

the Accused Products (36,453 units), including sales made before the issuance of the '284 patent. The second page of this exhibit shows only the sales made by the Company after the issuance of the '284 patent. Specifically, the second page of the trial exhibit shows that only 8,689 units were sold after the '284 patent issued. Appx1054. Lubby's counsel cross-examined Chung regarding this trial exhibit and elicited testimony regarding the sales numbers shown on the second sheet. Appx786-787 at 110:7-111:24. The exhibit was ultimately admitted into evidence. Appx786 at 110:7-10.

Rado testified that Lubby's request for monetary compensation was intended to include sales made "[f]rom the filing date of [the '284] patent," and not from the *issuance* of the '284 patent. Appx923 at 20:10-19. Rado also testified that "the number of units that are at issue in this case that the defendant sold without permission are the numbers that are reported somewhere in the range of 38,000, 35,000 units." Appx630 at 133:8-12.

Lubby's counsel perpetuated this erroneous position in its closing argument when it argued that "each one of those 36,453 units infringe," despite the majority of them being sold before the '284 patent issued. Appx965 at 62:1-20. Lubby's counsel also mistakenly attributed both the pre- and post-issuance sales to Chung, not the non-party Company. *Id*.

The Jury's damages verdict of $863,936.10 indicates that they accepted Lubby's erroneous and unsupported allegation that all 36,453 units infringe.[3] Reversal of the District Court's denial of Chung's motion for JMOL is therefore appropriate because "the evidence, construed in the light most favorable to the nonmoving party, permits only one reasonable conclusion, which is contrary to the jury's verdict." *Hagen v. City of Eugene*, 736 F.3d 1251, 1256 (9th Cir. 2013) (internal citations omitted).

In the alternative, a new trial is appropriate because there was not a sufficiently clear jury instruction clarifying that sales made before the issuance of the '284 patent cannot be included in an infringement damages calculation. In the Ninth Circuit, even if a party does not object properly to jury instructions at trial, the instructions are still reviewable for plain error. *See Wordtech Systems, Inc*, 609 F.3d at 1314. As in *Wordtech*, the District Court's error in failing to correctly instruct the Jury regarding the noninfringement of pre-issuance sales was not harmless. Although the Jury concluded that all sales of the Accused Products infringed, a correctly instructed Jury should have, by law, concluded otherwise. *See id.*

---

[3] Lubby proposed a per unit royalty based on the difference between its per unit sale price ($45) and its per unit cost ($5.50) multiplied by a 60% royalty. The resulting per unit royalty ($23.7) multiplied by the alleged 36,453 infringing units equals the Jury's damages verdict of $863,936.10.

$863,936.10 = (([$45 - $5.50) x 60%) x 36,453 units.

The damages verdict is also against the clear weight of the evidence. The evidence in the record is that only 8,689 Accused Products were sold after the issuance of the '284 patent. Appx1054. There is no testimony or evidence that 36,453 units were sold after the issuance of the '284 patent or that they should have been included in the damages calculation. The Jury's verdict accepting Lubby's counsel's prejudicial closing argument and adopting his lump sum amount to the penny over the clear weight of the trial evidence is grounds for a new trial, and it was an abuse of discretion to deny Chung's request.

**B.** **There is not substantial evidence to support the reasonable royalty rate set forth at trial, and upholding the damages verdict was improper.**

*1. Lubby's requested damages and the resulting Jury verdict are speculative and cannot stand.*

Under Federal Circuit precedent, Plaintiff has the burden of proving damages by a preponderance of evidence. *Dow Chem. Co. v. Mee Indus., Inc.*, 341 F.3d 1370, 1381 (Fed. Cir. 2003). An award of speculative damages is inappropriate, and the failure to grant a new trial on a speculative damages verdict is an abuse of discretion. *Whitserve, LLC v. Computer Packages, Inc.*, 694 F.3d 10, 33–34 (Fed. Cir. 2012).

Lubby did not finalize its damages position until it sprung it on Chung during closing argument at trial. In Lubby's initial disclosures, it simply stated, "Plaintiffs seek damages for patent infringement measured by the Defendants' sales of infringing products, a reasonable royalty for the sale of each infringing product,

35

Plaintiff's losses from Defendants' sales of infringing products, as measured by Plaintiffs' retail price of each sale of Defendants' infringing products." Appx1043-1044. In response to written discovery, Lubby objected and responded: "PLAINTIFFS await the progress of further discovery to produce responsive answers." Appx1222-1223. In their pretrial contentions of fact and law, Lubby still hadn't nailed down its damages position. Appx146-150.

About six weeks before trial, Lubby still had not disclosed a computation of its damages in violation of Fed. R. Civ. P. 26(a)(1)(A)(iii) which required Lubby to disclose its "computation of each category of damages claimed." Chung sought judicial intervention, and the District Court ordered Lubby to disclose its damages theory or risk sanctions under Fed. R. Civ. P. 37. Appx164-188; Appx307. Finally, on May 6, 2019, the day before trial, Lubby revealed its requested royalty to 60% on the difference between a $45 sale price and $16.50 cost of goods (a $17.10 per unit royalty) for a total of $623,346.30.[4] Appx308-310. This extremely late disclosure of a damages theory was incredibly prejudicial and prevented Chung from fully developing countervailing evidence.

_____

[4] When Chung's counsel attempted to ask Rado questions about this figure amount during trial, Lubby's counsel objected and erroneously argued that this number was part of settlement communication. Appx922-923 at 19:15-20:1. The District Court mistakenly sustained the objection. *Id.*

To make matters worse, by the end of trial just three days later, Lubby discarded its court ordered May 6 damages theory and presented a new damages position and calculation in its closing argument: 60% on the difference between $45 sale price and a $5.50 cost of goods, or a whopping $23.70 per unit royalty. Appx967 at 64:12-22. This change was unfounded as the underlying facts that Lubby relied upon in both its May 6 and closing argument damages positions had not changed. In sum, *Chung did not receive notice of Lubby's damages theory until closing argument at trial*. Lubby provided no explanation for the dramatic change or why it waited until closing arguments to reveal its true, although flawed, damages theory. This tactic violated the District Court's order that Lubby "serve the Defendants and the Court their computation of damages" before trial and was deeply prejudicial to Chung. Appx307.

Chung's counsel attempted to question Rado regarding Lubby's requested $623,000 in reasonable royalty damages it set forth in its May 6 court ordered disclosure. Appx922-923 at 19:15-20:1. Lubby's counsel objected to the question and erroneously argued that this amount had been part of settlement communication. The District Court sustained the objection, mistakenly believing this amount was made in settlement, and improperly prevented Chung's counsel's only opportunity to prove the foundation of Lubby's requested damages. *Id.*

Lubby's tactics are even more inexcusable considering that each element of Lubby's final damages theory (sales prices, cost, and proposed royalty) were entirely based on Lubby's business and had nothing to do with Chung. Appx628-630 at 131:22-133:7 (Rado testifying that $45 reflected Lubby's retail price and that $5.50 reflected Lubby's costs).

Lubby did not provide any documentary evidence of its $45 sale price or $5.50 cost of goods. Indeed, Rado testified that only 38% of Lubby's sales were at the $45 retail point. Appx628-630 at 131:22-133:7. The rest of Lubby's sales were apparently to wholesale for only $16.50 per unit. *Id.* Lubby did not provide corroborating documentary evidence to support this testimony. Yet, when the Jury calculated the royalty to be assed on the Company's sales, it entered a verdict which the District Court upheld under the assumption that ***all sales would have been made at Lubby's $45 retail point***. Lubby did not present evidence to support this position. By contrast, Chung testified that based upon his experience in the industry and the owner of patents in the relevant field, "5 percent is the industry standard, but anywhere from 3 to 10 percent." Appx830 at 154:9-14. Lubby's royalty analysis failed to take this into consideration.

In short, Lubby's damages theory was not supported by any documentation and swung wildly without any change in the underlying facts. This amounts to speculation, and the District Court erred by upholding a jury verdict "based only on

speculation or guesswork." *Brooktree Corp. v. Advanced Micro Devices, Inc.*, 977 F.2d 1555, 1580 (Fed. Cir. 1992).

<em>2.     The licenses used were not sufficiently comparable to the hypothetical license at issue.</em>

Lubby provided almost no analysis on how it arrived at its proposed royalty rate of 60%. In fact, during the entire trial the proposed rate of 60% was only referenced by Lubby's counsel during opening and closing arguments. Appx573 at 76:3-8; Appx966-968 at 63:10-65:2. Of course, "[a]ttorney argument is not evidence." *Icon Health & Fitness, Inc. v. Strava, Inc.*, 849 F.3d 1034, 1043 (Fed. Cir. 2017); *see also Gemtron Corp. v. Saint-Gobain Corp.*, 572 F.3d 1371, 1380 (Fed. Cir. 2009) ("[U]nsworn attorney argument . . . is not evidence and cannot rebut . . . other admitted evidence . . . .").

Lubby's counsel presented a make-shift explanation during its closing argument that 60% was an appropriate royalty because Lubby had an alleged licensing deal for 45% supposedly based on a $4 million a year output. Appx965-967 at 62:21-64:11. Lubby's counsel added:

> I know you have to go on the evidence in the record, but at a certain point you are allowed to use your common sense. The common sense tells you that if you're going to do a deal with someone that's not going to buy $4 million a year worth of profit, and you are giving that deal 45 percent, you've got to raise the percentage. It's just common sense. It's common business.

39

Appx966 at 63:10-20. None of this was corroborated by any other unbiased witness or supporting documentary evidence. But "hypothetical negotiations would not occur in a vacuum of pure logic. They would involve a market place confrontation of the parties," involving a slew of relevant factors. *Georgia-Pac. Corp. v. U.S. Plywood Corp.*, 318 F. Supp. 1116, 1121 (S.D.N.Y. 1970).

Lubby's lone uncorroborated and undocumented license as a hypothetical negotiation datapoint is problematic. Licenses relied on by a patentee to prove damages must be sufficiently comparable to the hypothetical license at issue in suit. *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1316 (Fed. Cir. 2011). Lubby's alleged license with Grenco Science for 45% is not established in the record, and the documented license was not presented to the Jury or entered into evidence. Rado testified that the Grenco Sciences license wasn't before the District Court or Jury and that he didn't think it was admissible. *Id.*

The limited trial testimony regarding this license was jumbled and unclear as to whether the alleged royalty rate of the 45% license was based on Grenco Science's gross revenue, net revenue, gross profit, operating profit, or some combination. The court reporter noted that Rado and his counsel were talking over each other making it difficult to transcribe let alone follow:

Q    So the 45 percent would be applied to the $12 sale?
A    Yes.
Q    Or the 12 minus 5, because you said your cost is $5.
A    No, that's something different.

40

Q     Their cost is $5?
A     My cost is just over 7.
Q     7, sorry.
A     Yes.
Q     And the sale price, the wholesale price is 12?
A     Yes. 12.50, actually.
Q     And the 45 percent royalty rate?
A     That's my percent, yes.
Q     Applied to what number?
A     That's what I'm saying.
Q     The difference between the $7 –
A     Yes.
THE REPORTER: One at a time.

Appx603-604 at 106:13-107:22.

There is no testimony provided as to the scope, nature, or duration of the Grenco Science's license, or what technology or products it covered. *See Georgia-Pacific Corp.*, 318 F. Supp. at 1120. There was no analysis provided to the Jury as to how this alleged license differed from the hypothetical license at issue with Chung, or how the alleged Grenco Science license impacts the reasonable royalty rate. *Id.* Rado testified that the Grenco Sciences agreement was not specific to the '284 patent, but that point was not weighed into the royalty presented to the Jury. Appx644-645 at 147:22-148:6. There was no testimony given as to the geographic scope of the Grenco Science license, or the products and patents covered. *Id.* There was no testimony or evidence provided as to other terms of the Grenco Sciences license (anticipation of litigation, tiers of royalties, reductions in royalty for minimum orders, etc.). *Id.* There was no expert to provide damages testimony. The

jury verdict of a 60% royalty in relation to this unsubstantiated Grenco Sciences license is based on "sheer surmise and conjecture," and it was an abuse of discretion to deny Chung's motion for a new trial as to damages. *Whitserve, LLC*, 694 F.3d at 33–34.

The closest thing that Lubby presented to documentary evidence of a proposed royalty were two pages of a 2015 Supply Agreement between Vaporous Technologies, LLC and the Company. Appx1001. Plaintiff contends that the 2015 Supply Agreement covers "anti-leak" technology under the '284 patent, but this is unclear as the '284 patent application was still pending and was several years from issuance. The Agreement itself includes notes regarding the uncertainty of what is covered by the agreement: "[DOES IT MAKE MORE SENSE TO ATTACH A SCHEDULE TO IDENTIFY THE ACTUAL PRODUCTS???]. Appx1001. And even if the 2015 Supply Agreement were related to the technology at issue, the document appears to support a much lower royalty than Lubby's proposed 60%: "Boom shall pay the cost portion of the Vaporous Product Purchase Price 'COD' and the 10% portion of the Vaporous Product Purchase Price shall be paid in the month after such product is sold." Appx1001.

There are presumably numerous differences between the hypothetical license at issue in the suit and the 2015 Supply Agreement. For instance, the 2015 Supply Agreement was a mutual agreement whereby both sides would sell their products to

the other, unlike the unilateral hypothetical license at issue at trial. Appx778 at 102:19-25. However, the terms of the 2015 Supply Agreement were not explored at trial, the full agreement was not admitted into evidence, and the impact of the 2015 Supply Agreement on the hypothetical negotiation was not analyzed. Determining the effect of the 2015 Supply Agreement on a reasonable royalty without sufficient evidence would be speculative and improper. *Indiana Michigan Power Co. v. United States*, 422 F.3d 1369, 1373 (Fed. Cir. 2005) ("[R]ecovery for speculative damages is precluded.")

### 3. *Lubby did not present sufficient analysis to support its hypothetical negotiation.*

In its closing argument, Lubby's counsel claimed that Lubby's proposed royalty came as the result of a "hypothetical negotiation." Appx966-967 at 63:21-64:11. This is not supported in the trial record, however, because Rado made no effort to analyze the traditional *Georgia-Pacific* hypothetical negotiation factors. Rado also did not explain the impact that the *Georgia-Pacific* factors had on his opinions. The jury verdict accepting the damages position premised on Lubby's unsupported reasonable royalty rate should not have been permitted to stand.

In *Whitserve, LLC v. Computer Package, Inc.*, the Federal Circuit held that a defendant's motion for judgment as a matter of law against a reasonable royalty award should have been granted, in part because the patentee's expert presented only a "superficial recitation of the *Georgia-Pacific* factors." *Whitserve, LLC*, 694 F.3d

at 31 ("[R]eciting each factor and making a conclusory remark about its impact on the damages calculation before moving on does no more than tell the jury what factors a damages analysis could take into consideration.") Rado's testimony does not even reach the level of the deficient testimony in *Whitserve*. Lubby's damages approach is inappropriate, inadmissible, and should carry no evidentiary weight. *ResQNet.com, Inc. v. Lansa, Inc.*, 594 F.3d 860, 870 (Fed. Cir. 2010) (vacating a damages award because the damages expert considered a few of the other Georgia–Pacific factors, but dismissed them because "[f]or the most part, the other factors have no real impact here.").

Outside of the unsupported and uncorroborated testimony about the alleged Grenco Sciences license, Rado did not present any evidence or testimony as to: royalties paid for the patent in suit (Factor 1, *see* Section II.B.2 herein); royalties paid by Chung for similar patents (Factor 2); the nature, scope, and length of the hypothetical license (Factors 3 and 7); the existing value of the patented technology as a generator of Lubby's non-patented products (Factor 6); Lubby's profitability and commercial success on products made under the patent (Factor 8); the advantages of the patent over existing technology (Factor 9); the customary profit margin in the industry (Factor 12); or the profit attributable to the non-patented elements of the products (Factor 13). *See Georgia-Pacific Corp.*, 318 F. Supp. at 1120. To the extent Rado alluded to any of the *Georgia-Pacific* factors, he did not

provide any analysis on how those factors would have impacted the hypothetical negotiation and resulting reasonable royalty.

Lubby did not consider the requirement that "a reasonable royalty must be fixed so as to leave the infringer a reasonable profit," or that a hypothetical negotiation "requires consideration not only of the amount hat a willing licensee would have paid for the patent license but also of the amount that a willing licensor would have accepted." *Hughes Tool Co. v. Dresser Indus., Inc.*, 816 F.2d 1549, 1558 (Fed. Cir. 1987); *Georgia-Pacific Corp.*, 318 F. Supp. at 1121. Lubby did not present any other method to support how it landed on its proposed royalty.

The jury verdict based on a 60% royalty is based on speculation without substantial evidence and cannot stand. *TVIIM, LLC*, 851 F.3d at 1362 (internal citations omitted). In the alternative, the issue should be remanded for a new trial as to an appropriate reasonable royalty. *Whitserve, LLC*, 694 F.3d at 33–34.

4. <u>*Lubby did not present sufficient evidence to support the royalty demand on the whole product.*</u>

To obtain reasonable royalty compensation on the whole product (instead of on certain portions of a product), the "patentee must prove that the patent-related feature is the 'basis for consumer demand.'" *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1336 (Fed. Cir. 2009). The reasonable royalty must be based upon the incremental value that the patented invention adds to the end products. *Exmark Mfg. Co. Inc. v. Briggs & Stratton Power Prod. Grp., LLC*, 879 F.3d 1332, 1348

(Fed. Cir. 2018). The patentee "must in every case give evidence tending to separate or apportion . . . damages between the patented feature and the unpatented features." *Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*, 904 F.3d 965, 977 (Fed. Cir. 2018). "The determination of a reasonable royalty, however, is based not on the infringer's profit, but on the royalty to which a willing licensor and a willing licensee would have agreed at the time the infringement began." *Radio Steel & Mfg. Co. v. MTD Prod., Inc.*, 788 F.2d 1554, 1557 (Fed. Cir. 1986). In the present case, the reasonable royalty awarded does not reflect the limited and incremental advantages provided by the hypothetically licensed '284 patent.

Rado testified that the '284 patent relates to specific improvements of "anti-leak" technology. *See generally* Appx8-39. There is no evidence in the record to show, however, that this patent-related feature is the "basis for consumer demand" as required under *Lucent Technologies v. Gateway*, 580 F.3d 1301, 1336 (Fed. Cir. 2009). Rado confirmed that "without [his] patented technology, vaping products still can be used by many consumers." Appx658 at 161:13-21. Chung testified that he had not noticed any consumer demand for the products implementing Lubby's '284 patented technology. Appx825-826 at 149:15-150:3.

Moreover, much of the technology embodied in the Accused Products existed well before the '284 patent. The background section of the '284 patent acknowledges the existence of many present-art vaporizers and components such as the fluid

chamber, atomizer, battery, and air path. *See* Appx30 at 1:15-58. Chung himself testified that he had patents in the vaping container space well before the filing of the '284 patent. Appx814-815 at 138:15-139:24; Appx819-823 at 143:22-147:25; Appx1055-1056. More importantly, Rado also testified that: "[t]here's a lot of standard things, like all vape pens have a battery, all vape pens burn liquid, all vape pens have something that gets hot." Appx653-654 at 156:25-157:2; *see also* Appx579 at 82:10-13 (Lubby's counsel's argument that personal vaporizers in the art have "an atomizer, heating element, battery.") Lubby did not present evidence regarding how much, if any, of the consumer demand was driven by the anti-leaking feature beyond the demand that already existed for the core vaping features already existing in the market.

> 5. *Lubby's damages position was an improper lost profits theory that was unsupported by law and had been dismissed by the District Court during trial.*

Lubby's royalty position presented at trial was little more than an improper and unsupported lost profits theory that had been rejected by the District Court and eliminated from the jury instructions. Appx932 at 29:12-25. The Jury's damages verdict based on this theory should be set aside or determined by a new trial.

At trial, Lubby argued for a 60% royalty applied to the difference between Lubby's retail sales price of $45 and Lubby's alleged cost of goods at $5.50. Essentially, Lubby was awarded a portion of the profits it would have received for

the sales but-for the alleged infringement. *See Rite-Hite Corp. v. Kelley Co.*, 56 F.3d 1538, 1545 (Fed. Cir. 1995) ("To recover lost profits damages, the patentee must show a reasonable probability that, "but for" the infringement, it would have made the sales that were made by the infringer.") The 60% figure applied to Lubby's profit margin on its retail sales accounts for the fact that only 38% of Lubby's sales were made at the $45 retail point, with the other 62% being made at the lower wholesale price of $16.50. Appx628-629 at 131:20-132:20. In essence, the resulting $23.70 royalty applied at trial reflects a blended profit margin by Lubby on all of its sales.

While Lubby's costs and profits can be considered when determining a reasonable royalty rate, that rate is then generally applied to the infringer's sales and revenue, not Lubby's, to determine reasonable royalty damages. After all, a reasonable royalty is based on the "use made of the invention by the infringer," and not of the potential use and profits that could have been made by the patentee. 35 U.S.C. § 284. This is particularly true considering that the Company's per unit profits were substantially lower than those made by Lubby. The Jury's reasonable royalty verdict against Chung based on Lubby's alleged profit margins per unit is an improper lost profits award and should not have been upheld.

**C.** **The damages verdict cannot stand because there is no evidence that Lubby complied with the marking and notice requirements under 35 U.S.C. § 287.**

If a patentee fails to mark its patented articles in accordance with 35 U.S.C. § 287(a), "no damages shall be recovered by the patentee in any action for infringement . . . ." *Id.* "The patentee bears the burden of pleading and proving he complied with § 287(a)'s marking requirement." *Arctic Cat Inc. v. Bombardier Recreational Prod. Inc.*, 876 F.3d 1350, 1366 (Fed. Cir. 2017). "[T]he duty of alleging and the burden of proving either [actual or constructive] notice is upon the [patentee]." *Dunlap v. Schofield*, 152 U.S. 244, 248 (1894). This is largely because whether a patentee's articles have been marked "is a matter peculiarly within his own knowledge." *Id.*

During the litigation, Lubby did not plead compliance with 35 U.S.C. § 287 in its complaint or its first amended complaint. Lubby did not provide any discovery responses that support any compliance with the marking requirements. Appx1222. At trial, Lubby did not present evidence that it appropriately marked its patented articles. The only evidence in the record of compliance with the marking requirement is the filing of the action for infringement. *See* 35 U.S.C. § 287(a) ("Filing of an action for infringement shall constitute such notice.").

Although there may be a "low bar" for alleged infringers to "articulate the products it believes are unmarked 'patented articles subject to § 287," patentees first

49

have the burden to plead compliance with the statute. *Arctic Cat Inc.*, 876 F.3d at 1367. "Section 287 is thus a limitation on damages, and not an affirmative defense," and "[c]ompliance with § 287 is a question of fact." *Id.*

Chung testified that he first learned of the issued '284 patent on the day it was served. Appx794-795 at 118:20-119:7. After receiving notice of Lubby's patent infringement lawsuit, the Company stopped sales of the Accused Products within seven days. During that intervening period, only a few units were sold. Even at Lubby's unsupported 60% rate on its own profit margin, this is only $9,669.60 in damages ($23.70 per unit royalty x 408 units). A non-speculative reasonable royalty based on the Company's limited sales revenue would result in much lower damages.

Chung raised the issue of Lubby's failure to plead or prove its compliance with § 287 in its answer to the first amended complaint. Appx134. Chung also presented the issue in its pre-trial Memorandum of Contention of Fact and Law. Appx154-158. Chung again raised the issue in its pre-trial objection to Lubby's computation of damages and specifically identified Lubby's J-Pen Starter Kit as patented article from Lubby that it did not properly mark. Appx313-314; Appx1258.

During trial, Chung moved for JMOL under Rule 50(a) because "Plaintiffs also failed to satisfy the 35 U.S.C. §287 notice/marking requirement." Appx327-328. During trial Chung's counsel objected to the jury instruction regarding Section 287 but was overruled, and the Jury was not properly instructed on this point.

Appx981 at 78:2-9. In its post-trial motions, Chung continued to point out Lubby's failure to meet the "pleading and proving" requirements of § 287.

In its orders denying Chung's motions for new trial and an amended judgment, the District Court ruled that there was sufficient evidence to uphold the jury verdict, erroneously shifted the burden of proving compliance with § 287 to Chung, the alleged infringer, and upheld the Jury's damages verdict despite the fact that there was no evidence that Lubby had plead or proved compliance with § 287. Appx5-7. A *de novo* review of the record supports reversal of the damages award. In the alternative, the District Court's orders were an abuse of discretion and warrant a new trial as to compliance with § 287 and the resulting damages, if any.

## CONCLUSION AND RELIEF SOUGHT

For the above reasons, the District Court's denial of Chung's Motion for JMOL and Motion to Amend the Judgment should be reversed. In the alternative, the District Court's denial of Chung's Motion for New Trial should be reversed, and the case should be remanded for further proceedings.


Dated: November 21, 2019

Respectfully submitted,

*/s/ Robert E. Aycock*
Robert E. Aycock
Joseph G. Pia
William B. Chadwick
PIA ANDERSON MOSS HOYT
136 E. South Temple, 19th Floor

51

Salt Lake City, UT 84111
(801) 350-9000

*Counsel for Defendant-Appellant*
*Henry Chung*

JS-6

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| LUBBY HOLDINGS, LLC, et al. | CASE NUMBER |
| | 2:18-cv-00715-RGK-JC |
| PLAINTIFF(S) | |
| v. | |
| HENRY CHUNG, et al. | **JUDGMENT ON THE VERDICT FOR THE PLAINTIFF(S)** |
| DEFENDANT(S). | |

This action came on for jury trial, the Honorable R. Gary Klausner _____ District Judge, presiding, and the issues having been duly tried and the jury having duly rendered its verdict,

IT IS ORDERED AND ADJUDGED that the plaintiff(s):

Lubby Holdings, LLC and Vaporous Technologies, Inc. _____

_____

recover of the defendant(s):

Henry Chung and Deepvapes, Inc. _____

_____

the sum of $863,936.10_____, with interest thereon at the legal rate as provided by the law, and its costs of action, taxed in the sum of _____.

Clerk, U. S. District Court

Dated: May 9, 2019 _____

By S. Williams _____
Deputy Clerk

At: Los Angeles, CA _____

cc: *Counsel of record*

CV-49 (05/98) **JUDGMENT ON THE VERDICT FOR THE PLAINTIFF(S)**

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 2:18-cv-00715-RGK-JC | Date | June 17, 2019 |
|---|---|---|---|
| Title | *Lubby Holdings LLC, et al. v. Henry Chung, et al.* | | |

Present: The Honorable   R. GARY KLAUSNER, UNITED STATES DISTRICT JUDGE

| Sharon L. Williams | Not Reported | N/A |
|---|---|---|
| Deputy Clerk | Court Reporter / Recorder | Tape No. |

Attorneys Present for Plaintiff:

Not Present

Attorneys Present for Defendant:

Not Present

Proceedings:     (IN CHAMBERS) Order Re: Defendant's Motion for Judgment as a Matter of Law [81]; Defendant's Request to Set Trial Date for the Equitable Issue of Patent Misuse [82]

## I.     INTRODUCTION

On January 26, 2018, plaintiffs Vaporous Technologies, Inc. and Lubby Holdings LLC (collectively, "Plaintiffs") filed a complaint against defendants Henry Chung ("Defendant Chung"), Ming Chen, and Deepvapes, Inc. (collectively, "Defendants").[1] In the Complaint, Plaintiffs assert that Defendants infringed certain claims of the United States Patent No. 9,750,284 (the "'284 patent").

The case went to trial on May 7, 2019. Defendant Chung moved for judgment as a matter of law ("JMOL") during trial, and the Court reserved consideration of the motion. After a three-day trial, the jury found that the asserted claims of the '284 patent were not invalid. The jury also found that Defendants infringed the patent and awarded Plaintiffs $863,936.10 in damages. (*See* ECF No. 75.)

Defendant Chung then filed the instant Motion for JMOL ("JMOL Motion") and Request to Set Trial Date for the Equitable Issue of Patent Misuse ("Trial Request") (DEs 81, 82).

For the following reasons, the Court **DENIES** Defendant Chung's JMOL Motion and Trial Request.

---

[1] The Court dismissed defendant Ming Chen on May 8, 2019. (*See* ECF No. 67.) While the Complaint and the jury's verdict are asserted against Defendants collectively, the instant motions are filed by Defendant Chung individually. That said, Defendant Chung appears to make arguments on behalf of all Defendants.

**Appx0002**

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | 2:18-cv-00715-RGK-JC | Date | June 17, 2019 |
|---|---|---|---|
| Title | *Lubby Holdings LLC, et al. v. Henry Chung, et al.* | | |

## II.   JUDICIAL STANDARDS

### A.   Judgment as a Matter of Law

After one party has been fully heard during a jury trial, the court may grant JMOL against that party when "a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue." Fed. R. Civ. P. 50(a). The movant may also file a renewed motion for judgment as a matter of law after the entry of judgment. Fed. R. Civ. P. 50(b). The test is whether "the evidence, construed in the light most favorable to the nonmoving party, permits only one reasonable conclusion, and that conclusion is contrary to that of the jury." *White v. Ford Motor Co.*, 312 F.3d 998, 1010 (9th Cir. 2002). The court must not weigh the evidence or assess the witnesses' credibility. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 135 (2000).

### B.   Order for Separate Trial

"For convenience, to avoid prejudice, or to expedite and economize, the court may order a separate trial of one or more separate issues, claims, crossclaims, counterclaims, or third-party claims." Fed. R. Civ. P. 42(b).

## III.   DISCUSSION

### C.   Motion for JMOL

Defendant Chung argues that the evidence does not support the jury's verdict. Specifically, he contends that there was insufficient evidence on three issues: (1) Plaintiffs' satisfaction of the marking requirement under 35 U.S.C. § 287; (2) the jury's reasonable royalty calculation and the use of pre-issuance sales data; and (3) Defendants' connection to the infringing products. After a review of the evidence presented at trial, the Court finds that there was sufficient evidence to support the jury's verdict at the close of trial. Accordingly, Defendant Chung's JMOL Motion is denied.

### D.   Request to Set Trial Date

Defendant Chung also files a request to set a trial date on the equitable defense of patent misuse. But the Court did not order a separate trial, nor did the Court grant a motion to bifurcate the issues in this case. As a result, the Trial Request is denied.

**Appx0003**

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 2:18-cv-00715-RGK-JC | Date | June 17, 2019 |
|---|---|---|---|
| Title | *Lubby Holdings LLC, et al. v. Henry Chung, et al.* | | |

## IV.   CONCLUSION

For the foregoing reasons, the Court **DENIES** Defendant Chung's JMOL Motion and Trial Request.

**IT IS SO ORDERED.**

:
_____   _____

Initials of Preparer

_____

**Appx0004**

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 2:18-cv-00715-RGK-JC | Date | July 12, 2019 |
|---|---|---|---|
| Title | *Lubby Holdings LLC, et al. v. Henry Chung, et al.* | | |

Present: The Honorable   R. GARY KLAUSNER, UNITED STATES DISTRICT JUDGE

| Sharon L. Williams | Not Reported | N/A |
|---|---|---|
| Deputy Clerk | Court Reporter / Recorder | Tape No. |

| Attorneys Present for Plaintiff: | Attorneys Present for Defendant: |
|---|---|
| Not Present | Not Present |

Proceedings:   **(IN CHAMBERS) Order Re: Defendant's Rule 59(a) Motion for New Trial [100]; Defendant's Rule 59(e) Motion to Alter Judgment [101]**

## I.   INTRODUCTION

On April 10, 2018, plaintiffs Vaporous Technologies, Inc. and Lubby Holdings LLC (collectively, "Plaintiffs") filed a First Amended Complaint against defendants Henry Chung ("Defendant Chung"), Ming Chen, and Deepvapes, Inc. (collectively, "Defendants").[1] In the Complaint, Plaintiffs assert that Defendants infringed certain claims of the United States Patent No. 9,750,284 (the "'284 patent").

The case went to trial on May 7, 2019. After a three-day trial, the jury found that the asserted claims of the '284 patent were not invalid. The jury also found that Defendants infringed the patent and awarded Plaintiffs $863,936.10 in damages. (*See* ECF No. 75.)

Defendant Chung has now filed a Rule 59(a) Motion for a New Trial ("Motion for New Trial") and a Rule 59(e) Motion to Alter Judgment ("Motion to Alter Judgment") (DEs 100, 101). For the following reasons, the Court **DENIES** Defendant Chung's Motion for New Trial and Motion to Alter Judgment.

---

[1] Plaintiffs' initial complaint was filed January 26, 2018. The Court dismissed defendant Ming Chen on May 8, 2019. (*See* ECF No. 67.)

**Appx0005**

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 2:18-cv-00715-RGK-JC | Date | July 12, 2019 |
|---|---|---|---|
| Title | *Lubby Holdings LLC, et al. v. Henry Chung, et al.* | | |

## II. JUDICIAL STANDARDS

### A. Motion for New Trial

Under Federal Rule of Civil Procedure ("Rule") 59, a court may grant a new trial to a party after a jury trial "for any reason for which a new trial has . . . been granted in an action at law in federal court." Fed. R. Civ. P. 59(a)(1)(A). Rule 59 does not specify the grounds on which a court may grant a new trial. Thus, the court is "bound by those grounds that have been historically recognized." *Zhang v. Am. Gem Seafoods, Inc.*, 339 F.3d 1020, 1035 (9th Cir. 2003). Those grounds include, but are not limited to, claims that the verdict is against the clear weight of the evidence or based on false evidence, that the damages are excessive, or that the trial was not fair to the moving party. *Montgomery Ward & Co. v. Duncan*, 311 U.S. 243, 251 (1940); *see also Tortu v. Las Vegas Metro. Police Dep't*, 556 F.3d 1075, 1087 (9th Cir. 2009).

### B. Motion to Alter Judgment

Under Rule 59(e), a court may alter or amend judgment in the following circumstances: (1) the court is presented with newly discovered evidence; (2) the court committed clear error or made a decision that was manifestly unjust; or (3) there is an intervening change in controlling law. *Zimmerman v. City of Oakland*, 255 F.3d 734, 740 (9th Cir. 2001).

## III. DISCUSSION

### A. Motion for New Trial

Defendant asks the Court to vacate the judgment and set a new trial for two main reasons: (1) the verdict is against the weight of the evidence; and (2) "prejudicial misconducts" by opposing counsel at trial. (Def.'s Mot. 2, ECF No. 100-1.)

Specifically, Defendant Chung argues that there is no evidence that he sold any of the accused products. Moreover, he argues that there is no evidence to support a royalty based on sales of the whole product rather than on the value of the "anti-leak" mechanism independently. Finally, Defendant Chung avers that Plaintiffs' counsel made false statements to the Court, failed to disclose damages calculations, and misled the jury about infringement.

As the Court discussed in its June 17, 2019 Order re: Defendant's Motion for JMOL, there was sufficient evidence to support the jury's verdict at the close of trial—including the jury's computation of damages and the jury's finding that Defendant Chung sold the allegedly infringing products. (*See* ECF No. 105.) Similarly, the Court has heard and rejected Defendant Chung's numerous arguments that

**Appx0006**

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | 2:18-cv-00715-RGK-JC | Date | July 12, 2019 |
|---|---|---|---|
| Title | *Lubby Holdings LLC, et al. v. Henry Chung, et al.* | | |

Plaintiff's counsel acted improperly or failed to make required disclosures. (*See, e.g.,* ECF Nos. 98, 63, 81.) After review of Defendant Chung's arguments and the evidence presented at trial, the Court finds insufficient grounds for a new trial under Rule 59(a).

### B.   Motion to Alter Judgment

Defendant Chung also moves to alter judgment under Rule 59(e) on the basis that the Court committed a clear error. Specifically, Defendant Chung contends that there was no evidence to show that Plaintiffs complied with the marking requirement of 35 U.S.C. § 287 ("§ 287"). As a result, the verdict was not supported by the evidence because the jury failed to limit Plaintiffs' damages calculation to begin on the day that Plaintiffs filed the action. Furthermore, Defendant Chung notes that Plaintiffs' counsel admitted that "he does not know this section 287 point of law." (Def.'s Mot. at 4.)

Luckily, the Court does. Under the § 287, "a patentee who makes or sells a patented article must mark his articles or notify infringers of his patent in order to recover damages." *Arctic Cat Inv. v. Bombardier Recreational*, 876 F.3d 1350, 1365 (Fed. Cir. 2017). An alleged infringer defendant may assert a "marking defense"—that the patentee plaintiff failed to comply with § 287, and thus the infringement claims fail. *See id.* But the defendant challenging the patentee's compliance with the marking statute bears the initial burden of production to "articulate the products it believes are unmarked 'patented articles' subject to § 287." *Id.* at 1368.

Here, Defendant failed to meet his initial burden. For example, Defendant does not identify unmarked products in his Answer, or in his Memorandum of Contentions of Fact and Law. (*See* ECF Nos. 23, 38.) As a result, the § 287 defense failed, and there is no basis to alter judgment under Rule 59(e).

## IV.   CONCLUSION

For the foregoing reasons, the Court **DENIES** Defendant Chung's Motion for New Trial and Motion to Alter Judgment.

**IT IS SO ORDERED.**

:

_____  _____

Initials of Preparer

_____

**Appx0007**



US009750284B2

## (12) United States Patent
### Rado

(10) **Patent No.:** **US 9,750,284 B2**
(45) **Date of Patent:** **Sep. 5, 2017**

(54) **PERSONAL VAPORIZER**

(71) Applicant: **Lubby Holdings, LLC**, Torrance, CA (US)

(72) Inventor: **J. Christian Rado**, Torrance, CA (US)

(*) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **15/253,664**

(22) Filed: **Aug. 31, 2016**

(65) **Prior Publication Data**

US 2016/0366945 A1 Dec. 22, 2016

### Related U.S. Application Data

(63) Continuation of application No. 14/985,389, filed on Dec. 30, 2015.

(60) Provisional application No. 62/098,197, filed on Dec. 30, 2014, provisional application No. 62/190,942, filed on Jul. 10, 2015.

(51) **Int. Cl.**
*A24F 47/00* (2006.01)
*F22B 1/28* (2006.01)
*H05B 3/46* (2006.01)

(52) **U.S. Cl.**
CPC ............ *A24F 47/008* (2013.01); *F22B 1/284* (2013.01); *H05B 3/46* (2013.01); *H05B 2203/016* (2013.01); *H05B 2203/021* (2013.01)

(58) **Field of Classification Search**
CPC ....... B05B 9/002; B05B 11/0002; H05B 3/46; H05B 2203/016; H05B 2203/021; F22B 1/284; A61M 15/00; A61M 15/06; A24F 47/002; A24F 47/008
USPC ................... 239/13, 135–136; 137/511–512; 392/395, 396–398, 401, 403–404
See application file for complete search history.

(56) **References Cited**

#### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 2,104,266 A | | 1/1938 | McCormick |
| 3,200,819 A | | 8/1965 | Gilbert |
| 3,725,990 A | * | 4/1973 | Petersen ............... B21D 22/26 137/539 |
| 4,947,874 A | | 8/1990 | Brooks et al. |
| 5,353,834 A | * | 10/1994 | Schmitt .................. B60T 8/341 137/539.5 |
| 7,832,410 B2 | | 11/2010 | Hon |
| 8,156,944 B2 | | 4/2012 | Han |
| 8,186,209 B2 | * | 5/2012 | Wang ................. B60C 23/0408 340/442 |
| 8,365,742 B2 | | 2/2013 | Hon |
| 8,375,957 B2 | | 2/2013 | Hon |
| 8,393,331 B2 | | 3/2013 | Hon |
| 8,794,231 B2 | | 8/2014 | Thorens et al. |
| 8,915,254 B2 | | 12/2014 | Monsees et al. |

(Continued)

#### OTHER PUBLICATIONS

Office Action from USPTO dated Feb. 24, 2017 for related U.S. Appl. No. 14/985,389.

*Primary Examiner* — Dana Ross
*Assistant Examiner* — James Sims, III
(74) *Attorney, Agent, or Firm* — Klein, O'Neill & Singh, LLP

(57) **ABSTRACT**

A personal vaporizer is configured to be usable both for non-liquid vaporizing media and for liquid vaporizing media. In some embodiments an electrically conductive check valve blocks vaporizing media from leaking out of air intake apertures during periods of nonuse, and delivers electric power to a heating element during use. In some embodiments, no wick structures extend into a fluid chamber, but a wick extends from a wick holder downstream of the fluid chamber to a vaporizing chamber.

**20 Claims, 20 Drawing Sheets**



(56)        **References Cited**

U.S. PATENT DOCUMENTS

9,220,303   B2      12/2015   Li et al.
9,380,811   B2       7/2016   Chung
9,491,974   B2      11/2016   DePiano et al.
2013/0247910  A1     9/2013   Postma
2013/0298905  A1    11/2013   Levin et al.
2014/0041655  A1     2/2014   Barron et al.
2015/0136158  A1*    5/2015   Stevens ................. A24F 47/008
                                                131/329

* cited by examiner



*FIG. 2*



*FIG. 1*

**Appx0010**



*FIG. 3*



*FIG. 4*

**Appx0012**



*FIG. 5*

*FIG. 6*

**Appx0013**



*FIG. 7*



*FIG. 8*



*FIG. 9*



FIG. 10A



FIG. 10B        FIG. 10C

Appx0017



FIG. 11A

FIG. 11B



*FIG. 12*



*FIG. 13*

Appx0020



*FIG. 14*

Appx0021



*FIG. 15*

Appx0022



*FIG. 16*

Appx0023



*FIG. 17*



FIG. 19

FIG. 18



FIG. 20



*FIG. 21A*



*FIG. 21B*



*FIG. 22A*



*FIG. 22B*



*FIG. 23*

Appx0029

# PERSONAL VAPORIZER

## CROSS-REFERENCE TO RELATED APPLICATION

This application is a continuation of U.S. application Ser. No. 14/985,389, which was filed Dec. 30, 2015, which application claims priority to U.S. Provisional Application Nos. 62/098,197, filed Dec. 30, 2014, and 62/190,942, filed Jul. 10, 2015. The entirety of each of the priority applications is hereby v-incorporated by reference.

## BACKGROUND

The present disclosure relates to the field of personal vaporizers

Personal vaporizers are handheld devices that vaporize a vaporizing medium such as a liquid solution or a wax. The vapor is then inhaled by its user. A typical personal vaporizer has an atomizer having a heating element that selectively heats the medium in order to produce the vapor. A rechargeable battery is also typically employed for powering the atomizer.

Personal vaporizers for vaporizing liquid media typically include a fluid chamber that holds the liquid, and a wick that communicates liquid from the chamber to the atomizer. The liquid solution typically includes chemicals such as one or more of propylene glycol, glycerin, polyethylene glycol 400, and an alcohol. Extracted flavorings can also be included in the fluid. Electronic cigarettes are a type of personal vaporizer, and use a liquid solution that includes tobacco-derived nicotine. Personal vaporizers also can be used with liquid solutions that include one or more of various essential oils, including cannabis oil.

Personal vaporizers for vaporizing wax media typically include a bowl- or cup-shaped structure at the atomizer into which wax media can be placed. Such personal vaporizers typically do not include a fluid chamber, but instead typically include a detachable mouthpiece that can be removed to provide access to the atomizer cup.

Personal vaporizers typically include an air path so that vaporized media can be mixed with air and delivered to the user. Thus, air holes are formed in and through various structures of each vaporizer. However, in certain conditions, such as during periods of nonuse, vaporizing media may leak from the air holes.

Further, for some types of personal vaporizers it is desired to keep the profile, such as the cross-sectional area, of the vaporizer as small as possible. However, it is also desired to maximize vapor delivery. Maximizing such vapor delivery entails maximizing the lumen size of a vapor delivery tube from a vaporization chamber to the mouthpiece, while simultaneously maximizing the cross-sectional area of the wick(s) that deliver vaporizing liquid from a tank to the vaporizing chamber. The considerations of reducing device profile while simultaneously maximizing the cross-sectional area dedicated to both the vapor delivery tube and the wick(s) are often competing.

## SUMMARY

There is a need in the art for a personal vaporizer that can simultaneously accommodate both liquid and wax media. There is a further need in the art for a personal vaporizer that will resist leaking, particularly during periods of nonuse. There is a still further need in the art for a personal vaporizer that can maximize both liquid delivery to the vaporizing chamber and vapor delivery from the vaporizing chamber to the mouthpiece while minimizing the cross-sectional profile of the device.

In accordance with one embodiment, the present specification provides a personal vaporizer, comprising: an atomizer module comprising a bowl and a coil arranged in or adjacent the bowl, the bowl configured to accept a wax having an essential oil; a battery assembly, the atomizer module connectable to the battery assembly so that actuation of the battery delivers electrical energy to the coil, causing the coil to heat and vaporize a wax that may be in the bowl; and a tank module selectively attachable to the atomizer module so that the atomizer module is disposed between the tank module and the battery assembly, the tank module comprising a fluid tank configured to contain a vaporizing liquid therewithin, and to deliver a portion of the vaporizing liquid to a vaporizing chamber adjacent the coil; wherein a wax placed in the atomizer module bowl and a vaporizing liquid from the fluid module can be simultaneously vaporized by the coil so as to form a combined vapor by simultaneously vaporizing both the wax and the vaporizing liquid.

In accordance with another embodiment, the present specification provides a personal vaporizer, comprising: a tube comprising a fluid chamber and a vapor passage extending through the fluid chamber; an atomizer module comprising a bowl having an upper edge, a coil being arranged in or adjacent the bowl, the bowl being configured to accept a vaporizing solution inside the tank; a check valve comprising an insulator housing, a conductive shell inside the insulator housing, and a sealing mechanism inside the conductive shell, the sealing mechanism providing a seal inside the conductive shell; and a battery assembly, the atomizer module connectable to the battery assembly through the check valve so that actuation of the battery delivers electrical energy to the coil, causing the coil to heat and vaporize the vaporizing solution.

Some embodiments additionally comprise one or more slots formed through a side wall of the bowl.

In additional embodiments, the sealing mechanism comprises a ball and a spring.

In further embodiments, the bowl has a first wire hole and a second wire hole extending through a bottom wall of the bowl and a second channel extending transversely from the second wire hole. In some such embodiments, the coil is a heating element having a first connection and a second connection, the first connection extending through the first wire hole and contacting the conductive shell, and the second connection extending through the second wire hole and the channel and spaced away from the conductive shell.

In accordance with another embodiment, the present specification provides a personal vaporizer, comprising: an atomizer module comprising a bowl and a heat element arranged in or adjacent the bowl, a vaporizing chamber defined in the bowl adjacent the heat element; a tank module selectively attachable to the atomizer module, the tank module comprising a fluid tank configured to contain a vaporizing liquid therewithin, the fluid tank comprising a bottom wall having at least one fluid delivery hole extending therethrough; a wick holder supporting a wick and defining a fluid receiver, the fluid receiver in communication with the at least one fluid delivery hole, the wick configured to communicate vaporizing fluid from the fluid receiver to the vaporizing chamber; and a vapor tube extending through the fluid chamber and defining a vapor passage that is separated from the fluid in the fluid chamber; wherein vapor from the vaporizing chamber is directed through the vapor passage.

Appx0030

In some embodiments, a cross-sectional area of the wick is greater than a cross-sectional area of the vapor passage.

In further embodiments, a combined cross-sectional area of all of the at least one fluid delivery holes is less than a cross-sectional area of the vapor passage.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is a perspective view of a battery assembly for use in some embodiments;

FIG. 2 is a side view of the battery assembly of FIG. 1;

FIG. 3 is a side view of a vaporizing structure and mouthpiece in accordance with one embodiment;

FIG. 4 is a side view of a personal vaporizer comprising the vaporizing structure of FIG. 3 attached to the battery assembly of FIG. 1;

FIG. 5 is a side view of an embodiment of a personal vaporizer having a modular construction;

FIG. 6 is an exploded view of the personal vaporizer of FIG. 5;

FIG. 7 is a perspective view of a vaporizing structure in accordance with another embodiment;

FIG. 8 is a cross-sectional view taken along lines 8-8 of FIG. 7;

FIG. 9 is a close-up view of the atomizer module of the structure of FIG. 8, depicting a wax media disposed in an atomizer cup;

FIG. 10A is a perspective view of an atomizer cup according to one embodiment;

FIG. 10B is a bottom view of the atomizer cup of FIG. 10A;

FIG. 10C is a top view of the atomizer cup of FIG. 10A;

FIG. 11A is a perspective view of a check valve according to one embodiment;

FIG. 11B is an exploded view of the check valve of FIG. 11A;

FIG. 12 is a cross-sectional view taken along line 12-12 of FIG. 7;

FIG. 13 is a side view of another embodiment of a personal vaporizer;

FIG. 14 is an exploded view of mouthpiece, tank and atomizer modules of the personal vaporizer of FIG. 13;

FIG. 15 is a cross-sectional view taken along lines 15-15 of FIG. 14, except that the tank and atomizer modules are shown connected to one another;

FIG. 16 is an exploded view of another embodiment of a check valve;

FIG. 17 is a close up view of an atomizer module portion of the structure depicted in FIG. 15;

FIG. 18 is a perspective view of another embodiment of an atomizer cup;

FIG. 19 is a partially cutaway perspective view of the atomizer of FIG. 14;

FIG. 20 is an exploded view of the tank module of FIG. 14;

FIG. 21A is a perspective view of a transfer member of the tank module of FIG. 14;

FIG. 21B is a cross-sectional view taken along line 21B-21B of FIG. 21A;

FIG. 22A is a perspective view of an embodiment of a wick holder;

FIG. 22B is a cross-sectional view taken along line 22B-22B of FIG. 22A; and

FIG. 23 is an exploded view of the mouthpiece embodiment of FIG. 14.

## DESCRIPTION

With initial reference to FIGS. 1 and 2, an embodiment of a battery assembly 20, or battery pack, for a personal vaporizer is illustrated. Certain features of the illustrated battery assembly 20 are typical of battery assemblies currently available on the market. For example, the battery assembly 20 may include a rechargeable battery, such as a lithium-ion battery, enclosed within a battery casing 22. The battery casing 22 may include an elongated body 24 that extends from a base or distal end 26 to a top or proximal end 28. An electronic controller may also be included within the casing 22 to control voltage, current, timing and the like. A button 29 may be provided for selectively actuating electricity delivery from the battery 20 to the atomizer. In some embodiments, the button 29 can include a light that indicates when power is being delivered.

With continued reference to FIGS. 1 and 2, at and adjacent the proximal end 28 of the battery assembly 20, the battery casing 22 defines a mount boss 30. The mount boss 30 includes connecting structures for connecting vaporizing structures, such as atomizers and fluid chambers, to the battery. The elongated body 24 is disposed distally of the mount boss 30. In some embodiments, the body 24 may include a decorative coating or sleeve that is configured to enhance the look of the vaporizer. For example, the body 24 may come in many different colors and/or have one or more unique and aesthetically pleasing surface treatments. Some embodiments may include a decorative sleeve that is selectively removable.

In the illustrated embodiment, the battery assembly mount boss 30 comprises an externally threaded portion 32 adjacent the decorative body 24. Preferably, the externally threaded portion 32 has a diameter somewhat smaller than a diameter of the decorative body 24. An extension 34 extends in a proximal direction from the externally threaded portion 32, preferably terminating in a top or proximal surface 36. As best shown in FIG. 2, the extension 34 preferably is tubular, defining a mount cavity 40 therewithin and having internal threads 42. Preferably, a diameter of the tubular extension 34 is less than the diameter of the externally threaded portion 32. A battery contact 44 is disposed within the tubular extension 34 at the base of the mount cavity 40. As shown, preferably a plurality of air intake slots 46 are formed in the extension at and adjacent the top surface.

As noted above, one or more vaporizing structures are attachable to the battery mount boss 30. Such vaporizing structures typically include an atomizer and a fluid chamber, which can be provided as separate pieces or combined as a single structure. The vaporizing structures can be of various styles, sizes, and configurations. For example, in some embodiments, the atomizer and fluid chamber are provided as one prefabricated cartridge. In some embodiments, such cartridges are disposable. In some embodiments, the fluid chamber is refillable so that the cartridges are reusable. In other embodiments, the atomizer and fluid chamber are separately formed and selectively attachable and detachable from one another.

Vaporizing structures can also be attached to the battery assembly 20 in various ways. In some embodiments, an atomizer can threadingly engage the external threads 32 of the battery mount boss 30. In other embodiments, an atomizer may threadingly engage the internal threads 42 of the mount cavity extension 40. Preferably, a pin or other elongated contact extends into the mount cavity 40 to engage the battery contact 44 so as to communicate power from the battery 20 to the atomizer. Additional embodiments can employ non-threaded connection structures such as detents, friction fits, J-locks, and the like.

With reference next to FIG. 3, one embodiment of a cartridge 50 is illustrated. Such a cartridge 50 can be

obtained from PenVape, and is sold under the trademark Indica. The illustrated cartridge **50** comprises an elongated cartridge body **52** that extends from a distal or battery end **54** to a top or proximal end **56**. The body **52** includes a fluid chamber **60** configured to hold a vaporizing medium such as a liquid solution comprising essential oils. The illustrated chamber **60** is made of a polymer material that is preferably at least partially transparent so that a user can see the level of essential oils remaining within the fluid chamber **60**. An atomizer **70** is provided at and adjacent the distal end **54**, which atomizer **70** is operatively connected to the fluid chamber **60**. In the illustrated embodiment, the atomizer **70** comprises a coil (not shown) constructed of a durable, electrically-conductive material, such as titanium or another metal, which coil generates heat when subjected to an electric current. A vaporization chamber is defined between the fluid chamber **60** and the atomizer coil. In some embodiments, a wick communicates liquid from the fluid chamber **60** to the vaporization chamber. Preferably, an elongated vapor passage **72** is formed adjacent the fluid chamber **60** and extends from the vaporization chamber to a vapor outlet **74** that is formed proximal of the fluid chamber **60**.

With continued reference to FIG. **3**, the illustrated atomizer **70** includes a battery connector pin **76** extending distally from a terminal surface **78** of the atomizer **70**. The illustrated battery connector pin **76** is externally threaded. Air intake holes (not shown) are formed through the terminal surface **78**. During use, air is drawn through the air intake holes and through the atomizer **70** into the vaporization chamber, where it is mixed with atomized fluid to form a vapor. The vapor exits the vaporization chamber through the vapor channel **72** and is exhausted through the vapor outlet **74**.

The proximal end **56** of the cartridge **50** includes a mouthpiece engagement portion **80** that has a reduced diameter relative to a diameter of the elongated body **52** in the chamber **60** and/or atomizer **70** portions. In the illustrated embodiment, the vapor outlet **74** opens within this mouthpiece engagement portion **80**. In the illustrated embodiment, a recessed portion **82** of the outer wall in the mouthpiece engagement portion **80** is provided, and the vapor outlet **74** is formed adjacent the recessed portion **82**. As such, the vapor outlet **74** is directly aligned with the flow path of vapor moving through the vapor channel **72**.

Continuing with reference to FIG. **3**, a mouthpiece seat **84** is defined on the cartridge **50**. At the mouthpiece seat **84**, the diameter of the cartridge **50** abruptly changes from that of the chamber **60** to that of the mouthpiece engagement portion **80**. A mouthpiece **90** can be placed atop the cartridge **50**. The mouthpiece **90** preferably includes an elongated tubular body **92** defining a lumen, and extends from a base **94** to an outlet end **96**. In the illustrated embodiment, the base **94** of the mouthpiece **90** fits over the mouthpiece engagement portion **80** of the cartridge **50**, and the base **94** of the mouthpiece **90** engages and rests upon the mouthpiece seat **84** of the cartridge **50**.

In the illustrated embodiment, a removable fill cap **98** is disposed at the proximal/mouthpiece end **56** of the cartridge **50**. The removable fill cap **90** can be removed so as to provide access to the fluid chamber **50** so that liquid or flavorings can be selectively added to the chamber.

With additional reference to FIG. **4**, the cartridge **50** can be mounted to a typical battery assembly **20** so that the cartridge **50** functions as the vaporizing structure for the illustrated embodiment of a personal vaporizer. In the illustrated embodiment, the externally-threaded battery connector pin **76** is advanced into the battery mount cavity **40** and threaded with the internal threads **42** of the battery mount

boss extension **34**. The cartridge **50** is threadingly advanced so that the battery connector pin **76** engages the battery connector **44** of the battery assembly **20**, and the terminal surface **78** of the atomizer **70** engages and sits upon the top surface **36** of the battery mount boss **30**. The air intake slots **46** of the mount boss **30** enable the cartridge's air intake holes to communicate with the surrounding atmosphere.

Additional details and structure related to the cartridge are discussed in Applicant's copending application Ser. No. 14/927,355, entitled CARTRIDGE COVER FOR PERSONAL VAPORIZER, filed Oct. 29, 2015, the entirety of which is incorporated by reference herein.

In use, the user inserts the mouthpiece **90** into his mouth, presses the battery button **29**, and draws a breath. Pressing the button **29** triggers the atomizer **70** to heat liquid provided to the vaporization chamber from the fluid chamber **60**, thereby vaporizing the liquid in the vaporizing chamber. By drawing a breath, or taking a pull, through the mouthpiece **90**, the user pulls air through the air intake slots **46** of the battery mount boss extension **34** into the mount cavity **40** and through the air intake holes of the cartridge atomizer **70**. The air further flows into the vaporization chamber and is mixed with the vaporized liquid, forming a vapor. The vapor then flows through the vapor channel **72** and through the vapor outlet **74** into the mouthpiece **90**, which directs it into the user's mouth and lungs.

With reference next to FIGS. **5** and **6**, one embodiment of a personal vaporizer **99** comprises an atomizer module **100** and a mouthpiece module **102** that are threadingly attachable to one another. As shown, the atomizer module **100** has a distal end **104** that is threadingly attachable to the mount boss **30** of the battery **20** so that, as in the embodiment discussed above, electric power can be provided to the atomizer. A distal end **106** of the mouthpiece module **102** is threadingly attachable to and detachable from a proximal end **108** of the atomizer module **100**. The mouthpiece module **102** preferably is tubular, delivering vapor generated in the atomizer module **100** to and through a mouthpiece **110** at its proximal end **112** for delivery to the user.

In the illustrated embodiment, a user gains access to the atomizer by detaching the mouthpiece module **102**. The user may then deliver vaporizing media, such as a wax, through the open proximal end **108** of the atomizer module **100** and into a bowl-shaped structure (not shown). The user preferably replaces the mouthpiece module **102** in order to use the personal vaporizer **99**. A vaporizing chamber is defined in the atomizer above the bowl and, in some embodiments, in at least part of the mouthpiece module. Notably, in this embodiment, there is no tank for storing a liquid vaporizing medium. As such, the illustrated embodiment is configured for use vaporizing non-liquid (i.e., wax) vaporizing media that is manually delivered to the vaporizing chamber by the user, in contrast with, for example, liquid media that can be automatically delivered from a storage structure such as a tank to the vaporizing chamber (such as via a wick).

With reference next to FIG. **7**, an embodiment of a hybrid vaporizing structure **120** is shown. The illustrated hybrid vaporizing structure can be attached to a battery assembly **20** so as to be used as a personal vaporizer. In this embodiment, the vaporizing structure **120** comprises a tank module **130** and an atomizer module **140** that are selectively detachable from one another. FIG. **8** is a cross-sectional view of the vaporizing structure **120** of FIG. **7**. As will be discussed in more detail below, the hybrid vaporizing structure is usable with liquid vaporizing media as well as non-liquid (i.e., wax) vaporizing media, both separately and simultaneously.

**Appx0032**

US 9,750,284 B2

7

With additional reference to FIG. 9, the atomizer module 140 comprises an atomizer 142 and a check valve 144 enclosed within an atomizer module housing 146. The atomizer housing 146 comprises a proximal end 148 that preferably is threaded so as to be selectively attachable to the tank module 130. A pin 150 at a distal end 152 of the atomizer housing 146 is configured to attach to the battery mount boss 30. In the illustrated embodiment the pin 150 is configured to attach to the internal threads 42 in the mount cavity 40 of the battery mount boss 30. Air passages 154 are formed through the pin. Thus, when the atomizer module 146 is attached to the battery assembly 20, air can flow through the battery slots 46 and the air passages 154 and into the atomizer module 140.

With continued reference to FIGS. 8 and 9, and additional reference to FIGS. 10A-C, the atomizer 142 preferably is a skillet-style atomizer comprising a cylindrical bowl- or cup-shaped container, or bowl, defining bottom and side walls 162, 164 and being open at the top. Preferably, the bowl 160 is an insulator, and can be made of an insulator material such as a ceramic. A heating element 166 is contained within the bowl 160. In the illustrated embodiment the heating element 166 comprises a pair of wire coils 170 wrapped about transversely-extending insulating cores 172, or wicks. The wire coils 160 can be constructed of a durable, electrically-conductive material such as a metal (such as titanium, kanthal, or nichrome) that provides durability and electrical conduction to selectively power the atomizer 142. A vaporizing chamber 180 is defined within the bowl 160, above and around the coils 170. When the vaporizing structure 120 is attached to a battery assembly 20, the coils 170 are electrically connected to the battery and, when energized, vaporizing media at or adjacent the coils will be atomized/vaporized.

In some embodiments, a single wire can be used to create both of the coils. In additional embodiments, each coil is formed by its own wire. Of course, additional embodiments may employ only one, or more than two, coils. Also, it is to be understood that other embodiments may employ other types of heating element structures, including electricity-based and/or gas-based structures.

A raised foundation 182 extends upwardly from the bottom wall 162, and the coils 170 are positioned atop the raised foundation 182. Air slots 184 extend through the raised foundation 182. In the illustrated embodiment two air slots 184 are formed, and each air slot aligns with a respective one of the coils so as to deliver air flow directly to the respective coil.

First and second wire holes 186, 188 extend through the bottom wall 162 of the bowl 160. A channel 196 is formed on the distal surface of the bottom wall 162 of the bowl 160, and extends from the second wire hole 188 to a side of the bowl 160. A first end portion 192 of the coil wire extends through the first wire hole 186, and a second end portion 194 of the coil wire extends through the second wire hole 188 and through the channel 190. As will be discussed below, electrical energy from the battery 20 can be applied across the first and second wire portions 192, 194 to energize the coil. As shown, the wire holes 186, 188 are at opposite sides of the raised foundation 182. It is to be understood, however, that the wire holes can be located anywhere along the bottom wall or, in other embodiments, side wall of the bowl.

With continued reference specifically to FIG. 9, the illustrated embodiment is particularly suited for non-liquid vaporizing media such as a wax 200, which is depicted in the vaporizing chamber in FIG. 9. In order to place such wax 200 in the vaporizing chamber, a user can remove the tank

8

module 130 from the atomizer module 140 and then deposit the wax 200 through the proximal opening and into the bowl 160.

With continued reference to FIG. 9, the tank module 130 comprises a tank top wall 202, tank bottom wall 204, and cylindrical outer wall 206 that cooperate to define a fluid chamber 210, or tank. The fluid chamber 210 is configured to hold a liquid solution such as a vaporizing solution comprising essential oils. A seal 212 adjacent the tank bottom wall 204 is configured to sealingly engage the outer wall 206. The outer wall in the illustrated embodiment can be made of a glass or polymer material that preferably is at least partially transparent so that a user can see the level of essential oil-based vaporization liquid remaining within the fluid chamber.

A vapor tube 220 extends generally axially through the fluid chamber 210, extending through the tank top wall, through the fluid chamber 210 and through the tank bottom wall 204. As such, a proximal portion 222 of the vapor tube 220 extends proximally from the tank top wall 202 and a distal portion 224 of the vapor tube 220 extends distally from the tank bottom wall 204. Preferably, fluid in the fluid chamber 210 is isolated from the vapor tube 220.

The tank 210 can have an opening 226 through the top wall 202 through which vaporizing solution can be added to the fluid chamber. A tank cap 228 can be removably placed atop the top wall of the tank. Preferably, a plug 229 extending from the tank cap 228 can be fit into and through the tank opening 226 so as to removably seal the opening. The cap 228 and plug 229 can be made of an elastomeric material such as silicone rubber.

With continued reference to FIGS. 9 and 12, one or more fluid delivery tubes 230 (two in the illustrated embodiment) are formed through the tank bottom wall 204 to communicate the fluid chamber 210 with the vaporizing chamber 180. A wick 240 (shown in only one of the fluid delivery tubes) can be disposed in each of the fluid delivery tubes 230. A proximal end 242 of the wick 240 extends into the fluid chamber 210 and a distal end 244 of the wick 240 extends into the vaporizing chamber 180, terminating at or adjacent the heating element 166. The wicks 240 can deliver a controlled amount of vaporizing solution from the tank to the atomizer through capillary action, gravity, pressure differential between the tank and the vaporizing chamber, and other forces. In the illustrated embodiment, wick supports 246 comprise elongated portions of the fluid delivery tubes 230 that accommodate and support the wicks.

The vapor tube 220 has a vapor passage 250 or lumen that extends from the proximal portion 222 of the vapor tube 220 to the distal portion 224 of the vapor tube 220 and does not communicate with the fluid chamber 210. As shown in FIGS. 8 and 12, the distal portion 224 of the vapor tube 220 extends into the atomizer module 140 so as to be within and/or in communication with the vaporizing chamber 180. An inlet opening 252 is provided in the distal portion 222 so that the vapor passage 250 can receive vapor generated in the vaporizing chamber 180. In the illustrated embodiment, two inlet openings 252 are provided through a side wall of the vapor tube 220. An outlet of the vapor passage is defined at the proximal portion of the vapor passage. In the illustrated embodiment, the outlet 254 is aligned with an axis of the vapor passage 250. If desired, a mouthpiece can be connected to the proximal portion 224 of the vapor tube 220 so that the vapor passage 250 will open into the mouthpiece.

In some examples, the proximal portion 222 can form a mouthpiece for a user to pull vapor from the vaporizing chamber through the vapor tube. In other examples, the

**9**

proximal portion can be externally threaded and/or provided with a detent structure so that a separately-formed mouthpiece can be releasably attached. When a mouthpiece is attached to the proximal portion, the elastomeric cap can be squeezed against the tank top wall to provide an additional seal for the tank opening. Also, the cap can be elastically compressible, behaving as a lock washer for the mouthpiece.

With continued reference to FIGS. **7-10** and **12**, in use, a user can place a vaporizing wax media **200** in the bowl **160** of the atomizer module **140** and then attach the tank module **130**, which can be filled with a vaporizing liquid, to the atomizer module **140**. When the battery button is actuated, a portion of the wax **200** in the bowl **160** is vaporized. Simultaneously, a portion of the vaporizing solution that is delivered to the heating element **160** via the wick **240** is also vaporized. As the user draws a breath through the mouthpiece, the vaporized wax and solution is combined with air to form a vapor that is delivered from the vaporizing chamber **180** through the vapor tube **220** and mouthpiece and into the user's lungs. As such, the present device enables a user to simultaneously vaporize a non-liquid vaporizing media (i.e., the wax) and a liquid vaporizing solution, and to mix the vapors and deliver the combination vapor to the user.

Waxes tend to provide a vapor having a relatively high concentration of the essential oils entrained within the wax, and thus provide a highly concentrated vapor. However, a bowl of wax tends to be fully vaporized after just a few pulls. Liquid solutions tend to provide a vapor having a lower concentration of essential oils, and thus provides a less concentrated vapor. However, a tank can store a relatively large volume of solution, and thus a tank of solution tends to last a relatively long time.

By enabling simultaneous vaporization of both wax and liquid solution, and by combining the vapors and delivering the combined vapors to the user, the present embodiment enables a higher volume of essential oils per user pull than has been previously available. Additionally, various blends of waxes and liquid solutions can now easily be enjoyed.

Still further, due to the modular nature of the device, tank modules and atomizer modules can easily be detached, switched out and reattached, enabling the user to easily and quickly switch between flavors and liquid solution types. For example, a user may have several tank modules, each of which is filled with a different flavor or type of liquid solution. The user can quickly and easily switch between these tank modules as desired. Also, the tank modules do not need to have their own atomizer; thus, individual tank modules can be relatively inexpensive and easy to maintain.

As discussed above, often waxes only last a limited number of pulls before the bowl of wax is exhausted. However, liquid solutions tend to last much longer due to the ability to use a storage tank. Thus, the current configuration allows a user to have several concentrated pulls in which both wax and liquid solution are vaporized simultaneously. However, after the wax is exhausted, the user may continue to use the device without further adjustment for pulls that provide only vaporized liquid from the tank.

With continued reference to FIGS. **8-10** and **12**, and additional reference to FIGS. **11A** and **B**, one embodiment of the conductive check valve **144** includes a housing **258**, a valve body **260**, and a sealing structure **262**. The valve body **260** is made up of a pin **264** and cap **266**, each of which preferably is made of an electronically conductive material such as a metal. In the illustrated embodiment, the conductive pin **262** comprises a hollow proximal cylinder **270** that necks down into a smaller diameter hollow distal cylinder

**10**

**272**. A valve seat **274** is defined where the proximal cylinder **270** necks down into the distal cylinder **272**. The conductive cap **266** covers the open end of the proximal cylinder **270** so that the sealing structure **262** is captured between the conductive pin **264** and the conductive cap **266**.

In the illustrated embodiment, the conductive cap **266** has an internally threaded side wall **276** extending distally and engaging with external threads formed on the proximal cylinder **270** of the pin **264**. In some examples, the conductive cap **266** can be fixed to the proximal cylinder **270** by welding, interference or press fit, snap fit, adhesive, or other attachment means.

The housing **258** also comprises a hollow proximal cylinder **280** that necks down into a smaller-diameter hollow distal cylinder **282**. In the illustrated embodiment, the housing **258** is configured to complementarily approximate the shape of the assembled pin **264** and cap **266** that define the valve body **260**. As such, the valve body **260** fits snugly within the housing **258**. Preferably, the housing **258** is formed of an electrically insulative material such as Delrin.

As shown in FIGS. **8**, **9** and **12**, the check valve **144** is disposed immediately distal of the atomizer **142** within the atomizer module housing **146**. The check valve **144** is placed within the atomizer module housing **146** so that the insulative check valve housing **258** engages the atomizer module housing **146** and electrically insulates the valve body **260** relative to the atomizer module housing **146**. A distal end **284** of the conductive pin **264** of the valve body **260** extends distally a short distance from the distal pin **150** of the atomizer module housing **146**, and thus is configured to engage the contact **44**, which is a first pole of the battery connector, when the atomizer module **140** is connected to the battery assembly **20**. The atomizer module housing **146** preferably is electrically conductive so that the pin **150**, when engaged with the internal threads **42** of the battery mount cavity **40**, engages a second pole of the battery connector.

As discussed above, a first portion **192** of the heating coil wire extends through the first wire hole **186** of the atomizer bowl **160**. As best shown in FIG. **12**, the first wire portion **192** is sandwiched between the conductive check valve cap and the atomizer. As such, the first wire portion is electrically connected to the conductive check valve **144**, which in turn is electrically connected to the first pole of the battery. The second wire portion **194** extends through the second wire hole **188** and into the channel **190**. Preferably, the second wire portion **194** extends through and out of the channel **190** so that it is sandwiched between the bowl **160** and the conductive atomizer module housing **146**, which is electrically connected to the second pole of the battery. Preferably, the channel **190** has a depth greater than a thickness of the second wire portion **194**. As such, the channel **190** enables the second wire portion **194** to be spaced from the conductive portions of the check valve (such as the cap **266** and pin **264**), and no electrical connection is made between the second wire portion **194** and the check valve **144**.

An electric circuit is defined from the first pole of the battery through the electrically conductive check valve **144** to the first wire portion **192**, through the coil **170** to the second wire portion **194**, and from the second wire portion through the atomizer module housing **146** to the second pole of the battery. When the circuit is energized, electric current is applied across the heating element coil, which quickly generates heat to vaporize media within the vaporizing chamber.

11

It is to be understood that, in other embodiments, an insulator can be applied in the channel to electrically insulate the second connection from the valve body. Also, other structure can be employed. For example, the second wire hole may be formed through a side wall of the bowl so that the second wire portion never approaches the conductive valve body.

In the illustrated embodiment, the atomizer module housing 146 is made of a conductive material. In additional embodiments, portions of the atomizer module housing can be made of non-conductive materials, but a conductive layer or portion can be provided that communicates with the second pole of the battery, and which is positioned to be attachable to the second wire portion.

As noted above, the battery connector has a plurality of air intake slots 46 so that air can enter the battery mount cavity 40. As best shown in FIG. 8, the atomizer housing distal pin 150 has air passages 154 that communicate with air passages 286 formed through the insulative check valve housing, and with air passages 288 formed through the check valve pin 264 to enable air to flow from within the battery mount cavity 40 into the hollow valve body 260. The conductive cap 266 of the valve body 260 has a bore 290 extending therethrough. The bore 290 is aligned with the air slots 184 of the atomizer bowl 160 so as to communicate air within the hollow valve body 260 to the vaporizing chamber 180.

Continuing with particular reference to FIGS. 8, 9 and 12, the sealing structure 262 in the illustrated embodiment comprises a ball 292 and a compression spring 294. One end of the compression spring 294 abuts against or is attached to the conductive cap 266, and a second end of the spring 294 urges the ball 292 against the valve seat 274 so as to form a seal. The seal blocks vaporizing media from the vaporizing chamber, wick(s) or tank from leaking into the distal cylinder 272 of the check valve pin 264. This can be especially useful when the personal vaporizer is not in use, as otherwise vaporizing fluid from the tank 210 may slowly flow through the wick(s) and into the vaporizing chamber, through the air slots into the hollow pin, and further through the air passages 288, 286, 154 and out of the personal vaporizer. On warm days, wax within the vaporizing chamber may similarly leak out of the device if left unchecked. When the ball 292 is engaged with the valve seat 274, vaporizing media is blocked from leaking from the device by way of the air passages.

During use, a user drawing a breath generates sufficient suction force or decrease in pressure to dislodge the ball 292 from the valve seat 274. As the user energizes the heating element, and draws a breath, air flow will push the ball 292 out of engagement with the valve seat 274. Also, vaporizing media that may have accumulated in the vaporizing chamber will be vaporized, and fluid that may have accumulated in the valve body 260 proximal of the ball 292 will be drawn into the atomizer bowl 160 and vaporized. When suction force from the user is removed, the spring 294 automatically urges the ball 292 back into engagement with the seat 274.

To use the vaporizing structure 120, the distal tip 150 preferably is connected to the battery mount, and preferably a mouthpiece is attached to the proximal portion 222. The user loads the device with vaporizing media by ensuring the fluid chamber 210 comprises vaporizing liquid and/or detaching the tank module 130 from the atomizer module 140, placing a wax W in the vaporizing chamber 180, and then replacing the tank module 130. The user then presses the battery button 29 and draws a breath through the mouthpiece. The heat element coils 170 quickly heats up, vaporizing wax W within the vaporizing chamber 180 and/or

12

liquid L delivered by the wick 240. Atmospheric air A is drawn through the battery air intake slots 46 and into the hollow pin 264 through the air passages 154, 286, 288. The ball 292 is dislodged from the seat 274 and air A flows around the ball 292 and through bore 290 and air slots 184, past the coils 170 and into the vaporizing chamber 180, where it is mixed with atomized vaporizing media, becoming a vapor V. the vapor V flows proximally through the inlet opening 252 and into the vapor passage 250, from which it is delivered via the mouthpiece to the user.

In some embodiments, a downstream one-way valve can be incorporated inside the vapor tube in order to prevent vaporizing media from leaking out of the vapor tube during periods of nonuse. The downstream one-way valve can be nonconductive and can have any of various valve structures.

As discussed above, the conductive check valve 144 prevents leaks of both liquid and non-liquid vaporizing media. Thus, it should be understood that a conductive check valve can be employed in embodiments of personal vaporizers configured for use solely with only one of liquid and non-liquid vaporizing media as well as embodiments configured for use with both liquid and non-liquid vaporizing media.

Although the illustrated embodiment employs a ball-and-spring type valve, it is to be understood that other embodiments can employ check valves having any of various types of check valve structure. Preferably, however, the check valve will employ a housing or other conductive pathway through which electrical energy may pass as it is supplied to the atomizer. Although the illustrated embodiment discloses a particular circuit that extends through the valve body and through the conductive cover, which is insulated relative to the valve body, it is to be understood that other embodiments can employ different specific circuit pathways, which pathways preferably employ structure of the device to supply electric current.

With reference next to FIG. 13, another embodiment of a hybrid personal vaporizer 300 is shown. The illustrated hybrid personal vaporizer 300 comprises an atomizer module 310 that is releasably attachable to a battery assembly 20. A tank module 320 is releasably connectable to the atomizer module 310, and a mouthpiece module 330 is releasably attachable to the tank module 320. As will be discussed below, the structure of the illustrated hybrid personal vaporizer 300 is somewhat different than the structure of embodiments described above. To be sure, the illustrated hybrid personal vaporizer employs some features not discussed in previous embodiments. However, certain of the structures operate on principles similar to features described in conjunction with the above embodiments.

With additional reference to FIGS. 14-17, the atomizer, tank and mouthpiece modules of the embodiment of FIG. 13 are shown in more detail and in cross-section. As shown, the atomizer module comprises an atomizer 332 and a check valve enclosed within an atomizer module housing 336. The atomizer module housing 336 comprises a proximal end 338 that preferably is threaded so as to be selectively attachable to the tank module 320. An internal transverse wall 340 is disposed between the proximal end 338 and a distal end 342 of the atomizer module housing 336. Air slots 344 are formed at the distal end 342. A distal cavity 346 is defined within the atomizer module housing 336 between the distal end and the transverse wall 340. A proximal cavity 348 is defined between the proximal end and the transverse wall 340. As shown, the conductive check valve 334 is supported by the transverse wall 340. The atomizer 332 is disposed in the proximal cavity 348.

With particular reference to FIGS. **16** and **17**, in the illustrated embodiment, the check valve **334** comprises a housing **352**, an insulator **352**, a pin **360**, a ball **362** and a cap **364**. As shown, the insulator **352** fits between the housing **352** and the pin **360** in order to electrically insulate the housing **352** from the pin **360** and to space the housing from the pin **360**. Preferably, both the housing and the pin **360** are electrically conductive. The pin **360** preferably is hollow and has a seat **366** defined between a proximal and a distal cavity **370**, **372**.

The cap **364** attaches to the proximal end of the pin **360** so as to enclose the proximal cavity. Like the pin **360**, the cap **364** preferably is electrically conductive. The cap **364** comprises a plurality of cap apertures **374** that are radially spaced from a center point that is aligned with an axis of the pin **360**. As such, the cap **364** preferably is solid at its center point. The ball **362** is contained within the proximal cavity and is constrained to move between engagement with the seat **366** and contact with the center point of the cap **364**. When the ball **362** is engaged with the seat **366**, fluid flow is blocked from moving between the proximal and distal cavities of the pin **360**. However when the ball **362** is disengaged from the seat **366**, and possibly engaged with the center point of the cap **364**, flow of air through the plurality of cap apertures **374** and proximally from the pin distal cavity to the proximal cavity is unimpeded by the ball **362**.

The housing preferably includes a distal threaded tip **378** that is sized and configured to threadingly engage the internal threads **42** of the battery mount cavity **40** so that the housing can be electrically connected to the second pole of the battery. A distal tip **380** of the pin **360** extends a short distance distally of the housing distal tip and is configured to engage the battery contact **44** when the housing distal tip is engaged with the battery mount cavity **40**. As such, the pin distal tip engages the first pole of the battery.

The pin **360** has a plurality of side apertures **382** distal of the seat **366**. Similarly, the check valve housing **350** has a plurality of side apertures **384**. Each of these apertures open into a space **386** between the pin **360** and the housing so that air may flow freely from within the distal cavity of the atomizer module **310** into the pin cavities.

When the atomizer module **310** is mounted to the battery, atmospheric air can flow through the air slots **344** into the distal cavity, and further from the distal cavity through the apertures and into the distal cavity of the pin **360**. When the ball **362** is disengaged from the seat **366**, air from within the distal cavity can flow proximally past the ball **362** and further through the cap apertures **374**. When the ball **362** is engaged with the seat **366**, leakage a vaporizing media is blocked as in embodiments discussed above.

In the illustrated embodiment, there is no biasing member to urge the ball **362** against the seat **366**. Nevertheless, the ball **362** is configured to be urged into engagement with the seat **366** by forces such as gravity, when the personal vaporizer is upright, and/or by flow of vaporizing media in a distal direction through the proximal cavity of the pin **360**. Thus, flow of vaporizing media in a direction tending to leak from the device will urge the ball **362** into sealing engagement with the seat **366**. Of course, it is to be understood that, in additional embodiments, any type of biasing member, and any type of check valve structure, can be employed as desired.

Continuing with reference to FIGS. **15-17**, in the illustrated embodiment, a mount aperture **388** is formed through the transverse wall **340** of the atomizer module housing **336**, and the check valve housing **350** is press-fit into the mount aperture **388** so that the check valve **334** is held in place

within the atomizer module **310** with a proximal portion of the check valve **334** extending into the proximal cavity and a distal portion of the check valve **334** extending into the distal cavity.

With additional reference to FIGS. **18** and **19**, in the illustrated embodiment the atomizer **332** comprises an atomizer bowl **390** having a proximal cavity **392** and a distal cavity **394**. A bottom wall **396** is defined between the proximal and distal cavities, and a side wall **398** of the bowl **390**, in combination with the bottom wall **396**, defines the proximal and distal cavities.

As best shown in FIG. **19**, preferably a pair of arcuate cradles **399** are formed on the proximal side of the bottom wall **396**. The arcuate cradles **399** generally complementarily correspond to the curvature of heating element coils **400** that are arranged adjacent the cradles. An air slot **402** is formed in each cradle so as to be aligned with the corresponding coil. A pair of first wire holes **404** is formed through the bottom wall **396** and open into the distal cavity. A pair of second wire holes **406** are also formed through the bottom wall **396** but do not open into the distal cavity. Instead, the second wire holes extend through a portion of the side wall and open at a distal end of the side wall. Channels **408** are formed in the side wall so as to extend from each second wire hole to a side surface of the bowl **390**.

With particular reference to FIGS. **17** and **19**, the bowl **390** preferably is fit into the proximal cavity of the atomizer module housing **336** so that distal ends of the side walls engage the transverse wall **340**, and the proximal portion of the check valve **334** extends into the distal cavity of the bowl **390**. Preferably, at least portions of a plurality of the cap apertures **374** are aligned with each air slot.

Continuing with particular reference to FIG. **17**, for each of the coils, a first wire end portion **414** of the coil extends through one of the first wire holes **404** and is placed into contact with the conductive check valve cap **364** without contacting the conductive check valve housing **350**. A second wire end portion **416** of the coil extends through one of the second wire holes **406** and into contact with the conductive atomizer module housing **336**, which is physically and electrically connected to the conductive check valve housing **350**. As such, the first wire end portion is connected through the check valve cap **364** and pin **360** to the first pole of the battery, and the second wire end portion is connected through the atomizer module housing **336** and check valve housing **350** to the second pole of the battery, defining a circuit enabling the battery to energize the coils when actuated.

With continued reference to FIG. **15** and additional reference to FIG. **20**, the tank module **320** comprises a tank top wall **420** that supports a proximal seal for **22**. A tank base **424** is configured to support an O-ring for **26**, and defines a bottom wall **428**. A tubular outer wall **430** is disposed between the top and bottom wall **428**. A vapor tube **440** extends proximally from the base and defines a vapor passage **441** therewithin. A proximal end **442** of the vapor tube **440** threadingly engages the tank top wall **420** so that the tank top wall **420** can be advanced toward the base. When the top wall **420** is threadingly advanced over the proximal end of the vapor tube **440**, the outer wall **430** is sandwiched between the top and bottom walls so as to create seals with the proximal seal and O-ring and define a fluid chamber **444**, or tank, therewithin. A proximal portion **446** of the vapor tube **440** extends proximally from the tank top wall **420**. A central aperture is formed in the bottom wall **428** and communicates with the vapor passage **441**. A distal end

148 of the base is threaded so as to threadingly connect to the atomizer module housing 336.

With continued reference to FIGS. 15 and 20, and additional reference to FIGS. 21A and 21B, a transfer member 450 comprises a cylindrical body 452 having a proximal flange 454. A proximal face 456 is defined on a proximal side of the proximal flange. A proximal connector for freight extends proximally from the proximal face and is configured to engage the central aperture of the base. In one embodiment, the proximal connector is threaded so that the proximal face can be advanced and fit snugly against the distal face of the tank module bottom wall 428.

A plurality of elongate secondary fluid delivery holes 460 extend longitudinally through the proximal face and the body. Preferably, the transfer member 450 is attached to the base so that the secondary fluid delivery holes 460 are at least generally aligned with the fluid delivery holes formed through the bottom wall 428. Also, preferably the proximal face generally sealingly engages the distal face of the tank module bottom wall 428 so that fluid from the tank will flow through the fluid delivery holes and secondary fluid delivery holes, and not between the proximal face and distal face of the tank module bottom wall 428. In another embodiment, the transfer member 450 can be press-fit against the bottom surface of the tank bottom wall 428. Other methods can also be used to attach the proximal face of the transfer member 450 tightly to the bottom surface of the tank bottom wall 428.

A distal cavity 462 is formed in the transfer member body 452, and the secondary fluid delivery holes 460 extend through the body and open into the distal cavity 462.

A plurality of transversely-directed vapor inlets 464 are also formed in the transfer member body. The vapor inlets 464 are placed so as to not intersect or interfere with the secondary fluid delivery holes 460. The vapor inlets communicate with a central vapor chamber 466 formed within the body, which central vapor chamber 466 is aligned with the proximal connector so that the central vapor chamber 466 is in communication with the vapor passage 441.

With particular reference again to FIG. 15, vaporizing fluid from within the fluid chamber 444 can be delivered to the vaporizing chamber 180 by flowing through the fluid delivery holes 429 of the bottom wall 428 and further through the secondary fluid delivery holes of the transfer member 450 into the vaporizing chamber 180. After being atomized, the vapor flows from the vaporizing chamber into the vapor inlets of the transfer member 450 to the central vapor chamber 466 and further to the vapor passage 441, from which it is delivered to the mouthpiece module 330.

With continued reference to FIG. 15 and additional reference to FIGS. 22A and 22B, a wick holder 470 is configured to fit into and attach to the distal cavity of the transfer member 450. Preferably, the wick holder 470 includes proximal threads 472 adapted to engage internal threads of the transfer member 450 so that the wick holder 470 can be attached to the transfer member 450. The wick holder 470 defines a wick holding passage 474 which, in the illustrated embodiment, is generally tapered to decrease in diameter moving distally. As such, the wick holding passage 474 can securely hold a wick therewithin. A proximal space 476 having a diameter greater than the wick holding passage is defined proximal of the wick holding passage. As shown in FIG. 15, a wick 480 can be retained by the wick holding passage for some for. Preferably, a proximal end 482 of the wick 480 is disposed in or distal of the proximal space 476, and the distal end 484 of the wick 480 is disposed at or adjacent the heating element of the atomizer 332.

In the illustrated embodiment, the wick 480 has a generally circular cross-section, is generally longitudinally aligned with the heating element, and has a diameter greater than one half the length of each heating element coil, more preferably greater than two thirds the length of each heating element coil, and in some embodiments greater than about three fourths the length of each heating element coil. In further embodiments the wick diameter is about the same as or greater than the length of each heating element coil.

In the illustrated embodiment, the wick 480 is completely distal of the bottom wall 428 of the tank so that no wick portion extends into the fluid chamber 444. As such, fluid flowing through the delivery holes is unconstrained by any wick or any other throttling structure. Similarly, fluid flow through the secondary fluid delivery holes is unconstrained by the presence of any wick. Instead, fluid flows freely through the fluid delivery holes and secondary fluid delivery holes, and accumulates in the proximal space above the wick. The proximal space enables fluid to spread out and evenly soak the wick. In the illustrated embodiment, the proximal space and wick are disposed within the proximal cavity of the atomizer module housing 336.

In the illustrated embodiment, a cross sectional area of the wick is about the same as or greater than a cross-sectional area of the vapor passage 441. Similarly, the cross-sectional area of the wick preferably is greater than the combined cross-sectional area of all of the fluid delivery holes. Further, preferably the cross-sectional area of the vapor passage is greater than the combined cross-sectional area of the fluid delivery holes. As such, the diameter of the vapor tube 440, and cross-sectional area of the vapor passage 441, can be maximized while the cross-sectional area dedicated to delivery tubes 429 is minimized, but without negatively affecting delivery flow of fluid through the wick 480 to the heating element 400. For example, in some embodiments, a ratio of the vapor passage diameter to an outer diameter of the tank module 320 is greater than 0.2. In further embodiments, the ratio is between 0.2 and 0.3, and in further embodiments the ratio is about 0.25.

In the illustrated embodiment, a single, relatively large, centrally-located wick is held by the wick holder 470. It is to be understood that other embodiments may employ a plurality of wick holding passages, and thus may hold a plurality of wicks. The plurality of wicks may each be smaller in diameter than the wick illustrated in FIG. 15, although the wicks collectively may present a cross-sectional area approaching, the same as, or even greater than the wick in the illustrated embodiment, or greater than the cross-sectional area of the vapor passage. Additionally, such embodiments can be configured so that wicks are more evenly distributed about the vaporizing chamber 180, and at or adjacent most or all portions of the heating element coils.

In the illustrated embodiment, the wick holder 470 can be removed from the transfer member 450 and replaced with another wick holder. The replacement wick holder may have a different configuration, may use different wick materials, or may simply be a new wick that hasn't been fouled by extensive use. Also, it is anticipated that different vaporizing liquids will have different viscosities. Thus, a user may wish to select a wick calculated to maximize device performance for a particular range of liquid viscosities. Notably, in the illustrated embodiment, the wick holder attaches to structure of the tank module 320, and comes with the tank module as the tank module 320 is detached from the atomizer module. As such, the wick holder is easily accessed by simply removing the tank module, and without disassembling the tank.

The illustrated transfer member **450** and wick holder **470** are generally cylindrical in shape, and the illustrated wick holder **470** attaches to the transfer member **450** via a threaded connection. It is to be understood that, in additional embodiments, various ways of connecting the wick holder to the transfer member can be employed, such as a j-lock, detent, or slide-in mechanism. Also, the transfer member and/or wick holder and/or wick may have a non-circular cross-section. For example, in some embodiments the wick holder and wick may have a rectangular cross-sectional shape, and may be sized to correspond to the cross-sectional footprint of the heat element coils. As such, the wick may deliver vaporizing fluid to every part of the coils.

Continuing with reference to FIGS. **14** and **15**, and with additional reference to FIG. **23**, the mouthpiece module **330** comprises a tubular mouthpiece **490**, which in some embodiments can be substantially transparent, that is received into a proximal cavity into of a mouthpiece base **494**. A distal portion **496** of the mouthpiece base comprises an O-ring seat **498** that receives an O-ring **499**. A mouthpiece mount **500** has a central threaded passage **502** that engages the proximal portion of the vapor tube **440** so that the mouthpiece module **330** can be tightened atop the tank module **320**.

A distal cavity **504** of the mouthpiece mount receives an elastomeric seal **506** that engages the top wall **420** of the tank module **320** so as to seal a tank fill opening **508** and help provide a tight fit between the mouthpiece module **330** and the tank module **320**. The central threaded passage **502** opens into a proximal cavity **510** of the mount **500**, into which the distal portion of the mouthpiece base is placed. The O-ring on the mouthpiece base engages a wall of the mount proximal cavity to create a seal so that vapor that flows through the vapor passage **441** and central threaded passage is further directed through a mouthpiece outlet **512**.

To use the personal vaporizer described in connection with FIGS. **13-23**, The user loads the device with vaporizing media by ensuring the fluid chamber **444** comprises vaporizing liquid L and/or detaching the tank module **320** from the atomizer module **310** and placing a wax W in the vaporizing chamber **180**, and then replacing the tank module. The user then presses the battery button **29** and draws a breath through the mouthpiece. The heat element coils quickly heat up, vaporizing wax W within the vaporizing chamber **180** and/or liquid L delivered by the wick. Atmospheric air A is drawn through the battery air intake slots **46** and into distal cavity, from which it flows through side holes and into the distal cavity of the pin **360**. The ball **362** is dislodged from the seat **366**, and air A flows around the ball **362** and through any of the plurality of cap apertures **374** and air slots, past the coils and into the vaporizing chamber, where it is mixed with atomized vaporizing media, becoming a vapor V. the vapor V flows proximally through the vapor inlets of the transfer member **450** and into the vapor passage **441**, from which it is delivered via the mouthpiece to the user. As vaporizing liquid L is being atomized, replacement liquid L flows from the fluid chamber **444** through the fluid delivery tubes and secondary fluid delivery tubes into the proximal space proximal of the wick. The liquid L spreads across the diameter of the wick, and is then communicated through the wick to the coils **400**, where it is atomized and mixed with air A to form the vapor V.

It is to be understood that the embodiments of a modular, hybrid personal vaporizer disclosed herein can be used with wax alone, liquid solution alone, or both wax and solution at the same time. Further, if being used with both wax and solution at the same time, and one or the other of the wax or

solution becomes exhausted, the hybrid personal vaporizer can continue to be used with the remaining material without necessitating any adjustments by the user. Further, it is to be understood that features disclosed herein may be employed with other embodiments of vaporizers, which embodiments may or may not be able to used with one or the other of wax and liquid solutions. Further, features discussed herein may be employed with vaporizers that are not modular.

In the illustrated embodiments, the fluid tank has been configured as a single compartment to hold a single liquid. In additional embodiments the tank can be divided into two, three or more chambers and can be configured to hold different liquid media, such as different flavors of liquid and/or different ingredients. In some embodiments such chambers can be configured to contain separate components. For example, a first chamber may contain a basic vaporizing fluid, and a second and/or third chamber may be configured to contain flavorings. Each chamber communicates with the vaporizing chamber **180** via liquid delivery holes and/or wicks, and thus liquid from each chamber is delivered simultaneously to the vaporizing chamber. The size of the delivery tubes and/or wicks can throttle delivery rates from each chamber, regulating the mixture. For example, the delivery tube(s) and/or wick from the first chamber may be configured to delivery much more volume of fluid to the vaporizing chamber than the delivery tube and/or wick from the second or third chambers. This can be accomplished in various ways, such as by providing delivery tubes of greater cross-sectional area aligned with the first chamber and comparatively small cross-sectional area aligned with the second and/or third chambers, using different wick materials that regulate fluid flow, or the like.

The embodiments discussed above have disclosed structures with substantial specificity. This has provided a good context for disclosing and discussing inventive subject matter. However, it is to be understood that other embodiments may employ different specific structural shapes and interactions. For example, the vaporizer embodiments discussed herein are generally cylindrical. It is to be understood that other embodiments may employ principles discussed herein in connection with vaporizers having different shapes and configurations.

Although inventive subject matter has been disclosed in the context of certain preferred or illustrated embodiments and examples, it will be understood by those skilled in the art that the inventive subject matter extends beyond the specifically disclosed embodiments to other alternative embodiments and/or uses of the invention and obvious modifications and equivalents thereof. In addition, while a number of variations of the disclosed embodiments have been shown and described in detail, other modifications, which are within the scope of the inventive subject matter, will be readily apparent to those of skill in the art based upon this disclosure. It is also contemplated that various combinations or subcombinations of the specific features and aspects of the disclosed embodiments may be made and still fall within the scope of the inventive subject matter. Accordingly, it should be understood that various features and aspects of the disclosed embodiments can be combined with or substituted for one another in order to form varying modes of the disclosed inventive subject matter. Thus, it is intended that the scope of the inventive subject matter herein disclosed should not be limited by the particular disclosed embodiments described above, but should be determined only by a fair reading of the claims that follow.

What is claimed is:

1. A personal vaporizer, comprising:

a tank module comprising a fluid chamber and a vapor passage extending through the fluid chamber, the fluid chamber configured to contain a vaporizing solution;

an atomizer module comprising a bowl having an upper edge and an air aperture, a heating element arranged in or adjacent the bowl, the bowl configured to accept vaporizing solution received from the fluid chamber;

a check valve comprising an insulator housing, a conductive shell inside the insulator housing, and a sealing mechanism inside the conductive shell, the conductive shell having an air inlet and an air outlet, an intake air flow path defined through the conductive shell from the air inlet to the air outlet, the sealing mechanism providing a seal inside the conductive shell, the seal interposed in the intake air flow path, the check valve arranged so that that the air outlet communicates with the bowl air aperture and the conductive shell is electrically connected to the heating element; and

a battery assembly, the heating element connectable to the battery assembly through the check valve so that actuation of the battery delivers electrical energy to the heating element, causing the heating element to heat and vaporize the vaporizing solution;

wherein the bowl has a first wire hole and a second wire hole extending through a bottom wall of the bowl and a channel extending transversely from the second wire hole.

2. The personal vaporizer as in claim 1, wherein the heating element has a first connection and a second connection, the first connection extending through the first wire hole and contacting the conductive shell, and the second connection extending through the second wire hole and the channel and spaced away from the conductive shell.

3. The personal vaporizer as in claim 2, wherein the first connector comprises a first conductive wire and the second connector comprises a second conductive wire.

4. The personal vaporizer as in claim 3, wherein the atomizer module comprises a housing that is electrically conductive, and the second conductive wire contacts the atomizer module housing.

5. The personal vaporizer as in claim 4, wherein the check valve is interposed between the atomizer module and the battery assembly so that the atomizer module housing overlaps the check valve, and wherein the insulator housing is interposed between the conductive shell and the atomizer module housing.

6. The personal vaporizer as in claim 2, wherein the check valve is part of the atomizer module.

7. The personal vaporizer as in claim 6, wherein the tank module is releasably connected to the atomizer module.

8. The personal vaporizer as in claim 2, additionally comprising one or more slots formed through a side wall of the bowl.

9. The personal vaporizer as in claim 2, wherein the sealing mechanism comprises a ball and a spring.

10. An atomizer for a personal vaporizer, comprising:

a housing having a distal end and a proximal end, the housing comprising an electrically conductive material, the distal end configured to be attachable to a first pole of a battery so that the distal end electrically communicates with the battery;

an atomizer bowl arranged within the housing, the atomizer bowl comprising a side wall and a bottom wall, the atomizer bowl configured to receive vaporizing media;

a heating element disposed at least partially within the atomizer bowl, the heating element having a first wire end portion and a second wire end portion, the heating element configured to produce heat when electric energy is applied across the first wire end portion and the second wire end portion;

a check valve having a valve body, a proximal outlet, a distal inlet, and a sealing structure interposed in an air flow path between the distal inlet and the proximal outlet, the valve body extending from a distal end to a proximal end and defining an electrically conductive flow path from the distal end to the proximal end, the sealing structure configured to accommodate air flow therethrough along the air flow path in a distal-to-proximal direction, but to resist air flow therethrough in a proximal-to-distal direction;

wherein the first wire end portion is in electrical communication with the proximal end of the valve body and the second wire end portion is in electrical communication with the housing.

11. The atomizer as in claim 10, wherein the atomizer bowl is nonconductive and the atomizer bowl has a first hole aligned with the valve body and a second hole aligned with the housing, and wherein the first wire end portion extends through the first hole and into contact with the valve body, and the second wire end portion extends through the second hole and into contact with the housing.

12. The atomizer as in claim 11, wherein the bottom wall of the atomizer bowl has an aperture aligned with the heating element, and the proximal outlet of the check valve is aligned with the bowl aperture.

13. The atomizer as in claim 12, wherein the atomizer has a longitudinal axis, and the second hole of the atomizer bowl is spaced farther from the axis than is the first hole of the atomizer bowl.

14. The atomizer as in claim 13, additionally comprising an insulator between the valve body and the housing.

15. The atomizer as in claim 13, wherein the heating element comprises a wire coil.

16. The atomizer as in claim 10, wherein the sealing mechanism comprises a ball and a valve seat.

17. The atomizer as in claim 16, wherein the ball is biased toward engagement with the valve seat.

18. The atomizer as in claim 10, additionally comprising a tank disposed proximal of the atomizer bowl, the tank configured to contain a liquid vaporizing media therewithin and to deliver the liquid vaporizing media to the atomizer bowl.

19. The atomizer as in claim 10 in combination with a tank module formed separately from the atomizer, a distal end of the tank module being selectively attachable to a proximal end of the atomizer, the tank module comprising a tank configured to contain a liquid vaporizing media therewithin and a wicking structure configured to deliver the liquid vaporizing media to the atomizer bowl.

20. The atomizer as in claim 10, wherein the distal end of the valve body is configured to be attachable to a second pole of the battery so that the distal end of the valve body electrically communicates with the battery, and an electric circuit is established from the second pole of the battery through the valve body, through the heating element, through the housing, and to the first pole of the battery.

* * * * *

# CERTIFICATE OF SERVICE

I hereby certify that I filed the foregoing **CORRECTED OPENING BRIEF FOR DEFENDANT-APPELLANT HENRY CHUNG** with the Clerk of the United States Court of Appeals for the Federal Circuit via the CM/ECF system and served a copy on counsel of record this 21st day of November, 2019 by the CM/ECF system and by electronic mail to the parties on service list below:

Daniel C. Callaway
Erik C. Olson
FARELLA BRAUN + MARTEL LLP
235 Montgomery Street, 17th Floor
San Francisco, CA 94104
(415) 954-4400
dcallaway@fbm.com
eolson@fbm.com

Dated:     November 21, 2019     */s/ Robert E. Aycock*
     Robert E. Aycock
     *Attorney for Defendant-Appellant*
     *Henry Chung*

# CERTIFICATE OF COMPLIANCE

Counsel for Defendant-Appellant hereby certifies that:

1.      The brief complies with the type-volume limitations of Federal Rule of Appellate Procedure 32(a)(7)(B)(i) because exclusive of the exempted portions it contains 12,251 words as counted by the word processing program used to prepare the brief; and

2.      the brief complies with the type face requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared using Microsoft Office Word 2016 in a proportionally spaced type face: Times New Roman, font size 14.


Dated:      November 21, 2019          */s/  Robert E. Aycock*
                                       Robert E. Aycock
                                       *Attorney for Defendant-Appellant*
                                       *Henry Chung*