2019-2286

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

_____

LUBBY HOLDINGS LLC, VAPOROUS TECHNOLOGIES, INC.,

*Plaintiffs-Appellees,*

*v.*

HENRY CHUNG,

*Defendant-Appellant*

_____

Appeal from the United States District Court for the
Central District of California in No. 2:18-cv-00715, Judge R. Gary Klausner

_____

**JOINT APPENDIX**

_____

| | |
|---|---|
| Robert E. Aycock | Jen-Feng Lee |
| Joseph G. Pia | LT PACIFIC LAW GROUP, LLP |
| William B. Chadwick | 17800 Castleton Street, #560 |
| PIA ANDERSON MOSS HOYT | City of Industry, CA 91748 |
| 136 E. South Temple, 19th Floor | (626) 810-7200 |
| Salt Lake City, UT 84111 | |
| (801) 350-9000 | |

*Counsel for Defendant-Appellant Henry Chung*

January 24, 2020

# TABLE OF CONTENTS

Judgment on the Verdict for the Plaintiffs (May 9, 2019)........................ Appx0001

Order Re: Defendant's Motion for Judgment as a Matter of Law (June 17, 2019) ................................................................................ Appx0002

Order Re: Defendant's Rule 59(a) Motion for New Trial; Defendant's Rule 59(e) Motion to Alter Judgment........................................ Appx0005

United States Patent 9,750,284 (Rado) .................................... Appx0008

Docket Sheet (Case No. 18-cv-715 (C.D. Cal.))........................................ Appx0040

Defendant's Memorandum In Support of Motion to Dismiss Complaint Pursuant to FRCP 12(b)(6) (March 30, 2018) ........................ Appx0053

Plaintiffs' First Amended Complaint Against Defendants for Patent Infringement (April 10, 2018)..................................................... Appx0060

U.S. Patent Application 2016/0366945 .................................... Appx0079

Chung's Answer to Plaintiff's First Amended Complaint (April 26, 2018) ................................................................................ Appx0129

Plaintiffs' Contentions of Fact and Law (February 25, 2019).................. Appx0146

Chung's LR-16 Memorandum of Contention of Fact and Law (February 25, 2019).................................................................. Appx0151

Notice Re Pretrial Conference (March 18, 2019).................................... Appx0163

Chung's Brief re Damages Disclosure and Sanctions (March 21, 2019) ................................................................................ Appx0164

Plaintiffs' Opposition to Defendants' Court Requested Brief Regarding Damages Calculations (March 27, 2019)............................... Appx0238

Joint Statement of Case (April 30, 2019) ................................ Appx0294

Order Re: Chung's Brief Re: Damages Disclosures and Sanctions (May 3, 2019)....................................................................... Appx0307

Plaintiff's Supplemental Rule 26(e) Disclosure Relating to Damages Calculations (May 6, 2019)..................................................................... Appx0308

Chung's Objection to Plaintiff's Filing of Computation of Damages (May 6, 2019)............................................................................... Appx0312

Chung's Rule 50(a) Motion for Judgment as a Matter of Law (May 9, 2019) ............................................................................................... Appx0324

List of Trial Exhibits and Witnesses (May 9, 2019)................................ Appx0332

Jury Instructions (May 9, 2019)........................................ Appx0345

Verdict Form (May 9, 2019)................................................... Appx0363

Judgment on the Verdict for the Plaintiffs (May 9, 2019)........................ Appx0366

Chung's Rule 50 Motion for Judgement as  Matter of Law; and Alternative Motion for New Trial (May 17, 2019)................................... Appx0367

Plaintiffs' Opposition to Chung's Rule 50(b) Motion for Judgment as a Matter of Law; and Alternative Motion for New Trial.......................... Appx0377

Trial Transcript Day 1 (May 7, 2019)..................................................... Appx0498

Trial Transcript Day 2 (May 8, 2019)..................................................... Appx0677

Trial Transcript Day 3 (May 9, 2019)..................................................... Appx0904

Trial Exhibit 103 – Supply Agreement................................................... Appx1001

Trial Exhibit 102 – Consulting Agreement............................................. Appx1006

Trial Exhibit 107 – Screenshots of boomvaporizer.com .......................... Appx1012

Excerpts from U.S. Patent 9,750,284 (Rado) ......................................... Appx1021

Trial Exhibit 201 (Esquire Distribution Inc. Sales by Item Summary).... Appx1053

U.S. Patent 9,380,811 (Chung) ............................................................. Appx1055

U.S. Patent 9,380,812 (Chung) ............................................................. Appx1056

Chung's Memorandum In Support of Rule 59(a) Motion for a New Trial (June 6, 2019) .......................................................................... Appx1079

Chung's Memorandum In Support of Rule 59(e) Motion to Alter or Amend Judgment (June 6, 2019) ........................................................ Appx1098

Plaintiffs' Opposition to Rule 59(e) Motion to Alter or Amend Judgment (June 17, 2019) ....................................................................... Appx1112

Plaintiffs' Opposition to Rule 59(a) Motion for a New Trial (June 17, 2019) ............................................................................................... Appx1124

Chung's Reply In Support of Rule 59(a) Motion for a New Trial (June 24, 2019) ................................................................................................ Appx1181

Chung's Reply In Support of Rule 59(e) Motion to Alter or Amend Judgment (June 24, 2019) ........................................................................ Appx1188

Chung's Notice of Appeal to Court of Appeals for the Federal Circuit (August 12, 2019) ................................................................................... Appx1210

Plaintiffs' Responses to Interrogatories (November 11, 2018) ................ Appx1213

Chung's Counsel's Declaration In Support of Chung's Objection to Plaintiffs' Computation of Damages (May 6, 2019) ............................... Appx1227

Plaintiffs' Complaint Against Defendants for Patent Infringement (January 26, 2018) ................................................................................... Appx1267

Chung's Notice of Interested Parties (April 4, 2018) ............................... Appx1314

Joint Jury Instructions (March 18, 2019) ................................................ Appx1317

Chung's Opposition to Motion for Attorney Fees per Section 285 (June 3, 2019) ......................................................................................... Appx1379

Chung's Notice re Deepvapes, Inc. (June 17, 2019) ............................... Appx1402

JS-6

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LUBBY HOLDINGS, LLC, et al. | CASE NUMBER |
| | 2:18-cv-00715-RGK-JC |
| PLAINTIFF(S) | |
| v. | |
| HENRY CHUNG, et al. | **JUDGMENT ON THE VERDICT FOR THE PLAINTIFF(S)** |
| DEFENDANT(S). | |

This action came on for jury trial, the Honorable R. Gary Klausner                        District Judge, presiding, and the issues having been duly tried and the jury having duly rendered its verdict,

IT IS ORDERED AND ADJUDGED that the plaintiff(s):

Lubby Holdings, LLC and Vaporous Technologies, Inc.

recover of the defendant(s):

Henry Chung and Deepvapes, Inc.

the sum of $863,936.10                                          , with interest thereon at the legal rate as provided by the law, and its costs of action, taxed in the sum of                          .

Clerk, U. S. District Court

Dated: May 9, 2019

By S. Williams

Deputy Clerk

At: Los Angeles, CA

cc: *Counsel of record*

CV-49 (05/98)                    **JUDGMENT ON THE VERDICT FOR THE PLAINTIFF(S)**

**Appx0001**

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 2:18-cv-00715-RGK-JC | Date | June 17, 2019 |
| --- | --- | --- | --- |
| Title | *Lubby Holdings LLC, et al. v. Henry Chung, et al.* | | |

Present: The Honorable   R. GARY KLAUSNER, UNITED STATES DISTRICT JUDGE

| Sharon L. Williams | Not Reported | N/A |
| --- | --- | --- |
| Deputy Clerk | Court Reporter / Recorder | Tape No. |

| Attorneys Present for Plaintiff: | Attorneys Present for Defendant: |
| --- | --- |
| Not Present | Not Present |

**Proceedings:**     **(IN CHAMBERS) Order Re: Defendant's Motion for Judgment as a Matter of Law [81]; Defendant's Request to Set Trial Date for the Equitable Issue of Patent Misuse [82]**

## I.     INTRODUCTION

On January 26, 2018, plaintiffs Vaporous Technologies, Inc. and Lubby Holdings LLC (collectively, "Plaintiffs") filed a complaint against defendants Henry Chung ("Defendant Chung"), Ming Chen, and Deepvapes, Inc. (collectively, "Defendants").[1] In the Complaint, Plaintiffs assert that Defendants infringed certain claims of the United States Patent No. 9,750,284 (the "'284 patent").

The case went to trial on May 7, 2019. Defendant Chung moved for judgment as a matter of law ("JMOL") during trial, and the Court reserved consideration of the motion. After a three-day trial, the jury found that the asserted claims of the '284 patent were not invalid. The jury also found that Defendants infringed the patent and awarded Plaintiffs $863,936.10 in damages. (*See* ECF No. 75.)

Defendant Chung then filed the instant Motion for JMOL ("JMOL Motion") and Request to Set Trial Date for the Equitable Issue of Patent Misuse ("Trial Request") (DEs 81, 82).

For the following reasons, the Court **DENIES** Defendant Chung's JMOL Motion and Trial Request.

---

[1] The Court dismissed defendant Ming Chen on May 8, 2019. (*See* ECF No. 67.) While the Complaint and the jury's verdict are asserted against Defendants collectively, the instant motions are filed by Defendant Chung individually. That said, Defendant Chung appears to make arguments on behalf of all Defendants.

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 2:18-cv-00715-RGK-JC | Date | June 17, 2019 |
|---|---|---|---|
| Title | *Lubby Holdings LLC, et al. v. Henry Chung, et al.* | | |

### II.  JUDICIAL STANDARDS

#### A.  Judgment as a Matter of Law

After one party has been fully heard during a jury trial, the court may grant JMOL against that party when "a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue." Fed. R. Civ. P. 50(a). The movant may also file a renewed motion for judgment as a matter of law after the entry of judgment. Fed. R. Civ. P. 50(b). The test is whether "the evidence, construed in the light most favorable to the nonmoving party, permits only one reasonable conclusion, and that conclusion is contrary to that of the jury." *White v. Ford Motor Co.*, 312 F.3d 998, 1010 (9th Cir. 2002). The court must not weigh the evidence or assess the witnesses' credibility. *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 135 (2000).

#### B.  Order for Separate Trial

"For convenience, to avoid prejudice, or to expedite and economize, the court may order a separate trial of one or more separate issues, claims, crossclaims, counterclaims, or third-party claims." Fed. R. Civ. P. 42(b).

### III.  DISCUSSION

#### C.  Motion for JMOL

Defendant Chung argues that the evidence does not support the jury's verdict. Specifically, he contends that there was insufficient evidence on three issues: (1) Plaintiffs' satisfaction of the marking requirement under 35 U.S.C. § 287; (2) the jury's reasonable royalty calculation and the use of pre-issuance sales data; and (3) Defendants' connection to the infringing products. After a review of the evidence presented at trial, the Court finds that there was sufficient evidence to support the jury's verdict at the close of trial. Accordingly, Defendant Chung's JMOL Motion is denied.

#### D.  Request to Set Trial Date

Defendant Chung also files a request to set a trial date on the equitable defense of patent misuse. But the Court did not order a separate trial, nor did the Court grant a motion to bifurcate the issues in this case. As a result, the Trial Request is denied.

**Appx0003**

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 2:18-cv-00715-RGK-JC | Date | June 17, 2019 |
|---|---|---|---|
| Title | *Lubby Holdings LLC, et al. v. Henry Chung, et al.* | | |

## IV.   CONCLUSION

For the foregoing reasons, the Court **DENIES** Defendant Chung's JMOL Motion and Trial Request.

**IT IS SO ORDERED.**

:

Initials of Preparer

Appx0004

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 2:18-cv-00715-RGK-JC | Date | July 12, 2019 |
|---|---|---|---|
| Title | *Lubby Holdings LLC, et al. v. Henry Chung, et al.* | | |

Present: The Honorable   R. GARY KLAUSNER, UNITED STATES DISTRICT JUDGE

| Sharon L. Williams | Not Reported | N/A |
|---|---|---|
| Deputy Clerk | Court Reporter / Recorder | Tape No. |

| Attorneys Present for Plaintiff: | Attorneys Present for Defendant: |
|---|---|
| Not Present | Not Present |

**Proceedings:**   (IN CHAMBERS) Order Re: Defendant's Rule 59(a) Motion for New Trial [100]; Defendant's Rule 59(e) Motion to Alter Judgment [101]

## I.   INTRODUCTION

On April 10, 2018, plaintiffs Vaporous Technologies, Inc. and Lubby Holdings LLC (collectively, "Plaintiffs") filed a First Amended Complaint against defendants Henry Chung ("Defendant Chung"), Ming Chen, and Deepvapes, Inc. (collectively, "Defendants").[1] In the Complaint, Plaintiffs assert that Defendants infringed certain claims of the United States Patent No. 9,750,284 (the "'284 patent").

The case went to trial on May 7, 2019. After a three-day trial, the jury found that the asserted claims of the '284 patent were not invalid. The jury also found that Defendants infringed the patent and awarded Plaintiffs $863,936.10 in damages. (*See* ECF No. 75.)

Defendant Chung has now filed a Rule 59(a) Motion for a New Trial ("Motion for New Trial") and a Rule 59(e) Motion to Alter Judgment ("Motion to Alter Judgment") (DEs 100, 101). For the following reasons, the Court **DENIES** Defendant Chung's Motion for New Trial and Motion to Alter Judgment.

---

[1] Plaintiffs' initial complaint was filed January 26, 2018. The Court dismissed defendant Ming Chen on May 8, 2019. (*See* ECF No. 67.)

**Appx0005**

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 2:18-cv-00715-RGK-JC | Date | July 12, 2019 |
|---|---|---|---|
| Title | *Lubby Holdings LLC, et al. v. Henry Chung, et al.* | | |

## II.   JUDICIAL STANDARDS

### A.   Motion for New Trial

Under Federal Rule of Civil Procedure ("Rule") 59, a court may grant a new trial to a party after a jury trial "for any reason for which a new trial has . . . been granted in an action at law in federal court." Fed. R. Civ. P. 59(a)(1)(A). Rule 59 does not specify the grounds on which a court may grant a new trial. Thus, the court is "bound by those grounds that have been historically recognized." *Zhang v. Am. Gem Seafoods, Inc.*, 339 F.3d 1020, 1035 (9th Cir. 2003). Those grounds include, but are not limited to, claims that the verdict is against the clear weight of the evidence or based on false evidence, that the damages are excessive, or that the trial was not fair to the moving party. *Montgomery Ward & Co. v. Duncan*, 311 U.S. 243, 251 (1940); *see also Tortu v. Las Vegas Metro. Police Dep't*, 556 F.3d 1075, 1087 (9th Cir. 2009).

### B.   Motion to Alter Judgment

Under Rule 59(e), a court may alter or amend judgment in the following circumstances: (1) the court is presented with newly discovered evidence; (2) the court committed clear error or made a decision that was manifestly unjust; or (3) there is an intervening change in controlling law. *Zimmerman v. City of Oakland*, 255 F.3d 734, 740 (9th Cir. 2001).

## III.   DISCUSSION

### A.   Motion for New Trial

Defendant asks the Court to vacate the judgment and set a new trial for two main reasons: (1) the verdict is against the weight of the evidence; and (2) "prejudicial misconducts" by opposing counsel at trial. (Def.'s Mot. 2, ECF No. 100-1.)

Specifically, Defendant Chung argues that there is no evidence that he sold any of the accused products. Moreover, he argues that there is no evidence to support a royalty based on sales of the whole product rather than on the value of the "anti-leak" mechanism independently. Finally, Defendant Chung avers that Plaintiffs' counsel made false statements to the Court, failed to disclose damages calculations, and misled the jury about infringement.

As the Court discussed in its June 17, 2019 Order re: Defendant's Motion for JMOL, there was sufficient evidence to support the jury's verdict at the close of trial—including the jury's computation of damages and the jury's finding that Defendant Chung sold the allegedly infringing products. (*See* ECF No. 105.) Similarly, the Court has heard and rejected Defendant Chung's numerous arguments that

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 2:18-cv-00715-RGK-JC | Date | July 12, 2019 |
|---|---|---|---|
| Title | *Lubby Holdings LLC, et al. v. Henry Chung, et al.* | | |

Plaintiff's counsel acted improperly or failed to make required disclosures. (*See, e.g.,* ECF Nos. 98, 63, 81.) After review of Defendant Chung's arguments and the evidence presented at trial, the Court finds insufficient grounds for a new trial under Rule 59(a).

### B.    Motion to Alter Judgment

Defendant Chung also moves to alter judgment under Rule 59(e) on the basis that the Court committed a clear error. Specifically, Defendant Chung contends that there was no evidence to show that Plaintiffs complied with the marking requirement of 35 U.S.C. § 287 ("§ 287"). As a result, the verdict was not supported by the evidence because the jury failed to limit Plaintiffs' damages calculation to begin on the day that Plaintiffs filed the action. Furthermore, Defendant Chung notes that Plaintiffs' counsel admitted that "he does not know this section 287 point of law." (Def.'s Mot. at 4.)

Luckily, the Court does. Under the § 287, "a patentee who makes or sells a patented article must mark his articles or notify infringers of his patent in order to recover damages." *Arctic Cat Inv. v. Bombardier Recreational*, 876 F.3d 1350, 1365 (Fed. Cir. 2017). An alleged infringer defendant may assert a "marking defense"—that the patentee plaintiff failed to comply with § 287, and thus the infringement claims fail. *See id.* But the defendant challenging the patentee's compliance with the marking statute bears the initial burden of production to "articulate the products it believes are unmarked 'patented articles' subject to § 287." *Id.* at 1368.

Here, Defendant failed to meet his initial burden. For example, Defendant does not identify unmarked products in his Answer, or in his Memorandum of Contentions of Fact and Law. (*See* ECF Nos. 23, 38.) As a result, the § 287 defense failed, and there is no basis to alter judgment under Rule 59(e).

## IV.    CONCLUSION

For the foregoing reasons, the Court **DENIES** Defendant Chung's Motion for New Trial and Motion to Alter Judgment.

**IT IS SO ORDERED.**

:

_____  _____

Initials of Preparer

_____

**Appx0007**



US009750284B2

## (12) United States Patent
### Rado

(10) **Patent No.:** **US 9,750,284 B2**
(45) **Date of Patent:** **Sep. 5, 2017**

(54) **PERSONAL VAPORIZER**

(71) Applicant: **Lubby Holdings, LLC**, Torrance, CA (US)

(72) Inventor: **J. Christian Rado**, Torrance, CA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **15/253,664**

(22) Filed: **Aug. 31, 2016**

(65) **Prior Publication Data**

US 2016/0366945 A1 Dec. 22, 2016

#### Related U.S. Application Data

(63) Continuation of application No. 14/985,389, filed on Dec. 30, 2015.

(60) Provisional application No. 62/098,197, filed on Dec. 30, 2014, provisional application No. 62/190,942, filed on Jul. 10, 2015.

(51) **Int. Cl.**
| | |
|---|---|
| *A24F 47/00* | (2006.01) |
| *F22B 1/28* | (2006.01) |
| *H05B 3/46* | (2006.01) |

(52) **U.S. Cl.**
CPC ............ *A24F 47/008* (2013.01); *F22B 1/284* (2013.01); *H05B 3/46* (2013.01); *H05B 2203/016* (2013.01); *H05B 2203/021* (2013.01)

(58) **Field of Classification Search**
CPC ....... B05B 9/002; B05B 11/0002; H05B 3/46; H05B 2203/016; H05B 2203/021; F22B 1/284; A61M 15/00; A61M 15/06; A24F 47/002; A24F 47/008
USPC .................. 239/13, 135–136; 137/511–512; 392/395, 396–398, 401, 403–404
See application file for complete search history.

(56) **References Cited**

#### U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 2,104,266 | A | 1/1938 | McCormick | |
| 3,200,819 | A | 8/1965 | Gilbert | |
| 3,725,990 | A * | 4/1973 | Petersen | B21D 22/26 |
| | | | | 137/539 |
| 4,947,874 | A | 8/1990 | Brooks et al. | |
| 5,353,834 | A * | 10/1994 | Schmitt | B60T 8/341 |
| | | | | 137/539.5 |
| 7,832,410 | B2 | 11/2010 | Hon | |
| 8,156,944 | B2 | 4/2012 | Han | |
| 8,186,209 | B2 * | 5/2012 | Wang | B60C 23/0408 |
| | | | | 340/442 |
| 8,365,742 | B2 | 2/2013 | Hon | |
| 8,375,957 | B2 | 2/2013 | Hon | |
| 8,393,331 | B2 | 3/2013 | Hon | |
| 8,794,231 | B2 | 8/2014 | Thorens et al. | |
| 8,915,254 | B2 | 12/2014 | Monsees et al. | |

(Continued)

#### OTHER PUBLICATIONS

Office Action from USPTO dated Feb. 24, 2017 for related U.S. Appl. No. 14/985,389.

*Primary Examiner* — Dana Ross
*Assistant Examiner* — James Sims, III
(74) *Attorney, Agent, or Firm* — Klein, O'Neill & Singh, LLP

(57) **ABSTRACT**

A personal vaporizer is configured to be usable both for non-liquid vaporizing media and for liquid vaporizing media. In some embodiments an electrically conductive check valve blocks vaporizing media from leaking out of air intake apertures during periods of nonuse, and delivers electric power to a heating element during use. In some embodiments, no wick structures extend into a fluid chamber, but a wick extends from a wick holder downstream of the fluid chamber to a vaporizing chamber.

**20 Claims, 20 Drawing Sheets**



**Appx0008**

(56)　　　**References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 9,220,303 B2 | 12/2015 | Li et al. | |
| 9,380,811 B2 | 7/2016 | Chung | |
| 9,491,974 B2 | 11/2016 | DePiano et al. | |
| 2013/0247910 A1 | 9/2013 | Postma | |
| 2013/0298905 A1 | 11/2013 | Levin et al. | |
| 2014/0041655 A1 | 2/2014 | Barron et al. | |
| 2015/0136158 A1* | 5/2015 | Stevens | A24F 47/008 |
| | | | 131/329 |

* cited by examiner



*FIG. 2*



*FIG. 1*



*FIG. 3*



FIG. 4



FIG. 5

FIG. 6



*FIG. 7*



*FIG. 8*



*FIG. 9*



*FIG. 10A*



*FIG. 10B*        *FIG. 10C*



*FIG. 11A*

*FIG. 11B*



*FIG. 12*

**Appx0019**



*FIG. 13*



*FIG. 14*



*FIG. 15*

Appx0022



*FIG. 16*



*FIG. 17*

Appx0024



FIG. 19

FIG. 18



*FIG. 20*



*FIG. 21A*



*FIG. 21B*

Appx0027



*FIG. 22A*



*FIG. 22B*



*FIG. 23*

# PERSONAL VAPORIZER

## CROSS-REFERENCE TO RELATED APPLICATION

This application is a continuation of U.S. application Ser. No. 14/985,389, which was filed Dec. 30, 2015, which application claims priority to U.S. Provisional Application Nos. 62/098,197, filed Dec. 30, 2014, and 62/190,942, filed Jul. 10, 2015. The entirety of each of the priority applications is hereby v-incorporated by reference.

## BACKGROUND

The present disclosure relates to the field of personal vaporizers

Personal vaporizers are handheld devices that vaporize a vaporizing medium such as a liquid solution or a wax. The vapor is then inhaled by its user. A typical personal vaporizer has an atomizer having a heating element that selectively heats the medium in order to produce the vapor. A rechargeable battery is also typically employed for powering the atomizer.

Personal vaporizers for vaporizing liquid media typically include a fluid chamber that holds the liquid, and a wick that communicates liquid from the chamber to the atomizer. The liquid solution typically includes chemicals such as one or more of propylene glycol, glycerin, polyethylene glycol 400, and an alcohol. Extracted flavorings can also be included in the fluid. Electronic cigarettes are a type of personal vaporizer, and use a liquid solution that includes tobacco-derived nicotine. Personal vaporizers also can be used with liquid solutions that include one or more of various essential oils, including cannabis oil.

Personal vaporizers for vaporizing wax media typically include a bowl- or cup-shaped structure at the atomizer into which wax media can be placed. Such personal vaporizers typically do not include a fluid chamber, but instead typically include a detachable mouthpiece that can be removed to provide access to the atomizer cup.

Personal vaporizers typically include an air path so that vaporized media can be mixed with air and delivered to the user. Thus, air holes are formed in and through various structures of each vaporizer. However, in certain conditions, such as during periods of nonuse, vaporizing media may leak from the air holes.

Further, for some types of personal vaporizers it is desired to keep the profile, such as the cross-sectional area, of the vaporizer as small as possible. However, it is also desired to maximize vapor delivery. Maximizing such vapor delivery entails maximizing the lumen size of a vapor delivery tube from a vaporization chamber to the mouthpiece, while simultaneously maximizing the cross-sectional area of the wick(s) that deliver vaporizing liquid from a tank to the vaporizing chamber. The considerations of reducing device profile while simultaneously maximizing the cross-sectional area dedicated to both the vapor delivery tube and the wick(s) are often competing.

## SUMMARY

There is a need in the art for a personal vaporizer that can simultaneously accommodate both liquid and wax media. There is a further need in the art for a personal vaporizer that will resist leaking, particularly during periods of nonuse. There is a still further need in the art for a personal vaporizer that can maximize both liquid delivery to the vaporizing chamber and vapor delivery from the vaporizing chamber to the mouthpiece while minimizing the cross-sectional profile of the device.

In accordance with one embodiment, the present specification provides a personal vaporizer, comprising: an atomizer module comprising a bowl and a coil arranged in or adjacent the bowl, the bowl configured to accept a wax having an essential oil; a battery assembly, the atomizer module connectable to the battery assembly so that actuation of the battery delivers electrical energy to the coil, causing the coil to heat and vaporize a wax that may be in the bowl; and a tank module selectively attachable to the atomizer module so that the atomizer module is disposed between the tank module and the battery assembly, the tank module comprising a fluid tank configured to contain a vaporizing liquid therewithin, and to deliver a portion of the vaporizing liquid to a vaporizing chamber adjacent the coil; wherein a wax placed in the atomizer module bowl and a vaporizing liquid from the fluid module can be simultaneously vaporized by the coil so as to form a combined vapor by simultaneously vaporizing both the wax and the vaporizing liquid.

In accordance with another embodiment, the present specification provides a personal vaporizer, comprising: a tube comprising a fluid chamber and a vapor passage extending through the fluid chamber; an atomizer module comprising a bowl having an upper edge, a coil being arranged in or adjacent the bowl, the bowl being configured to accept a vaporizing solution inside the tank; a check valve comprising an insulator housing, a conductive shell inside the insulator housing, and a sealing mechanism inside the conductive shell, the sealing mechanism providing a seal inside the conductive shell; and a battery assembly, the atomizer module connectable to the battery assembly through the check valve so that actuation of the battery delivers electrical energy to the coil, causing the coil to heat and vaporize the vaporizing solution.

Some embodiments additionally comprise one or more slots formed through a side wall of the bowl.

In additional embodiments, the sealing mechanism comprises a ball and a spring.

In further embodiments, the bowl has a first wire hole and a second wire hole extending through a bottom wall of the bowl and a second channel extending transversely from the second wire hole. In some such embodiments, the coil is a heating element having a first connection and a second connection, the first connection extending through the first wire hole and contacting the conductive shell, and the second connection extending through the second wire hole and the channel and spaced away from the conductive shell.

In accordance with another embodiment, the present specification provides a personal vaporizer, comprising: an atomizer module comprising a bowl and a heat element arranged in or adjacent the bowl, a vaporizing chamber defined in the bowl adjacent the heat element; a tank module selectively attachable to the atomizer module, the tank module comprising a fluid tank configured to contain a vaporizing liquid therewithin, the fluid tank comprising a bottom wall having at least one fluid delivery hole extending therethrough; a wick holder supporting a wick and defining a fluid receiver, the fluid receiver in communication with the at least one fluid delivery hole, the wick configured to communicate vaporizing fluid from the fluid receiver to the vaporizing chamber; and a vapor tube extending through the fluid chamber and defining a vapor passage that is separated from the fluid in the fluid chamber; wherein vapor from the vaporizing chamber is directed through the vapor passage.

Appx0030

In some embodiments, a cross-sectional area of the wick is greater than a cross-sectional area of the vapor passage.

In further embodiments, a combined cross-sectional area of all of the at least one fluid delivery holes is less than a cross-sectional area of the vapor passage.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is a perspective view of a battery assembly for use in some embodiments;

FIG. 2 is a side view of the battery assembly of FIG. 1;

FIG. 3 is a side view of a vaporizing structure and mouthpiece in accordance with one embodiment;

FIG. 4 is a side view of a personal vaporizer comprising the vaporizing structure of FIG. 3 attached to the battery assembly of FIG. 1;

FIG. 5 is a side view of an embodiment of a personal vaporizer having a modular construction;

FIG. 6 is an exploded view of the personal vaporizer of FIG. 5;

FIG. 7 is a perspective view of a vaporizing structure in accordance with another embodiment;

FIG. 8 is a cross-sectional view taken along lines 8-8 of FIG. 7;

FIG. 9 is a close-up view of the atomizer module of the structure of FIG. 8, depicting a wax media disposed in an atomizer cup;

FIG. 10A is a perspective view of an atomizer cup according to one embodiment;

FIG. 10B is a bottom view of the atomizer cup of FIG. 10A;

FIG. 10C is a top view of the atomizer cup of FIG. 10A;

FIG. 11A is a perspective view of a check valve according to one embodiment;

FIG. 11B is an exploded view of the check valve of FIG. 11A;

FIG. 12 is a cross-sectional view taken along line 12-12 of FIG. 7;

FIG. 13 is a side view of another embodiment of a personal vaporizer;

FIG. 14 is an exploded view of mouthpiece, tank and atomizer modules of the personal vaporizer of FIG. 13;

FIG. 15 is a cross-sectional view taken along lines 15-15 of FIG. 14, except that the tank and atomizer modules are shown connected to one another;

FIG. 16 is an exploded view of another embodiment of a check valve;

FIG. 17 is a close up view of an atomizer module portion of the structure depicted in FIG. 15;

FIG. 18 is a perspective view of another embodiment of an atomizer cup;

FIG. 19 is a partially cutaway perspective view of the atomizer of FIG. 14;

FIG. 20 is an exploded view of the tank module of FIG. 14;

FIG. 21A is a perspective view of a transfer member of the tank module of FIG. 14;

FIG. 21B is a cross-sectional view taken along line 21B-21B of FIG. 21A;

FIG. 22A is a perspective view of an embodiment of a wick holder;

FIG. 22B is a cross-sectional view taken along line 22B-22B of FIG. 22A; and

FIG. 23 is an exploded view of the mouthpiece embodiment of FIG. 14.

## DESCRIPTION

With initial reference to FIGS. 1 and 2, an embodiment of a battery assembly 20, or battery pack, for a personal vaporizer is illustrated. Certain features of the illustrated battery assembly 20 are typical of battery assemblies currently available on the market. For example, the battery assembly 20 may include a rechargeable battery, such as a lithium-ion battery, enclosed within a battery casing 22. The battery casing 22 may include an elongated body 24 that extends from a base or distal end 26 to a top or proximal end 28. An electronic controller may also be included within the casing 22 to control voltage, current, timing and the like. A button 29 may be provided for selectively actuating electricity delivery from the battery 20 to the atomizer. In some embodiments, the button 29 can include a light that indicates when power is being delivered.

With continued reference to FIGS. 1 and 2, at and adjacent the proximal end 28 of the battery assembly 20, the battery casing 22 defines a mount boss 30. The mount boss 30 includes connecting structures for connecting vaporizing structures, such as atomizers and fluid chambers, to the battery. The elongated body 24 is disposed distally of the mount boss 30. In some embodiments, the body 24 may include a decorative coating or sleeve that is configured to enhance the look of the vaporizer. For example, the body 24 may come in many different colors and/or have one or more unique and aesthetically pleasing surface treatments. Some embodiments may include a decorative sleeve that is selectively removable.

In the illustrated embodiment, the battery assembly mount boss 30 comprises an externally threaded portion 32 adjacent the decorative body 24. Preferably, the externally threaded portion 32 has a diameter somewhat smaller than a diameter of the decorative body 24. An extension 34 extends in a proximal direction from the externally threaded portion 32, preferably terminating in a top or proximal surface 36. As best shown in FIG. 2, the extension 34 preferably is tubular, defining a mount cavity 40 therewithin and having internal threads 42. Preferably, a diameter of the tubular extension 34 is less than the diameter of the externally threaded portion 32. A battery contact 44 is disposed within the tubular extension 34 at the base of the mount cavity 40. As shown, preferably a plurality of air intake slots 46 are formed in the extension at and adjacent the top surface.

As noted above, one or more vaporizing structures are attachable to the battery mount boss 30. Such vaporizing structures typically include an atomizer and a fluid chamber, which can be provided as separate pieces or combined as a single structure. The vaporizing structures can be of various styles, sizes, and configurations. For example, in some embodiments, the atomizer and fluid chamber are provided as one prefabricated cartridge. In some embodiments, such cartridges are disposable. In some embodiments, the fluid chamber is refillable so that the cartridges are reusable. In other embodiments, the atomizer and fluid chamber are separately formed and selectively attachable and detachable from one another.

Vaporizing structures can also be attached to the battery assembly 20 in various ways. In some embodiments, an atomizer can threadingly engage the external threads 32 of the battery mount boss 30. In other embodiments, an atomizer may threadingly engage the internal threads 42 of the mount cavity extension 40. Preferably, a pin or other elongated contact extends into the mount cavity 40 to engage the battery contact 44 so as to communicate power from the battery 20 to the atomizer. Additional embodiments can employ non-threaded connection structures such as detents, friction fits, J-locks, and the like.

With reference next to FIG. 3, one embodiment of a cartridge 50 is illustrated. Such a cartridge 50 can be

obtained from PenVape, and is sold under the trademark Indica. The illustrated cartridge **50** comprises an elongated cartridge body **52** that extends from a distal or battery end **54** to a top or proximal end **56**. The body **52** includes a fluid chamber **60** configured to hold a vaporizing medium such as a liquid solution comprising essential oils. The illustrated chamber **60** is made of a polymer material that is preferably at least partially transparent so that a user can see the level of essential oils remaining within the fluid chamber **60**. An atomizer **70** is provided at and adjacent the distal end **54**, which atomizer **70** is operatively connected to the fluid chamber **60**. In the illustrated embodiment, the atomizer **70** comprises a coil (not shown) constructed of a durable, electrically-conductive material, such as titanium or another metal, which coil generates heat when subjected to an electric current. A vaporization chamber is defined between the fluid chamber **60** and the atomizer coil. In some embodiments, a wick communicates liquid from the fluid chamber **60** to the vaporization chamber. Preferably, an elongated vapor passage **72** is formed adjacent the fluid chamber **60** and extends from the vaporization chamber to a vapor outlet **74** that is formed proximal of the fluid chamber **60**.

With continued reference to FIG. **3**, the illustrated atomizer **70** includes a battery connector pin **76** extending distally from a terminal surface **78** of the atomizer **70**. The illustrated battery connector pin **76** is externally threaded. Air intake holes (not shown) are formed through the terminal surface **78**. During use, air is drawn through the air intake holes and through the atomizer **70** into the vaporization chamber, where it is mixed with atomized fluid to form a vapor. The vapor exits the vaporization chamber through the vapor channel **72** and is exhausted through the vapor outlet **74**.

The proximal end **56** of the cartridge **50** includes a mouthpiece engagement portion **80** that has a reduced diameter relative to a diameter of the elongated body **52** in the chamber **60** and/or atomizer **70** portions. In the illustrated embodiment, the vapor outlet **74** opens within this mouthpiece engagement portion **80**. In the illustrated embodiment, a recessed portion **82** of the outer wall in the mouthpiece engagement portion **80** is provided, and the vapor outlet **74** is formed adjacent the recessed portion **82**. As such, the vapor outlet **74** is directly aligned with the flow path of vapor moving through the vapor channel **72**.

Continuing with reference to FIG. **3**, a mouthpiece seat **84** is defined on the cartridge **50**. At the mouthpiece seat **84**, the diameter of the cartridge **50** abruptly changes from that of the chamber **60** to that of the mouthpiece engagement portion **80**. A mouthpiece **90** can be placed atop the cartridge **50**. The mouthpiece **90** preferably includes an elongated tubular body **92** defining a lumen, and extends from a base **94** to an outlet end **96**. In the illustrated embodiment, the base **94** of the mouthpiece **90** fits over the mouthpiece engagement portion **80** of the cartridge **50**, and the base **94** of the mouthpiece **90** engages and rests upon the mouthpiece seat **84** of the cartridge **50**.

In the illustrated embodiment, a removable fill cap **98** is disposed at the proximal/mouthpiece end **56** of the cartridge **50**. The removable fill cap **90** can be removed so as to provide access to the fluid chamber **50** so that liquid or flavorings can be selectively added to the chamber.

With additional reference to FIG. **4**, the cartridge **50** can be mounted to a typical battery assembly **20** so that the cartridge **50** functions as the vaporizing structure for the illustrated embodiment of a personal vaporizer. In the illustrated embodiment, the externally-threaded battery connector pin **76** is advanced into the battery mount cavity **40** and threaded with the internal threads **42** of the battery mount

boss extension **34**. The cartridge **50** is threadingly advanced so that the battery connector pin **76** engages the battery connector **44** of the battery assembly **20**, and the terminal surface **78** of the atomizer **70** engages and sits upon the top surface **36** of the battery mount boss **30**. The air intake slots **46** of the mount boss **30** enable the cartridge's air intake holes to communicate with the surrounding atmosphere.

Additional details and structure related to the cartridge are discussed in Applicant's copending application Ser. No. 14/927,355, entitled CARTRIDGE COVER FOR PERSONAL VAPORIZER, filed Oct. 29, 2015, the entirety of which is incorporated by reference herein.

In use, the user inserts the mouthpiece **90** into his mouth, presses the battery button **29**, and draws a breath. Pressing the button **29** triggers the atomizer **70** to heat liquid provided to the vaporization chamber from the fluid chamber **60**, thereby vaporizing the liquid in the vaporizing chamber. By drawing a breath, or taking a pull, through the mouthpiece **90**, the user pulls air through the air intake slots **46** of the battery mount boss extension **34** into the mount cavity **40** and through the air intake holes of the cartridge atomizer **70**. The air further flows into the vaporization chamber and is mixed with the vaporized liquid, forming a vapor. The vapor then flows through the vapor channel **72** and through the vapor outlet **74** into the mouthpiece **90**, which directs it into the user's mouth and lungs.

With reference next to FIGS. **5** and **6**, one embodiment of a personal vaporizer **99** comprises an atomizer module **100** and a mouthpiece module **102** that are threadingly attachable to one another. As shown, the atomizer module **100** has a distal end **104** that is threadingly attachable to the mount boss **30** of the battery **20** so that, as in the embodiment discussed above, electric power can be provided to the atomizer. A distal end **106** of the mouthpiece module **102** is threadingly attachable to and detachable from a proximal end **108** of the atomizer module **100**. The mouthpiece module **102** preferably is tubular, delivering vapor generated in the atomizer module **100** to and through a mouthpiece **110** at its proximal end **112** for delivery to the user.

In the illustrated embodiment, a user gains access to the atomizer by detaching the mouthpiece module **102**. The user may then deliver vaporizing media, such as a wax, through the open proximal end **108** of the atomizer module **100** and into a bowl-shaped structure (not shown). The user preferably replaces the mouthpiece module **102** in order to use the personal vaporizer **99**. A vaporizing chamber is defined in the atomizer above the bowl and, in some embodiments, in at least part of the mouthpiece module. Notably, in this embodiment, there is no tank for storing a liquid vaporizing medium. As such, the illustrated embodiment is configured for use vaporizing non-liquid (i.e., wax) vaporizing media that is manually delivered to the vaporizing chamber by the user, in contrast with, for example, liquid media that can be automatically delivered from a storage structure such as a tank to the vaporizing chamber (such as via a wick).

With reference next to FIG. **7**, an embodiment of a hybrid vaporizing structure **120** is shown. The illustrated hybrid vaporizing structure can be attached to a battery assembly **20** so as to be used as a personal vaporizer. In this embodiment, the vaporizing structure **120** comprises a tank module **130** and an atomizer module **140** that are selectively detachable from one another. FIG. **8** is a cross-sectional view of the vaporizing structure **120** of FIG. **7**. As will be discussed in more detail below, the hybrid vaporizing structure is usable with liquid vaporizing media as well as non-liquid (i.e., wax) vaporizing media, both separately and simultaneously.

7

With additional reference to FIG. 9, the atomizer module 140 comprises an atomizer 142 and a check valve 144 enclosed within an atomizer module housing 146. The atomizer housing 146 comprises a proximal end 148 that preferably is threaded so as to be selectively attachable to the tank module 130. A pin 150 at a distal end 152 of the atomizer housing 146 is configured to attach to the battery mount boss 30. In the illustrated embodiment the pin 150 is configured to attach to the internal threads 42 in the mount cavity 40 of the battery mount boss 30. Air passages 154 are formed through the pin. Thus, when the atomizer module 146 is attached to the battery assembly 20, air can flow through the battery slots 46 and the air passages 154 and into the atomizer module 140.

With continued reference to FIGS. 8 and 9, and additional reference to FIGS. 10A-C, the atomizer 142 preferably is a skillet-style atomizer comprising a cylindrical bowl- or cup-shaped container, or bowl, defining bottom and side walls 162, 164 and being open at the top. Preferably, the bowl 160 is an insulator, and can be made of an insulator material such as a ceramic. A heating element 166 is contained within the bowl 160. In the illustrated embodiment the heating element 166 comprises a pair of wire coils 170 wrapped about transversely-extending insulating cores 172, or wicks. The wire coils 160 can be constructed of a durable, electrically-conductive material such as a metal (such as titanium, kanthal, or nichrome) that provides durability and electrical conduction to selectively power the atomizer 142. A vaporizing chamber 180 is defined within the bowl 160, above and around the coils 170. When the vaporizing structure 120 is attached to a battery assembly 20, the coils 170 are electrically connected to the battery and, when energized, vaporizing media at or adjacent the coils will be atomized/vaporized.

In some embodiments, a single wire can be used to create both of the coils. In additional embodiments, each coil is formed by its own wire. Of course, additional embodiments may employ only one, or more than two, coils. Also, it is to be understood that other embodiments may employ other types of heating element structures, including electricity-based and/or gas-based structures.

A raised foundation 182 extends upwardly from the bottom wall 162, and the coils 170 are positioned atop the raised foundation 182. Air slots 184 extend through the raised foundation 182. In the illustrated embodiment two air slots 184 are formed, and each air slot aligns with a respective one of the coils so as to deliver air flow directly to the respective coil.

First and second wire holes 186, 188 extend through the bottom wall 162 of the bowl 160. A channel 196 is formed on the distal surface of the bottom wall 162 of the bowl 160, and extends from the second wire hole 188 to a side of the bowl 160. A first end portion 192 of the coil wire extends through the first wire hole 186, and a second end portion 194 of the coil wire extends through the second wire hole 188 and through the channel 190. As will be discussed below, electrical energy from the battery 20 can be applied across the first and second wire portions 192, 194 to energize the coil. As shown, the wire holes 186, 188 are at opposite ends of the raised foundation 182. It is to be understood, however, that the wire holes can be located anywhere along the bottom wall or, in other embodiments, side wall of the bowl.

With continued reference specifically to FIG. 9, the illustrated embodiment is particularly suited for non-liquid vaporizing media such as a wax 200, which is depicted in the vaporizing chamber in FIG. 9. In order to place such wax 200 in the vaporizing chamber, a user can remove the tank

8

module 130 from the atomizer module 140 and then deposit the wax 200 through the proximal opening and into the bowl 160.

With continued reference to FIG. 9, the tank module 130 comprises a tank top wall 202, tank bottom wall 204, and cylindrical outer wall 206 that cooperate to define a fluid chamber 210, or tank. The fluid chamber 210 is configured to hold a liquid solution such as a vaporizing solution comprising essential oils. A seal 212 adjacent the tank bottom wall 204 is configured to sealingly engage the outer wall 206. The outer wall in the illustrated embodiment can be made of a glass or polymer material that preferably is at least partially transparent so that a user can see the level of essential oil-based vaporization liquid remaining within the fluid chamber.

A vapor tube 220 extends generally axially through the fluid chamber 210, extending through the tank top wall, through the fluid chamber 210 and through the tank bottom wall 204. As such, a proximal portion 222 of the vapor tube 220 extends proximally from the tank top wall 202 and a distal portion 224 of the vapor tube 220 extends distally from the tank bottom wall 204. Preferably, fluid in the fluid chamber 210 is isolated from the vapor tube 220.

The tank 210 can have an opening 226 through the top wall 202 through which vaporizing solution can be added to the fluid chamber. A tank cap 228 can be removably placed atop the top wall of the tank. Preferably, a plug 229 extending from the tank cap 228 can be fit into and through the tank opening 226 so as to removably seal the opening. The cap 228 and plug 229 can be made of an elastomeric material such as silicone rubber.

With continued reference to FIGS. 9 and 12, one or more fluid delivery tubes 230 (two in the illustrated embodiment) are formed through the tank bottom wall 204 to communicate the fluid chamber 210 with the vaporizing chamber 180. A wick 240 (shown in only one of the fluid delivery tubes) can be disposed in each of the fluid delivery tubes 230. A proximal end 242 of the wick 240 extends into the fluid chamber 210 and a distal end 244 of the wick 240 extends into the vaporizing chamber 180, terminating at or adjacent the heating element 166. The wicks 240 can deliver a controlled amount of vaporizing solution from the tank to the atomizer through capillary action, gravity, pressure differential between the tank and the vaporizing chamber, and other forces. In the illustrated embodiment, wick supports 246 comprise elongated portions of the fluid delivery tubes 230 that accommodate and support the wicks.

The vapor tube 220 has a vapor passage 250 or lumen that extends from the proximal portion 222 of the vapor tube 220 to the distal portion 224 of the vapor tube 220 and does not communicate with the fluid chamber 210. As shown in FIGS. 8 and 12, the distal portion 224 of the vapor tube 220 extends into the atomizer module 140 so as to be within and/or in communication with the vaporizing chamber 180. An inlet opening 252 is provided in the distal portion 222 so that the vapor passage 250 can receive vapor generated in the vaporizing chamber 180. In the illustrated embodiment, two inlet openings 252 are provided through a side wall of the vapor tube 220. An outlet of the vapor passage is defined at the proximal portion of the vapor passage. In the illustrated embodiment, the outlet 254 is aligned with an axis of the vapor passage 250. If desired, a mouthpiece can be connected to the proximal portion 224 of the vapor tube 220 so that the vapor passage 250 will open into the mouthpiece.

In some examples, the proximal portion 222 can form a mouthpiece for a user to pull vapor from the vaporizing chamber through the vapor tube. In other examples, the

proximal portion can be externally threaded and/or provided with a detent structure so that a separately-formed mouthpiece can be releasably attached. When a mouthpiece is attached to the proximal portion, the elastomeric cap can be squeezed against the tank top wall to provide an additional seal for the tank opening. Also, the cap can be elastically compressible, behaving as a lock washer for the mouthpiece.

With continued reference to FIGS. 7-10 and 12, in use, a user can place a vaporizing wax media 200 in the bowl 160 of the atomizer module 140 and then attach the tank module 130, which can be filled with a vaporizing liquid, to the atomizer module 140. When the battery button is actuated, a portion of the wax 200 in the bowl 160 is vaporized. Simultaneously, a portion of the vaporizing solution that is delivered to the heating element 160 via the wick 240 is also vaporized. As the user draws a breath through the mouthpiece, the vaporized wax and solution is combined with air to form a vapor that is delivered from the vaporizing chamber 180 through the vapor tube 220 and mouthpiece and into the user's lungs. As such, the present device enables a user to simultaneously vaporize a non-liquid vaporizing media (i.e., the wax) and a liquid vaporizing solution, and to mix the vapors and deliver the combination vapor to the user.

Waxes tend to provide a vapor having a relatively high concentration of the essential oils entrained within the wax, and thus provide a highly concentrated vapor. However, a bowl of wax tends to be fully vaporized after just a few pulls. Liquid solutions tend to provide a vapor having a lower concentration of essential oils, and thus provides a less concentrated vapor. However, a tank can store a relatively large volume of solution, and thus a tank of solution tends to last a relatively long time.

By enabling simultaneous vaporization of both wax and liquid solution, and by combining the vapors and delivering the combined vapors to the user, the present embodiment enables a higher volume of essential oils per user pull than has been previously available. Additionally, various blends of waxes and liquid solutions can now easily be enjoyed.

Still further, due to the modular nature of the device, tank modules and atomizer modules can easily be detached, switched out and reattached, enabling the user to easily and quickly switch between flavors and liquid solution types. For example, a user may have several tank modules, each of which is filled with a different flavor or type of liquid solution. The user can quickly and easily switch between these tank modules as desired. Also, the tank modules do not need to have their own atomizer; thus, individual tank modules can be relatively inexpensive and easy to maintain.

As discussed above, often waxes only last a limited number of pulls before the bowl of wax is exhausted. However, liquid solutions tend to last much longer due to the ability to use a storage tank. Thus, the current configuration allows a user to have several concentrated pulls in which both wax and liquid solution are vaporized simultaneously. However, after the wax is exhausted, the user may continue to use the device without further adjustment for pulls that provide only vaporized liquid from the tank.

With continued reference to FIGS. 8-10 and 12, and additional reference to FIGS. 11A and B, one embodiment of the conductive check valve 144 includes a housing 258, a valve body 260, and a sealing structure 262. The valve body 260 is made up of a pin 264 and cap 266, each of which preferably is made of an electronically conductive material such as a metal. In the illustrated embodiment, the conductive pin 262 comprises a hollow proximal cylinder 270 that necks down into a smaller diameter hollow distal cylinder

272. A valve seat 274 is defined where the proximal cylinder 270 necks down into the distal cylinder 272. The conductive cap 266 covers the open end of the proximal cylinder 270 so that the sealing structure 262 is captured between the conductive pin 264 and the conductive cap 266.

In the illustrated embodiment, the conductive cap 266 has an internally threaded side wall 276 extending distally and engaging with external threads formed on the proximal cylinder 270 of the pin 264. In some examples, the conductive cap 266 can be fixed to the proximal cylinder 270 by welding, interference or press fit, snap fit, adhesive, or other attachment means.

The housing 258 also comprises a hollow proximal cylinder 280 that necks down into a smaller-diameter hollow distal cylinder 282. In the illustrated embodiment, the housing 258 is configured to complementarily approximate the shape of the assembled pin 264 and cap 266 that define the valve body 260. As such, the valve body 260 fits snugly within the housing 258. Preferably, the housing 258 is formed of an electrically insulative material such as Delrin.

As shown in FIGS. 8, 9 and 12, the check valve 144 is disposed immediately distal of the atomizer 142 within the atomizer module housing 146. The check valve 144 is placed within the atomizer module housing 146 so that the insulative check valve housing 258 engages the atomizer module housing 146 and electrically insulates the valve body 260 relative to the atomizer module housing 146. A distal end 284 of the conductive pin 264 of the valve body 260 extends distally a short distance from the distal pin 150 of the atomizer module housing 146, and thus is configured to engage the contact 44, which is a first pole of the battery connector, when the atomizer module 140 is connected to the battery assembly 20. The atomizer module housing 146 preferably is electrically conductive so that the pin 150, when engaged with the internal threads 42 of the battery mount cavity 40, engages a second pole of the battery connector.

As discussed above, a first portion 192 of the heating coil wire extends through the first wire hole 186 of the atomizer bowl 160. As best shown in FIG. 12, the first wire portion 192 is sandwiched between the conductive check valve cap and the atomizer. As such, the first wire portion is electrically connected to the conductive check valve 144, which in turn is electrically connected to the first pole of the battery. The second wire portion 194 extends through the second wire hole 188 and into the channel 190. Preferably, the second wire portion 194 extends through and out of the channel 190 so that it is sandwiched between the bowl 160 and the conductive atomizer module housing 146, which is electrically connected to the second pole of the battery. Preferably, the channel 190 has a depth greater than a thickness of the second wire portion 194. As such, the channel 190 enables the second wire portion 194 to be spaced from the conductive portions of the check valve (such as the cap 266 and pin 264), and no electrical connection is made between the second wire portion 194 and the check valve 144.

An electric circuit is defined from the first pole of the battery through the electrically conductive check valve 144 to the first wire portion 192, through the coil 170 to the second wire portion 194, and from the second wire portion through the atomizer module housing 146 to the second pole of the battery. When the circuit is energized, electric current is applied across the heating element coil, which quickly generates heat to vaporize media within the vaporizing chamber.

It is to be understood that, in other embodiments, an insulator can be applied in the channel to electrically insulate the second connection from the valve body. Also, other structure can be employed. For example, the second wire hole may be formed through a side wall of the bowl so that the second wire portion never approaches the conductive valve body.

In the illustrated embodiment, the atomizer module housing 146 is made of a conductive material. In additional embodiments, portions of the atomizer module housing can be made of non-conductive materials, but a conductive layer or portion can be provided that communicates with the second pole of the battery, and which is positioned to be attachable to the second wire portion.

As noted above, the battery connector has a plurality of air intake slots 46 so that air can enter the battery mount cavity 40. As best shown in FIG. 8, the atomizer housing distal pin 150 has air passages 154 that communicate with air passages 286 formed through the insulative check valve housing, and with air passages 288 formed through the check valve pin 264 to enable air to flow from within the battery mount cavity 40 into the hollow valve body 260. The conductive cap 266 of the valve body 260 has a bore 290 extending therethrough. The bore 290 is aligned with the air slots 184 of the atomizer bowl 160 so as to communicate air within the hollow valve body 260 to the vaporizing chamber 180.

Continuing with particular reference to FIGS. 8, 9 and 12, the sealing structure 262 in the illustrated embodiment comprises a ball 292 and a compression spring 294. One end of the compression spring 294 abuts against or is attached to the conductive cap 266, and a second end of the spring 294 urges the ball 292 against the valve seat 274 so as to form a seal. The seal blocks vaporizing media from the vaporizing chamber, wick(s) or tank from leaking into the distal cylinder 272 of the check valve pin 264. This can be especially useful when the personal vaporizer is not in use, as otherwise vaporizing fluid from the tank 210 may slowly flow through the wick(s) and into the vaporizing chamber, through the air slots into the hollow pin, and further through the air passages 288, 286, 154 and out of the personal vaporizer. On warm days, wax within the vaporizing chamber may similarly leak out of the device if left unchecked. When the ball 292 is engaged with the valve seat 274, vaporizing media is blocked from leaking from the device by way of the air passages.

During use, a user drawing a breath generates sufficient suction force or decrease in pressure to dislodge the ball 292 from the valve seat 274. As the user energizes the heating element, and draws a breath, air flow will push the ball 292 out of engagement with the valve seat 274. Also, vaporizing media that may have accumulated in the vaporizing chamber will be vaporized, and fluid that may have accumulated in the valve body 260 proximal of the ball 292 will be drawn into the atomizer bowl 160 and vaporized. When suction force from the user is removed, the spring 294 automatically urges the ball 292 back into engagement with the seat 274.

To use the vaporizing structure 120, the distal tip 150 preferably is connected to the battery mount, and preferably a mouthpiece is attached to the proximal portion 222. The user loads the device with vaporizing media by ensuring the fluid chamber 210 comprises vaporizing liquid and/or detaching the tank module 130 from the atomizer module 140, placing a wax W in the vaporizing chamber 180, and then replacing the tank module 130. The user then presses the battery button 29 and draws a breath through the mouthpiece. The heat element coils 170 quickly heats up, vaporizing wax W within the vaporizing chamber 180 and/or

liquid L delivered by the wick 240. Atmospheric air A is drawn through the battery air intake slots 46 and into the hollow pin 264 through the air passages 154, 286, 288. The ball 292 is dislodged from the seat 274 and air A flows around the ball 292 and through bore 290 and air slots 184, past the coils 170 and into the vaporizing chamber 180, where it is mixed with atomized vaporizing media, becoming a vapor V. the vapor V flows proximally through the inlet opening 252 and into the vapor passage 250, from which it is delivered via the mouthpiece to the user.

In some embodiments, a downstream one-way valve can be incorporated inside the vapor tube in order to prevent vaporizing media from leaking out of the vapor tube during periods of nonuse. The downstream one-way valve can be nonconductive and can have any of various valve structures.

As discussed above, the conductive check valve 144 prevents leaks of both liquid and non-liquid vaporizing media. Thus, it should be understood that a conductive check valve can be employed in embodiments of personal vaporizers configured for use solely with only one of liquid and non-liquid vaporizing media as well as embodiments configured for use with both liquid and non-liquid vaporizing media.

Although the illustrated embodiment employs a ball-and-spring type valve, it is to be understood that other embodiments can employ check valves having any of various types of check valve structure. Preferably, however, the check valve will employ a housing or other conductive pathway through which electrical energy may pass as it is supplied to the atomizer. Although the illustrated embodiment discloses a particular circuit that extends through the valve body and through the conductive cover, which is insulated relative to the valve body, it is to be understood that other embodiments can employ different specific circuit pathways, which pathways preferably employ structure of the device to supply electric current.

With reference next to FIG. 13, another embodiment of a hybrid personal vaporizer 300 is shown. The illustrated hybrid personal vaporizer 300 comprises an atomizer module 310 that is releasably attachable to a battery assembly 20. A tank module 320 is releasably connectable to the atomizer module 310, and a mouthpiece module 330 is releasably attachable to the tank module 320. As will be discussed below, the structure of the illustrated hybrid personal vaporizer 300 is somewhat different than the structure of embodiments described above. To be sure, the illustrated hybrid personal vaporizer employs some features not discussed in previous embodiments. However, certain of the structures operate on principles similar to features described in conjunction with the above embodiments.

With additional reference to FIGS. 14-17, the atomizer, tank and mouthpiece modules of the embodiment of FIG. 13 are shown in more detail and in cross-section. As shown, the atomizer module comprises an atomizer 332 and a check valve enclosed within an atomizer module housing 336. The atomizer module housing 336 comprises a proximal end 338 that preferably is threaded so as to be selectively attachable to the tank module 320. An internal transverse wall 340 is disposed between the proximal end 338 and a distal end 342 of the atomizer module housing 336. Air slots 344 are formed at the distal end 342. A distal cavity 346 is defined within the atomizer module housing 336 between the distal end and the transverse wall 340. A proximal cavity 348 is defined between the proximal end and the transverse wall 340. As shown, the conductive check valve 334 is supported by the transverse wall 340. The atomizer 332 is disposed in the proximal cavity 348.

13

With particular reference to FIGS. **16** and **17**, in the illustrated embodiment, the check valve **334** comprises a housing **352**, an insulator **352**, a pin **360**, a ball **362** and a cap **364**. As shown, the insulator **352** fits between the housing **352** and the pin **360** in order to electrically insulate the housing **352** from the pin **360** and to space the housing from the pin **360**. Preferably, both the housing and the pin **360** are electrically conductive. The pin **360** preferably is hollow and has a seat **366** defined between a proximal and a distal cavity **370, 372**.

The cap **364** attaches to the proximal end of the pin **360** so as to enclose the proximal cavity. Like the pin **360**, the cap **364** preferably is electrically conductive. The cap **364** comprises a plurality of cap apertures **374** that are radially spaced from a center point that is aligned with an axis of the pin **360**. As such, the cap **364** preferably is solid at its center point. The ball **362** is contained within the proximal cavity and is constrained to move between engagement with the seat **366** and contact with the center point of the cap **364**. When the ball **362** is engaged with the seat **366**, fluid flow is blocked from moving between the proximal and distal cavities of the pin **360**. However when the ball **362** is disengaged from the seat **366**, and possibly engaged with the center point of the cap **364**, flow of air through the plurality of cap apertures **374** and proximally from the pin distal cavity to the proximal cavity is unimpeded by the ball **362**.

The housing preferably includes a distal threaded tip **378** that is sized and configured to threadingly engage the internal threads **42** of the battery mount cavity **40** so that the housing can be electrically connected to the second pole of the battery. A distal tip **380** of the pin **360** extends a short distance distally of the housing distal tip and is configured to engage the battery contact **44** when the housing distal tip is engaged with the battery mount cavity **40**. As such, the pin distal tip engages the first pole of the battery.

The pin **360** has a plurality of side apertures **382** distal of the seat **366**. Similarly, the check valve housing **350** has a plurality of side apertures **384**. Each of these apertures open into a space **386** between the pin **360** and the housing so that air may flow freely from within the distal cavity of the atomizer module **310** into the pin cavities.

When the atomizer module **310** is mounted to the battery, atmospheric air can flow through the air slots **344** into the distal cavity, and further from the distal cavity through the apertures and into the distal cavity of the pin **360**. When the ball **362** is disengaged from the seat **366**, air from within the distal cavity can flow proximally past the ball **362** and further through the cap apertures **374**. When the ball **362** is engaged with the seat **366**, leakage a vaporizing media is blocked as in embodiments discussed above.

In the illustrated embodiment, there is no biasing member to urge the ball **362** against the seat **366**. Nevertheless, the ball **362** is configured to be urged into engagement with the seat **366** by forces such as gravity, when the personal vaporizer is upright, and/or by flow of vaporizing media in a distal direction through the proximal cavity of the pin **360**. Thus, flow of vaporizing media in a direction tending to leak from the device will urge the ball **362** into sealing engagement with the seat **366**. Of course, it is to be understood that, in additional embodiments, any type of biasing member, and any type of check valve structure, can be employed as desired.

Continuing with reference to FIGS. **15-17**, in the illustrated embodiment, a mount aperture **388** is formed through the transverse wall **340** of the atomizer module housing **336**, and the check valve housing **350** is press-fit into the mount aperture **388** so that the check valve **334** is held in place

14

within the atomizer module **310** with a proximal portion of the check valve **334** extending into the proximal cavity and a distal portion of the check valve **334** extending into the distal cavity.

With additional reference to FIGS. **18** and **19**, in the illustrated embodiment the atomizer **332** comprises an atomizer bowl **390** having a proximal cavity **392** and a distal cavity **394**. A bottom wall **396** is defined between the proximal and distal cavities, and a side wall **398** of the bowl **390**, in combination with the bottom wall **396**, defines the proximal and distal cavities.

As best shown in FIG. **19**, preferably a pair of arcuate cradles **399** are formed on the proximal side of the bottom wall **396**. The arcuate cradles **399** generally complementarily correspond to the curvature of heating element coils **400** that are arranged adjacent the cradles. An air slot **402** is formed in each cradle so as to be aligned with the corresponding coil. A pair of first wire holes **404** is formed through the bottom wall **396** and open into the distal cavity. A pair of second wire holes **406** are also formed through the bottom wall **396** but do not open into the distal cavity. Instead, the second wire holes extend through a portion of the side wall and open at a distal end of the side wall. Channels **408** are formed in the side wall so as to extend from each second wire hole to a side surface of the bowl **390**.

With particular reference to FIGS. **17** and **19**, the bowl **390** preferably is fit into the proximal cavity of the atomizer module housing **336** so that distal ends of the side walls engage the transverse wall **340**, and the proximal portion of the check valve **334** extends into the distal cavity of the bowl **390**. Preferably, at least portions of a plurality of the cap apertures **374** are aligned with each air slot.

Continuing with particular reference to FIG. **17**, for each of the coils, a first wire end portion **414** of the coil extends through one of the first wire holes **404** and is placed into contact with the conductive check valve cap **364** without contacting the conductive check valve housing **350**. A second wire end portion **416** of the coil extends through one of the second wire holes **406** and into contact with the conductive atomizer module housing **336**, which is physically and electrically connected to the conductive check valve housing **350**. As such, the first wire end portion is connected through the check valve cap **364** and pin **360** to the first pole of the battery, and the second wire end portion is connected through the atomizer module housing **336** and check valve housing **350** to the second pole of the battery, defining a circuit enabling the battery to energize the coils when actuated.

With continued reference to FIG. **15** and additional reference to FIG. **20**, the tank module **320** comprises a tank top wall **420** that supports a proximal seal for **22**. A tank base **424** is configured to support an O-ring for **26**, and defines a bottom wall **428**. A tubular outer wall **430** is disposed between the top and bottom wall **428**. A vapor tube **440** extends proximally from the base and defines a vapor passage **441** therewithin. A proximal end **442** of the vapor tube **440** threadingly engages the tank top wall **420** so that the tank top wall **420** can be advanced toward the base. When the top wall **420** is threadingly advanced over the proximal end of the vapor tube **440**, the outer wall **430** is sandwiched between the top and bottom walls so as to create seals with the proximal seal and O-ring and define a fluid chamber **444**, or tank, therewithin. A proximal portion **446** of the vapor tube **440** extends proximally from the tank top wall **420**. A central aperture is formed in the bottom wall **428** and communicates with the vapor passage **441**. A distal end

**15**

148 of the base is threaded so as to threadingly connect to the atomizer module housing **336**.

With continued reference to FIGS. **15** and **20**, and additional reference to FIGS. **21**A and **21**B, a transfer member **450** comprises a cylindrical body **452** having a proximal flange flange **454**. A proximal face **456** is defined on a proximal side of the proximal flange. A proximal connector for freight extends proximally from the proximal face and is configured to engage the central aperture of the base. In one embodiment, the proximal connector is threaded so that the proximal face can be advanced and fit snugly against the distal face of the tank module bottom wall **428**.

A plurality of elongate secondary fluid delivery holes **460** extend longitudinally through the proximal face and the body. Preferably, the transfer member **450** is attached to the base so that the secondary fluid delivery holes **460** are at least generally aligned with the fluid delivery holes formed through the bottom wall **428**. Also, preferably the proximal face generally sealingly engages the distal face of the tank module bottom wall **428** so that fluid from the tank will flow through the fluid delivery holes and secondary fluid delivery holes, and not between the proximal face and distal face of the tank module bottom wall **428**. In another embodiment, the transfer member **450** can be press-fit against the bottom surface of the tank bottom wall **428**. Other methods can also be used to attach the proximal face of the transfer member **450** tightly to the bottom surface of the tank bottom wall **428**.

A distal cavity **462** is formed in the transfer member body **452**, and the secondary fluid delivery holes **460** extend through the body and open into the distal cavity **462**.

A plurality of transversely-directed vapor inlets **464** are also formed in the transfer member body. The vapor inlets **464** are placed so as to not intersect or interfere with the secondary fluid delivery holes **460**. The vapor inlets communicate with a central vapor chamber **466** formed within the body, which central vapor chamber **466** is aligned with the proximal connector so that the central vapor chamber **466** is in communication with the vapor passage **441**.

With particular reference again to FIG. **15**, vaporizing fluid from within the fluid chamber **444** can be delivered to the vaporizing chamber **180** by flowing through the fluid delivery holes **429** of the bottom wall **428** and further through the secondary fluid delivery holes of the transfer member **450** into the vaporizing chamber **180**. After being atomized, the vapor flows from the vaporizing chamber into the vapor inlets of the transfer member **450** to the central vapor chamber **466** and further to the vapor passage **441**, from which it is delivered to the mouthpiece module **330**.

With continued reference to FIG. **15** and additional reference to FIGS. **22**A and **22**B, a wick holder **470** is configured to fit into and attach to the distal cavity of the transfer member **450**. Preferably, the wick holder **470** includes proximal threads **472** adapted to engage internal threads of the transfer member **450** so that the wick holder **470** can be attached to the transfer member **450**. The wick holder **470** defines a wick holding passage **474** which, in the illustrated embodiment, is generally tapered to decrease in diameter moving distally. As such, the wick holding passage **474** can securely hold a wick therewithin. A proximal space **476** having a diameter greater than the wick holding passage is defined proximal of the wick holding passage. As shown in FIG. **15**, a wick **480** can be retained by the wick holding passage for some for. Preferably, a proximal end **482** of the wick **480** is disposed in or distal of the proximal space **476**, and the distal end **484** of the wick **480** is disposed at or adjacent the heating element of the atomizer **332**.

**16**

In the illustrated embodiment, the wick **480** has a generally circular cross-section, is generally longitudinally aligned with the heating element, and has a diameter greater than one half the length of each heating element coil, more preferably greater than two thirds the length of each heating element coil, and in some embodiments greater than about three fourths the length of each heating element coil. In further embodiments the wick diameter is about the same as or greater than the length of each heating element coil.

In the illustrated embodiment, the wick **480** is completely distal of the bottom wall **428** of the tank so that no wick portion extends into the fluid chamber **444**. As such, fluid flowing through the delivery holes is unconstrained by any wick or any other throttling structure. Similarly, fluid flow through the secondary fluid delivery holes is unconstrained by the presence of any wick. Instead, fluid flows freely through the fluid delivery holes and secondary fluid delivery holes, and accumulates in the proximal space above the wick. The proximal space enables fluid to spread out and evenly soak the wick. In the illustrated embodiment, the proximal space and wick are disposed within the proximal cavity of the atomizer module housing **336**.

In the illustrated embodiment, a cross sectional area of the wick is about the same as or greater than a cross-sectional area of the vapor passage **441**. Similarly, the cross-sectional area of the wick preferably is greater than the combined cross-sectional area of all of the fluid delivery holes. Further, preferably the cross-sectional area of the vapor passage is greater than the combined cross-sectional area of the fluid delivery holes. As such, the diameter of the vapor tube **440**, and cross-sectional area of the vapor passage **441**, can be maximized while the cross-sectional area dedicated to delivery tubes **429** is minimized, but without negatively affecting delivery flow of fluid through the wick **480** to the heating element **400**. For example, in some embodiments, a ratio of the vapor passage diameter to an outer diameter of the tank module **320** is greater than 0.2. In further embodiments, the ratio is between 0.2 and 0.3, and in further embodiments the ratio is about 0.25.

In the illustrated embodiment, a single, relatively large, centrally-located wick is held by the wick holder **470**. It is to be understood that other embodiments may employ a plurality of wick holding passages, and thus may hold a plurality of wicks. The plurality of wicks may each be smaller in diameter than the wick illustrated in FIG. **15**, although the wicks collectively may present a cross-sectional area approaching, the same as, or even greater than the wick in the illustrated embodiment, or greater than the cross-sectional area of the vapor passage. Additionally, such embodiments can be configured so that wicks are more evenly distributed about the vaporizing chamber **180**, and at or adjacent most or all portions of the heating element coils.

In the illustrated embodiment, the wick holder **470** can be removed from the transfer member **450** and replaced with another wick holder. The replacement wick holder may have a different configuration, may use different wick materials, or may simply be a new wick that hasn't been fouled by extensive use. Also, it is anticipated that different vaporizing liquids will have different viscosities. Thus, a user may wish to select a wick calculated to maximize device performance for a particular range of liquid viscosities. Notably, in the illustrated embodiment, the wick holder attaches to structure of the tank module **320**, and comes with the tank module as the tank module **320** is detached from the atomizer module. As such, the wick holder is easily accessed by simply removing the tank module, and without disassembling the tank.

**17**

The illustrated transfer member **450** and wick holder **470** are generally cylindrical in shape, and the illustrated wick holder **470** attaches to the transfer member **450** via a threaded connection. It is to be understood that, in additional embodiments, various ways of connecting the wick holder to the transfer member can be employed, such as a j-lock, detent, or slide-in mechanism. Also, the transfer member and/or wick holder and/or wick may have a non-circular cross-section. For example, in some embodiments the wick holder and wick may have a rectangular cross-sectional shape, and may be sized to correspond to the cross-sectional footprint of the heat element coils. As such, the wick may deliver vaporizing fluid to every part of the coils.

Continuing with reference to FIGS. **14** and **15**, and with additional reference to FIG. **23**, the mouthpiece module **330** comprises a tubular mouthpiece **490**, which in some embodiments can be substantially transparent, that is received into a proximal cavity into of a mouthpiece base **494**. A distal portion **496** of the mouthpiece base comprises an O-ring seat **498** that receives an O-ring **499**. A mouthpiece mount **500** has a central threaded passage **502** that engages the proximal portion of the vapor tube **440** so that the mouthpiece module **330** can be tightened atop the tank module **320**.

A distal cavity **504** of the mouthpiece mount receives an elastomeric seal **506** that engages the top wall **420** of the tank module **320** so as to seal a tank fill opening **508** and help provide a tight fit between the mouthpiece module **330** and the tank module **320**. The central threaded passage **502** opens into a proximal cavity **510** of the mount **500**, into which the distal portion of the mouthpiece base is placed. The O-ring on the mouthpiece base engages a wall of the mount proximal cavity to create a seal so that vapor that flows through the vapor passage **441** and central threaded passage is further directed through a mouthpiece outlet **512**.

To use the personal vaporizer described in connection with FIGS. **13-23**, The user loads the device with vaporizing media by ensuring the fluid chamber **444** comprises vaporizing liquid L and/or detaching the tank module **320** from the atomizer module **310** and placing a wax W in the vaporizing chamber **180**, and then replacing the tank module. The user then presses the battery button **29** and draws a breath through the mouthpiece. The heat element coils quickly heat up, vaporizing wax W within the vaporizing chamber **180** and/or liquid L delivered by the wick. Atmospheric air A is drawn through the battery air intake slots **46** and into distal cavity, from which it flows through side holes and into the distal cavity of the pin **360**. The ball **362** is dislodged from the seat **366**, and air A flows around the ball **362** and through any of the plurality of cap apertures **374** and air slots, past the coils and into the vaporizing chamber, where it is mixed with atomized vaporizing media, becoming a vapor V. the vapor V flows proximally through the vapor inlets of the transfer member **450** and into the vapor passage **441**, from which it is delivered via the mouthpiece to the user. As vaporizing liquid L is being atomized, replacement liquid L flows from the fluid chamber **444** through the fluid delivery tubes and secondary fluid delivery tubes into the proximal space proximal of the wick. The liquid L spreads across the diameter of the wick, and is then communicated through the wick to the coils **400**, where it is atomized and mixed with air A to form the vapor V.

It is to be understood that the embodiments of a modular, hybrid personal vaporizer disclosed herein can be used with wax alone, liquid solution alone, or both wax and solution at the same time. Further, if being used with both wax and solution at the same time, and one or the other of the wax or

**18**

solution becomes exhausted, the hybrid personal vaporizer can continue to be used with the remaining material without necessitating any adjustments by the user. Further, it is to be understood that features disclosed herein may be employed with other embodiments of vaporizers, which embodiments may or may not be able to used with one or the other of wax and liquid solutions. Further, features discussed herein may be employed with vaporizers that are not modular.

In the illustrated embodiments, the fluid tank has been configured as a single compartment to hold a single liquid. In additional embodiments the tank can be divided into two, three or more chambers and can be configured to hold different liquid media, such as different flavors of liquid and/or different ingredients. In some embodiments such chambers can be configured to contain separate components. For example, a first chamber may contain a basic vaporizing fluid, and a second and/or third chamber may be configured to contain flavorings. Each chamber communicates with the vaporizing chamber **180** via liquid delivery holes and/or wicks, and thus liquid from each chamber is delivered simultaneously to the vaporizing chamber. The size of the delivery tubes and/or wicks can throttle delivery rates from each chamber, regulating the mixture. For example, the delivery tube(s) and/or wick from the first chamber may be configured to delivery much more volume of fluid to the vaporizing chamber than the delivery tube and/or wick from the second or third chambers. This can be accomplished in various ways, such as by providing delivery tubes of greater cross-sectional area aligned with the first chamber and comparatively small cross-sectional area aligned with the second and/or third chambers, using different wick materials that regulate fluid flow, or the like.

The embodiments discussed above have disclosed structures with substantial specificity. This has provided a good context for disclosing and discussing inventive subject matter. However, it is to be understood that other embodiments may employ different specific structural shapes and interactions. For example, the vaporizer embodiments discussed herein are generally cylindrical. It is to be understood that other embodiments may employ principles discussed herein in connection with vaporizers having different shapes and configurations.

Although inventive subject matter has been disclosed in the context of certain preferred or illustrated embodiments and examples, it will be understood by those skilled in the art that the inventive subject matter extends beyond the specifically disclosed embodiments to other alternative embodiments and/or uses of the invention and obvious modifications and equivalents thereof. In addition, while a number of variations of the disclosed embodiments have been shown and described in detail, other modifications, which are within the scope of the inventive subject matter, will be readily apparent to those of skill in the art based upon this disclosure. It is also contemplated that various combinations or subcombinations of the specific features and aspects of the disclosed embodiments may be made and still fall within the scope of the inventive subject matter. Accordingly, it should be understood that various features and aspects of the disclosed embodiments can be combined with or substituted for one another in order to form varying modes of the disclosed inventive subject matter. Thus, it is intended that the scope of the inventive subject matter herein disclosed should not be limited by the particular disclosed embodiments described above, but should be determined only by a fair reading of the claims that follow.

What is claimed is:

1. A personal vaporizer, comprising:

a tank module comprising a fluid chamber and a vapor passage extending through the fluid chamber, the fluid chamber configured to contain a vaporizing solution;

an atomizer module comprising a bowl having an upper edge and an air aperture, a heating element arranged in or adjacent the bowl, the bowl configured to accept vaporizing solution received from the fluid chamber;

a check valve comprising an insulator housing, a conductive shell inside the insulator housing, and a sealing mechanism inside the conductive shell, the conductive shell having an air inlet and an air outlet, an intake air flow path defined through the conductive shell from the air inlet to the air outlet, the sealing mechanism providing a seal inside the conductive shell, the seal interposed in the intake air flow path, the check valve arranged so that that the air outlet communicates with the bowl air aperture and the conductive shell is electrically connected to the heating element; and

a battery assembly, the heating element connectable to the battery assembly through the check valve so that actuation of the battery delivers electrical energy to the heating element, causing the heating element to heat and vaporize the vaporizing solution;

wherein the bowl has a first wire hole and a second wire hole extending through a bottom wall of the bowl and a channel extending transversely from the second wire hole.

2. The personal vaporizer as in claim 1, wherein the heating element has a first connection and a second connection, the first connection extending through the first wire hole and contacting the conductive shell, and the second connection extending through the second wire hole and the channel and spaced away from the conductive shell.

3. The personal vaporizer as in claim 2, wherein the first connector comprises a first conductive wire and the second connector comprises a second conductive wire.

4. The personal vaporizer as in claim 3, wherein the atomizer module comprises a housing that is electrically conductive, and the second conductive wire contacts the atomizer module housing.

5. The personal vaporizer as in claim 4, wherein the check valve is interposed between the atomizer module and the battery assembly so that the atomizer module housing overlaps the check valve, and wherein the insulator housing is interposed between the conductive shell and the atomizer module housing.

6. The personal vaporizer as in claim 2, wherein the check valve is part of the atomizer module.

7. The personal vaporizer as in claim 6, wherein the tank module is releasably connected to the atomizer module.

8. The personal vaporizer as in claim 2, additionally comprising one or more slots formed through a side wall of the bowl.

9. The personal vaporizer as in claim 2, wherein the sealing mechanism comprises a ball and a spring.

10. An atomizer for a personal vaporizer, comprising:

a housing having a distal end and a proximal end, the housing comprising an electrically conductive material, the distal end configured to be attachable to a first pole of a battery so that the distal end electrically communicates with the battery;

an atomizer bowl arranged within the housing, the atomizer bowl comprising a side wall and a bottom wall, the atomizer bowl configured to receive vaporizing media;

a heating element disposed at least partially within the atomizer bowl, the heating element having a first wire end portion and a second wire end portion, the heating element configured to produce heat when electric energy is applied across the first wire end portion and the second wire end portion;

a check valve having a valve body, a proximal outlet, a distal inlet, and a sealing structure interposed in an air flow path between the distal inlet and the proximal outlet, the valve body extending from a distal end to a proximal end and defining an electrically conductive flow path from the distal end to the proximal end, the sealing structure configured to accommodate air flow therethrough along the air flow path in a distal-to-proximal direction, but to resist air flow therethrough in a proximal-to-distal direction;

wherein the first wire end portion is in electrical communication with the proximal end of the valve body and the second wire end portion is in electrical communication with the housing.

11. The atomizer as in claim 10, wherein the atomizer bowl is nonconductive and the atomizer bowl has a first hole aligned with the valve body and a second hole aligned with the housing, and wherein the first wire end portion extends through the first hole and into contact with the valve body, and the second wire end portion extends through the second hole and into contact with the housing.

12. The atomizer as in claim 11, wherein the bottom wall of the atomizer bowl has an aperture aligned with the heating element, and the proximal outlet of the check valve is aligned with the bowl aperture.

13. The atomizer as in claim 12, wherein the atomizer has a longitudinal axis, and the second hole of the atomizer bowl is spaced farther from the axis than is the first hole of the atomizer bowl.

14. The atomizer as in claim 13, additionally comprising an insulator between the valve body and the housing.

15. The atomizer as in claim 13, wherein the heating element comprises a wire coil.

16. The atomizer as in claim 10, wherein the sealing mechanism comprises a ball and a valve seat.

17. The atomizer as in claim 16, wherein the ball is biased toward engagement with the valve seat.

18. The atomizer as in claim 10, additionally comprising a tank disposed proximal of the atomizer bowl, the tank configured to contain a liquid vaporizing media therewithin and to deliver the liquid vaporizing media to the atomizer bowl.

19. The atomizer as in claim 10 in combination with a tank module formed separately from the atomizer, a distal end of the tank module being selectively attachable to a proximal end of the atomizer, the tank module comprising a tank configured to contain a liquid vaporizing media therewithin and a wicking structure configured to deliver the liquid vaporizing media to the atomizer bowl.

20. The atomizer as in claim 10, wherein the distal end of the valve body is configured to be attachable to a second pole of the battery so that the distal end of the valve body electrically communicates with the battery, and an electric circuit is established from the second pole of the battery through the valve body, through the heating element, through the housing, and to the first pole of the battery.

* * * * *

ACCO,(JCx),<span style="color:purple">APPEAL</span>,<span style="color:orange">CLOSED</span>,DISCOVERY,MANADR

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA (Western Division - Los Angeles)
## CIVIL DOCKET FOR CASE #: 2:18-cv-00715-RGK-JC

Lubby Holdings LLC et al v. Henry Chung et al
Assigned to: Judge R. Gary Klausner
Referred to: Magistrate Judge Jacqueline Chooljian
Case in other court:  Federal Circuit, 19-02286
Cause: 28:1338 Patent Infringement

Date Filed: 01/26/2018
Date Terminated: 05/09/2019
Jury Demand: Plaintiff
Nature of Suit: 830 Patent
Jurisdiction: Federal Question

### Plaintiff

**Lubby Holdings LLC**
*a Delaware limited liability company*

represented by **Drew Harris Sherman**
Adli Law Group PC
444 South Flower Street Suite 3100
Los Angeles, CA 90071
213-623-6546
Fax: 213-623-6554
Email: drew.sherman@adlilaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Joshua H Eichenstein**
Hamrick & Evans LLP
2600 W. Olive Ave
Suite 1020
Burbank, CA 91505
818-763-5292
Fax: 818-763-2308
Email: jeichenstein@hamricklaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Dariush G Adli**
Adli Law Group PC
444 South Flower Street Suite 3100
Los Angeles, CA 90071
213-623-6546
Fax: 213-623-6554
Email: adli@adlilaw.com
*ATTORNEY TO BE NOTICED*

### Plaintiff

**Vaporous Technologies, Inc.**
*a Delaware corporation*

represented by **Drew Harris Sherman**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Joshua H Eichenstein**
(See above for address)

**Appx0040**

*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Dariush G Adli**
(See above for address)
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Henry Chung**                          represented by   **Kenneth K Tanji , Jr**
*an individual*                                           LT Pacific Law Group LLP
                                                          17800 Castleton Street Suite 560
                                                          City of Industry, CA 91748
                                                          626-810-7200
                                                          Fax: 626-810-7300
                                                          Email: ktanji@ltpacificlaw.com
                                                          *LEAD ATTORNEY*
                                                          *ATTORNEY TO BE NOTICED*

                                                          **Jen-Feng Lee**
                                                          LT Pacific Law Group LLP
                                                          17800 Castleton Street Suite 560
                                                          City of Industry, CA 91748
                                                          626-810-7200
                                                          Fax: 626-810-7300
                                                          Email: jflee@ltpacificlaw.com
                                                          *ATTORNEY TO BE NOTICED*

**Defendant**

**Ming Chen**
*an individual*
*TERMINATED: 05/08/2019*

**Defendant**

**Deepvapes, Inc.**
*a California Corporation*
*doing business as*
Boom Vaporizer

**Defendant**

**Does**
*1-10, inclusive*

**Mediator (ADR Panel)**

**Alan M Kindred**                       represented by   **Alan M Kindred**
                                                          Leech Tishman Fuscaldo and Lampl, Inc.
                                                          Suite 210
                                                          200 S Los Robles Avenue
                                                          Pasadena, CA 91101
                                                          818-636-5933
                                                          Fax: 626-795-6321

**Appx0041**

Email: akindred@leechtishman.com
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 01/26/2018 | 1 | COMPLAINT Receipt No: 0973-21168473 - Fee: $400, filed by Plaintiff VAPOROUS TECHNOLOGIES, INC., LUBBY HOLDINGS LLC. (Attachments: # 1 Exhibit A, # 2 Exhibit B) (Attorney Dariush G Adli added to party LUBBY HOLDINGS LLC(pty:pla), Attorney Dariush G Adli added to party VAPOROUS TECHNOLOGIES, INC.(pty:pla)) (Adli, Dariush) (Entered: 01/26/2018) |
| 01/26/2018 | 2 | Request for Clerk to Issue Summons on Complaint (Attorney Civil Case Opening), 1 filed by Plaintiffs LUBBY HOLDINGS LLC, VAPOROUS TECHNOLOGIES, INC.. (Adli, Dariush) (Entered: 01/26/2018) |
| 01/26/2018 | 3 | CORPORATE DISCLOSURE STATEMENT filed by Plaintiff LUBBY HOLDINGS LLC (Adli, Dariush) (Entered: 01/26/2018) |
| 01/26/2018 | 4 | CORPORATE DISCLOSURE STATEMENT filed by Plaintiff VAPOROUS TECHNOLOGIES, INC. (Adli, Dariush) (Entered: 01/26/2018) |
| 01/26/2018 | 5 | CIVIL COVER SHEET filed by Plaintiffs LUBBY HOLDINGS LLC, VAPOROUS TECHNOLOGIES, INC.. (Adli, Dariush) (Entered: 01/26/2018) |
| 01/26/2018 | 6 | REPORT ON THE FILING OF AN ACTION Regarding a Patent or a Trademark (Initial Notification) filed by LUBBY HOLDINGS LLC, VAPOROUS TECHNOLOGIES, INC.. (Adli, Dariush) (Entered: 01/26/2018) |
| 01/30/2018 | 7 | NOTICE OF ASSIGNMENT to District Judge R. Gary Klausner and Magistrate Judge Jacqueline Chooljian. (car) (Entered: 01/30/2018) |
| 01/30/2018 | 8 | NOTICE TO PARTIES OF COURT-DIRECTED ADR PROGRAM filed. (car) (Entered: 01/30/2018) |
| 01/30/2018 | 9 | 21 DAY Summons Issued re Complaint (Attorney Civil Case Opening), 1 as to Defendants Ming Chen, Henry Chung, Deepvapes, Inc. (car) (Entered: 01/30/2018) |
| 01/31/2018 | 10 | STANDING ORDER REGARDING NEWLY ASSIGNED CASES by Judge R. Gary Klausner. (sw) (Entered: 01/31/2018) |
| 03/15/2018 | 11 | STIPULATION Extending Time to Answer the complaint as to Henry Chung answer now due 3/30/2018, re Complaint (Attorney Civil Case Opening), 1 filed by defendant Henry Chung.(Attorney Jen-Feng Lee added to party Henry Chung(pty:dft))(Lee, Jen-Feng) (Entered: 03/15/2018) |
| 03/16/2018 | 12 | SCHEDULING NOTICE TO PLAINTIFF AND ORDER by Judge R. Gary Klausner. The Court has reviewed the Stipulation Extending Time to Answer as to defendant Henry Chung 11 . Plaintiff shall immediately file the proof of service of the summons and complaint. THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY. (sw) TEXT ONLY ENTRY (Entered: 03/16/2018) |
| 03/16/2018 | 13 | PROOF OF SERVICE Executed by Plaintiff Vaporous Technologies, Inc., Lubby Holdings LLC, upon Defendant Henry Chung served on 2/20/2018, answer due 3/30/2018. Service of the Summons and Complaint were executed upon Henry Chung in compliance with Federal Rules of Civil Procedure by method of service not specified.Original Summons NOT returned. *Summons and Complaint was served by email to Defendant's Counsel Jen-Feng Lee. Acceptance and acknowledgment through* |

**Appx0042**

| | | |
|---|---|---|
| | | *email communication attached.* (Attachments: # 1 Exhibit A)(Adli, Dariush) (Entered: 03/16/2018) |
| 03/30/2018 | 14 | NOTICE OF MOTION AND MOTION to Dismiss defendant Henry Chung filed by defendant Henry Chung. Motion set for hearing on 5/14/2018 at 09:00 AM before Judge R. Gary Klausner. (Attachments: # 1 Memorandum of Points and Authorities, # 2 Proposed Order) (Lee, Jen-Feng) (Entered: 03/30/2018) |
| 04/02/2018 | 15 | SCHEDULING NOTICE TO ALL PARTIES AND ORDER by Judge R. Gary Klausner. Defendant Henry Chung's Motion to Dismiss 14 , noticed for hearing on 05/14/2018 at 9:00 am, HAS BEEN ADVANCED TO 04/30/2018 at 9:00 am. THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY. (sw) TEXT ONLY ENTRY (Entered: 04/02/2018) |
| 04/03/2018 | 16 | NOTICE TO FILER OF DEFICIENCIES in Electronically Filed Documents RE: NOTICE OF MOTION AND MOTION to Dismiss defendant Henry Chung 14 . The following error(s) was/were found: Local Rule 7.1-1 No Notice of Interested Parties.. In response to this notice, the Court may: (1) order an amended or correct document to be filed; (2) order the document stricken; or (3) take other action as the Court deems appropriate. You need not take any action in response to this notice unless and until the Court directs you to do so. (bp) (Entered: 04/03/2018) |
| 04/04/2018 | 17 | RESPONSE BY THE COURT TO NOTICE TO FILER OF DEFICIENCIES IN ELECTRONICALLY FILED DOCUMENTS RE: NOTICE OF MOTION AND MOTION to Dismiss defendant Henry Chung 14 by Judge R. Gary Klausner. The document is accepted as filed. Notice of Interested Parties shall be filed by 12:00 noon on April 6, 2018. (bp) (Entered: 04/04/2018) |
| 04/04/2018 | 18 | NOTICE of Interested Parties filed by Defendant Henry Chung, identifying N/A. (Lee, Jen-Feng) (Entered: 04/04/2018) |
| 04/04/2018 | 19 | ORDER SETTING SCHEDULING CONFERENCE by Judge R. Gary Klausner. A Scheduling Conference has been placed on calendar for July 16, 2018 at 9:00 a.m. The Conference will be held pursuant to F.R.Civ. P. 16(b). Trial counsel must be present and there are no telephonic appearances. Counsel are ordered to file a joint statement providing a brief factual summary of the case, including the claims being asserted. The parties are reminded of their obligations to disclose information and confer on a discovery plan not later than 21 days prior to the scheduling conference, and to file a joint statement with the Court not later than 14 days after they confer, as required by F.R. Civ.P. 26 and the Local Rules of this Court. Failure to comply may lead to the imposition of sanctions. Plaintiff's counsel is directed to give notice of the scheduling conference to each party that makes an initial appearance in the action after this date. (pso) (Entered: 04/04/2018) |
| 04/10/2018 | 20 | First AMENDED COMPLAINT against Defendants Ming Chen, Henry Chung, Deepvapes, Inc., Does amending Complaint (Attorney Civil Case Opening), 1 , filed by Plaintiffs Vaporous Technologies, Inc., Lubby Holdings LLC(Sherman, Drew) (Entered: 04/10/2018) |
| 04/10/2018 | 21 | NOTICE TO PARTIES by U.S. Magistrate Judge Jacqueline Chooljian. Effective, April 11, 2018, Judge Chooljian will be located at the Edward R. Roybal Federal Building and U.S. Courthouse ("Roybal Building"), located at 255 East Temple Street, Los Angeles, California 90012. All Court appearances shall be made in Courtroom 750 on the 7th floor of the Roybal Building. All mandatory chambers copies shall be hand delivered to the judge's mail box located outside of the Clerk's Office on the 12th floor of the Roybal Building. Paper civil and criminal documents exempted from electronic filing shall be filed in Room 180 on the Terrace Level of the Roybal Building. Magistrate Judge |

**Appx0043**

| | | Chooljian's Courtroom Deputy Clerk, Kerri Hays, may be reached at (213) 894-2921. THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY. (rrey) TEXT ONLY ENTRY (Entered: 04/10/2018) |
|---|---|---|
| 04/11/2018 | 22 | SCHEDULING NOTICE TO ALL PARTIES AND ORDER by Judge R. Gary Klausner. According to court records, on April 10, 2018, plaintiff(s) filed a First Amended Complaint 20 . Therefore, defendants' Motion to Dismiss 14 , is denied as moot. THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY. (sw) TEXT ONLY ENTRY (Entered: 04/11/2018) |
| 04/26/2018 | 23 | ANSWER to Amended Complaint/Petition 20 with JURY DEMAND filed by Defendant Henry Chung.(Lee, Jen-Feng) (Entered: 04/26/2018) |
| 04/26/2018 | 24 | NOTICE filed by defendant Henry Chung. *(Notice of Unavailability)* (Lee, Jen-Feng) (Entered: 04/26/2018) |
| 07/09/2018 | 25 | NOTICE AND REQUEST BY DEFENSE COUNSEL FOR HENRY CHUNG RE DELAYED FILING OF SEPARATE PORTION OF THE RULE 26(F) REPORT filed by defendant Henry Chung. (Lee, Jen-Feng) (Entered: 07/09/2018) |
| 07/09/2018 | 26 | JOINT REPORT Rule 26(f) Discovery Plan *with only Plaintiff's portions* ; estimated length of trial 3 days, filed by Plaintiffs Lubby Holdings LLC, Vaporous Technologies, Inc... (Sherman, Drew) (Entered: 07/09/2018) |
| 07/10/2018 | 27 | RULE 26(F) REPORT REPORT of DEFENDANT'S RULE 26(F) REPORT filed by Defendant Henry Chung. (Lee, Jen-Feng) (Entered: 07/10/2018) |
| 07/16/2018 | 28 | ORDER RE JURY TRIAL by Judge R. Gary Klausner. Pretrial Conference set for 3/18/2019 at 9:00 am; Jury Trial set for 4/2/2019 at 9:00 am. See Order for details. (sw) (Entered: 07/16/2018) |
| 07/16/2018 | 29 | ORDER/REFERRAL to ADR Procedure No. 2 by Judge R. Gary Klausner. Case ordered to Court Mediation Panel for mediation. ADR Proceeding to be held no later than 02/01/2019. (sw) (Entered: 07/16/2018) |
| 07/16/2018 | 30 | MINUTES OF SCHEDULING CONFERENCE before Judge R. Gary Klausner: The Scheduling Conference is held. The Court orders thefollowing dates:Jury Trial: 4/2/2019 at 9:00 AM. Pretrial Conference: 3/18/2019 at 9:00 AM. Motion Cut-Off Date: 1/18/2019. Discovery Cut-Off Date: 1/4/2019. The last day to motion the Court or amend the complaint is 9/1/2018. The parties inform the Court that the have selected Settlement Option 2. After the conclusion of the hearing, the Court orders all unserved defendants dismissed. Court Reporter: Sandra MacNeil. (jp) (Entered: 07/17/2018) |
| 10/04/2018 | 31 | NOTICE OF ASSIGNMENT of Panel Mediator. Mediator (ADR Panel) Alan M Kindred has been assigned to serve as Panel Mediator. (mb) (Entered: 10/04/2018) |
| 01/10/2019 | 32 | Joint STIPULATION to Continue Motion Filing Cut-off from 01-18-2019 to 03-19-2019 and Continue ADR Cut-off from 02-01-2019 to 03-01-2019 and Continue Final Pretrial Conference from 03-19-2019 to 04-16-2019 and Continue Jury Trial from 04-09-2019 to 05-14-2019 filed by Plaintiffs Lubby Holdings LLC, Vaporous Technologies, Inc.. (Attachments: # 1 Proposed Order)(Adli, Dariush) (Entered: 01/10/2019) |
| 01/11/2019 | 33 | ORDER GRANTING Joint Stipulation for Continuance of Dates by Amending Scheduling Order 32 by Judge R. Gary Klausner, the Court continues the dates below as follows: ADR Cutoff on 3/1/2019. ALL OTHER DATES REMAIN AS ORDERED. (jp) (Entered: 01/11/2019) |
| 02/25/2019 | 34 | MEDIATION REPORT Filed by Mediator (ADR Panel) Alan M Kindred: Mediation held on 02/20/2019. The parties are unable to reach an agreement at this time. |

**Appx0044**

| | | Counsel: Please evaluate the effectiveness of the ADR Program by completing a survey on your mediation experience. To access the survey, click on the following link: MediationParticipantSurvey(Kindred, Alan) (Entered: 02/25/2019) |
|---|---|---|
| 02/25/2019 | 35 | MEMORANDUM of CONTENTIONS of FACT and LAW filed by Plaintiffs Lubby Holdings LLC, Vaporous Technologies, Inc.. (Adli, Dariush) (Entered: 02/25/2019) |
| 02/25/2019 | 36 | JOINT Exhibit List filed by Plaintiffs Lubby Holdings LLC, Vaporous Technologies, Inc... (Adli, Dariush) (Entered: 02/25/2019) |
| 02/25/2019 | 37 | Witness List filed by Plaintiffs Lubby Holdings LLC, Vaporous Technologies, Inc... (Adli, Dariush) (Entered: 02/25/2019) |
| 02/25/2019 | 38 | MEMORANDUM of CONTENTIONS of FACT and LAW filed by Defendant Henry Chung. (Lee, Jen-Feng) (Entered: 02/25/2019) |
| 02/26/2019 | 39 | NOTICE OF ERRATA, RE ECF DKT. #38 filed by defendant Henry Chung. (Lee, Jen-Feng) (Entered: 02/26/2019) |
| 03/07/2019 | 40 | NOTICE OF LODGING Proposed Pretrial Conference Order Plaintiffs Lubby Holdings LLC, Vaporous Technologies, Inc.. (Attachments: # 1 Exhibit A)(Adli, Dariush) (Entered: 03/07/2019) |
| 03/13/2019 | 41 | DISCLOSURE of PLAINTIFFS EXPERT WITNESS filed by Plaintiffs Lubby Holdings LLC, Vaporous Technologies, Inc. (Adli, Dariush) (Entered: 03/13/2019) |
| 03/15/2019 | 42 | DISCLOSURE of Defense Expert Qualifications and Testimony filed by Defendant Henry Chung (Lee, Jen-Feng) (Entered: 03/15/2019) |
| 03/17/2019 | 43 | PROPOSED JURY INSTRUCTIONS (Annotated Defendant's Separate set) filed by defendant Henry Chung.. (Lee, Jen-Feng) (Entered: 03/17/2019) |
| 03/18/2019 | 44 | PROPOSED JURY INSTRUCTIONS (Joint set) filed by Plaintiffs Lubby Holdings LLC, Vaporous Technologies, Inc... (Sherman, Drew) (Entered: 03/18/2019) |
| 03/18/2019 | 45 | PROPOSED JURY INSTRUCTIONS (Plaintiffs set) filed by Plaintiffs Lubby Holdings LLC, Vaporous Technologies, Inc... (Sherman, Drew) (Entered: 03/18/2019) |
| 03/18/2019 | 46 | MINUTES OF PRETRIAL CONFERENCE before Judge R. Gary Klausner: Case called. Court and counsel confer re jury impanelment, court hours, admitted evidence and the voir dire process. Not later than 3/21/2019, counsel shall file damage disclosure motions and briefing on Rule 37 objections. The Court informs counsel that it intends to impose time limits of 3 to 4 hours per side, and will give final time limits on the first day of trial. Counsel may contact the Court if they feel that a further settlement conference with a Magistrate Judge would be beneficial. Court Reporter: Sandra MacNeil. (jp) (Entered: 03/20/2019) |
| 03/21/2019 | 47 | STIPULATION to Continue Trial from 04/02/2019 to 05/07/2019 filed by defendant Henry Chung. (Attachments: # 1 Proposed Order)(Lee, Jen-Feng) (Entered: 03/21/2019) |
| 03/21/2019 | 48 | OBJECTIONS to Jury Instructions (Proposed) 45 (Plaintiffs Additional Proposed Jury Instructions) filed by Defendant Henry Chung. (Lee, Jen-Feng) (Entered: 03/21/2019) |
| 03/21/2019 | 49 | BRIEF filed by defendant Henry Chung. re Damages Disclosure and Sanctions (Attachments: # 1 Declaration of Defense Counsel, # 2 Exhibit A, # 3 Exhibit B)(Lee, Jen-Feng) (Entered: 03/21/2019) |
| 03/21/2019 | 50 | BRIEF filed by Plaintiffs Lubby Holdings LLC, Vaporous Technologies, Inc.. Requesting Rule 37 Sanctions (Attachments: # 1 Declaration of DHS in Support of Plaintiffs' Request for Rule 37 Sanctions)(Sherman, Drew) (Entered: 03/21/2019) |

**Appx0045**

| 03/22/2019 | 51 | SCHEDULING NOTICE TO ALL PARTIES AND ORDER by Judge R. Gary Klausner. Any opposition to the briefs submitted on damages or Rule 37 shall be submitted on or before March 27, 2019. Reply briefs will not be accepted. THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY. (sw) TEXT ONLY ENTRY (Entered: 03/22/2019) |
|---|---|---|
| 03/25/2019 | 52 | ORDER Granting Joint Stipulation to Continue trial 47 by Judge R. Gary Klausner that the Trial shall continue to 5/7/2019 at 9:00 AM. (jp) (Entered: 03/25/2019) |
| 03/27/2019 | 53 | Opposition to Plaintiffs BRIEF filed by defendant Henry Chung. regarding Brief (non-motion non-appeal) 50 . (Attachments: # 1 Declaration of Defense Counsel, # 2 Exhibit C, # 3 Exhibit D, # 4 Exhibit E, # 5 Exhibit F)(Lee, Jen-Feng) (Entered: 03/27/2019) |
| 03/27/2019 | 54 | RESPONSE filed by Plaintiffs Lubby Holdings LLC, Vaporous Technologies, Inc.to Brief (non-motion non-appeal) 49 (Sherman, Drew) (Entered: 03/27/2019) |
| 03/29/2019 | 55 | DECLARATION of Drew H. Sherman re Response 54 *to Defendants' Brief Regarding Damages Calculations* filed by Plaintiffs Lubby Holdings LLC, Vaporous Technologies, Inc.. (Sherman, Drew) (Entered: 03/29/2019) |
| 04/01/2019 | 56 | OBJECTIONS to Declaration 55 *of Drew Sherman* filed by Defendant Henry Chung. (Attachments: # 1 Declaration by Defense Counsel)(Lee, Jen-Feng) (Entered: 04/01/2019) |
| 04/30/2019 | 57 | STATEMENT OF CASE filed by Plaintiffs Lubby Holdings LLC, Vaporous Technologies, Inc. (Adli, Dariush) (Entered: 04/30/2019) |
| 04/30/2019 | 58 | Proposed Voir Dire Questions filed by Plaintiffs Lubby Holdings LLC, Vaporous Technologies, Inc... (Adli, Dariush) (Entered: 04/30/2019) |
| 04/30/2019 | 59 | TRIAL BRIEF filed by defendant Henry Chung.. (Attachments: # 1 Declaration by Defense Counsel)(Lee, Jen-Feng) (Entered: 04/30/2019) |
| 05/01/2019 | 60 | OBJECTIONS to Voir Dire Questions (Proposed) 58 filed by Defendant Henry Chung. (Lee, Jen-Feng) (Entered: 05/01/2019) |
| 05/03/2019 | 61 | MINUTE ORDER (IN CHAMBERS) Order Re: Defendant Henry Chung's Brief re: Damages Disclosure and Sanctions (DE 49); Plaintiff Lubby Holdings, LLC.'s Requested Brief Regarding Plaintiffs' Request for Rule 37 Sanctions Against Defendants for Listing Undisclosed Documents as Exhibits for Trial (DE 50) by Judge R. Gary Klausner. The Court has read and considered both patties' briefs. Plaintiffs are ordered to serve the Defendants and the Court their computation of damages by Monday, May 6th, 2018 at 10 a.m. Failure to do so will result in possible sanctions under Federal Rule of Civil Procedure ("Rule") 37. The Court denies Plaintiffs' request for Rule 37 sections against Defendants. IT IS SO ORDERED. (lom) (Entered: 05/03/2019) |
| 05/06/2019 | 62 | DISCLOSURE of Damages Computations re Minutes of In Chambers Order/Directive - no proceeding held,,, 61 *in response thereto,* filed by Plaintiffs Lubby Holdings LLC, Vaporous Technologies, Inc. (Sherman, Drew) (Entered: 05/06/2019) |
| 05/06/2019 | 63 | OBJECTIONS to Disclosure 62 *of Computation of Damages* filed by Defendant Henry Chung. (Attachments: # 1 Declaration of Defense Counsel, # 2 Exhibit A, # 3 Exhibit B, # 4 Exhibit C, # 5 Exhibit D, # 6 Exhibit E)(Lee, Jen-Feng) (Entered: 05/06/2019) |
| 05/06/2019 | 64 | DEFENDANT'S AMENDED Exhibit List filed by defendant Henry Chung.. (Lee, Jen-Feng) (Entered: 05/06/2019) |
| 05/06/2019 | 65 | RESPONSE filed by Plaintiffs Lubby Holdings LLC, Vaporous Technologies, Inc.to Objection, 63 (Attachments: # 1 Declaration of DHS in support of Plaintiffs' Response to |

**Appx0046**

| | | Defendants' Objections to Plaintiffs' Supplemental Disclosure Regarding Damages Computations)(Sherman, Drew) (Entered: 05/06/2019) |
|---|---|---|
| 05/07/2019 | 66 | MINUTES OF 1st Day Jury Trial Held and Continued before Judge R. Gary Klausner: Jury impaneled and sworn. Opening statements made by Plaintiff and Defendants. Witnesses called, sworn and testified. Exhibits identified and admitted. Case continued to 5/8/2019 at 8:30 AM., for further trial/further jury deliberation. Court Reporter: Carol Zurborg. (jp) (Entered: 05/07/2019) |
| 05/08/2019 | 67 | MINUTES OF 2nd Day - Jury Trial Held and Continued before Judge R. Gary Klausner: Witnesses called, sworn and testified. Exhibits identified and admitted. Plaintiff(s) rest. Case continued to 5/9/2019 at 8:30 AM., for further trial/further jury deliberation. Defense addresses the Court regarding a motion for judgment as a matter of law, the motion may be filed. The Court dismisses defendant Ming Chen. Court Reporter: Carol Zurborg. (jp) (Entered: 05/08/2019) |
| 05/09/2019 | 68 | NOTICE OF MOTION AND MOTION for Judgment as a Matter of Law on the basis of: Federal Rule of Civil Procedure 50(a) filed by defendant Henry Chung. (Attachments: # 1 Proposed Order) (Tanji, Kenneth) (Entered: 05/09/2019) |
| 05/09/2019 | 69 | MINUTES OF 3rd Day - Jury Trial held and completed before Judge R. Gary Klausner: Witnesses called, sworn and testified. Exhibits identified and admitted. Plaintiff(s) rest. Defendant(s) rest. Closing arguments made by Plaintiff(s) and Defendant(s). Court instructs jury. Bailiff(s) sworn. Jury retires to deliverate. Jury Verdict in favor of Plaintiff. Jury polled. Filed Witness and Exhibits Lists. Filed jury notes. File jury instruction. Clerk reveiwed admitted exhibits with counsel to be submitted to the Jury/Court for deliberation/findings. All exhibits returned to counsel at the conclusion of the trial. Rule 50 motions to be filed by 5/17/2019. Oppositions due 5/22/2019. The matter will then be deemed submitted and the Court will issue a determination. Court Reporter: Carol Zurborg. (jp) (Entered: 05/09/2019) |
| 05/09/2019 | 70 | REDACTED - Jury Notes # 1 filed. (jp) (Entered: 05/09/2019) |
| 05/09/2019 | 71 | SEALED UNREDACTED - Jury Notes No. 1 re Redacted Jury Notes No. 1 70 . (jp) (Entered: 05/09/2019) |
| 05/09/2019 | 72 | LIST OF EXHIBITS AND WITNESSES at trial. (jp) (Entered: 05/09/2019) |
| 05/09/2019 | 73 | JURY INSTRUCTIONS. (jp) (Entered: 05/09/2019) |
| 05/09/2019 | 74 | REDACTED - VERDICT FORM. (jp) (Entered: 05/09/2019) |
| 05/09/2019 | 75 | SEALED - UNREDACTED Verdict Form re: Redacted - Verdict Form 74 . (jp) (Entered: 05/09/2019) |
| 05/09/2019 | 76 | JUDGMENT ON THE VERDICT FOR THE PLAINTIFF(S) by Judge R. Gary Klausner. IT IS ORDERED AND ADJUDGED that the Plaintiffs Lubby Holdings, LLC and Vaporous Technologies Inc., recover of the Defendants Deepvapes, Inc., Henry Chung the sum of $863,936.10, with interest thereon at the legal rate as provided by the law. (MD JS-6, Case Terminated). (jp) (Entered: 05/09/2019) |
| 05/09/2019 | 77 | REPORT ON THE DETERMINATION OF AN ACTION Regarding a Patent or Trademark. (Closing). (Attachments: # 1 Judgment on the Verdict) (jp) (Entered: 05/09/2019) |
| 05/15/2019 | 78 | TRANSCRIPT ORDER as to Plaintiffs Lubby Holdings LLC, Vaporous Technologies, Inc. for Court Reporter. Court will contact William Ceravone at William.ceravone@adlilaw.com with further instructions regarding this order. Transcript |

**Appx0047**

| | | |
|---|---|---|
| | | preparation will not begin until payment has been satisfied with the court reporter. (Adli, Dariush) (Entered: 05/15/2019) |
| 05/16/2019 | 79 | PARTIAL TRANSCRIPT for proceedings held on 5/8/19 EXCERPT TRIAL DAY 2. Court Reporter: Carol Jean Zurborg, phone number (213) 894-3539. Transcript may be viewed at the court public terminal or purchased through the Court Reporter before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Notice of Intent to Redact due within 7 days of this date. Redaction Request due 6/6/2019. Redacted Transcript Deadline set for 6/17/2019. Release of Transcript Restriction set for 8/14/2019. (Zurborg, Carol) (Entered: 05/16/2019) |
| 05/16/2019 | 80 | NOTICE OF FILING TRANSCRIPT filed for proceedings 5/8/19 EXCERPT TRIAL DAY 2 re Transcript 79 THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY. (Zurborg, Carol) TEXT ONLY ENTRY (Entered: 05/16/2019) |
| 05/17/2019 | 81 | NOTICE OF MOTION AND MOTION for Judgment as a Matter of Law on the basis of: RULE 50 filed by defendant Henry Chung. (Attachments: # 1 Proposed Order) (Lee, Jen-Feng) (Entered: 05/17/2019) |
| 05/21/2019 | 82 | REQUEST to Set Trial Date *for the Equitable Issue of Patent Misuse; Alternative Request to Set Briefing Schedule In Lieu of Trial* filed by defendant Henry Chung. (Lee, Jen-Feng) (Entered: 05/21/2019) |
| 05/22/2019 | 83 | REQUEST for Ruling re Timing of Filing Motion for Attorney Fees filed by defendant Henry Chung. (Attachments: # 1 Exhibit A) (Lee, Jen-Feng) (Entered: 05/22/2019) |
| 05/22/2019 | 84 | NOTICE TO FILER OF DEFICIENCIES in Electronically Filed Documents RE: REQUEST for Ruling re Timing of Filing Motion for Attorney Fees 83 , REQUEST to Set Trial Date *for the Equitable Issue of Patent Misuse; Alternative Request to Set Briefing Schedule In Lieu of Trial* 82 . The following error(s) was/were found: Proposed Document was not submitted as separate attachment. In response to this notice, the Court may: (1) order an amended or correct document to be filed; (2) order the document stricken; or (3) take other action as the Court deems appropriate. You need not take any action in response to this notice unless and until the Court directs you to do so. (yl) (Entered: 05/22/2019) |
| 05/22/2019 | 85 | Opposition in Opposition to re: NOTICE OF MOTION AND MOTION for Judgment as a Matter of Law on the basis of: RULE 50 81 filed by Plaintiffs Lubby Holdings LLC, Vaporous Technologies, Inc.. (Attachments: # 1 Declaration of DGA in support of Plaintiffs' Opposition to Defendant's Rule 50(b) Motion)(Sherman, Drew) (Entered: 05/22/2019) |
| 05/22/2019 | 86 | Opposition in Opposition to re: NOTICE OF MOTION AND MOTION for Judgment as a Matter of Law on the basis of: Federal Rule of Civil Procedure 50(a) 68 filed by Plaintiffs Lubby Holdings LLC, Vaporous Technologies, Inc.. (Attachments: # 1 Declaration of DGA in support of Plaintiffs' Opposition to Defendant's Rule 50(a) Motion)(Sherman, Drew) (Entered: 05/22/2019) |
| 05/22/2019 | 87 | NOTICE OF ERRATA filed by Plaintiffs Lubby Holdings LLC, Vaporous Technologies, Inc.. correcting Objection/Opposition (Motion related), 85 (Attachments: # 1 Exhibit A: Corrected Declaration and Exhibits 1-7)(Adli, Dariush) (Entered: 05/22/2019) |
| 05/23/2019 | 88 | REQUEST FOR JUDICIAL NOTICE filed by Defendant Henry Chung. (Attachments: # 1 Exhibit A)(Lee, Jen-Feng) (Entered: 05/23/2019) |
| 05/23/2019 | 89 | TRANSCRIPT for proceedings held on 5/7/19 Trial Day 1. Court Reporter: Carol Jean Zurborg, phone number (213) 894-3539. Transcript may be viewed at the court public terminal or purchased through the Court Reporter before the deadline for Release of |

**Appx0048**

| | | |
|---|---|---|
| | | Transcript Restriction. After that date it may be obtained through PACER. Notice of Intent to Redact due within 7 days of this date. Redaction Request due 6/13/2019. Redacted Transcript Deadline set for 6/24/2019. Release of Transcript Restriction set for 8/21/2019. (Zurborg, Carol) (Entered: 05/23/2019) |
| 05/23/2019 | 90 | TRANSCRIPT for proceedings held on 5/8/19 Trial Day 2. Court Reporter: Carol Jean Zurborg, phone number (213) 894-3539. Transcript may be viewed at the court public terminal or purchased through the Court Reporter before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Notice of Intent to Redact due within 7 days of this date. Redaction Request due 6/13/2019. Redacted Transcript Deadline set for 6/24/2019. Release of Transcript Restriction set for 8/21/2019. (Zurborg, Carol) (Entered: 05/23/2019) |
| 05/23/2019 | 91 | TRANSCRIPT for proceedings held on 5/9/19 Trial Day 3. Court Reporter: Carol Jean Zurborg, phone number (213) 894-3539. Transcript may be viewed at the court public terminal or purchased through the Court Reporter before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Notice of Intent to Redact due within 7 days of this date. Redaction Request due 6/13/2019. Redacted Transcript Deadline set for 6/24/2019. Release of Transcript Restriction set for 8/21/2019. (Zurborg, Carol) (Entered: 05/23/2019) |
| 05/23/2019 | 92 | NOTICE OF FILING TRANSCRIPT filed for proceedings 5/7/19 Trial Day 1, 5/8/19 Trial Day 2 and 5/9/19 Trial Day 3 re Transcript 89 , 90 , 91 THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY. (Zurborg, Carol) TEXT ONLY ENTRY (Entered: 05/23/2019) |
| 05/23/2019 | 93 | NOTICE OF MOTION AND MOTION for Attorney Fees filed by Plaintiffs Lubby Holdings LLC, Vaporous Technologies, Inc.. Motion set for hearing on 6/24/2019 at 09:00 AM before Judge R. Gary Klausner. (Attachments: # 1 Memorandum of Points and Authorities in Support of Plaintiffs' Motion for Attorney's Fees, # 2 Declaration of DGA in support of Plaintiffs' Motion for Attorney's Fees, # 3 Proposed Order on Plaintiffs' Motion for Attorney's Fees) (Sherman, Drew) (Entered: 05/23/2019) |
| 05/23/2019 | 94 | APPLICATION to Re-Tax Costs against Henry Chung Re: Judgment, 76 filed by Plaintiffs Vaporous Technologies, Inc., Lubby Holdings LLC. (Sherman, Drew) (Entered: 05/23/2019) |
| 05/24/2019 | 95 | OBJECTIONS to REQUEST to Set Trial Date *for the Equitable Issue of Patent Misuse; Alternative Request to Set Briefing Schedule In Lieu of Trial* 82 filed by Plaintiffs Lubby Holdings LLC, Vaporous Technologies, Inc.. (Sherman, Drew) (Entered: 05/24/2019) |
| 05/24/2019 | 96 | MINUTES (IN CHAMBERS) Order Re: Defendant's Request for Guidance 83 by Judge R. Gary Klausner: Having read and considered Defendants' filing, the Court DENIES Defendants request. (jp) (Entered: 05/24/2019) |
| 05/27/2019 | 97 | RESPONSE filed by Defendant Henry Chungto Objection, 95 (Lee, Jen-Feng) (Entered: 05/27/2019) |
| 06/03/2019 | 98 | OPPOSITION to NOTICE OF MOTION AND MOTION for Attorney Fees 93 filed by Defendant Henry Chung. (Attachments: # 1 Declaration by Defense Counsel)(Lee, Jen-Feng) (Entered: 06/03/2019) |
| 06/06/2019 | 99 | OBJECTIONS to APPLICATION to Re-Tax Costs against Henry Chung Re: Judgment, 76 94 filed by Defendant Henry Chung. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C)(Lee, Jen-Feng) (Entered: 06/06/2019) |
| 06/06/2019 | 100 | NOTICE OF MOTION AND MOTION for New Trial *(pursuant to Rule 59(a))* filed by defendant Henry Chung. Motion set for hearing on 7/8/2019 at 09:00 AM before Judge |

**Appx0049**

| | | R. Gary Klausner. (Attachments: # 1 Memorandum of Points and Authorities, # 2 Declaration of Counsel, # 3 Exhibit A, # 4 Proposed Order) (Lee, Jen-Feng) (Entered: 06/06/2019) |
|---|---|---|
| 06/06/2019 | 101 | NOTICE OF MOTION AND MOTION to Alter Judgment re Judgment, 76 . *(pursuant to Rule 59(e))* filed by defendant Henry Chung. Motion set for hearing on 7/8/2019 at 09:00 AM before Judge R. Gary Klausner. (Attachments: # 1 Memorandum of Points and Authorities, # 2 Declaration of counsel, # 3 Exhibit A, # 4 Proposed Order) (Lee, Jen-Feng) (Entered: 06/06/2019) |
| 06/10/2019 | 102 | [DOCUMENT STRICKEN PER ORDER DATED ON 6/11/2019, SEE DOCKET ENTRY NO. 103] REPLY in Support of NOTICE OF MOTION AND MOTION for Attorney Fees 93 filed by Plaintiffs Lubby Holdings LLC, Vaporous Technologies, Inc.. (Adli, Dariush) Modified on 6/11/2019 (jp). (Entered: 06/10/2019) |
| 06/11/2019 | 103 | ORDER TO STRIKE ELECTRONICALLY FILED DOCUMENTS by Judge R. Gary Klausner: the following document(s) be STRICKEN for failure to comply with the Local Rules, General Order and/or the Courts Case Management Order: Reply 102 , for the following reasons: Document contains single-spaced text (LR 11-3.6). Counsel may refile within 24 hours. (jp) (Entered: 06/11/2019) |
| 06/11/2019 | 104 | REPLY in Support of NOTICE OF MOTION AND MOTION for Attorney Fees 93 filed by Plaintiffs Lubby Holdings LLC, Vaporous Technologies, Inc.. (Adli, Dariush) (Entered: 06/11/2019) |
| 06/17/2019 | 105 | MINUTES (IN CHAMBERS) Order Re: Defendant's Motion for Judgment as a Matter of Law 81 ; Defendant's Request to Set Trial Date for the Equitable Issue of Patent Misuse 82 by Judge R. Gary Klausner: The Court DENIES Defendant Chung's JMOL Motion and Trial Request. (SEE CIVIL MINUTE FOR FURTHER SPECIFICS). (jp) (Entered: 06/17/2019) |
| 06/17/2019 | 106 | NOTICE RE DEEPVAPES, INC. filed by defendant Henry Chung. (Lee, Jen-Feng) (Entered: 06/17/2019) |
| 06/17/2019 | 107 | Opposition Opposition re: NOTICE OF MOTION AND MOTION to Alter Judgment re Judgment, 76 . *(pursuant to Rule 59(e))* 101 filed by Plaintiffs Lubby Holdings LLC, Vaporous Technologies, Inc.. (Attachments: # 1 Declaration of DHS in support of Plaintiff's Opposition to Defendant's Rule 59(e) Motion)(Sherman, Drew) (Entered: 06/17/2019) |
| 06/17/2019 | 108 | Opposition Opposition re: NOTICE OF MOTION AND MOTION for New Trial *(pursuant to Rule 59(a))* 100 filed by Plaintiffs Lubby Holdings LLC, Vaporous Technologies, Inc.. (Attachments: # 1 Declaration of DGA in support of Plaintiffs' Opposition to Defendant's Rule 59(a) Motion)(Sherman, Drew) (Entered: 06/17/2019) |
| 06/19/2019 | 109 | SCHEDULING NOTICE TO ALL PARTIES AND ORDER by Judge R. Gary Klausner. Plaintiff's Motion for Attorney Fees 93 and Plaintiff's Motion to Retax Costs 94 , calendared for hearing on June 24, 2019, have been taken under submission and off the motion calendar. No appearances by counsel are necessary. The Court will issue a ruling after full consideration of properly submitted pleadings. THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY. (sw) TEXT ONLY ENTRY (Entered: 06/19/2019) |
| 06/19/2019 | 110 | AMENDED SCHEDULING NOTICE TO ALL PARTIES AND ORDER by Judge R. Gary Klausner. Plaintiff's Motion for Attorney Fees 93 , calendared for hearing on June 24, 2019, has been taken under submission and off the motion calendar. No appearances by counsel are necessary. The Court will issue a ruling after full consideration of properly submitted pleadings. The Application at 94 was incorrectly titled Application to Retax |

**Appx0050**

Costs and will be directed to the clerk for determination. THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY. (sw) TEXT ONLY ENTRY (Entered: 06/19/2019)

| | | |
|---|---|---|
| 06/24/2019 | 111 | REPLY in support of NOTICE OF MOTION AND MOTION for New Trial *(pursuant to Rule 59(a))* 100 filed by Defendant Henry Chung. (Lee, Jen-Feng) (Entered: 06/24/2019) |
| 06/24/2019 | 112 | REPLY in support of NOTICE OF MOTION AND MOTION to Alter Judgment re Judgment, 76 . *(pursuant to Rule 59(e))* 101 filed by Defendant Henry Chung. (Attachments: # 1 Declaration of Counsel, # 2 Exhibit B, # 3 Exhibit C)(Lee, Jen-Feng) (Entered: 06/24/2019) |
| 06/27/2019 | 113 | MINUTES (IN CHAMBERS) Order Re: Plaintiffs Motion for Attorneys Fees (DE93) by Judge R. Gary Klausner: The Court DENIES Plaintiffs' Motion for Attorneys' Fees 93 . (SEE CIVIL MINUTES FOR FURTHER SPECIFICS). (jp) (Entered: 06/27/2019) |
| 07/02/2019 | 114 | SCHEDULING NOTICE TO ALL PARTIES AND ORDER by Judge R. Gary Klausner. Defendant Henry Chung's Motion for New Trial 100 ; and Defendant Henry Chung's Motion to Alter Judgment 101 , calendared for hearing on July 8, 2019, have been taken under submission and off the motion calendar. No appearances by counsel are necessary. The Court will issue a ruling after full consideration of properly submitted pleadings. THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY. (sw) TEXT ONLY ENTRY (Entered: 07/02/2019) |
| 07/12/2019 | 115 | MINUTE (IN CHAMBERS) Order Re: Defendant's Rule 59(a) Motion for New Trial 100 ; Defendant's Rule 59(e) Motion to Alter Judgment 101 by Judge R. Gary Klausner: The Court DENIES Defendant Chung's Motion for New Trial and Motion to Alter Judgment. (jp) (Entered: 07/12/2019) |
| 08/12/2019 | 116 | NOTICE OF APPEAL to the 9th Circuit Court of Appeals filed by defendant Henry Chung. Appeal of Order on Motion for New Trial,, Order on Motion to Alter Judgment, 105 , Judgment, 76 , Minutes of In Chambers Order/Directive - no proceeding held, 115 . (Appeal Fee - $505 Fee Paid, Receipt No. 0973-24243958.) (Lee, Jen-Feng) (Entered: 08/12/2019) |
| 08/12/2019 | 117 | NOTICE OF APPEAL to the Federal Circuit Court of Appeals filed by defendant Henry Chung. Appeal of Order on Motion for New Trial,, Order on Motion to Alter Judgment, 105 , Judgment, 76 , Minutes of In Chambers Order/Directive - no proceeding held, 115 . (Appeal Fee - $505.00 Previously Paid on 08/12/2019, Receipt No. 0973-24243958.) (Lee, Jen-Feng) (Entered: 08/12/2019) |
| 08/12/2019 | 118 | NOTICE filed by Defendant Henry Chung. *Notice of Errata Re Appellate Filing* (Lee, Jen-Feng) (Entered: 08/12/2019) |
| 08/12/2019 | | TRANSMISSION of the Notice of Appeal, Docket Sheet, Judgment and or order e-mailed to the US Court of Appeals for the Federal Circuit re: Notice of Appeal to Federal Circuit Court of Appeals, 117 (car) (Entered: 08/12/2019) |
| 08/19/2019 | 119 | NOTIFICATION from Federal Circuit Court of Appeals of case number assigned and briefing schedule. Appeal Docket No. 19-2286 assigned to Notice of Appeal to Federal Circuit Court of Appeals, 117 as to Henry Chung. (car) (Entered: 08/20/2019) |
| 10/08/2019 | 120 | ABSTRACT of Judgment issued in favor of plaintiffs Vaporous Technologies, Inc., Lubby Holdings LLC and against Henry Chung in the principal amount of $ 863,936.10, interest in the amount of $.00, attorneys fees of $.00, costs of $.00. RE: Judgment, 76 (lc) (Entered: 10/10/2019) |
| 10/22/2019 | 121 | BILL OF COSTS. Costs Taxed in amount of $282.00 in favor of Plaintiff and against Defendant. RE: APPLICATION to Tax Costs against Henry Chung Re: Judgment, 76 94 |

**Appx0051**

Jen-Feng Lee, SBN 204328
jflee@ltpacificlaw.com
Kenneth K. Tanji, Jr., SBN 162273
ktanji@ltpacificlaw.com
**LT Pacific Law Group, LLP**
17800 Castleton Street, #560
City of Industry, CA 91748
T: 626-810-7200
F: 626-810-7300

Attorneys for Defendant
HENRY CHUNG

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LUBBY HOLDINGS LLC, a Delaware limited liability company; VAPOROUS TECHNOLOGIES, INC., a Delaware corporation;<br><br>             Plaintiffs,<br><br>       vs.<br><br>HENRY CHUNG, an individual; MING CHEN, an individual; DEEPVAPES, INC., a California Corporation d/b/a BOOM VAPORIZER; DOES 1-10, inclusive,<br><br>             Defendants. | No.   2:18-cv-00715-RGK-JC<br><br>**DEFENDANT HENRY CHUNG'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO DISMISS COMPLAINT PURSUANT TO FRCP 12(b)(6) FOR FAILURE TO STATE A CLAIM UPON WHICH RELIEF MAY BE GRANTED**<br><br>Date:       May 14, 2018<br>Time:       9:00 a.m.<br>Courtroom:  850<br>            Roybal Federal Building |

---

**MEMORANDUM RE: DEFENDANT HENRY CHUNG'S MOTION TO DISMISS**

63311                                                                 1

**Appx0053**

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.

### INTRODUCTION

Defendant Henry Chung ("Chung") hereby moves to dismiss the Complaint filed by Plaintiffs Lubby Holdings LLC and Vaporous Technologies, Inc., (Docket #1) for failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(6).

Defendant Chung operates his own vaping business. Defendant Chung developed his own technology that is incorporated into the products sold by his business.  Plaintiff seeks to damage Chung by filing this unfounded action.  As set forth below, Plaintiffs failed to plead the facts necessary to state a valid claim for relief in its Complaint against Defendant Chung.

### II.

### THE COMPLAINT

Plaintiffs' Complaint consists of one claim for Patent Infringement, accusing Chung of infringing claims of the '284 patent, entitled "Personal Vaporizer."

The Complaint alleges Chung manufactures, uses, sells, offers for sale, and/or imports products which use or incorporate one or more of claims 1-6, 10, 14, 16-18 of the '284 Patent (Complaint ¶¶18-20).

The Accused Products are described as including but not limited to CONSEAL A and CONSEAL B e-cigarette. (Complaint ¶18).

### III.

### LEGAL STANDARDS RE: 12(b)(6) MOTION TO DISMISS

Under Fed. R. Civ. P.  8(a), a complaint must contain a "short and plain statement of the claim showing that the [plaintiff] is entitled to relief."  If a complaint fails to do this, the defendant may move to dismiss it under Rule 12(b)(6).

A motion to dismiss under FRCP 12(b)(6) tests whether the complaint "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl.*

_____

**MEMORANDUM RE: DEFENDANT HENRY CHUNG'S MOTION TO DISMISS**

2

63311

*Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  When deciding a Rule 12(b)(6) motion, the court must accept the facts pleaded in the complaint as true, and construe them in the light most favorable to the plaintiff.  *Faulkner v. ADT Sec. Servs., Inc.*, 706 F.3d 1017, 1019 (9th Cir. 2013).  The court, however, is not required to accept "legal conclusions … cast in the form of factual allegations." *W. Mining Council v. Watt*, 643 F.2d 618, 624 (9th Cir. 1981).

After accepting all non-conclusory allegations as true and drawing all reasonable inferences in favor of the plaintiff, the court must determine whether the complaint alleges a plausible claim to relief.  *Iqbal* at 679-680.  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inferences that the defendant is liable for the misconduct alleged … The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id* at 678.

"[I]n the post-Twombly and Iqbal era, pleading on information and belief, without more, is insufficient to survive a motion to dismiss for failure to state a claim." *Solis v. City of Fresno*, No. 1:11-cv-00053 AWI GSA, 2012 WL 868681 *8 (E.D.Cal. March 13, 2012).  Now, the Plaintiff must on the face of the Complaint "provide the 'grounds' of his 'entitle[ment] to relief' … and a formulaic recitation of the elements of a cause of action will not do." *Twombly* at 555.

## IV.

## <u>LEGAL STANDARDS RE: PLEADING CLAIM</u>
## <u>FOR PATENT INFRINGEMENT</u>

The most recent amendments to the Federal Rules abrogated Rule 84.  FRCP 84 (abrogated).  Accordingly, Form 18 no longer provides a safe harbor for pleading direct infringement.

"[M]erely naming a product and providing a conclusory statement that it infringes a patent is insufficient to meet the 'plausibility' standard set forth in *Twombly*

---

**MEMORANDUM RE: DEFENDANT HENRY CHUNG'S MOTION TO DISMISS**

63311

Appx0055

and *Iqbal.*" *Medsquire LLC v. Spring Medical Sys., Inc.*, No. 2:11-cv-04504-JHN-PLA, 2011 WL 4101093, at *3 (C.D.Cal. Aug. 31, 2011).

To satisfy the requirements of *Iqbal* and *Twombly*, a plaintiff must "[P]rovide fair notice to [d]efendant of the specific infringements alleged.  Sufficient allegations would include, at a minimum, a brief description of what the patent at issue does, and an allegation that certain named and specifically identified products or product components also do what the patent does, thereby raising a plausible claim that the named products are infringing." *Bender v. LG Elecs. U.S.A., Inc.*, No. C09-02114 JF (PVT), 2010 WL 889541 at *6 (N.D.Cal. March 10, 2010) (emphasis added).

To state a claim for patent infringement, Plaintiff must state allegations sufficient to permit the court to infer the accused product infringes each element of at least one claim.  *Tannerite Sports, LLC v. Jerent Enterprises, LLC*, Case No. 15-cv-00180-AA, 2016 WL 1737740, at *3 (D. Or. May 2, 2016).

The complaint must identify the accused product and plead facts to show the accused product meets each and every limitation of at least one claim of the patent. *McAfee Enters., Inc. v. Yamaha Corp. of Am.*, No.2:16-2562-BRO (FFMx), 2016 WL 6920675 at *2-3 (C.D. Cal. June 24, 2016); *Agarwal v. Buchanan*, Case No. 17-cv-2182-BRO (MRWx), 2017 WL 5125752 at *4 (C.D.Cal. June 22, 2017).

In other words, Plaintiffs must plead sufficient facts to show that the accused products "practice all elements of a patent claim." *TeleSign Corp. v. Twilio, Inc.,* Case No. 16-cv-2106-PSG, 2016 WL 4703873, at *3 (C.D. Cal. Aug. 3, 2016).

**V.**

**<u>THE COMPLAINT FAILS TO STATE A CLAIM</u>**
**<u>OF PATENT INFRINGEMENT</u>**

Plaintiffs' Complaint fails to meet the pleadings standard set forth in *Twombly* and *Iqbal*, and thus should be dismissed for failure to state a plausible claim for relief.

---

**MEMORANDUM RE: DEFENDANT HENRY CHUNG'S MOTION TO DISMISS**

4

63311

**Appx0056**

Plaintiffs make only conclusory statements about Plaintiffs' alleged practice of the claimed methods.  The only "factual" allegations Plaintiffs makes are on information and belief (Complaint ¶¶18-19).

It is insufficient for Plaintiffs to simply recite claim elements and say the elements are met by the accused products.  Plaintiffs must provide a plain explanation for why or how the claim allegedly reads on the accused products.  In *McAfee* and *Agarwal*, the Court found sufficient pleading where the patentee alleged specific features of the accused products that are alleged to infringe the claims of the respective patents at issue (in *McAfee*, the accused product's "Fast Blast" feature; in *Agarwal*: magnets worn by the user of the accused product).

In contrast, other than identifying certain asserted claims 1-6, 10, 14, 16-18 (Complaint ¶20), Plaintiffs failed to state in any detail how the accused products, CONSEAL A and CONSEAL B E-cigarette allegedly infringed the '284 Patent.  Nor does the Complaint describe how any of Chung's products relate to the '284 Patent claims in general.

If Plaintiffs brought this action in good faith, they should be able to describe how they believe Chung's product infringe the '284 Patent.  Other than the foregoing conclusory allegation that was adapted from the language of 35 U.S.C. §271, the Complaint contains no specific factual allegations of the infringement by Defendant's accused products.

Plaintiff's single conclusory allegation is precisely the type of legal assertion the Court need not accept as true.  *Apollo Fin., LLC v. Cisco Sys., Inc.*, 190 F. Supp.3d 939, 942 (C.D.Cal. 2016).

In summary, Chung has no basis upon which to determine the plausibility of Plaintiffs' claims and respond to the Complaint's allegations of patent infringement.

## VI.

## CONCLUSION

---

**MEMORANDUM RE: DEFENDANT HENRY CHUNG'S MOTION TO DISMISS**

63311

5

**Appx0057**

For these reasons stated above, Plaintiffs' Complaint fails to meet the notice pleading requirements of Fed.R.Civ. Proc. 8, *Iqbal* and *Twombly*.  Chung respectfully requests the Court dismiss the Complaint in its entirety for failure to state a claim upon which relief may be granted.

Respectfully Submitted,
LT PACIFIC LAW GROUP LLP

Dated: March 30, 2018

/s/Jen-Feng Lee

By: _____

Jen-Feng Lee
Kenneth Tanji, Jr.
Attorneys for Defendant, Henry Chung

---

**MEMORANDUM RE: DEFENDANT HENRY CHUNG'S MOTION TO DISMISS**

63311

6

**Appx0058**

## <u>PROOF OF SERVICE</u>

The undersigned certifies that the foregoing document, **DEFENDANT HENRY CHUNG'S MEMORANDUM OF POINTS AND AUTHORITIES ISO the MOTION TO DISMISS COMPLAINT PURSUANT TO FED. R. CIV. P. 12(b)(6)**, was filed electronically in compliance with Local Rule 5 – 3.3 and Federal Rules of Civil Procedure.  As such, this document was served on all counsel deemed to have consented to electronic service.  Local Rule 5 – 4.1.3.All other counsel of record or per se parties not deemed to have consented to electronic service were served with a true and correct copy of the foregoing by U.S. Mail, as identified below:

NONE.

On this 30th day of March, 2018.

/s/Jen-Feng Lee_____
Jen-Feng Lee

---

**MEMORANDUM RE: DEFENDANT HENRY CHUNG'S MOTION TO DISMISS**

63311

7

Dariush G. Adli, Esq. (SBN: 204959)
  adli@adlilaw.com
Drew H. Sherman, Esq. (SBN: 237045)
  drew.sherman@adlilaw.com
Joshua H. Eichenstein (SBN 299392)
  Josh.eichenstein@adlilaw.com
ADLI LAW GROUP, P.C.
444 South Flower Street, Suite 3100
Los Angeles, California 90071
Telephone: 213-623-6546
Facsimile: 213-623-6554
Attorneys for Plaintiffs Lubby Holdings LLC,
Vaporous Technologies, LLC

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LUBBY HOLDINGS LLC, a Delaware limited liability company; VAPOROUS TECHNOLOGIES, INC., a Delaware corporation;<br><br>Plaintiffs,<br><br>v.<br><br>HENRY CHUNG, an individual; MING CHEN, an individual; DEEPVAPES, INC., a California Corporation d/b/a BOOM VAPORIZER; DOES 1-10, inclusive,<br><br>Defendants. | Case No.   2:18-cv-00715-RGK-JC<br><br>**PLAINTIFFS' FIRST AMENDED COMPLAINT AGAINST DEFENDANTS FOR PATENT INFRINGEMENT**<br><br>**JURY TRIAL DEMANDED** |

ADLI LAW GROUP, P.C.
www.adlilaw.com
(213) 623-6546

2087.202

PLAINTIFF'S FIRST AMENDED COMPLAINT AGAINST DEFENDANTS FOR PATENT INFRINGEMENT

**Appx0060**

of the '284 Patent, and knowing that the Accused Products are not staple articles of commerce suitable for a substantial use other than described herein.

54.     Plaintiffs have been and continues to be damaged by Defendants' use or incorporation of one or more claims of the '284 Patent in the Accused Products. Plaintiffs are informed and believe, and thereon allege, that, since Defendants have knowledge of the '284 Patent, Defendants knew or should have known that, without taking a license to the '284 Patent, their actions continue to be unlawful, thereby acting willfully.

### COUNT I – INFRINGEMENT OF U.S. PATENT NO 9,750,284

55.     The allegations contained in paragraphs 1-54 above are incorporated herein by reference and realleged as if fully set forth herein.

56.      Plaintiffs are the owners, assignees, and owner of the right, title, and interest in and to the '284 Patent, now and for the entire period of and relevant to the Defendants' to the use or incorporation of one or more claims of the '284 Patent in the Accused Products, including the right to assert all causes of action arising under said patent and the right to any remedies for infringement of it.

57.     Plaintiffs are informed and believe, and thereon allege, that Defendants are, and have been, on notice of the '284 Patent since before this lawsuit was filed.

58.     Plaintiffs are informed and believe, and thereon allege, that Defendants have directly infringed and/or indirectly infringed, literally and/or under the doctrine of equivalents, the '284 Patent under 35 U.S.C. § 271.

59.     Plaintiffs are informed and believe, and thereon allege, that Defendants have possessed and continue to possess the specific intent to encourage direct and indirect infringement of the '284 Patent by distributors and retailers who make, sell, or use the Accused Products that embody or otherwise practice one or more of the claims of the '284 Patent.

60.     Plaintiffs are informed and believe, and thereon allege, that Defendants' actions, including their sales, advertising, and instructions, have induced direct

13

**Appx0073**

ADLI LAW GROUP, P.C.
(213) 623-6546

2087.202



US 20160366945A1

(19) **United States**
(12) **Patent Application Publication**    (10) Pub. No.: US 2016/0366945 A1
    Rado                             (43) Pub. Date:       **Dec. 22, 2016**

(54) **PERSONAL VAPORIZER**

(71) Applicant: **Lubby Holdings, LLC**, Torrance, CA (US)

(72) Inventor: **J. Christian Rado**, Torrance, CA (US)

(21) Appl. No.: **15/253,664**

(22) Filed: **Aug. 31, 2016**

**Related U.S. Application Data**

(63) Continuation of application No. 14/985.389, filed on Dec. 30, 2015.

(60) Provisional application No. 62/098,197, filed on Dec. 30, 2014, provisional application No. 62/190,942, filed on Jul. 10, 2015.

**Publication Classification**

(51) **Int. Cl.**
    *A24F 47/00*        (2006.01)
    *F22B 1/28*         (2006.01)
(52) **U.S. Cl.**
    CPC ............ *A24F 47/008* (2013.01); *F22B 1/284* (2013.01); *H05B 2203/021* (2013.01)

(57)            **ABSTRACT**

A personal vaporizer is configured to be usable both for non-liquid vaporizing media and for liquid vaporizing media. In some embodiments an electrically conductive check valve blocks vaporizing media from leaking out of air intake apertures during periods of nonuse, and delivers electric power to a heating element during use. In some embodiments, no wick structures extend into a fluid chamber, but a wick extends from a wick holder downstream of the fluid chamber to a vaporizing chamber.



US 2016/0366945 A1

Dec. 22, 2016

9

preferably greater than two thirds the length of each heating element coil, and in some embodiments greater than about three fourths the length of each heating element coil. In further embodiments the wick diameter is about the same as or greater than the length of each heating element coil.

[0114] In the illustrated embodiment, the wick **480** is completely distal of the bottom wall **428** of the tank so that no wick portion extends into the fluid chamber **444**. As such, fluid flowing through the delivery holes is unconstrained by any wick or any other throttling structure. Similarly, fluid flow through the secondary fluid delivery holes is unconstrained by the presence of any wick. Instead, fluid flows freely through the fluid delivery holes and secondary fluid delivery holes, and accumulates in the proximal space above the wick. The proximal space enables fluid to spread out and evenly soak the wick. In the illustrated embodiment, the proximal space and wick are disposed within the proximal cavity of the atomizer module housing **336**.

[0115] In the illustrated embodiment, a cross sectional area of the wick is about the same as or greater than a cross-sectional area of the vapor passage **441**. Similarly, the cross-sectional area of the wick preferably is greater than the combined cross-sectional area of all of the fluid delivery holes. Further, preferably the cross-sectional area of the vapor passage is greater than the combined cross-sectional area of the fluid delivery holes. As such, the diameter of the vapor tube **440**, and cross-sectional area of the vapor passage **441**, can be maximized while the cross-sectional area dedicated to delivery tubes **429** is minimized, but without negatively affecting delivery flow of fluid through the wick **480** to the heating element **400**. For example, in some embodiments, a ratio of the vapor passage diameter to an outer diameter of the tank module **320** is greater than 0.2. In further embodiments, the ratio is between 0.2 and 0.3, and in further embodiments the ratio is about 0.25.

[0116] In the illustrated embodiment, a single, relatively large, centrally-located wick is held by the wick holder **470**. It is to be understood that other embodiments may employ a plurality of wick holding passages, and thus may hold a plurality of wicks. The plurality of wicks may each be smaller in diameter than the wick illustrated in FIG. **15**, although the wicks collectively may present a cross-sectional area approaching, the same as, or even greater than the wick in the illustrated embodiment, or greater than the cross-sectional area of the vapor passage. Additionally, such embodiments can be configured so that wicks are more evenly distributed about the vaporizing chamber **180**, and at or adjacent most or all portions of the heating element coils.

[0117] In the illustrated embodiment, the wick holder **470** can be removed from the transfer member **450** and replaced with another wick holder. The replacement wick holder may have a different configuration, may use different wick materials, or may simply be a new wick that hasn't been fouled by extensive use. Also, it is anticipated that different vaporizing liquids will have different viscosities. Thus, a user may wish to select a wick calculated to maximize device performance for a particular range of liquid viscosities. Notably, in the illustrated embodiment, the wick holder attaches to structure of the tank module **320**, and comes with the tank module as the tank module **320** is detached from the atomizer module. As such, the wick holder is easily accessed by simply removing the tank module, and without disassembling the tank.

[0118] The illustrated transfer member **450** and wick holder **470** are generally cylindrical in shape, and the illustrated wick holder **470** attaches to the transfer member **450** via a threaded connection. It is to be understood that, in additional embodiments, various ways of connecting the wick holder to the transfer member can be employed, such as a j-lock, detent, or slide-in mechanism. Also, the transfer member and/or wick holder and/or wick may have a non-circular cross-section. For example, in some embodiments the wick holder and wick may have a rectangular cross-sectional shape, and may be sized to correspond to the cross-sectional footprint of the heat element coils. As such, the wick may deliver vaporizing fluid to every part of the coils.

[0119] Continuing with reference to FIGS. **14** and **15**, and with additional reference to FIG. **23**, the mouthpiece module **330** comprises a tubular mouthpiece **490**, which in some embodiments can be substantially transparent, that is received into a proximal cavity into of a mouthpiece base **494**. A distal portion **496** of the mouthpiece base comprises an O-ring seat **498** that receives an O-ring **499**. A mouthpiece mount **500** has a central threaded passage **502** that engages the proximal portion of the vapor tube **440** so that the mouthpiece module **330** can be tightened atop the tank module **320**.

[0120] A distal cavity **504** of the mouthpiece mount receives an elastomeric seal **506** that engages the top wall **420** of the tank module **320** so as to seal a tank fill opening **508** and help provide a tight fit between the mouthpiece module **330** and the tank module **320**. The central threaded passage **502** opens into a proximal cavity **510** of the mount **500**, into which the distal portion of the mouthpiece base is placed. The O-ring on the mouthpiece base engages a wall of the mount proximal cavity to create a seal so that vapor that flows through the vapor passage **441** and central threaded passage is further directed through a mouthpiece outlet **512**.

[0121] To use the personal vaporizer described in connection with FIGS. **13-23**, The user loads the device with vaporizing media by ensuring the fluid chamber **444** comprises vaporizing liquid L and/or detaching the tank module **320** from the atomizer module **310** and placing a wax W in the vaporizing chamber **180**, and then replacing the tank module. The user then presses the battery button **29** and draws a breath through the mouthpiece. The heat element coils quickly heat up, vaporizing wax W within the vaporizing chamber **180** and/or liquid L delivered by the wick. Atmospheric air A is drawn through the battery air intake slots **46** and into distal cavity, from which it flows through side holes and into the distal cavity of the pin **360**. The ball **362** is dislodged from the seat **366**, and air A flows around the ball **362** and through any of the plurality of cap apertures **374** and air slots, past the coils and into the vaporizing chamber, where it is mixed with atomized vaporizing media, becoming a vapor V. the vapor V flows proximally through the vapor inlets of the transfer member **450** and into the vapor passage **441**, from which it is delivered via the mouthpiece to the user. As vaporizing liquid L is being atomized, replacement liquid L flows from the fluid chamber **444** through the fluid delivery tubes and secondary fluid delivery tubes into the proximal space proximal of the wick. The liquid L spreads across the diameter of the wick, and is then communicated through the wick to the coils **400**, where it is atomized and mixed with air A to form the vapor V.

Jen-Feng Lee, SBN 204328
jflee@ltpacificlaw.com
Kenneth K. Tanji, Jr., SBN 162273
ktanji@ltpacificlaw.com
**LT Pacific Law Group, LLP**
17800 Castleton Street, #560
City of Industry, CA 91748
T: 626-810-7200
F: 626-810-7300

Attorneys for Defendant
Henry Chung

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LUBBY HOLDINGS LLC, a Delaware limited liability company; VAPOROUS TECHNOLOGIES, INC., a Delaware corporation<br><br>            Plaintiffs,<br><br>     v.<br><br>HENRY CHUNG, an individual; MING CHEN, an individual; DEEPVAVES, INC., a California Corporation d/b/a BOOM VAPORIZER; DOES 1-10, inclusive,<br><br>            Defendants. | Case No.:2:18-cv-00715-RGK-JL<br><br>Defendant HENRY CHUNG's Answer to Plaintiffs' First Amended Complaint |

---

**Henry Chung's Answer to FAC**

1

18.63331

**Appx0129**

49. Deny.

50. Defendant does not have sufficient information to admit or deny the allegations about another party, and, on that basis, deny.

51. Deny.

52. Deny.

53. Deny.

54. Deny.

55. No need to respond.

56. No need to respond to legal conclusion made; denied as to allegations of infringement.

57. Admit as to having notice of the issuance of the '284 patent; deny as to having notice of the claimed substance as stated in the full patent document.

58. Deny.

59. Deny.

60. Deny.

61. Deny.

62. Deny.

63. Deny.

64. Deny.

65. Deny.

66. Deny.

67. Deny.

///

///

///

///

---

**Henry Chung's Answer to FAC**

18.63331

5

**Appx0133**

## AFFIRMATIVE DEFENSES

### First Affirmative Defense

Plaintiff failed to state a claim upon which relief can be granted.

### Second Affirmative Defense

Plaintiff's asserted patent is invalid for failure to comply with 35 U.S.C. sections 101, 102, 103, 112.

### Third Affirmative Defense

Plaintiff's claims are barred in whole or in part due to unenforceability by inequitable conduct, prosecution estoppel, or failure of duty of candor.

### Fourth Affirmative Defense

Plaintiff's claims are barred to the extent that some or all of the accused activities and/or products are licensed, expressly or impliedly.

### Fifth Affirmative Defense

To the extent Plaintiffs or their licensee have failed to properly mark or give notice as required by 35 U.S.C. §287, Plaintiffs' claims for recovery are limited in whole or in part. Plaintiffs are barred by 35 U.S.C. §288 from recovering costs.

### Sixth Affirmative Defense

Plaintiffs' claims are barred in whole or in part under doctrines of equity, including laches, waiver, estoppel, and/or unclean hands.

---

18.63331

**Appx0134**

Dariush G. Adli, Esq. (SBN: 204959)
  adli@adlilaw.com
Drew H. Sherman, Esq. (SBN: 237045)
  drew.sherman@adlilaw.com
Joshua H. Eichenstein (SBN: 299392)
  Josh.eichenstein@adlilaw.com
ADLI LAW GROUP, P.C.
444 South Flower Street, Suite 3100
Los Angeles, California 90071
Telephone: 213-623-6546
Facsimile: 213-623-6554

Attorneys for Plaintiffs
Lubby Holdings LLC,
Vaporous Technologies, LLC

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| LUBBY HOLDINGS LLC, a Delaware limited liability company; VAPOROUS TECHNOLOGIES, INC., a Delaware corporation;<br><br>*Plaintiffs,*<br><br>v.<br><br>HENRY CHUNG, an individual; MING CHEN, an individual; DEEPVAPES, INC., a California Corporation d/b/a BOOM VAPORIZER; DOES 1-10, inclusive,<br><br>*Defendants.* | Case No: 2:18-cv-00715-RGK-JC<br><br>*Honorable R. Gary Klausner*<br>*United States District Judge*<br><br>**PLAINTIFF LUBBY HOLDINGS, LLC., et. al. CONTENTIONS OF FACT AND LAW**<br><br>**Pretrial Conference:**<br>**March 18, 2019 at 09:00 AM**<br><br>**Jury Trial Date:**<br>**April 2, 2019 at 09:00 AM** |

ADLI LAW GROUP, P.C.
www.adlilaw.com
(213) 623-6546

PLAINTIFF LUBBY HOLDINGS, LLC., et. al. CONTENTIONS OF FACT AND LAW

2087.202

# MEMORANDUM OF CONTENTIONS OF FACT AND LAW

Pursuant to Local Rule 16-4, Plaintiffs Lubby Holdings LLC, and Vaporous Technologies, Inc. (hereinafter collectively as "Plaintiffs" submit their Memorandum of Contentions of Fact and Law. Claims and Defenses. Plaintiffs have pleaded and indicated they plan to puruse the following claims agasint Defendants HENRY CHUNG, an individual; MING CHEN, an individual; DEEPVAPES, INC., a California Corporation d/b/a BOOM VAPORIZER.

## A. Summary of Plaintiffs' Claims:

- CLAIM 1: Defendants knowingly and willfully infringed Plaintiffs' exclusive rights to patent No. 9,750,284 (hereinafter "the '284 Patent" or "the Patent In Suit") under 35 U.S.C § 271;

The elements required to establish a claim for patent infringement are:

1. Defendants have made, used, sold, offered for sale, or imported within the United States a product; and

2. Defendants' product include each and every element of at least one asserted claim of the Patent In Suit.

The elements required to establish willful infringement are:

1. Infringement of a patent claim, and

2. The preponderance of the evidence indicates that Defendants intentionally ignored or recklessly disregarded the claims of '284 Patent. See N.D. Cal. Model Jury Instructions §§ 3.2, 3.3, 3.10. *Apple Inc. v. Samsung Elecs. Co.,* 258 F. Supp. 3d 1013, 1023 (N.D. Cal. 2017)

## B. Summary of Plaintiff's Key Evidence in Support of its claims

- Testimony of Plaintiff's Expert: Andreas Brekke establishing infringement of the '284 Patent
- Andreas Brekke' written analysis and acocmpanying Exhibits establishing infringement of the '284 Patent

ADLI LAW GROUP, P.C.
www.adlilaw.com
(213) 623-6546

2087.202

- Testimony of Christian Rado concering inventorship the Patent In Suit, and relationship with Defendants, specificallt Henry Chung
- Evidence showing NDA between Rado and Chung dated July 22, 2015 which involved sharing confidential information from Plaintiff to Defendant
- Evidence showing second NDA between Plaintiff and Henry Chung dated October 27, 2015
- Evidence showing supply agreement dated October 14, 2015 between Plaintiff and Defendant
- Evidence showing Henry Chung is the registrant, admin and tech contat for BoomVaporizer.com;
- Evidence showing email communications between Parties establishing willfulness;
- The issued '284 Patent;
- The prosecution history file of the '284 Patent.

**C. DEFENDANT'S AFFIRMATIVE DEFENSES:**

In the Rule 16 conference of Counsel, the Defendants did not state their intention to assert any affirmative defenses.

**D. Anticipated Evidenary Issues:**

The deadline to file motions in limine has passed and Defendants have not filed any. Therefore Defendants have waived any evidenatiry issues they may have against Plaintiff's evidence. No evidentary issues were identified in the Rule 16 Conference of counsel. Plaintiffs anticipate a disagreement regarding Defendant's evidence regarding sales of infringing products.

**E. Anticipated Issues of Law**

Plaintiffs are not aware of any issues of law and none were discussed during the Rule 16 conference of counsel. Plaintiffs reserve the right to supplement this brief

ADLI LAW GROUP, P.C.
www.adlilaw.com
(213) 623-6546

3

PLAINTIFF LUBBY HOLDINGS, LLC., et. al. CONTENTIONS OF FACT AND LAW

2087.202

if Defendants raise any further issues in this regard.

## I.      Bifurcation of Issues

Plaintiffs do not request bifurcation of any issues in this case.

## II.     Jury Trial

The Court set a jury trial in its July 16, 2018 Order (ECF Dkt. 28). The jury trial is currently set for April 2, 2019. All claims and affirmative defenses are triable to a jury.

Enhanced Damages

Plaintiffs have contended that Defendants infringement of the '284 Patent was willful.   Plaintiffs plan to ask the Court to award enhanced damages based on willfulness.

## III.    Attorneys' Fees

Plaintiffs request this case be declared exceptional within the meaning of 35 U.S.C. §285 as interpreted by the Supreme Court in *Octane Fitness,* and therefore entitled to attorneys' fees , costs, and expenses incurred in connection with the action as stated in its prayer for relief. *See Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 572 U.S. 545, 553 (2014)

The Court has discretion to award reasonable attorneys' fees and costs to the prevailing party in exceptional cases. *Id.*

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

ADLI LAW GROUP, P.C.
www.adlilaw.com
(213) 623-6546

2087.202

4

PLAINTIFF LUBBY HOLDINGS, LLC., et. al. CONTENTIONS OF FACT AND LAW

## IV.        Abandonment of Issues

Defendants abandoned all affirmative defenses.

Dated: February 25, 2019                ADLI LAW GROUP, P.C.


By:  */s/ Dariush G. Adli*
     Dariush Adli
     Drew Sherman
     Joshua Eichenstein
     *Attorneys for Plaintiff*
     Lubby Holdings LLC,
     Vaporous Technologies, LLC

ADLI LAW GROUP, P.C.
www.adlilaw.com
(213) 623-6546

5

PLAINTIFF LUBBY HOLDINGS, LLC., et. al. CONTENTIONS OF FACT AND LAW

2087.202

**Appx0150**

Jen-Feng Lee, SBN 204328
jflee@ltpacificlaw.com
Kenneth K. Tanji, Jr., SBN 162273
ktanji@ltpacificlaw.com
**LT Pacific Law Group, LLP**
17800 Castleton Street, #560
City of Industry, CA 91748
T: 626-810-7200
F: 626-810-7300

Attorneys for Defendant
HENRY CHUNG

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LUBBY HOLDINGS LLC, a Delaware limited liability company; VAPOROUS TECHNOLOGIES, INC., a Delaware corporation; <br><br> Plaintiffs, <br><br> vs. <br><br> HENRY CHUNG, an individual; MING CHEN, an individual; DEEPVAPES, INC., a California Corporation d/b/a BOOM VAPORIZER; DOES 1-10, inclusive, <br><br> Defendants. | No.   2:18-cv-00715-RGK-JC <br><br> DEFENDANT HENRY CHUNG'S LR-16 Memorandum of Contention of Fact and Law <br><br><br> FPTC:   03/18/2019,   9 am <br> Trial:    04/02/ 2019,  9 am <br><br> Hon. R. Gary Klausner |

_____

**DEFENDANT CHUNG'S Memorandum of Contention of Fact and Law**

1

63311

**Appx0151**

# I. **INTRODUCTION**

Plaintiffs Lubby Holdings LLC and Vaporous Technologies, Inc. ("Plaintiffs") sued Defendant Chung, and others, for infringement of the 9,750,284 Patent ("284 Patent").

Christian Rado ("Rado") is the sole inventor of the 284 Patent.

The 284 Patent disclosed and claimed a certain "Personal Vaporizer."  One of the patented features in the 284 Patent includes "an electrically conductive check valve" that "blocks vaporizing media from leaking out of air intake apertures during periods of nonuse" (quoted from the Abstract, and similar description in the Specification).

The application ("Application') for the 284 Patent was filed on 08/31/2016.

The Application was published (triggering potential section 154(d) provisional damages right) on 12/22/2016.

The 284 Patent was issued on 09/05/2017.

Plaintiff filed the instant action ("Action') on 01/26/2018.

Plaintiffs alleged that Defendants (including Defendant Chung) manufacture, use, sell, offer for sale, and/or import products CONSEAL A and CONSEAL B ("Accused Products") which infringed upon claims 1, 2, 6, 10, 16, 17 and 18 of the 284 Patent.

Defendant Chung produced sales record[1] of the Accused Products that shows total sales of $194,838.05, from 3/1/2016 to 2/1/2018. In total, 43,203 units were sold.

The sales record of the Accused Products shows post-issuance sales of $41,283.30, from 9/6/2017 to 2/1/2018. In total, 8,689 units were sold, post-issuance.

---

[1] As of August 20, 2018, Defendant Chung gave explicit discovery response to Plaintiffs that all the sales were made by the corporate entity of Esquire Distribution, Inc., a corporation owned by Defendant Chung. Defendant Chung did not import or sell any of the Accused Products. The discussion herein is for the purpose of Plaintiff's potential entitlement to damages (against Esquire Distribution, a party not in this suit) and certainly not Chung's potential liability for damages when Chung imported/sold zero unit of the Accused Products. The Accused Products were made by a factory in China; the identity of said factory was disclosed to Plaintiffs during discovery.

**DEFENDANT CHUNG'S Memorandum of Contention of Fact and Law**

2

63311

Claims 1 and 10 are independent claims. All the asserted claims of the 284 Patent are listed herein, showing all the elements that Plaintiffs must prove to exist on the Accused Products:

1. A personal vaporizer, comprising:

a tank module comprising a fluid chamber and a vapor passage extending through the fluid chamber, the fluid chamber configured to contain a vaporizing solution;

an atomizer module comprising a bowl having an upper edge and an air aperture, a heating element arranged in or adjacent the bowl, the bowl configured to accept vaporizing solution received from the fluid chamber;

a check valve comprising an insulator housing, a conductive shell inside the insulator housing, and a sealing mechanism inside the conductive shell, the conductive shell having an air inlet and an air outlet, an intake air flow path defined through the conductive shell from the air inlet to the air outlet, the sealing mechanism providing a seal inside the conductive shell, the seal interposed in the intake air flow path, the check valve arranged so that that the air outlet communicates with the bowl air aperture and the conductive shell is electrically connected to the heating element; and

a battery assembly, the heating element connectable to the battery assembly through the check valve so that actuation of the battery delivers electrical energy to the heating element, causing the heating element to heat and vaporize the vaporizing solution;

wherein the bowl has a first wire hole and a second wire hole extending through a bottom wall of the bowl and a channel extending transversely from the second wire hole.

2. The personal vaporizer as in claim 1, wherein the heating element has a first connection and a second connection, the first connection extending through the first wire hole and contacting the conductive shell, and the second connection extending through the second wire hole and the channel and spaced away from the conductive shell.

6. The personal vaporizer as in claim 2, wherein the check valve is part of the atomizer module.

10. An atomizer for a personal vaporizer, comprising:

a housing having a distal end and a proximal end, the housing comprising an electrically conductive material, the distal end configured to be attachable to a first pole of a battery so that the distal end electrically communicates with the battery;

an atomizer bowl arranged within the housing, the atomizer bowl comprising a side wall and a bottom wall, the atomizer bowl configured to receive vaporizing media;

a heating element disposed at least partially within the atomizer bowl, the heating element having a first wire end portion and a second wire end portion, the heating element configured to produce heat when electric energy is applied across the first wire end portion and the second wire end portion;

a check valve having a valve body, a proximal outlet, a distal inlet, and a sealing structure interposed in an air flow path between the distal inlet and the proximal outlet, the valve body extending from a distal end to a proximal end and defining an electrically conductive flow path from the distal end to the proximal end, the sealing structure configured to accommodate air flow therethrough along the air flow path in a distal-to-proximal direction, but to resist air flow therethrough in a proximal-to-distal direction;

wherein the first wire end portion is in electrical communication with the proximal end of the valve body and the second wire end portion is in electrical communication with the housing.

16. The atomizer as in claim 10, wherein the sealing mechanism comprises a ball and a valve seat.

17. The atomizer as in claim 16, wherein the ball is biased toward engagement with the valve seat.

18. The atomizer as in claim 10, additionally comprising a tank disposed proximal of the atomizer bowl, the tank configured to contain a liquid vaporizing media therewithin and to deliver the liquid vaporizing media to the atomizer bowl.

## II

## ELEMENTS REQUIRED  IN PLAINTIFFS' CASE

First: Liability

It is Plaintiff's burden to prove infringement. Plaintiff has to prove that the accused products contained all the elements in the asserted claims. This is the **"all-elements-rule"**: even if one claim limitation, or its equivalent, is not present in the accused device, there cannot be infringement. *Bell Atlantic Network v. Covad Comm.*, 262 F.3d 1258 (Fed. Cir. 2001).

Plaintiffs relied upon technical expert Mr. Andreas Brekke to prove liability.

Second: Damages

Even if infringement liability is proven, Plaintiffs still need to prove extent of damages.

In this case, there is **no document or information** to show Plaintiffs suffered any loss of sales. As such, Plaintiff has no way of proving Loss Profit damages.

_____

**DEFENDANT CHUNG'S Memorandum of Contention of Fact and Law**

4

**Appx0154**

Plaintiffs, however, may be entitled to reasonable royalty as damages compensation, under 35 USC §284: "in no event less than a reasonable royalty for the use made of the invention by the infringer".

Plaintiffs' right to recover damages, nonetheless, is limited by the "marking" requirement of 35 USC §287. If the marking requirement is not satisfied, Plaintiffs' damages accrual does not start until the filing of an infringement suit.

Plaintiffs allegedly are asking for damages under 35 USC §154(d) for provisional damages right, which allows recovery of reasonable royalty after publication of the application **and** if the infringer has "actual notice" of the published application.

Plaintiffs allegedly are asking for increased damages (in this Action, only reasonable royalty). Per 35 USC §284: Increased damages under this paragraph shall not apply to provisional rights under 35 USC §154(d).

## III.

### ELEMENTS IN DEFENDANT'S CASE

Defendant Chung does not practice Plaintiffs' 284 Patent because he has no need to.

Defendant Chung has his own patents that are earlier than Plaintiff's 284 Patent. The factory in China made the Accused Products by referencing/utilizing Chung's own patented technology (9,380,811; 9,380,812; and 9,440,035; all are earlier than the asserted 284 Patent) as well as those commonly known features found on many vaporizers sold in the public domain.

In another word, the Accused Products were designed and made without reference to any of the teaching embodied in the 284 Patent.

Moreover, Defendant Chung will testify that Accused Products are made by adapting his earlier product mock-ups at least as early as Feb. 2014 (product photos were produced and identified in the exhibits), which was more than two (2) years

---

before the 284 Patent's filing date. To the extent some of the claimed elements of the 284 Patent can assert priority date up to its earliest parental (provisional) application date 12/30/2014 (application number 62/098,197; provisional application is never published), Chung's product designs, including those technical details used and implemented in the Accused Products, were still earlier than Plaintiffs' earlier date.

Even if the earlier-made facts are disregarded, the Accused Products are still non-infringing, because Plaintiffs fail to satisfy the **all-elements rule**.

Claims 1 and 10 define very specific implementation details, which cover a limited scope of improvement over the commonly available personal vaporizer. The accused products, basing on common personal vape product mechanism and Chung's own patented technology, simply do not have those parts that meet the claim limitations stated.

The dependent claims added more elements to the base configurations defined in the two (2) independent claims. Plaintiffs must prove that the Accused Products contained all these added elements of the dependent claims: an impossible task because the Plaintiffs are already failing in the all-elements-rule threshold in relation to the two (2) independent claims.

Defendant Chung timely produced his rebuttal expert report along with the materials referenced/used by expert George Wakalopulos, who will testify at trial as to Plaintiffs' failure to meet the all-elements-rule requirement.

Defendant Chung did not raise counterclaim of invalidity. However, Defendant Chung raised certain affirmative defenses that may come into play based upon the evidence presented at trial.

Second Affirmative Defense:

Invalidity based upon, including and not limited to, sections 101, 102, 103, or 112.

Eighth Affirmative Defense:

_____

**DEFENDANT CHUNG'S Memorandum of Contention of Fact and Law**

6

**Appx0156**

Patent misuse. It is a patent misuse if the patentee tries to expand the scope of the patent in a way that has an anti-competitive effect. *B. Braun Med. V. Abbot Labs*, 124 F.3d 1419, 1426 (Fed. Cir. 1997).

## IV.

## **LIMITED DAMAGES, EVEN IF INFRINGEMENT IS FOUND**

Neither side retained a damages expert.

Plaintiffs' damages compensation has only one form: reasonable royalty.

Plaintiffs' entitlement to damages (against a non-party Esquire Distribution, Inc.) is very limited due to the very short damages accrual period and the low total damages-qualified sales amount.

Defendant Chung produced Esquire Distribution's sales report which listed all the sales of the Accused Products with two (2) damages accrual periods: 3/1/2016 to 2/1/2018 and 9/6/2017 to 2/1/2018.

The total sales amount (3/1/2016 to 2/1/2018) is $194,838.05.

The damages-qualified factors include, and as explained further below:

(a) 9/5/2017: the patent issuance date (no exclusive right to enforce prior to issuance);

(b) 12/22/2016:The publication date for the provisional damages claims under 35 USC §154(d);

(c) Marking requirement.

Since the patent was issued on 9/5/2017, Plaintiff's damages period is limited to the duration between 9/6/2017 and 2/1/2018. (No right to claim infringement damages before patent issuance. No accused products were sold after 2/1/2018.)

To the extent Plaintiffs can lay claim to section 154(d) provisional damages claim (by proving Chung to have received "actual notice" of the published application that happened on 12/22/2016; however, Plaintiff produced no evidence in this regard), the royalty damages claims period is limited to between 12/23/2016 and 2/1/2018. This

---

**DEFENDANT CHUNG'S Memorandum of Contention of Fact and Law**

7

63311

is fourteen (14) months of potential damages within the 23 months' time (3/1/2016 – 2/1/2018) that has total sales of $194,838.05. To say it simply, Plaintiffs may have a chance to engage in the reasonable royalty calculation based upon the gross sales amount of some $118.597 (derived by $194.838 x 14 / 23). A 5% royalty (unsubstantiated by any evidence) would get Plaintiff the damages compensation amount of $5,929.

Last but not least, a patentee's right to claim damages is also limited by the compliance with the "marking" requirement under section 287.

If Plaintiffs fail to prove that they properly satisfied the marking requirement, the damages-qualified amount of sales is limited to **six (6) days**: from 1/27/2018 to 2/1/2018, with a projected sales revenue of $1,411 (interpolated from 23 months' amount). The royalty percentage, at this $1,411 point, is not really relevant.

## V.

## ANTICIPATED EVIDENTIARY ISSUES AT TRIAL

During the LR 16-2 conference of counsel, it was agreed that all the exhibits at trial will be compiled from the documents produced during discovery (discovery cut-off date 1/4/2019); no Motion In Limine was needed in this respect.

Plaintiff's evidence to produce/prove liability and damages:

(1) Opening expert report/testimony to prove liability;

(2) No evidence of any loss profit;

(3) No evidence "actual notice" re section 154(d) provisional claim;

(4) No evidence of any reasonable royalty per section 284;

(5) No evidence of proper marking per section 287.

Defendant's evidence to rebut liability and for affirmative defenses:

(1) Rebuttal expert report/testimony to counter liability;

---

**DEFENDANT CHUNG'S Memorandum of Contention of Fact and Law**

8

63311

**Appx0158**

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | CV 18-00715-RGK (JCx) | Date | March 18, 2019 |
|---|---|---|---|
| Title | LUBBY HOLDINGS LLC, et al. v. HENRY CHUNG, et al. | | |

| Present: The Honorable | R. GARY KLAUSNER, UNITED STATES DISTRICT JUDGE |
|---|---|

| Sharon L. Williams | Sandra MacNeil | N/A |
|---|---|---|
| Deputy Clerk | Court Reporter / Recorder | Tape No. |

| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
|---|---|
| Dr. Dariush Adli; Drew Sherman and Joshua Eichenstein | Jen-Feng Lee |

**Proceedings:**     **PRETRIAL CONFERENCE**

Case called.  Counsel state their appearances.  Court and counsel confer re jury impanelment, court hours, admitted evidence and the voir dire process.

Not later than March 21, 2019, counsel shall file damage disclosure motions and briefing on Rule 37 objections.  Counsel shall file a brief (1 paragraph) joint statement of the case to be read to the jury and an updated witness list.  Every day of trial, counsel shall submit to the Court a list of witnesses to be called, in the order they will be called.  The Court informs counsel that it intends to impose time limits of 3 to 4 hours per side, and will give final time limits on the first day of trial.

Counsel may contact the Court if they feel that a further settlement conference with a Magistrate Judge would be beneficial.

**IT IS SO ORDERED.**

|  | : | 18 |
|---|---|---|
| Initials of Preparer | slw | |

Jen-Feng Lee, SBN 204328
jflee@ltpacificlaw.com
Kenneth K. Tanji, Jr., SBN 162273
ktanji@ltpacificlaw.com
**LT Pacific Law Group, LLP**
17800 Castleton Street, #560
City of Industry, CA 91748
T: 626-810-7200
F: 626-810-7300

Attorneys for Defendant
HENRY CHUNG

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LUBBY HOLDINGS LLC, a Delaware limited liability company; VAPOROUS TECHNOLOGIES, INC., a Delaware corporation;<br><br>Plaintiffs,<br><br>vs.<br><br>HENRY CHUNG, an individual; MING CHEN, an individual; DEEPVAPES, INC., a California Corporation d/b/a BOOM VAPORIZER; DOES 1-10, inclusive,<br><br>Defendants. | No.  2:18-cv-00715-RGK-JC<br><br>DEFENDANT HENRY CHUNG'S **Brief** re **Damages Disclosure and Sanctions**<br><br><br><br><br>Hon. R. Gary Klausner |

During Final Pre-Trial Conference held on 3/18/2019, parties reported to the Court regarding Rule 26 damages disclosure dispute that went on during the past month. Pursuant to the Court's order, Defendant Chung presents this brief.

_____

**DEFENDANT CHUNG'S Brief re Damages Disclosure and Sanctions**

63311

1

**ISSUE**: Whether Plaintiffs complied with the Rule 26 damages disclosure obligation, and, if not, whether Rule 37 sanction should apply to Plaintiffs, forbidding the use at trial any information or evidence that is not properly disclosed.

## I. Summary Facts Leading Up to The Disputed Issue

a. Fact discovery ended on January 4, 2019.

b. Parties timely exchanged expert reports on patent technical issues (infringement and invalidity); neither party engaged damages experts.

c. By 2/25/2019, when Plaintiffs filed their LR-16 Memorandum of Contention of Facts and Laws ("Contention", ECF #35), Plaintiffs did not make any rule-complaint disclosure re computation of damages.

d. Based upon all of Plaintiffs' disclosures, including all discovery documents, Defendant Chung did not receive the rule-compliant damages disclosure from Plaintiffs. See **Declaration by Defense Counsel**.

e. Starting on 2/26/2019, parties engaged in meet-and-confers (via letters, emails and phone conferences) related to Plaintiffs' failure to make proper damages disclosure during discovery, including their pre-trial disclosure obligation under Rule 26(c). Defendant's letters are attached as **Exhibit A**.

f. Plaintiffs provided no "computation of damages" of any kind related to how, or how much, they plan to seek for damages under the Lost Profit category or the Reasonable Royalty category. (The only "damages computation" Plaintiffs provided was through a phone discussion where Plaintiffs' counsel indicated that they would seek $0.75-per-piece royalty, a figure first disclosed to Defendant during the 2/20/2019 mediation. However, there is no such disclosed basis, or formula of royalty demand, for the $0.75-per-piece royalty outside of the mediation context.)

---

**DEFENDANT CHUNG'S Brief re Damages Disclosure and Sanctions**

2

63311

**Appx0165**

g. Plaintiffs pointed to their 1st Supplemental Rule 26(e) Disclosures (served on 1/3/2019) and asserted that they complied with the litigation rules re damages disclosure; said Supplemental Rule 26(e) Disclosure was attached as **Exhibit B.**

h. Given all of Plaintiffs' 35 pages of produced documents (excluding patent and prosecution files), the Rule 26(a) Initial Disclosure, the Supplemental Rule 26(e) Disclosure and tidbits gleaned from Plaintiffs' ECF #35 Contention, there is no computation of any kind related to the two categories of damages Plaintiffs are seeking: either Lost Profit or Reasonable Royalty

## II.      Arguments

Rule 26(a)(1)(A)(iii) requires disclosure of "computation of each category of damages claimed" by the Plaintiff. A plaintiff "cannot shift to the defendant the burden of attempting to determine the amount of the plaintiff's alleged damages." *Jackson v. United Artists Theatrie Circuit*, 278 F.R.D. 586, 593 (D. Nev. 2011). Defendants are not required to compute damages.

The damages disclosure obligation is codified in Rule 26(a) (Initial Disclosure") and is further included in Rule 26(e) (Supplemental Disclosure) and Rule 26(a)(3) (Pretrial Disclosure).

Simply providing documents or other information and assuming that the defendant will somehow divine the plaintiff's damages computation from those documents or other information is insufficient and not in accord with the requirements of Rule 26(a) and (e). *Patton v. Wal-Mart Stores,* 2013 wl 6158461, at *4.

Rule 37(c)(1) gives teeth to these requirements by forbidding the use at trial of any information required to be disclosed by Rule 26(a) that is not properly

_____

**DEFENDANT CHUNG'S Brief re Damages Disclosure and Sanctions**

3

63311

disclosed.  *Ketab Corp. v. Mesriani Law Group*, 2016 WL 5921767, at \*1 (citing to *Yeti by Molly v. Deckers Outdoors*, 259 F.3d 1101, 1106 (9th Cir. 2001)).

This point of law (Rule 26 obligation re disclosure of damages computation and Rule 37 "self-executing sanction unless justified") is abundantly clear.

This Court in fact dealt with a similar factual scenario and made a ruling consistent with the authorities cited herein. See *Hsu v. Thorsen Tool*, 2014 WL 12607677.

A few of the Central District of California similar rulings are given herein.

*Frontline Medical v. Coventry Health Care*, 263 FRD 567 (2009)

*Spin Master v. Zobmondo Entertainment*, 2011 WL 13127349.

*TCL Comm. v. Telefonaktienbolaget LM Ericsson*, 2016 WL 6562075.

*Bennion and Deville Fine Homes v. Windermere* , 2018 WL 4802011.

The court in *Hoffman v. Construction Protective Svs.*,  541 F.3d 1175, at 1180 (9th Cir. 2008) held that 'we reject the notion that the district court was required to make a finding of willfulness or bad faith to excluded the damages evidence. To the contrary, the portion of Rule 37 relied on by the district court has been described as "a self-executing, automatic sanction to provide a strong inducement for disclosure of materials" . . . The implementation of the sanction is appropriate "even when a litigant's entire cause of action … [will be] precluded"'.

During repeated meet-and-confers, Plaintiffs asserted, in counsel's 3/6/2019 11:23 pm email, that '[P]laintiff in our case has met its obligations for the damages calculations under these standards. Our client's supplemental disclosures states that we will seek damages in the form of "Plaintiff's losses from Defendants' sales of infringing products, as measured by Plaintiffs' retail price of each sale of Defendants' infringing products". Thus, from that statement, your client was able to gauge his risk factor and make informed decision for settlement and the litigation.'

_____

**DEFENDANT CHUNG'S Brief re Damages Disclosure and Sanctions**

4

63311

**Appx0167**

Plaintiffs' Supplemental Rule 26(e) Disclosures (see **Exhibit B**) at most amounted to "broad types of damages", which fell short of the "lump sum statement of damages", much less a "more detailed specification of damages", as instructed by *City and County of San Francisco v. Tutor-Saliba Corp.*, 218 FRD 219, 221 (N.D. Cal. 2003).

For the claimed Lost Profit damages sought by Plaintiffs, the explanation in *Frontline Medical*, at 569 (citing to *Design Strategy v. Davis*, 469 F.3d 284, 295; 2nd Cir. 2006) is applicable: there is nothing close to the required "computation of expenses and lost profits", and supported by documents.

For the claimed Reasonable Royalty damages sought by Plaintiffs, the ruling in *Veritas Operating Corp. v Microsoft*, 2008 WL 657936 (adopted as 2008 WL 687116) is instructive: Microsoft's claim of reasonably royalty fee for the asserted 5,884,147 patent is denied for failure to provide a "specific computation of damages" that Veritas was entitled to.

The *TCL Comm, v. Telefonaktienbolaget* court gave a similar ruling: TCL's lack of making damages disclosure in its 26(a) and (e) disclosures, including all other discovery responses and productions, warranted the grant of defense motion of no damages, including its reasonable royalty claims.

### III.     Conclusion

During discovery, Defendant Chung produced the sales information of the accused products for Plaintiffs to engage in the needed computation of damages.

Leading up to the trial prep phase, Plaintiffs provided no rule-compliant disclosure of damages computation, given all the Plaintiffs' exhibits (Nos. 101 – 117, identified in Joint Exhibit List filed as ECF #36) and the "Summary of Plaintiffs' Key Evidence in Support of its claims" in Plaintiffs' Contention (ECF #35),  despite repeated meet-and-confers.

Plaintiffs' knowing violation of litigation rules should not be tolerated.

_____

**DEFENDANT CHUNG'S Brief re Damages Disclosure and Sanctions**

63311

5

The Court is respectfully urged to find that Plaintiffs' violation of Rule 26 damages computation obligation is deliberate and there is no justification to avoid the Rule 37 sanction.

The Court is respectfully urged to issue an order precluding Plaintiffs from introducing testimony or evidence regarding their damages claims, either in the form of Lost Profit or Reasonable Royalty.

Respectfully Submitted,
LT PACIFIC LAW GROUP LLP

Dated: March 21, 2019

/s/Jen-Feng Lee

By: _____

Jen-Feng (Jeff) Lee
Kenneth Tanji, Jr.
Attorneys for Defendant, Henry Chung

---

**DEFENDANT CHUNG'S Brief re Damages Disclosure and Sanctions**

6

63311

**Appx0169**

**PROOF OF SERVICE**

The undersigned certifies that the foregoing document, **DEFENDANT Henry Chung's Brief re Damages Disclosure and Sanctions**, was filed electronically in compliance with Local Rule 5 – 3.3 and Federal Rules of Civil Procedure. As such, this document was served on all counsel deemed to have consented to electronic service. Local Rule 5 – 4.1.3.All other counsel of record or per se parties not deemed to have consented to electronic service were served with a true and correct copy of the foregoing by U.S. Mail, as identified below:

NONE.

On this 21st ay of March, 2019.

/s/Jen-Feng Lee_____
Jen-Feng Lee

_____

**DEFENDANT CHUNG'S Brief re Damages Disclosure and Sanctions**

63311

7

**Appx0170**

Jen-Feng Lee, SBN 204328
jflee@ltpacificlaw.com
Kenneth K. Tanji, Jr., SBN 162273
ktanji@ltpacificlaw.com
**LT Pacific Law Group, LLP**
17800 Castleton Street, #560
City of Industry, CA 91748
T: 626-810-7200
F: 626-810-7300

Attorneys for Defendant
HENRY CHUNG

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LUBBY HOLDINGS LLC, a Delaware limited liability company; VAPOROUS TECHNOLOGIES, INC., a Delaware corporation; <br><br> Plaintiffs, <br><br> vs. <br><br> HENRY CHUNG, an individual; MING CHEN, an individual; DEEPVAPES, INC., a California Corporation d/b/a BOOM VAPORIZER; DOES 1-10, inclusive, <br><br> Defendants. | No.   2:18-cv-00715-RGK-JC <br><br> **Declaration by Defense Counsel** ISO HENRY CHUNG'S Brief  re Damages Disclosure and Sanctions |

My name is Jen-Feng Lee. I generally go by Jeff Lee. I made the following statements based upon my personal knowledge. If called as a witness, I will testify competently and truthfully to the best of my knowledge.

_____

**Declaration by Defense Counsel ISO CHUNG'S Brief re Damages Disclosure and Sanctions**

63311                                          1

**Appx0171**

1. By discovery cut-off, Plaintiffs produced a total of 35 pages (not counting patent or prosecution files, which are publicly available documents). These produced documents are Bates-numbered as P.001 through P.035.

2. Among the 35 pages, P.001 - P.015 and P.027 – P.032 encompassed certain contractual documents signed (around July and October of 2015[1]) between Vaporous Technologies and Henry Chung.

3. Among the 35 pages, P.016 – P.025 showed acts of Defendant's web registration, online offers of accused products (Defendant admitted to such business activities at the relevant times.)

4. P.026 showed Plaintiff's web page, showing Plaintiff's product J-PEN STARTER KIT, priced at $65.

5. P.033 – P.035 showed certain emails in or around February, 2016, generally discussing business cooperation along the lines of the relationship based upon the contractual documents (P.001 – P.015 and P.027 – P.032).

6. Plaintiffs' discovery documents provide no information as to any:
   a. market demand for the patented products;
   b. Plaintiffs' reduction in sales;
   c. Plaintiffs' price erosion;
   d. comparable licensing agreement on similar patents' royalty rates;
   e. price premium evaluation for the patented feature;
   f. market share information, including potential third party's "infringing products", or availability of non-infringing substitutes.

7. Plaintiffs' Initial Rule 26(a) and Supplemental Rule 26(e) Disclosures, including the filed Memorandum of Contention of Facts and Laws

---

[1] Plaintiffs' asserted '284 Patent was not filed until 8/1/2016. None of the contractual terms could possibly refer, or relate, to a non-existent subject matter.

**Declaration by Defense Counsel ISO CHUNG'S Brief re Damages Disclosure and Sanctions**

2

63311

**Appx0172**

("Contention", ECF Dkt. #35) provided nothing close to the requisite "computation of damages" required by the rules.

8. All of Plaintiffs' disclosures stated above provided <u>no information</u> related to the "computation of each category of damages claimed": (a) Lost Profit damages, or (b) Reasonable Royalty damages, or how they attempted to calculate the damages sought, any analysis, any formula, any supporting basis, any specific range of damages, let alone anything close to a "lump sum statement of damages".

9. During the meet-and-confers in early March, Plaintiffs' counsel indicated, orally on the phone, that they were asking for $0.75 per piece. This figure appeared only in the 2/20/2019 mediation, which is legally inadmissible (in that context) as discussed in my letter dated 3/6/2019.

Exhibits:
Exhibit A contains three (3) letters I dispatched to Plaintiffs' counsel.
Exhibit B is the Rule 26(e) Supplemental Disclosure served by Plaintiffs.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: March 21, 2019                    Executed at: Industry, California

                                              /s/Jen-Feng Lee
                                    By:    _____
                                              Jen-Feng (Jeff) Lee

_____

**Declaration by Defense Counsel ISO CHUNG'S Brief re Damages Disclosure and Sanctions**

63311                                              3

# Exhibit A

Exhibit A

Appx0174

# LT PACIFIC LAW GROUP LLP
## A Limited Liability Partnership

17800 Castleton Street, #560    Industry, California 91748
Tel: (626) 810-7200    Fax: (626) 810-7300

Kenneth Tanji, Jr., Partner
Jen-Feng Lee, Partner

Writer's e-mail:
jflee@ltpacificlaw.com

File No.: 63331

February 26, 2019

**Via Email and U.S. Mail**
Mr. Dariush Adli, Esq.
ADLI Law Group, P.C.
444 South Flower Street, #3100
Los Angeles, CA 90071
T: 213-623-6546
T: 213-623-6554
E: adli@adlilaw.com

Re:    Lubby Holdings et al v. Chung, et al., 18-cv-00715-RGK-JC
Damages Disclosure per Rule 26(a)(1)(A)(iii)

Dear Mr. Adli,

Fact discovery ended more than one month ago. Parties are now in the trial prep phase.

A plaintiff has the burden of proof, including proving the amount of damages sought. Per Federal Rule 26(a)(1)(A)(iii), Plaintiffs must disclose computation of damages.

A plaintiff "cannot shift to the defendant the burden of attempting to determine the amount of the plaintiff's alleged damages." *Jackson v. United Artists Theatrie Circuit*, 278 F.R.D. 586, 593 (D. Nev. 2011). Defendants are not required to compute damages. Rule 26 requires a plaintiff to do so. "Rule26(a)(1)(A)(iii) specifically requires the plaintiff to provide a computation of each category of damages and make the documents on which each computation is based available for inspection and copying. *Jackson*, supra.

Simply providing documents or other information and assuming that the defendant will somehow divine the plaintiff's damages computation from those documents or other information is insufficient and not in accord with the requirements of Rule 26(a) and (e). *Patton v. Wal-Mart Stores*, 2013 wl 6158461, at *4.

Plaintiff's Initial Disclosure, belatedly served on 11/8/2018, justifiably did not give the damages disclosure per Rule 26(a)(1)(A)(iii) due to lack of sufficient discovery. However, Plaintiffs, even in the filed Memorandum of Contention of Fact and Law, failed to update the

WWW.LTPACIFICLAW.COM

63331-L-086

**Appx0175**

Lubby Holdings v. Chung; 18-cv-00715
Damages Disclosure per Rule 26(a)(1)(A)(iii)
2/26/2019

Page 2 of 2

required damages disclosure by providing a non-speculative damages figure in compliance with the federal rules, local rules and the orders of this Court.

Please immediately provide Plaintiff's non-speculative damages computation. I hope to resolve this matter without the Court's intervention. But if Plaintiffs refuse to follow the rules, we will be forced to bring to the Court's attention.

Thank you.

Sincerely

Jen-Feng (Jeff) Lee
Attorney for Defendant Henry Chung

# LT PACIFIC LAW GROUP LLP
## A Limited Liability Partnership

17800 Castleton Street, #560    Industry, California 91748
Tel: (626) 810-7200    Fax: (626) 810-7300

Kenneth Tanji, Jr., Partner
Jen-Feng Lee, Partner

Writer's e-mail:
jflee@ltpacificlaw.com

File No.: 63331

March 6, 2019

**Via Email and U.S. Mail**
Mr. Drew Sherman
Mr. Dariush Adli, Esq.
ADLI Law Group, P.C.
444 South Flower Street, #3100
Los Angeles, CA 90071
T: 213-623-6546
E: drew.sherman@adlilaw.com
E: adli@adlilaw.com

Re:    Lubby Holdings et al v. Chung, et al., 18-cv-00715-RGK-JC
Damages Disclosure per Rule 26(a)(1)(A)(iii)

Dear Drew,

This note serves to follow up on our brief phone conversation earlier today related to Plaintiffs' failure to comply with the obligations re damages disclosure per Rule 26(a)(1)(A)(iii).

The Plaintiffs' obligation for damages disclosure, following completion of discovery, means that defendant is entitled to a specific damages computation and the documents or other evidentiary material on which the computation is based. This point is made explicitly clear in *Design Strategy v. Davis*, 469 F.3d 284 (2nd Cir. 2006).

At 284, *Design* holds that "Rule 26(a) requires more than providing – without any explanation – undifferentiated financial statements; it requires a "computation," supported by documents. The need for computation and supporting documents is especially necessary in a case like this, where the damages claims is for lost profits".

To engage in a trial, the evidence will be based upon the limited universe of the documents produced during discovery, Plaintiffs MUST give the specific computation of claimed damages by pointing to the specific documents.

For lost profit: Plaintiffs must give specific number of dollar amount, with reasonable certainty that they will prove at trial, and identify how to arrive at such number, and point to what documents support such calculation/computation.

63331-L-087

**Appx0177**

Lubby Holdings v. Chung; 18-cv-00715                                                              Page 2 of 2
   Damages Disclosure per Rule 26(a)(1)(A)(iii)
   3/6/2019

For reasonable royalty: you told me that Plaintiffs are demanding $0.75 per unit (though you indicated that this $0.75 figure is from the 2/20/2019 mediation, but as I told you, using this inadmissible $0.75 figure is a violation of the mediation rules.) Plaintiffs also need to identify what total damages computation amounts to, given the different "notice" periods that Plaintiffs may be pursuing at trial, as well as any documents for supporting the $0.75 per unit, to the extent Plaintiffs in fact made the specific demands.

In *Design*, the Court ruled that Plaintiff was not allowed to have a jury trial on the lost profit damages. The "[C]omplaint for breach of employment agreement and thereby arguably put the defendants on notice that lost profits might be sought, Design has not provided any specific computation of lost profits nor provided any evidence on the basis of which such computation might be made", at 293.

Consequently, the 2nd Circuit affirmed the district court's order precluding "Design from presenting evidence in support of its claim for lost profits, pursuant to Fed. Rule. Civ. P. 37(b), on the ground that plaintiff had not disclosed the computation of those lost profits", at 287.

So far, other than putting Defendants "on notice" of the vague damages Plaintiffs seek to recover, Plaintiffs' violation of the damages disclosure has been undisputably blatant.

Please immediately provide Plaintiff's non-speculative damages computation. I hope to resolve this matter without the Court's intervention. But if Plaintiffs continue to violate the rules, we will be forced to bring to the Court's attention.

Thank you.

                                        Sincerely



                                        Jen-Feng (Jeff) Lee
                                        Attorney for Defendant Henry Chung

Appx0178

# LT PACIFIC LAW GROUP LLP
## A Limited Liability Partnership

17800 Castleton Street, #560    Industry, California 91748
Tel: (626) 810-7200    Fax: (626) 810-7300

Kenneth Tanji, Jr., Partner
Jen-Feng Lee, Partner

Writer's e-mail:
jflee@ltpacificlaw.com

File No.: 63331

March 8, 2019

**Via Email and U.S. Mail**
Mr. Drew Sherman
Mr. Dariush Adli, Esq.
ADLI Law Group, P.C.
444 South Flower Street, #3100
Los Angeles, CA 90071
T: 213-623-6546
E: drew.sherman@adlilaw.com
E: adli@adlilaw.com

    **Re:**    Lubby Holdings et al v. Chung, et al., 18-cv-00715-RGK-JC
            Violation of Damages Disclosure rules

Dear Drew,

    Your position, as reflected in your email date-stamped 2019-0306-1123, is completely wrong. Plaintiffs continue to blatantly violate pertinent rules of litigation in federal court.

    Plaintiffs failed to understand the context:
a. This is NOT about compelling any deficiencies (and the grounds/justifications of the deficiencies) related to discovery dispute. We are way past that.
b. Defendant Chung explicitly acknowledged: "Plaintiff's Initial Disclosure, belatedly served on 11/8/2018, justifiably did not give the damages disclosure per Rule 26(a)(1)(A)(iii) due to lack of sufficient discovery"; see bottom of page 1 in my 2/26/2019 letter.
c. Your repeated assertion that Plaintiff "has met its obligations for the damages calculations" is shocking, given that the only "computation" we have now is the $0.75 figure from the blatant violation of seeking to admit the facts in settlement correspondence.

The *Hartman* case.
Your reliance is completely misguided. The case is about a discovery dispute to compel alleged deficient <u>initial</u> Rule 26(a) Initial Disclosure. We are in a completely different context and the ruling is not applicable herein. You focused on the Court's exoneration for the deficient Initial Disclosure, which "is merely a preliminary assessment and is subject to revision", a point not in dispute. The Court in fact cited to the 2nd circuit *Design Strategy* case to support my

63331-L-088

Appx0179

Lubby Holdings v. Chung; 18-cv-00715
Damages Disclosure per Rule 26(a)(1)(A)(iii)
3/8/2019

Page 2 of 2

position: By its very terms Rule 26(a) requires more than providing – without any explanation – undifferentiated financial statement; it requires a 'computation,' supported by documents.

The *City and County of San Francisco v. Tuto Saliba* case.
Your reliance is similarly misguided. This case is also about discovery compel motion re the sufficiency of the underlined Rule 26(a) Initial Disclosure. The court refused to sanction Plaintiffs for the deficiency in the Initial Disclosure because, among others, the cases cited, such as *Gilvin v. Fire*, dealt with a factual scenario closer to our instant case than the *City and County of San Francisco* case. "In *Gilvin*, the court excluded from trial claims for damages because the plaintiff failed to disclose the claim until just weeks before trial and provided no substantial quantification of the elements or computation of the claimed damages", at \*220.

The *R and R Sails v. Insurance Co. of Pennsylvania* case
The core discovery issue in that case is about lack of production of "invoices reflecting attorneys fees and costs". That is NOT the issue in this instant case. At this point, no one is complaining about lack of document production. The issue herein is: what is Plaintiffs' computation of damages, based upon all the documents produced and identified in the joint exhibit list, so that Plaintiffs will seek to prove, at trial, the stated amount based upon the computation given.

Rule 37(c)(1) provides , in pertinent part, that a party which, "without substantial justification fails to disclose information required by Rule 26(a) or 26(e)(1), or to amend a prior response to discovery as required by Rule 26(e)(2), is not, unless such failure is harmless, permitted to use as evidence at a trial, at a hearing, or one a motion any witness or information not so disclosed."

The Rule 37 sanction is a "self-executing", "automatic" sanction. *Yety by Molly v. Deckers Outdoors*, 259 F.3d 1101, 1106 (9th Cir. 2001).

Plaintiffs continue to refuse, despite repeated urging from Defendant Chung, to make damages computation in compliance with the litigation rules.

What's the computation for the claimed reasonable royalty? (Note that we have not received any "$0.75 per unit" as basis for reasonable royalty because we cannot accept Plaintiffs' violation of the inadmissible settlement correspondence practice.) What's the computation for the claimed lost profits?

It is very clear to me that, without the Court's intervention, Plaintiffs will adhere to the continued and blatant violations.

Sincerely

Jen-Feng (Jeff) Lee
Attorney for Defendant Henry Chung

# Exhibit B

Exhibit B

Appx0181

Dariush G. Adli, SBN 204959
  adli@adlilaw.com
Drew H. Sherman, SBN 237045
  drew.sherman@adlilaw.com
Joshua H. Eichenstein SBN 299392
  Josh.Eichenstein@adlilaw.com
ADLI LAW GROUP, PC
444 South Flower St., Suite 3100
Los Angeles, California 90071
Telephone:  (213) 623-6546
Attorneys for Plaintiffs

ADLI LAW GROUP, P.C.
www.adlilaw.com
(213) 623-6546

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

LUBBY HOLDINGS LLC, a Delaware limited liability company; VAPOROUS TECHNOLOGIES, INC., a Delaware corporation;

*Plaintiff*,

vs.

HENRY CHUNG, an individual; MING CHEN, an individual; DEEPVAPES, INC., a California Corporation d/b/a BOOM VAPORIZER; DOES 1-10, inclusive,

*Defendants*.

Case No: 2:18-cv-00715-RGK-JC

**PLAINTIFF'S 1st SUPPLEMENTAL RULE 26(e) DISCLOSURES**

Complaint Filed:  January 26, 2018

2087.204

**Appx0182**

Plaintiff, doing business under his corporate entity, is in the business of making, selling, marketing and distributing vaporizer products, including certain mechanical or electronic products that are invented and designed by Plaintiff. United States Patent No. 9,750,284 (the "'284 Patent"), entitled "Personal Vaporizer," was duly and legally issued by the United States Patent and Trademark Office to Lubby on September 5, 2017.  Lubby is the exclusive owner of the '284 patent and VAPOROUS TECHNOLOGIES, INC., is a nonexclusive licensee and both have the right to bring this suit to recover damages for any current or past infringement of these patents.

Plaintiffs Lubby Holdings LLC, a Delaware limited liability company and Vaporous Technologies, Inc., a Delaware corporation ("Plaintiffs"), serve this 1st Supplemental Disclosure Statement pursuant to Fed. R. Civ. Pro. 26(e) based on the information reasonably available to them at the time of service of these 1st Supplemental Disclosures. Plaintiffs make these disclosures to the best of their abilities and reserve the right to supplement these disclosures under Fed. Rules of Civl Pro. 26(e).

## GENERAL STATEMENT

Defendants have not completed their investigation relating to this action. The supplemental disclosures made are limited to the information reasonably available to Plaintiffs at the present time.  Discovery as well as Plaintiffs' ongoing investigation and analysis may yield additional information.  Plaintiffs therefore reserves the right to further supplement, revise, correct, clarify or otherwise amend the information disclosed, consistent with the Federal Rules of Civil Procedure and any applicable orders of the Court.  By making these disclosures, Plaintiffs does not waive any applicable privilege, work product or other objection, and reserve their right to object to the production or admissibility of any information included in the categories described below.  Subject to this general statement and the reservation of rights therein, Plaintiffs provides the following information:

PLAINTIFF'S RULE 26(e) SUPPLEMENTAL DISCLOSURES

**Appx0183**

ADLI LAW GROUP, P.C.
www.adlilaw.com
(213) 623-6546

1013.210

**A. Fed. R. Civ. P. 26(a)(1)(A)(i): Individuals**

Plaintiffs hereby identify the following individuals pursuant to Rule 26(a)(1)(A)(i).   After a reasonable inquiry, Plaintiffs believe the following individuals are likely to have discoverable information that Plaintiffs may use to support its claims or defenses.  Plaintiffs reserve the right to further supplement this list and identify additional individuals at a later date.  Such identifications are not an admission that these individuals' testimony would be admissible evidence or that discovery may properly be sought from them consistent with Rule 26.

Plaintiffs do not consent to communications with, or authorize Defendants to communicate with Plaintiffs' employees, former employees, or those persons being represented by attorneys, and do not consent to or authorize any communications with the individuals listed below that is otherwise prohibited by the applicable rules of professional conduct.

| Name | Company | Contact Information | Subject |
|------|---------|---------------------|---------|
| Christian Rado | Vaporous Technologies, LLC | Through counsel: Adli Law Group, PC; 444 South Flower St., Suite 3100 Los Angeles, CA 90071 213-623-6546 | First interactions between Plaintiffs and Defendants; invention of the '284 Patent; Defendants history of conduct; Defendants other technologies and capabilities; contracts made and executed between the parties |
| Henry Chung | N/A | Through Defendants' counsel. | Manufacturing, importing, distribution, and sales of accused products; revenues derived from accused products |

ADLI LAW GROUP, P.C.
www.adlilaw.com
(213) 623-6546

2087.204

2

PLAINTIFF'S RULE 26(e) SUPPLEMENTAL DISCLOSURES

**Appx0184**

| PMK from DeepVapes Inc. | DeepVapes, Inc. | Defendants' Counsel | Manufacturing, importing, distribution, and sales of accused products; revenues derived from accused products |
|---|---|---|---|
| PMK from Vaporous Technologies, Inc. | Vaporous Technologies, Inc. | Through counsel: Adli Law Group, PC; 444 South Flower St., Suite 3100 Los Angeles, CA 90071 213-623-6546 | Use, invention, and revenues derived from '284 Patent. |
| Lubby's Holdings, LLC | Lubby's Holdings, LLC | Through counsel: Adli Law Group, PC; 444 South Flower St., Suite 3100 Los Angeles, CA 90071 213-623-6546 | Use, invention, and revenues derived from '284 Patent. |
| Ming Chen | N/A | Through Defendants' counsel | Manufacturing, importing, distribution, and sales of accused products; revenues derived from accused products |

In addition to the above-listed individuals, Plaintiffs note that there are likely other individuals (*e.g.*, individuals disclosed in Defendants' disclosures or persons identified in documents to be produced by the parties in this case and/or in response to interrogatories) who may have knowledge of relevant facts.  Plaintiffs may seek information from such persons to support their claims and defenses.  Plaintiffs specifically reserve the right to further supplement this list of individuals as necessary as their investigation and discovery continues.

**B.  Fed. R. Civ. P. 26(a)(1)(A)(ii): Documents and Things**

Based upon presently available information, the following categories describe documents, electronically stored information, and tangible things that Plaintiffs may use to support its claims or defenses.  Plaintiffs reserve the right to

ADLI LAW GROUP, P.C.
www.adlilaw.com
(213) 623-6546

2087.204

3

PLAINTIFF'S RULE 26(e) SUPPLEMENTAL DISCLOSURES

**Appx0185**

identify and use documents from additional categories if, during the course of discovery and investigation relating to this case, Plaintiffs learn that such additional categories contain relevant documents.  Plaintiffs also reserve the right to use additional categories of documents to rebut or respond to the contentions and allegations that Plaintiffs may make.

Plaintiffs may use documents within the following categories to support their claims and defenses:

1.     Accused Products' blue prints, schematics, drawings, and/or models. Plaintiffs believe such documents are in the possession of Defendants.

2.     Shipping manifests, P.O.'s, invoices, contracts, profit/loss statements, label orders, sales reports, and box requirements for accused products.  Plaintiffs believe such documents are in the possession of Defendants.

3.     Communications between Defendants and manufacturers in China, between Defendants and shipping companies, between Defendants and distributors, between Defendants and retailers.  Communications from customers to Defendants and/or their clients.  Plaintiffs believe such documents are in the possession of Defendants.

4.     Sales reports, revenue reports, P.O.'s, invoices, and contracts for products with the the '284 Patent.  Documents are in the possession of Plaintiffs.

5.     The '284 Patent.  Document is available to the public through the USPTO.

6.     Expert report and rebuttal expert report showing infringement and damages.  Documents are in the possession of Plaintiffs' counsel.

7.     October 2015 Non-disclosure agreements executed between Defendants and principal of Plaintiffs.  Documents are in the possession of Plaintiffs' counsel.

8.     October 2015 Supply agreement for products containing the '284 Patent. Documents are in the possession of Plaintiffs' counsel.

ADLI LAW GROUP, P.C.
www.adlilaw.com
(213) 623-6546

2087.204

4

PLAINTIFF'S RULE 26(e) SUPPLEMENTAL DISCLOSURES

**Appx0186**

9.    October 2015 Consulting agreement in which Defendants hired Plaintiffs' principal to consult on Defendants' products.  Documents are in the possession of Plaintiffs' counsel.

10.    February 2016 emails between Defendants and Plaintiffs' principal. Documents are in the possession of Plaintiffs' counsel.

11.    Documents disclosed by the parties to each other through discovery.

Plaintiffs reserve the right to further supplement this disclosure as additional documents, data compilations, or tangible things become available to them.

**C. Fed. R. Civ. P. 26(a)(1)(A)(iii): Computation of Damages**

Plaintiffs seek damages for patent infringement measured by the Defendants' sales of infringing products, a reasonable royalty for the sale of each infringing product, Plaintiff's losses from Defendants' sales of infringing products, as measured by Plaintiffs' retail price of each sale of Defendants' infringing products.

Plaintiffs will also seek costs incurred in this action, including its attorneys' fees, and expert fees, which is determined by actual hard costs (filing fees, expert fees, etc.) plus reasonable attorney's fees under the *Octane* standard, as determined by multiplying the hours attorneys spend working on this case by their hourly rates.

**D. Fed. R. Civ. P. 26(a)(1)(A)(iv): Insurance Agreements**

Plaintiffs are not currently aware of any insurance applicable to this matter. If circumstances warrant, Plaintiffs will further supplement these disclosures as required by the Federal Rules of Civil Procedure, Rule 26(e).

ADLI LAW GROUP, P.C.

Dated: January 3, 2019          By   /s/ Drew H. Sherman

Dariush Adli
Drew H. Sherman
Joshua Eichenstein
Attorneys for Plaintiffs

ADLI LAW GROUP, P.C.
www.adlilaw.com
(213) 623-6546

2087.204

5

PLAINTIFF'S RULE 26(e) SUPPLEMENTAL DISCLOSURES

**Appx0187**

ADLI LAW GROUP, P.C.
www.adlilaw.com
(213) 623-6546

**PROOF OF SERVICE**

I am over eighteen (18) years of age, employed in the County of Los Angeles, and not a party to this action. My business address is 444 South Flower Street, Suite 3100, Los Angeles, California 90071. I hereby certify that on January 3, 2019, I served the following documents:

**PLAINTIFFS' 1st SUPPLEMENTAL DISCLOSURES**

By delivering the document(s) to:

Jen-Feng Lee (SBN: 204328)
LT Pacific Law Group LLP
17800 Castelton Street, Suite 560
City of Industry, California 91748
Telephone:  (626) 810-7200
Facsimile: (626) 810-7300
jflee@ltpacificlaw.com

BY E-MAIL. I sent an electronic mail with the document referenced above to the email addresses listed.

I declare, under penalty of perjury under the laws of the United States, that the foregoing is true and correct. Executed January 3, 2019 at Los Angeles, California.

/s/Drew H. Sherman
Drew H. Sherman

6

PLAINTIFF'S RULE 26(e) SUPPLEMENTAL DISCLOSURES

2087.204

Dariush G. Adli, Esq. (SBN: 204959)
  adli@adlilaw.com
Drew H. Sherman, Esq. (SBN: 237045)
  drew.sherman@adlilaw.com
Joshua H. Eichenstein (SBN: 299392)
  Josh.eichenstein@adlilaw.com
ADLI LAW GROUP, P.C.
444 South Flower Street, Suite 3100
Los Angeles, California 90071
Telephone: 213-623-6546
Facsimile: 213-623-6554

Attorneys for Plaintiffs
Lubby Holdings LLC,
Vaporous Technologies, LLC

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| LUBBY HOLDINGS LLC, a Delaware limited liability company; VAPOROUS TECHNOLOGIES, INC., a Delaware corporation;<br><br>   *Plaintiffs*,<br><br>  v.<br><br>HENRY CHUNG, an individual; MING CHEN, an individual; DEEPVAPES, INC., a California Corporation d/b/a BOOM VAPORIZER; DOES 1-10, inclusive,<br><br>   *Defendants*. | Case No: 2:18-cv-00715-RGK-JC<br><br>**PLAINTIFF LUBBY HOLDINGS, LLC.'S OPPOSITION TO DEFENDANTS' COURT REQUESTED BRIEF REGARDING DAMAGES CALCULATIONS**<br><br>**Trial Date: May 7, 2019**<br>**Time: 8:30 a.m.**<br>**Royball** |

ADLI LAW GROUP, P.C.
www.adlilaw.com
(213) 623-6546

2087.202

PLAINTIFFS' OPPOSITION TO DEFENDANTS' BRIEF REGARDING DAMAGES CALCULATIONS

**Appx0238**

Plaintiffs Lubby Holdings, LLC and Vaporous Technologies, INC. ("Plaintiffs") hereby submit this opposition (the "Opposition") to Defendants' brief regarding Plaintiffs' damages calculations (Dkt. No. 49) (the "Brief") as follows:

## I. <u>INTRODUCTION</u>

Plaintiffs apologize to the Court for having to spend its time and resources on this frivolous and unfounded Brief.  Plaintiffs sought to engage with Defendants' counsel in good faith meet and confers since Defendants brought up the purported issue (See Declaration of Drew H. Sherman "Dec. of Sherman").  However, every time Plaintiffs' counsel engaged with Defendants' counsel regarding clarification as to Defendants' exact position on the matter and the authority for Defendants' position, Defendants' counsel pivoted to different arguments each time and finally cut off all meet and confer communications with Plaintiffs' counsel (See Dec. of Sherman).

It is telling that Defendants only attached to their brief their counsel's letters to Plaintiffs' counsel but did not attach the response from Plaintiffs' counsel. Indeed, attaching Plaintiff's counsel's responses to the meet and confer letters of Defendants' counsel would show that Defendants have provided this Court with half-truths, mis-direction, fabrications of the record, and red-herrings on this issue; clearly this Brief is the personification of the idiom that "desperate times call for desperate measures."  Defendants' position on this issue is nothing more than a house of cards that will collapse with a faint breeze.

Plaintiffs are baffled by this "motion," especially since they kept requesting Defendants clarify their position on this issue and provide the authority upon which the Defendants rely (See Dec. of Sherman).  Defendants never specifically responded to Plaintiffs' requests and the authority they now cite in their Brief was never put forth by the Defendants' counsel during the meet and confer discussions and letters (See Dec. of Sherman).  Though none of Defendants authorities cited in the Brief are applicable, bringing them to the attention of Plaintiffs' counsel during

ADLI LAW GROUP, P.C.
www.adlilaw.com
(213) 623-6546

1920.201

2

the meet and confer process might have helped clarify the issue and avoided Defendants' having to waste this Court's time and resources in dealing with the Brief (See Dec. of Sherman).

In truth, Plaintiffs have met all obligations required by the Rules of Civil Procedure, including those relating to damages calculations.  Plaintiffs have disclosed all documents and witnesses they intend use to prove their case, including their burden of proof on damages (See Dec. of Sherman).  Plaintiffs have served their initial Rule 26(a) disclosures, their supplemental Rule 26(e) disclosures, and their pre-trial disclosures.  Plaintiffs have not failed to disclose, Rule 37 sanctions are not proper or warranted, and the Defendants' request in the Brief should be summarily denied[1].

## II. BRIEF PROCEDURAL HISTORY AND STATEMENT OF FACT

The Parties to the action at bar have been engaged in multiple litigations in federal and state courts for almost three (3) years.  In fact, this District Court granted summary judgment in favor of Plaintiffs in a patent infringement litigation prosecuted by the Defendants against Plaintiffs involving one of the patents at issue that the Defendants are going to attempt to use to meet the burden of proof on their affirmative defenses (See C.D. Cal. No. 2:16-cv-08586-RSWL-PLA).  Many of the same items for discovery were produced in that previous patent litigation as were produced by both sides in this litigation (See Dec. of Sherman).

Defendants served their initial Rule 26 disclosures on Plaintiffs and propounded their written discovery on Plaintiffs in August 2018.  With stipulated extensions Plaintiffs responded to Defendants written requests for discovery in October 2018 (See Dec. of Sherman).  Defendants also responded to Plaintiffs' discovery requests in August 2018 (See Dec. of Sherman).  Plaintiffs served their initial Rule 26 disclosures, with damages calculations, on Defendants shortly

---

[1] Given Defendants' failure to truly meet and confer in good faith for this frivolous Brief, sanctions by this Court are warranted on this issue, if this Court deems it appropriate.

PLAINTIFFS' OPPOSITION TO DEFENDANTS' BRIEF REGARDING DAMAGES CALCULATIONS

**Appx0240**

ADLI LAW GROUP, P.C.
www.adlilaw.com
(213) 623-6546

1920.201

thereafter (See Dec. of Sherman).  Plaintiffs then supplemented their responses to the Defendants written discovery requests and Rule 26 disclosures once before the close of fact discovery (See Dec. of Sherman).  Those supplemental disclosures also contained a damages calculation.

No other written discovery requests were propounded on Plaintiffs by Defendants.  Defendants did not request Plaintiffs' counsel to meet and confer in person or over the phone on any proposed discovery motions by Defendants (See Dec. of Sherman).  Though both sides noticed depositions of each other's principals, the Parties could not coordinate deposition schedules before the close of fact discovery (See Dec. of Sherman).

Defendants' counsel first brought up the issue he has regarding the Plaintiffs' disclosures of damages calculations at the mediation in this case, February 8, 2019, just before the parties met and conferred for the final pre-trial conference (See Dec. of Sherman).  After multiple phone calls and correspondence, Defendants' counsel cut off communications and gave up on a non-judicial remedy to the issue regarding the Plaintiffs' disclosures of damages calculations (See Dec. of Sherman). Defendants' request to file the Brief was their next action on the issue.

### III.   ARGUMENT IN OPPOSITION TO THE BRIEF

Plaintiffs' initial Rule 26(a) and supplemental Rule 26(e) disclosures state the following in the section for Damages Calculations:

> "Plaintiffs seek damages for patent infringement measured by the Defendants' sales of infringing products, a reasonable royalty for the sale of each infringing product, Plaintiff's losses from Defendants' sales of infringing products, as measured by Plaintiffs' retail price of each sale of Defendants' infringing products." (See Dec. of Sherman)

As the calculations of damages provided by the Plaintiffs in their Rule 26 disclosures allowed Defendants to understand the methodology Plaintiffs would be

PLAINTIFFS' OPPOSITION TO DEFENDANTS' BRIEF REGARDING DAMAGES CALCULATIONS

**Appx0241**

ADLI LAW GROUP, P.C.
www.adlilaw.com
(213) 623-6546

1920.201

ADLI LAW GROUP, P.C.
www.adlilaw.com
(213) 623-6546

using to calculate damages at trial, whereby Defendants could gauge their exposure, and whereas Defendants' arguments in the Brief does not explain how Plaintiffs' disclosures are deficient or how the cited authority applies, the Brief should not be considered by this Court.  Rule 37 sanctions against the Plaintiffs for failing to provide a damages calculation in their disclosures is not applicable for the action at bar.

## A. Defendants' Could Gauge Their Potential Exposure From Plaintiffs' Disclosures

"The 'computation' of damages required by Rule 26(a)(1)(C) contemplates some analysis," enough so that the opposing party can "understand the contours of its potential exposure [...]." *City & Cty. of San Francisco v. Tutor–Saliba Corp.*, 218 F.R.D. 219, 221 (N.D. Cal. 2003).  As a case cited by Defendants in the Brief appropriately put it, "[a]s this language [Fed Rule of Civ. Pro. 26(a)(1)(A)(iii)] indicates, for disclosures purposes damages are determined, not by actual cost, but by what the party claims. *Patton v. Wal-Mart Stores*, 2013 WL 6158461 at \*4 (citing *Sylla–Sawdon v. Uniroyal Goodrich Tire Co.,* 47 F.3d 277, 284 (8th Cir.1995) (stating that the purpose of Rule 26(a) is to enable parties to prepare for trial, not calculate liability)).

In *Patton*, a magistrate judge granted the defendant's Rule 37 sanctions motion to exclude evidence of future medical expenses in a slip and fall case because the plaintiff supplemented her disclosures six (6) times but did not list a calculation or an actual number for future medical expenses until after the close of discovery. *Patton*, 2013 WL 6158461 at \*4.  The plaintiff in *Patton* argued against sanctions in that, through her disclosures, she did inform the defendant that her medical expenses would increase as she scheduled future surgeries, and that plaintiff did provide defendants with records and bills from her surgery center.  The court was not persuaded by the plaintiff's argument, reasoning that the plaintiff engaged in gamesmanship Rule 26 and 37 seeks to preclude because the plaintiff

5

1920.201

recharacterized over $100,000 in future medicals as past damages. *Id*. Moreover, the plaintiff's production of bills and records from her surgery did not satisfy the purpose of Rule 26 because it did not provide the defendant with any way to tell what the plaintiff was going to "claim" as damages. *Id*.

In the case at bar, Plaintiffs' disclosures do exactly what the plaintiff in *Patton* failed to do; calculate what the Plaintiffs are going to "claim" for their damages at trial. The calculations of damages in Plaintiffs' disclosures in this case state that Plaintiffs will claim the amount of dollars Defendants realized from the sales of the accused products, as well as the number of accused products sold by the Defendants multiplied by the Plaintiffs' retail price of similar products as damages (See Dec. of Sherman). Further, the Plaintiffs' disclosures list witnesses who will testify as to revenues taken in by both Plaintiffs and Defendants from these types of products (See Dec. of Sherman).

Thus, Defendants had a basis for approximating the amount exposure they would face because they knew the dollars they earned from the accused products (1 of 2 of Plaintiffs' ways to calculate damages) and the Defendants also knew the amount of accused products they sold (2 of 2 of Plaintiffs' ways to calculate damages). Albeit the second calculation method would require Defendants to perform some investigation as to the retail price of similar units, but Defendants were guided by the Plaintiffs' disclosures as to the witnesses who would testify as to the retail price of these products (See Dec. of Sherman). Hence, Plaintiffs' disclosures provided Defendants with a clear starting point to determine their potential exposure. The requirement and spirit of Rule 26 was met by Plaintiffs.

In *City and County of San Francisco*, no sanctions based on calculations of damages were even handed down. Rather, *City and County* states in general terms that aggregating damages caused by multiple defendants under multiple contracts for multiple causes of action is not compliant with what Rule 26 requires. *City & Cty. of San Francisco*, 218 F.R.D. at 221-222. In fact, City and County falls in

ADLI LAW GROUP, P.C.
www.adlilaw.com
(213) 623-6546

1920.201

6

favor of the Plaintiffs in this case because the court there stated that specific dollar amounts are not required by Rule 26, nor are specifically detailed computations broken down by each alleged act for each alleged category of damages, as that is the type of information contention interrogatories are intended to discover. *Id*. Rather, *City and County* stands for the maxim that Rule 26 is intended to allow a defendant to do an analysis of exposure for settlement purposes by using a computation provided by the plaintiff. *Id*. at 221.

As discussed above, the Plaintiffs in the action at bar, have done just as the court in *City and County* stated was the intent of Rule 26.  The Plaintiffs' disclosures provide computations for the Defendants to follow in calculating the potential risk they face by just doing some simple using variable that are already in their possession and control.

As such, Defendants' position in the Brief fails as Plaintiffs have met their obligation under Rule 26.

### B. A Reasonable Royalty Is Not A Computation For Disclosures

The model jury instruction on "Reasonable Royalty" talks about value of the invention and hypothetical negotiations.  These are very ambiguous concepts for a jury that is not made for an equation.  However, Plaintiffs have disclosed that their witnesses will testify to the information which juries can consider for reasonable royalties.  Defendants did not want to take their depositions.  Plaintiffs were compliant with Rule 26.

### IV.      CONCLUSION

In conclusion, Plaintiffs request this Court deny Defendants' requested relief.

ADLI LAW GROUP, P.C.
www.adlilaw.com
(213) 623-6546

1920.201

7

PLAINTIFFS' OPPOSITION TO DEFENDANTS' BRIEF REGARDING DAMAGES CALCULATIONS

**Appx0244**

Dated: March 27, 2019          ADLI LAW GROUP, P.C.


By: */s/ Dariush G. Adli*
    Dariush Adli
    Drew Sherman
    Joshua Eichenstein
    Attorneys for Plaintiff
    Lubby Holdings LLC,
    Vaporous Technologies, LLC.

ADLI LAW GROUP, P.C.
www.adlilaw.com
(213) 623-6546

8

PLAINTIFFS' OPPOSITION TO DEFENDANTS' BRIEF REGARDING DAMAGES CALCULATIONS

1920.201

**Appx0245**

Dariush G. Adli, Esq. (SBN: 204959)
  adli@adlilaw.com
Drew H. Sherman, Esq. (SBN: 237045)
  drew.sherman@adlilaw.com
Joshua H. Eichenstein (SBN: 299392)
  Josh.eichenstein@adlilaw.com
ADLI LAW GROUP, P.C.
444 South Flower Street, Suite 3100
Los Angeles, California 90071
Telephone: 213-623-6546
Facsimile: 213-623-6554

Attorneys for Plaintiffs
Lubby Holdings LLC,
Vaporous Technologies, LLC

ADLI LAW GROUP, P.C.
www.adlilaw.com
(213) 623-6546

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LUBBY HOLDINGS LLC, a Delaware limited liability company; VAPOROUS TECHNOLOGIES, INC., a Delaware corporation;<br><br>       *Plaintiffs*,<br><br>  v.<br><br>HENRY CHUNG, an individual; MING CHEN, an individual; DEEPVAPES, INC., a California Corporation d/b/a BOOM VAPORIZER; DOES 1-10, inclusive,<br><br>       *Defendants*. | Case No: 2:18-cv-00715-RGK-JC<br><br>*Honorable R. Gary Klausner*<br>*United States District Judge*<br><br>**JOINT STATEMENT OF CASE**<br><br>**Jury Trial Date:**<br>**May 7, 2019 at 09:00 AM** |

2087.204

ADLI LAW GROUP, P.C.
www.adlilaw.com
(213) 623-6546

Ladies and Gentlemen of the Jury:

This case involves the infringement by Defendant Henry Chung and Deep Vapes, Inc. of Plaintiffs' Lubby Holdings LLC and Vaporous Technologies, Inc.'s patent related to consumer vapor devices.  Plaintiffs own the patent for an energized check valve that:

- blocks liquid from leaking out of personal vaporizer devices, and

- delivers electric power to a heating element during use.

Plaintiff Vaporous Technologies Inc. invents, designs, and manufactures personal vaporizer products and sells them to wholesale and retail customers.  Defendant Henry Chung is also in the personal vaporizer industry in connection with manufacturing and selling personal vaporizer products to wholesale and retail customers. Defendant Chung has denied the charge of infringement.

The issues for you to assess in this trial include whether or not Henry Chung and/or Deep Vapes, Inc. infringed the patent at issue in this case, and the willfulness of the Defendant's behavior, and the amount of damages, statutory damages, and punitive damages to award Plaintiff as a result of Defendant's infringement. You will also be asked to decide if the '284 Patent is valid.

**[SIGNATURES ON FOLLOWING PAGE]**

1

JOINT STATEMENT OF CASE

**Appx0295**

1013.201

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 2:18-cv-00715-RGK-JC | Date | May 03, 2019 |
|---|---|---|---|
| Title | *Lubby Holdings LLC et al. v. Henry Chung et al.* | | |

Present: The Honorable   R. GARY KLAUSNER, UNITED STATES DISTRICT JUDGE

| Sharon L. Williams | Not Reported | N/A |
|---|---|---|
| Deputy Clerk | Court Reporter / Recorder | Tape No. |

| Attorneys Present for Plaintiff: | Attorneys Present for Defendant: |
|---|---|
| Not Present | Not Present |

**Proceedings:**   **(IN CHAMBERS) Order Re: Defendant Henry Chung's Brief re: Damages Disclosure and Sanctions (DE 49); Plaintiff Lubby Holdings, LLC.'s Requested Brief Regarding Plaintiffs' Request for Rule 37 Sanctions Against Defendants for Listing Undisclosed Documents as Exhibits for Trial (DE 50)**

The Court has read and considered both parties' briefs. Plaintiffs are ordered to serve the Defendants and the Court their computation of damages by Monday, May 6th, 2018 at 10 a.m. Failure to do so will result in possible sanctions under Federal Rule of Civil Procedure ("Rule") 37. The Court denies Plaintiffs' request for Rule 37 sections against Defendants.

**IT IS SO ORDERED.**

_____   : _____

Initials of Preparer   _____

**Appx0307**

Dariush G. Adli, SBN 204959
  adli@adlilaw.com
Drew H. Sherman, SBN 237045
  drew.sherman@adlilaw.com
Joshua H. Eichenstein SBN 299392
  Josh.Eichenstein@adlilaw.com
ADLI LAW GROUP, PC
444 South Flower St., Suite 3100
Los Angeles, California 90071
Telephone:  (213) 623-6546
Attorneys for Plaintiffs

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| LUBBY HOLDINGS LLC, a Delaware limited liability company; VAPOROUS TECHNOLOGIES, INC., a Delaware corporation;<br><br>*Plaintiff*,<br><br>vs.<br><br>HENRY CHUNG, an individual; MING CHEN, an individual; DEEPVAPES, INC., a California Corporation d/b/a BOOM VAPORIZER; DOES 1-10, inclusive,<br><br>*Defendants*. | Case No: 2:18-cv-00715-RGK-JC<br><br>**PLAINTIFF'S SUPPLEMENTAL RULE 26(e) DISCLOSURES RELATING TO DAMAGES CALCULATIONS**<br><br>Complaint Filed:  January 26, 2018 |

ADLI LAW GROUP, P.C.
www.adlilaw.com
(213) 623-6546

PLAINTIFF'S RULE 26(e) SUPPLEMENTAL DISCLOSURES

2087.204

**Appx0308**

Plaintiff, doing business under his corporate entity, is in the business of making, selling, marketing and distributing vaporizer products, including certain mechanical or electronic products that are invented and designed by Plaintiff. United States Patent No. 9,750,284 (the "'284 Patent"), entitled "Personal Vaporizer," was duly and legally issued by the United States Patent and Trademark Office to Lubby on September 5, 2017.  Lubby is the exclusive owner of the '284 patent and VAPOROUS TECHNOLOGIES, INC., is a nonexclusive licensee and both have the right to bring this suit to recover damages for any current or past infringement of these patents.

Plaintiffs Lubby Holdings LLC, a Delaware limited liability company and Vaporous Technologies, Inc., a Delaware corporation ("Plaintiffs"), serve this Supplemental Disclosure Statement Relating to damages calculations pursuant to Fed. R. Civ. Pro. 26(a)(1)(A)(iii) and 26(e) based on the information reasonably available to them at the time of service of this Supplemental Disclosure. Plaintiffs make this disclosure to the best of their abilities and reserve the right to supplement this disclosure under Fed. Rules of Civl Pro. 26(e).

## GENERAL STATEMENT

By making these disclosures, Plaintiffs does not waive any applicable privilege, work product or other objection, and reserve their right to object to the production or admissibility of any information included in the categories described below.  Subject to this general statement and the reservation of rights therein, Plaintiffs provides the following information:

**A. Fed. R. Civ. P. 26(a)(1)(A)(iii): Computation of Damages**

Plaintiffs seek damages for patent infringement based on the following computations and calculations:

1. Lost Profits:

   a. Wholesale: ($16.50 (Plaintiffs' 2016 wholesale price per unit for competitive product line to accused products containing Patent '284) -

1

**Appx0309**

ADLI LAW GROUP, P.C.
www.adlilaw.com
(213) 623-6546

1013.210

$5.50 (Plaintiffs' 2016 cost per unit of competitive product line to accused products with Patent '284)) x (36,453 (number of accused products sold by Defendants) x 62% (Plaintiffs' percentage of overall sales of competitive product line sold at the wholesale level)) = $248,611.

   b. Retail: (($45 (Plaintiffs' 2016 retail price per unit for competitive product line to accused products containing Patent '284) - $5.50 (Plaintiffs' 2016 cost per unit of competitive product line to accused products with Patent '284)) x (36,453 (number of accused products sold by Defendants) x 38% (Plaintiffs' percentage of overall sales of competitive product line sold at the retail level)) =  $547,154.

   c. Total Lost Profits (Wholesale and Retail): $795,765

2. Reasonable Royalty: (($45 (Standard per unit retail price of competitive product line to accused products containing Patent '284) - $16.50 (Plaintiffs' 2016 wholesale price of competitive product line to accused products with Patent '284)) x 60% (Plaintiffs' royalty rate) x 36,453 (number of accused products sold by Defendants) =  $623,346.30.

3. Plaintiffs will also seek costs incurred in this action, including its attorneys' fees, and expert fees, which is determined by actual hard costs (filing fees, expert fees, etc.) plus reasonable attorney's fees under the *Octane* standard, as determined by multiplying the hours attorneys spend working on this case by their hourly rates.

ADLI LAW GROUP, P.C.

Dated: May 6, 2019      By  /s/ Drew H. Sherman

                                      Dariush Adli
                                      Drew H. Sherman
                                      Joshua Eichenstein
                                      Attorneys for Plaintiffs

2

ADLI LAW GROUP, P.C.
www.adlilaw.com
(213) 623-6546

PLAINTIFF'S RULE 26(e) SUPPLEMENTAL DISCLOSURES

**Appx0310**

ADLI LAW GROUP, P.C.

www.adlilaw.com

(213) 623-6546

**PROOF OF SERVICE**

I am over eighteen (18) years of age, employed in the County of Los Angeles, and not a party to this action. My business address is 444 South Flower Street, Suite 3100, Los Angeles, California 90071. I hereby certify that on May 6, 2019, I served the following documents:

**PLAINTIFFS' SUPPLEMENTAL DISCLOSURES RELATING TO DAMAGES CALCULATIONS**

By delivering the document(s) to:

Jen-Feng Lee (SBN: 204328)
LT Pacific Law Group LLP
17800 Castelton Street, Suite 560
City of Industry, California 91748
Telephone:   (626) 810-7200
Facsimile: (626) 810-7300
jflee@ltpacificlaw.com

BY E-MAIL. I sent an electronic mail with the document referenced above to the email addresses listed.

I declare, under penalty of perjury under the laws of the United States, that the foregoing is true and correct. Executed May 6, 2019 at Los Angeles, California.

/s/Drew H. Sherman

Drew H. Sherman

3

PLAINTIFF'S RULE 26(e) SUPPLEMENTAL DISCLOSURES

2087.204

**Appx0311**

Jen-Feng Lee, SBN 204328
jflee@ltpacificlaw.com
Kenneth K. Tanji, Jr., SBN 162273
ktanji@ltpacificlaw.com
**LT Pacific Law Group, LLP**
17800 Castleton Street, #560
City of Industry, CA 91748
T: 626-810-7200
F: 626-810-7300

Attorneys for Defendant
HENRY CHUNG

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LUBBY HOLDINGS LLC, a Delaware limited liability company; VAPOROUS TECHNOLOGIES, INC., a Delaware corporation; <br><br> Plaintiffs, <br><br> vs. <br><br> HENRY CHUNG, an individual; MING CHEN, an individual; DEEPVAPES, INC., a California Corporation d/b/a BOOM VAPORIZER; DOES 1-10, inclusive, <br><br> Defendants. | No.   2:18-cv-00715-RGK-JC <br><br> DEFENDANT HENRY CHUNG'S **Objection to Plaintiffs' Filing of Computation of Damages, ECF #62** <br><br><br><br><br><br><br><br> Hon. R. Gary Klausner |

Defendant objected to Plaintiff's filing of computation of damages ("Computation"), filed/served as ECF #62, as stated below:

---

**DEFENDANT CHUNG'S Objection to Plaintiffs' Computation of Damages (ECF #62)**

1

**A. Proper damages computation supported by laws and facts**

1. There was no infringement before 9/5/2017. The '284 Patent was filed on 8/31/2016 and issued on 9/5/2017. As such, if Plaintiffs satisfied the section 287 "notice/marking" requirement on the first day of patent issuance, Plaintiffs might have a damages claims over 8,689 units of "infringing" products, having dollar amount of $42,284.30. See **Exhibit A** attached to counsel declaration.

2. Plaintiffs stated, in response to interrogatories, that they complied with the section 287 "notice/marking" requirement: "Plaintiff's online store references US Patent protection with each product". See **Exhibit B** attached to counsel declaration.

3. Plaintiffs produced only one page of web document (P-026) that may be relevant to the section 287 "notice/marking" requirement. It can be seen that Plaintiffs did not comply. See **Exhibit C** attached to counsel declaration.

4. This court is familiar with the requirements of section 287 "notice/marking". Brief excepts are attached in **Exhibit D** attached to counsel declaration.

5. Defense counsel gave reminder to Plaintiffs' counsel that the ordered computation of damages filed should be warranted by existing law, not for improper purpose, and supported by the discovery production in this case. See **Exhibit E** attached to counsel declaration.

6. The damages, if infringement is proven, **can only be based upon 408 units, with a total dollar amount of $1,986.46**. See ¶¶7-8 of counsel declaration.

---

**DEFENDANT CHUNG'S Objection to Plaintiffs' Computation of Damages (ECF #62)**

2

63311

**B.  Plaintiffs' baseless damages Computation is in violation of Rule 11**

1. Plaintiffs' Lost Profit computation is baseless

    a.  As already explained in Defendant's LR 16-10 Trial Brief (ECF #59), there is no discovery production to support any claimed Lost Profit.

    b.  None of the figures of $16.50, $5.50, 62%, 38%, or the lump sums of $248,611, $547,154, $795,765 were ever produced or disclosed.

    c.  Plaintiffs completely ignored the 284 Patent was issued on 9/5/2017 and that they failed to satisfy the section 287 notice/marking requirement.

2. Plaintiffs' Reasonable Royalty computation is baseless

    a.  As already explained in Defendant's ECF #59 Trail Brief, Plaintiffs had no documentary support/analysis to satisfy their reasonable royalty claims.

    b.  None of the figures of $45, $5.50, or **60% royalty rate**, or the lump sum of $623,346.30, were ever produced or disclosed.

    c.  Plaintiffs completely ignored the 284 Patent was issued on 9/5/2017 and that they failed to satisfy the section 287 notice/marking requirement.

3. Plaintiffs are asking for expert fees that they did not pay.  Plaintiff's expert made express representation that the expert's work was free. ("I do not receive compensation for my time spent on this matter and will not be further compensated regardless the outcome of the case"; bottom of page 1 of expert report.)

---

**DEFENDANT CHUNG'S Objection to Plaintiffs' Computation of Damages (ECF #62)**

63311

3

Defendant Chung objected to Plaintiffs' Computation because it is not warranted by existing law and not supported by the discovery production in this case, and appears to serve improper, and undisclosed, purposes.

Dated: May 6, 2019

LT PACIFIC LAW GROUP LLP

/s/Jen-Feng Lee

By:

Jen-Feng (Jeff) Lee
Kenneth Tanji, Jr.
Attorneys for Defendant, Henry Chung

---

**DEFENDANT CHUNG'S Objection to Plaintiffs' Computation of Damages (ECF #62)**

63311

4

Jen-Feng Lee, SBN 204328
jflee@ltpacificlaw.com
Kenneth K. Tanji, Jr., SBN 162273
ktanji@ltpacificlaw.com
**LT Pacific Law Group, LLP**
17800 Castleton Street, #560
City of Industry, CA 91748
T: 626-810-7200
F: 626-810-7300

Attorneys for Defendant
HENRY CHUNG

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LUBBY HOLDINGS LLC, a Delaware limited liability company; VAPOROUS TECHNOLOGIES, INC., a Delaware corporation;<br><br>                Plaintiffs,<br><br>   vs.<br><br>HENRY CHUNG, an individual; MING CHEN, an individual; DEEPVAPES, INC., a California Corporation d/b/a BOOM VAPORIZER; DOES 1-10, inclusive,<br><br>                Defendants. | No.   2:18-cv-00715-RGK-JC<br><br>**DEFENDANT HENRY CHUNG's RULE 50(a) MOTION FOR JUDGMENT AS A MATTER OF LAW**<br><br>Trial:  May 7, 2019<br><br><br><br>Hon. R. Gary Klausner |

_____

**DEFENDANT CHUNG'S RULE 50(a) MOTION FOR JMOL**

63311

1

**Appx0324**

## MEMORANDUM OF POINTS AND AUTHORITIES

## INTRODUCTION

Pursuant to Federal Rule of Civil Procedure 50(a), Defendant Henry Chung ("Chung"), respectfully moves for Judgment as a Matter of Law on the issue that Plaintiffs, Lubby Holdings LLC and Vaporous Technologies, Inc., are not entitled to damages as Plaintiffs have not presented evidence constituting legally sufficient proof for damages, assuming liability against Chung is established.

## I.     COURT MAY ENTER JUDGMENT AS A MATTER OF LAW

"If a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue, the court may (A) resolve the issue against the party; and (B) grant a motion for judgment as a matter of law against the party on a claim or defense that, under the controlling law, can be maintained or defeated only with a favorable finding on that issue."  Fed.R.Civ.P. 50(a).

The standard for judgment as a matter of law is the same as the standard for summary judgment. *Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 139, 149 (2000).   Summary judgment is appropriate where "there is no genuine issue as to any material fact" and "the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(a).

## II.    CHUNG IS ENTITLED TO JUDGMENT AS A MATTER OF LAW THAT PLAINTIFFS ARE NOT ENTITLED TO LOST PROFITS DAMAGES

If Plaintiffs prevail on the issue of patent infringement, there are two measures of patent damages: (1) Lost Profits; or (2) Reasonable Royalty.   A prevailing Plaintiff is entitled to recover Lost Profits or Reasonable Royalty but not

---

**DEFENDANT CHUNG'S RULE 50(a) MOTION FOR JMOL**

2

63311

**Appx0325**

both. *SmithKline Diagnostics, Inc. v. Helena Labs. Corp*. 926 F.2d 1161, 1164 (Fed.Cir. 1991).

To prove Lost Profits, the patentee must prove there is a reasonable probability that, 'but for' the infringement, the patentee would have made the sales that were made by the infringer.  A showing under the four-factor *Panduit* test [*Panduit Corp. v. Stahlin Bros. Fibre Works, Inc.,* 575 F.2d 1152, 1156 (6th Cir. 1978)] establishes the required causation: (1) demand for the patented product; (2) absence of acceptable noninfringing alternatives; (3) capacity to exploit the demand; and (4) the amount of profit the patentee would have made.  *Versata Software, Inc. v. SAP Am., Inc*., 717 F.3d 1255, 1264 (Fed.Cir. 2013).

Plaintiffs did not present evidence sufficient to establish they are entitled to recover Lost Profits.  Plaintiffs' Lost Profit computation is baseless.  As already explained in Defendant's LR 16-10 Trial Brief (ECF #59) and Objection to Plaintiffs' Computation of Damages (ECF #62), there is no evidence or discovery production to support any claimed Lost Profit, even with Mr. Christian Rado's unfounded and wild testimony.

None of the purported figures that support Plaintiffs' Lost Profits calculation made in the ECF #62 filing: i.e. $16.50 [2016 wholesale price per unit of competitive product line], $5.50 [2016 cost per unit of competitive product line], 62% [Plaintiffs' percentage of overall sales of competitive product line sold wholesale], 38% [Plaintiffs' percentage of overall sales of competitive product line sold retail], or the lump sums of $248,611 [lost profits – wholesale], $547,154 [lost profits – retail], or $795,765 [lost profits – wholesale plus retail] were ever produced or disclosed to Chung in pretrial discovery.

The demanded compensations are speculative at least in the sense that the calculation goes BEFORE the time when the '284 Patent did not exist, when it was issues on 9/5/2017.

_____

**DEFENDANT CHUNG'S RULE 50(a) MOTION FOR JMOL**

3

63311

Plaintiffs also failed to satisfy the 35 U.S.C. §287 notice/marking requirement.

### III.   CHUNG IS ENTITLED TO JUDGMENT AS A MATTER OF LAW THAT PLAINTIFFS ARE NOT ENTITLED TO REASONABLE ROYALTY DAMAGES

The Reasonable Royalty measure of damages is based on a reasonable royalty for the use made of the invention by the infringer.  35 U.S.C. §284.

To obtain reasonable royalty compensation on the whole product (instead of just for certain portions of a product) the "patentee must prove that the patent-related feature is the 'basis for consumer demand.'"  *Lucent Technologies, Inc., v. Gateway, Inc.,* 580 F.3d 1301, 1336 (Fed.Cir. 2009).

The reasonable royalty must be based upon the incremental value that the patented invention adds to the end products. *Exmark Mfg. Co. v. Briggs & Stratton Power Prods*., 879 F.3d 1132, 1348 (Fed.Cir. 2018).  The patentee "must in every case give evidence tending to separate or apportion … damages between the patented feature and the unpatented features." *Power Integrations, Inc. v. Fairchild Semiconductor International, Inc*., 904 F.3d 965, 977 (Fed.Cir. 2018).

Licenses relied on by the patentee in providing damages must be sufficiently comparable to the hypothetical license at issue in suit.  *Uniloc USA, Inc. v. Microsoft Corp*., 632 F.3d 1292, 1316 (Fed.Cir. 2011).

Plaintiffs' Reasonable Royalty computation is baseless.  As already explained in Defendant's ECF #59 Trail Brief and Objection to Plaintiffs' Computation of Damages (ECF #62), Plaintiffs had no evidence or documentary support/analysis to satisfy their reasonable royalty claims.

None of Plaintiff's purported figures of $45 [Plaintiffs' 2016 retail price per unit for competitive product line], $5.50 [Plaintiffs' 2016 cost per unit of competitive product line], or **60% royalty rate**, or the lump sum of $623,346.30

---

[total reasonable royalty], were ever produced or disclosed by Plaintiff in pretrial discovery.

The demanded compensations are further speculative and baseless in the sense that the calculation used information and sales figure that went BEFORE the time when the '284 Patent was issued on 9/5/2017.

Plaintiffs also failed to satisfy the section 287 notice/marking requirement.

## IV. PLAINTIFFS DID NOT COMPLY WITH MARKING REQUIREMENTS

The '284 Patent was filed on 8/31/2016 and issued on 9/5/2017. Therefore, there cannot be any infringement before 9/5/2017.

Plaintiffs did not present evidence establishing that Plaintiffs complied with the 35 U.S.C. §287 "notice/marking" requirement.

## V. CONCLUSION

Causation is an element of the plaintiff's proof of damages. *Nycal Offshore Development v. U.S.*, 743 F.3d 837, 846 (Fed. Cir. 2014).

Plaintiffs sued two addition Defendants: Ming Chen (dismissed) and DeepVapes, Inc. (still in the case). Plaintiff produced no evidence to satisfy the "causation" requirement. "Plaintiff must show, by preponderance of the evidence, that the plaintiff's alleged loss was the proximate result" of the wrongdoing; *Energy Capital Crop. V. United States*, 302 F.3d 1314, 1324 (Fed. Cir. 2002), and not because of other Defendants' wrongful acts, which were equally "infringing" by Plaintiffs' allegations. Plaintiffs also failed to account for the loss it alleged suffered due to other unidentified competitors, whether there was in fact infringement, or because the loss was the result of price-shopping.

For these reasons stated above, Defendant Henry Chung, respectfully moves for Judgment as a Matter of Law on the issue that Plaintiffs have not presented

_____

**DEFENDANT CHUNG'S RULE 50(a) MOTION FOR JMOL**

5

63311

evidence constituting legally sufficient proof for damages, even assuming liability against Chung is established.

Dated: May 9, 2019                                      Respectfully Submitted,

                                                        /s/Jen-Feng Lee
                                        By:             _____
                                                        Jen-Feng Lee
                                                        Kenneth Tanji, Jr.
                                                        Attorneys for Defendant, Henry Chung
                                                        LT PACIFIC LAW GROUP LLP
                                                        17800 Castleton Street, Suite 560
                                                        City of Industry, CA 91748

---

**DEFENDANT CHUNG'S RULE 50(a) MOTION FOR JMOL**

63311

**PROOF OF SERVICE**

The undersigned certifies that the foregoing document, **DEFENDANT HENRY CHUNG's RULE 50(a) MOTION FOR JUDGMENT AS A MATTER OF LAW,** was filed electronically in compliance with Local Rule 5 – 3.3 and Federal Rules of Civil Procedure.  As such, this document was served on all counsel deemed to have consented to electronic service.  Local Rule 5 – 4.1.3.All other counsel of record or per se parties not deemed to have consented to electronic service were served with a true and correct copy of the foregoing by U.S. Mail, as identified below:

NONE.

On this 9th day of May, 2019.

/s/Jen-Feng Lee_____
Jen-Feng Lee

---

**DEFENDANT CHUNG'S RULE 50(a) MOTION FOR JMOL**

7

63311

## LIST OF EXHIBITS AND WITNESSES

| Case Number | CV 18-00715-RGK | Title | LUBBY HOLDINGS V. CHUNG |
|---|---|---|---|
| Judge | GARY KLAUSNER | | |
| Dates of Trial or Hearing | 05-07-19; 05-08-19; 05-09-19 | | |
| Court Reporters or Tape No. | CAROL ZURBORG | | |
| Deputy Clerks | SHARON WILLIAMS | | |

CLERK U.S. DISTRICT COURT
MAY - 9 2019
CENTRAL DISTRICT OF CALIFORNIA
DEPUTY

| Attorney(s) for Plaintiff(s) / Petitioner(s) | Attorney(s) for Defendant(s) / Respondent(s) |
|---|---|
| DARIUSH ABLI, | JEN-FENG LEE |
| DREW SHERMAN | |
| JOSHUA EICHENSTEIN | |
| | |
| | |

| Ex. No. | Id. | Ev. | Ex. No. | Id. | Ev | EXHIBIT DESCRIPTION / WITNESS | Called By |
|---|---|---|---|---|---|---|---|
| | | | | | | CHRISTIAN RADO | π |
| 101 | ✓ | ✓ | | | | NON DISCLOSURE AGREEMENT | |
| 102 | ✓ | ✓ | | | | NON DISCLOSURE AGREEMENT | |
| 104 | ✓ | ✓ | | | | CONSULTING AGREEMENT | |
| 103 | ✓ | ✓ | | | | SUPPLY AGREEMENT | |
| 114 | ✓ | ✓ | | | | PATENT | |
| | | | 211 | ✓ | | PATENT | |
| | | | | | | ANDRES BREKKE | π |
| 113 | ✓ | | | | | EXPERT REPORT | |
| | | | 210 | ✓ | | | |
| | | | | | | HENRY CHUNG | π |
| 109 | ✓ | ✓ | | | | | |
| 107 | ✓ | ✓ | | | | | |
| 110 | ✓ | ✓ | | | | | |
| | | | 201 | ✓ | ✓ | | |
| | | | | | | HENRY CHUNG | Δ |
| | | | 202 | ✓ | ✓ | PG 1 | |
| | | | 204 | ✓ | ✓ | PG 1 | |
| | | | 206 | ✓ | ✓ | PG 1, 2, 4 | |
| | | | | | | GEORGE NAKALOPULOS | Δ |
| | | | | | | CHRISTIAN RADO | Δ |

G-65 (03/07)                    LIST OF EXHIBITS AND WITNESSES                    Page 1 of ___

**Appx0332**

**Plaintiffs' Portion of Joint Exhibit List**

| No. | Description | Date Identified | Date Admitted | Offered By | Objections |
|-----|-------------|-----------------|---------------|------------|------------|
| 101 | 7/22/15 Confidentiality Agreement | 1/4/19 | MAY 0 7 2019 | Plaintiff | Relevance |
| 102 | 10/27/15 confidentiality agreement | 12/12/18 | MAY 0 7 2019 | Plaintiff | Relevance |
| 103 | 10/14/15 Supply Agreement | 12/12/18 | MAY 0 7 2019 | Plaintiff | Relevance |
| 104 | 10/14/15 Consulting Agreement | 12/12/18 | MAY 0 7 2019 | Plaintiff | Relevance |
| 105 | 2/12/16 Email from Brian Nguy to Chris Rado and Henry Chung | 1-4-19 | | Plaintiff | Relevance |
| 106 | 2/17/16 Email from Brian Nguy to Chris Rado and Henry Chung | 1-4-19 | | Plaintiff | Relevance |
| 107 | Screenshots of Conseal A and Conseal B on www.boomvaporizer.com; screenshot of address on boomvaporizer.com | 12-12-18 | MAY 0 8 2019 | Plaintiff | Relevance |
| 108 | Screenshot of Henry Chung in Youtube video in | 12-12-18 | | Plaintiff | Relevance |

2

Joint Exhibit List

ADLI LAW GROUP, P.C.
www.adlilaw.com
(213) 623-6546

2087 202

**Appx0336**

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

LUBBY HOLDINGS LLC, a Delaware limited liability company; VAPOROUS TECHNOLOGIES, INC., a Delaware corporation;

Plaintiffs,

v.

HENRY CHUNG, an individual; ~~MING CHEN, an individual;~~ DEEPVAPES, INC., a California Corporation d/b/a BOOM VAPORIZER; DOES 1-10, inclusive,

Defendants.

Case No: 2:18-cv-00715-RGK-JC

*Honorable R. Gary Klausner*
*United States District Judge*

**JURY INSTRUCTIONS**

**Jury Trial Date:**
**May 7, 2019 at 09:00 AM**

**No. 1**

Members of the jury, now that you have heard all the evidence [and the arguments of the attorneys], it is my duty to instruct you on the law which applies to this case. A copy of these instructions will be available in the jury room for you to consult if you find it necessary.

It is your duty to find the facts from all the evidence in the case. To those facts you will apply the law as I give it to you. You must follow the law as I give it to you whether you agree with it or not. You must not be influenced by any personal likes or dislikes, opinions, prejudices, or sympathy. That means that you must decide the case solely on the evidence before you. You will recall that you took an oath promising to do so at the beginning of the case.

In following my instructions, you must follow all of them and not single out some and ignore others; they are all equally important. You must not read into these instructions or into anything the court may have said or done for any suggestion as to what verdict you should return – that is a matter entirely up to you.

**Jury Instruction No. 2**

## What is Evidence

The evidence you are to consider in deciding what the facts are consists of:

1. the sworn testimony of any witness;

2. the exhibits that are admitted into evidence;

3. any facts to which the lawyers have agreed; and

4. any facts that I [may instruct] [have instructed] you to accept as proved.

Jury Instruction No. **3**

## Credibility Of Witnesses

In deciding the facts in this case, you may have to decide which testimony to believe and which testimony not to believe. You may believe everything a witness says, or part of it, or none of it.

In considering the testimony of any witness, you may take into account:

1. the opportunity and ability of the witness to see or hear or know the things testified to;

2. the witness's memory;

3. the witness's manner while testifying;

4. the witness's interest in the outcome of the case, if any;

5. the witness's bias or prejudice, if any;

6. whether other evidence contradicted the witness's testimony;

7. the reasonableness of the witness's testimony in light of all the evidence; and

8. any other factors that bear on believability.

Sometimes a witness may say something that is not consistent with something else he or she said. Sometimes different witnesses will give different versions of what happened. People often forget things or make mistakes in what they remember. Also, two people may see the same event but remember it differently. You may consider these differences, but do not decide that testimony is untrue just because it differs from other testimony.

However, if you decide that a witness has deliberately testified untruthfully about something important, you may choose not to believe anything that witness said. On the other hand, if you think the witness testified untruthfully about some things but told the truth about others, you may accept the part you think is true and ignore the rest.

The weight of the evidence as to a fact does not necessarily depend on the

number of witnesses who testify. What is important is how believable the witnesses were, and how much weight you think their testimony deserves.

**Jury Instruction No. 4**

## Expert Opinion

You [have heard] [are about to hear] testimony from [name] who [testified] [will testify] to opinions and the reasons for [his] [her] opinions. This opinion testimony is allowed, because of the education or experience of this witness.

Such opinion testimony should be judged like any other testimony. You may accept it or reject it, and give it as much weight as you think it deserves, considering the witness's education and experience, the reasons given for the opinion, and all the other evidence in the case.

Jury Instruction No. **5**

### What a Patent is And How One Is Obtained

Patents are granted by the United States Patent and Trademark Office (sometimes called "the PTO"). A valid United States patent gives the patent owner the right to prevent others from making, using, offering to sell, or selling the patented invention within the United States, or from importing it into the United States, during the term of the patent without the patent holder's permission. A violation of the patent owner's rights is called infringement. The patent owner may try to enforce a patent against persons believed to be infringers by a lawsuit filed in federal court.

Jury Instruction No. __6__

## Patent Litigation

Someone is said to be infringing on claims of a patent when they, without permission from the patent owner, import, make, use, offer to sell, or sell a product made by the patented process, as defined by the claims, within the United States before the term of the patent expires. A patent owner who believes someone is infringing on the exclusive rights of the patent may bring a lawsuit like this to attempt to stop the alleged infringing acts and to potentially recover damages, which generally is money paid by the infringer to the patent owner to compensate for the harm caused by the infringement. The patent owner must prove infringement of the claims of the patent and damages.

**Jury Instruction No. 7**

**Infringement—Burden Of Proof**

I will now instruct you on the rules you must follow in deciding whether Platiniffs have proven that · Defendants

·have infringed one or more of the asserted claims of the '284 Patent. To prove infringement of any claim, Plaintiffs must persuade you that it is more likely than not that · Defendants

... ·· have infringed that claim.

## Jury Instruction No. __8__

## <u>Direct Infringement by "Literal Infringement"</u>

In order to prove direct infringement by literal infringement, Lubby must prove by a preponderance of the evidence, i.e., that it is more likely than not, that Defendants made, used, sold, offered for sale within, or imported into the United States a product that meets all of the requirements of a claim and did so without the permission of Lubby during the time the '284 patent was in force. You must compare the infringing product with each and every one of the requirements of a claim to determine whether all of the requirements of that claim are met. You must determine, separately for each asserted claim, whether or not there is infringement. There is one exception to this rule. If you find that a claim on which other claims depend is not infringed, there cannot be infringement of any dependent claim that refers directly or indirectly to that independent claim. On the other hand, if you find that an independent claim has been infringed, you must still decide, separately, whether the product meets additional requirements of any claims that depend from the independent claim, thus, whether those claims have also been infringed. A dependent claim includes all the requirements of any of the claims to which it refers plus additional requirements of its own.

21

Jury Instruction No. ___9___

## Damages Introduction

If you find that Henry Chung or Deep Vapes infringed any valid claim of the '284 patent, you must then consider what amount of damages to award to Plaintiffs. I will now instruct you about the measure of damages. By instructing you on damages, I am not suggesting which party should win this case, on any issue. If you find that Henry Chung or Deep Vapes have not infringed any valid claim of the patent, then Plaintiffs is not entitled to any damages. The damages you award must be adequate to compensate Plaintiffs for the infringement. They are not meant to punish an infringer. Your damages award, if you reach this issue, should put Plaintiffs in approximately the same financial position that it would have been in had the infringement not occurred. Plaintiffs has the burden to establish the amount of its damages by a preponderance of the evidence. In other words, you should award only those damages that Plaintiffs establishes that it more likely than not suffered. While Plaintiffs is not required to prove the amount of its damages with mathematical precision, it must prove them with reasonable certainty. You may not award damages that are speculative, damages that are only possible, or damages that are based on guesswork. There are different types of damages that Plaintiffs may be entitled to recover. In this case, Plaintiffs seeks                                    a reasonable royalty.

Appx0355

**Jury Instruction No. 10**

**Reasonable Royalty**

If you find that Plaintiffs has established infringement, Plaintiffs is entitled to at least a reasonable royalty to compensate it for that infringement.

## Jury Instruction No. ___11___
### Reasonable Royalty Definition

A royalty is a payment made to a patent holder in exchange for the right to make, use, or sell the claimed invention. A reasonable royalty is the amount of royalty payment that a patent holder and the alleged infringer would have agreed to in a hypothetical negotiation taking place at a time prior to when the infringement first began. In considering this hypothetical negotiation, you should focus on what the expectations of the patent holder and the alleged infringer would have been had they entered into an agreement at that time, and had they acted reasonably in their negotiations. In determining this, you must assume that both parties believed the patent was valid and infringed and that both parties were willing to enter into an agreement. The reasonable royalty you determine must be a royalty that would have resulted from the hypothetical negotiation, and not simply a royalty either party would have preferred. Evidence of things that happened after the infringement first began can be considered in evaluating the reasonable royalty only to the extent that the evidence aids in assessing what royalty would have resulted from a hypothetical negotiation. Although evidence of the actual profits an alleged infringer made may be used to determine the anticipated profits at the time of the hypothetical negotiation, the royalty may not be limited or increased based on the actual profits the alleged infringer made.

## Jury Instruction No. **12**

### Invalidity—Burden Of Proof

I will now instruct you on the rules you must follow in deciding whether or not Defendant has proven that claims 1, 2, 6, 10, 16, 17, 18 of the '284 patent are invalid. Patents are presumed valid. To prove that any claim of a patent is invalid, Defendant must persuade you by clear and convincing evidence, i.e., you must be left with a clear conviction that the claim is invalid.

# COURT'S CLOSING INSTRUCTION NO. 13
## (ANTICIPATION—GENERALLY)

Defendants claim that one or more patented claims are invalid because they lack novelty in that those claims were anticipated by prior art. In order to prevail on this defense, Defendants must prove anticipation by clear and convincing evidence.

In order for a claim to have been anticipated, you must find the earlier invention completely embodied the same process or product as the patented claim and all the elements listed in the patented claim were previously found in exactly the same situation and united in the same way to perform the identical function. Each and every element of the patented claim must have been either inherent or expressly disclosed in a single prior invention or in a single prior art reference.

## Jury Instruction No. 14

### Duty to Deliberate

When you begin your deliberations, you should elect one member of the jury as your presiding juror. That person will preside over the deliberations and speak for you here in court.

You will then discuss the case with your fellow jurors to reach agreement if you can do so. Your verdict must be unanimous.

Each of you must decide the case for yourself, but you should do so only after you have considered all of the evidence, discussed it fully with the other jurors, and listened to the views of your fellow jurors.

Do not hesitate to change your opinion if the discussion persuades you that you should. Do not come to a decision simply because other jurors think it is right.

It is important that you attempt to reach a unanimous verdict but, of course, only if each of you can do so after having made your own conscientious decision. Do not change an honest belief about the weight and effect of the evidence simply to reach a verdict.

## Jury Instruction No. 15

### Communication with Court

If it becomes necessary during your deliberations to communicate with me, you may send a note through the marshal, signed by your presiding juror or by one or more members of the jury. No member of the jury should ever attempt to communicate with me except by a signed writing; I will communicate with any member of the jury on anything concerning the case only in writing, or here in open court. If you send out a question, I will consult with the parties before answering it, which may take some time. You may continue your deliberations while waiting for the answer to any question. Remember that you are not to tell anyone—including me—how the jury stands, numerically or otherwise, until after you have reached a unanimous verdict or have been discharged. Do not disclose any vote count in any note to the court.

**Jury Instruction No. ____16____**

<u>**Return of Verdict**</u>

A verdict form has been prepared for you. After you have reached unanimous agreement on a verdict, your presiding juror will fill in the form that has been given to you, sign and date it, and advise the court that you are ready to return to the courtroom.

CLERK, U.S. DISTRICT COURT

MAY - 9 2019

CENTRAL DISTRICT OF CALIFORNIA
BY                              DEPUTY

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LUBBY HOLDINGS LLC, a Delaware limited liability company; VAPOROUS TECHNOLOGIES, INC., a Delaware corporation;<br><br>    *Plaintiff,*<br><br>vs.<br><br>HENRY CHUNG, an individual; ~~MING CHEN, an individual~~; DEEPVAPES, INC., a California Corporation d/b/a BOOM VAPORIZER; DOES 1-10, inclusive,<br><br>    *Defendants.* | Case No: 2:18-cv-00715-RGK-JC<br><br>**VERDICT FORM** |

## VERDICT FORM

When answering the following questions and filling out this Verdict Form, please follow the directions provided throughout the form. Your answer to each question must be unanimous. Some of the questions contain legal terms that are defined and explained in detail in the Jury Instructions. Please refer to the Jury Instructions if you are unsure about the meaning or usage of any legal term that appears in the questions below.

We, the jury, unanimously agree to the answers to the following questions and return them under the instructions of this Court as our verdict in this case.

### I.      Patent Infringement

1. Did Plaintiffs prove by a preponderance of the evidence that any claim of the 9,750,284 patent (the '284 patent) has been infringed by Defendants?

YES _X__ NO _____

Only proceed to the next question if you answered "YES" above. If you answered "NO," please sign and date this form.

### II.      Invalidity

2. Did Defendants prove, by clear and convincing evidence, that the asserted claims of the '284 patent are invalid?

YES_____ NO _X__

Only proceed to the next question if you answered "NO" above. If you answered "YES," please sign and date this form.

**Appx0364**

## III.   Damages

3. What amount of damages do you award to Plaintiffs for the infringement by
Defendants of the '284 patent?


'284 patent: $ __863 936.10__


      You have now reached the end of the Verdict Form and should review it to
ensure it accurately reflects your unanimous determinations. The Presiding Juror
should then sign and date the Verdict Form in the spaces below and notify the
court personnel that you have reached a verdict. The Presiding Juror should retain
possession of the Verdict Form and bring it when the jury is brought back into the
courtroom.

      DATED: __5/9/19__ , 2019  By        REDACTED

JS-6

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LUBBY HOLDINGS, LLC, et al. | CASE NUMBER |
| | 2:18-cv-00715-RGK-JC |
| PLAINTIFF(S) | |
| v. | |
| HENRY CHUNG, et al. | **JUDGMENT ON THE VERDICT FOR THE PLAINTIFF(S)** |
| DEFENDANT(S). | |

This action came on for jury trial, the Honorable <u>R. Gary Klausner</u> District Judge, presiding, and the issues having been duly tried and the jury having duly rendered its verdict,

IT IS ORDERED AND ADJUDGED that the plaintiff(s):

<u>Lubby Holdings, LLC and Vaporous Technologies, Inc.</u>

recover of the defendant(s):

<u>Henry Chung and Deepvapes, Inc.</u>

the sum of <u>$863,936.10</u>, with interest thereon at the legal rate as provided by the law, and its costs of action, taxed in the sum of _____.

Clerk, U. S. District Court

Dated: <u>May 9, 2019</u>      By <u>S. Williams</u>

Deputy Clerk

At: <u>Los Angeles, CA</u>

cc: *Counsel of record*

CV-49 (05/98)                    JUDGMENT ON THE VERDICT FOR THE PLAINTIFF(S)

**Appx0366**

Jen-Feng Lee, SBN 204328
jflee@ltpacificlaw.com
Kenneth K. Tanji, Jr., SBN 162273
ktanji@ltpacificlaw.com
**LT Pacific Law Group, LLP**
17800 Castleton Street, #560
City of Industry, CA 91748
T: 626-810-7200
F: 626-810-7300

Attorneys for Defendant
HENRY CHUNG

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LUBBY HOLDINGS LLC, a Delaware limited liability company; VAPOROUS TECHNOLOGIES, INC., a Delaware corporation;<br><br>Plaintiffs,<br><br>vs.<br><br>HENRY CHUNG, an individual; MING CHEN, an individual; DEEPVAPES, INC., a California Corporation d/b/a BOOM VAPORIZER; DOES 1-10, inclusive,<br><br>Defendants. | No.   2:18-cv-00715-RGK-JC<br><br>**DEFENDANT HENRY CHUNG's RULE 50 MOTION FOR JUDGMENT AS A MATTER OF LAW; AND ALTERNATIVE MOTION FOR NEW TRIAL**<br><br>Trial:  May 7, 2019 |

---

**DEFENDANT CHUNG'S RULE 50 MOTION FOR JMOL**

1

63311

**Appx0367**

## MEMORANDUM OF POINTS AND AUTHORITIES

## INTRODUCTION

Pursuant to Federal Rule of Civil Procedure 50 and the Court's Order, ECF #69, Defendant Henry Chung ("Chung"), respectfully moves for Judgment as a Matter of Law on the issue that Plaintiffs, Lubby Holdings LLC and Vaporous Technologies, Inc., are not entitled to damages as Plaintiffs have not presented evidence constituting legally sufficient proof for damages award, based upon the verdict of the accused products having found to be infringing.

## I.   COURT MAY ENTER JUDGMENT AS A MATTER OF LAW

"If a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue, the court may (A) resolve the issue against the party; and (B) grant a motion for judgment as a matter of law against the party on a claim or defense that, under the controlling law, can be maintained or defeated only with a favorable finding on that issue." Fed.R.Civ.P. 50.

The standard for judgment as a matter of law is the same as the standard for summary judgment. *Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 139, 149 (2000). Summary judgment is appropriate where "there is no genuine issue as to any material fact" and "the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(a).

## II.   CHUNG IS ENTITLED TO JUDGMENT AS A MATTER OF LAW THAT PLAINTIFFS ARE NOT ENTITLED TO LOST PROFITS DAMAGES

_____

**DEFENDANT CHUNG'S RULE 50 MOTION FOR JMOL**

2

63311

**Appx0368**

The Court ruled, outside of the presence of the jury, that Plaintiffs' evidence is completely speculative and that, as a matter of law, Plaintiffs are not entitled to Lost Profit damages.[1]

### III.  THERE IS NO EVIDENCE THAT PLAINTIFFS SATISFIED THE SECTION 287 "NOTICE/MARKING" REQUIREMENT

It is Plaintiffs' burden to satisfy the 35 U.S.C. §287 "notice/marking" requirement.

This section 287 "notice/marking" requirement has always been clear to this Court. As cited to in Defendant's ECF #63 (Objection to Plaintiffs' Damages Disclosure), failure to comply with the section 287 requirement led the Court to grant summary judgment of no damages in *Juno Manufacturing v. Nola Lig*hting, 2015 WL 11438613.

By the close of the whole case, there was no evidence of patent-marking pursuant to section 287[2]. In light of Plaintiffs' completely speculative "evidence" (the lack thereof), Defendant gave the computation of reasonable royalty (as reported to Court in ECF #63 before trial, assuming liability was found) of 408 pieces, with a dollar amount of $1,986.46. (**Thus, if a 10% rate is the reasonable royalty rate, Plaintiffs would get $198.64 for the 7 days of infringing sales made by Esquire Distribution.**)

Plaintiffs are not entitled to the amount awarded in the verdict for the failure to comply with section 287 "notice/marking" requirement.

---

[1] The Court also struck down Plaintiffs' claims of inducement infringement, contributory infringement, willfulness, and infringement by equivalence, all on account of the same ground of speculative and weak evidence.

[2] Defense Counsel raised objection to the Court regarding the error of not including the section 287 notice/marking requirement in the jury instructions. The Court overruled such objection.

**DEFENDANT CHUNG'S RULE 50 MOTION FOR JMOL**

3

63311

## IV. THE EVIDENCE IS INSUFFICIENT TO SUPPORT THE AMOUNT OF REASONABLE ROYALTY AWARD

A patent plaintiff can seek compensation by the Reasonable Royalty measure; 35 U.S.C. §284.

To obtain reasonable royalty compensation on the whole product (instead of on some portion of a product that contain the patented feature), the "patentee must prove that the patent-related feature is the 'basis for consumer demand.'" *Lucent Technologies, Inc., v. Gateway, Inc.,* 580 F.3d 1301, 1336 (Fed.Cir. 2009).

The reasonable royalty must be based upon the incremental value that the patented invention adds to the end products. *Exmark Mfg. Co. v. Briggs & Stratton Power Prods*., 879 F.3d 1132, 1348 (Fed.Cir. 2018). The patentee "must in every case give evidence tending to separate or apportion … damages between the patented feature and the unpatented features." *Power Integrations, Inc. v. Fairchild Semiconductor International, Inc*., 904 F.3d 965, 977 (Fed.Cir. 2018).

Licenses relied on by the patentee in providing damages must be sufficiently comparable to the hypothetical license at issue in suit. *Uniloc USA, Inc. v. Microsoft Corp*., 632 F.3d 1292, 1316 (Fed.Cir. 2011).

Given the admitted evidence at trial, other than Mr. Rado's testimony of some unsupported percentage (40% and above) regarding a licensing agreement (and admitted at cross-examination that said license is not a '284 Patent license), there is no basis to support any claimed royalty rate.

It is undisputed that Plaintiffs' own patent is related to certain improvement of "anti-leak" technology embodied in the "check valve" and builds on existing parts (see generally Column 1, Lines 17 – 46, Tr.Ex. 114), there is no evidence to show that the award complied with the "incremental value" requirements *of Exmark Mfg*., and *Power Integrations v. Fairchaild*.

---

**DEFENDANT CHUNG'S RULE 50 MOTION FOR JMOL**

4

**Appx0370**

63311

There is no evidence to show that the patent-related feature is the 'basis for consumer demand', as stated in *Lucent Technologies*.

The evidence that Henry Chung designed his own version of vaping products and filing for patents is not disputed. The evidence of Henry Chung doing the product design and patent filing **earlier** than '284 Patent's earliest claimed date is not disputed: [beginning of 2014 for Chung] vs. [end of 2014 for Rado]. See Defendant Chung's Tr. Exhibits 202, 204, and 206.

To the extent the continue-to-be-improved products added in the 284-claimed feature (the "anti-leak") led to the finding of accused products coming within the scope of 284 patent, there is NO evidence to separate out the values of the prior-and-existing (unpatented) components vis-à-vis the added (the patented "anti-leak") components.

As already explained in Defendant's ECF #59 Trial Brief and Objection to Plaintiffs' Computation of Damages (ECF #62), Plaintiffs had no evidence or documentary support/analysis to satisfy their reasonable royalty claims.

None of Plaintiff's purported figures (disclosed to Defendant and the Court in ECF #62) of $45 [Plaintiffs' 2016 retail price per unit for competitive product line], $5.50 [Plaintiffs' 2016 cost per unit of competitive product line], or **60% royalty rate**, or the lump sum of $623,346.30[3] [total reasonable royalty], were ever produced or disclosed by Plaintiff in pretrial discovery.

The evidence in this case does not support Plaintiffs' entitlement to the reasonable royalty amount awarded, though Plaintiffs may be entitled to nominal damages, per the provision of 35 U.S.C. §284.

---

[3] During trial, when Defense Counsel sought to cross-examine Mr. Rado regarding the basis and computation of such a $623,346.30 damages demand, Plaintiffs' counsel Mr. Adli made false representation to the Court that such a figure is settlement discussion. The $623,346.30 royalty calculation was never brought up during any settlement context. That figured was disclosed and filed to the Court, on 5/6/2019, per the Court's order ECF #61, due to Plaintiffs' violation of their obligation to make timely damages disclosure.

---

**DEFENDANT CHUNG'S RULE 50 MOTION FOR JMOL**

63311

## V.     EVIDENCE OF PRE-ISSUANCE SALES CANNOT BE PART OF PLAINTIFFS' BASIS FOR DAMAGES COMPUTATION

The '284 Patent became a valid U.S. patent on 9/5/2017, and gave "the patent owner the right to prevent others from making, using, offering to sell or selling the patented invention within the United States, or from importing it into the United States"; a "violation of the patent owner's rights is called infringement"; see Jury Instruction No. 5.

There was no infringement, and thus no infringement damages (in the form of Reasonable Royalty in this case) on or before 9/5/2017.

The reported sales of the accused products, admitted as P.2 in Tr. Ex.201, shows total units of 8,689 post-issuance. Not considering the section 287 "notice/marking" issue, these 8,689 units would be the "Damages Basis" to calculate reasonable royalty.

However, Plaintiffs improperly urged the jury to compute damages based upon sales amount of over 30,000 pieces reflected in P.1 in Tr.Ex.201, covering the sales period from 3/1/2016 to 2/1/2018. Those pre-issuance sales cannot be counted into damages calculation.

As a matter of law, the verdict is not supported by the evidence.

## VI.     NO EVIDENCE TO SUPPORT THE VERDICT WHICH RESULTED FROM JURY SPECULATING THE LEGAL ELEMENTS OF ALTER EGO AND/OR PIERCING CORPORATE VEIL

As a matter of law, the awarded amount of $863,936.10, from the accused products sold by Esquire Distribution and against Henry Chung and Deepvapes, Inc.,

---

**DEFENDANT CHUNG'S RULE 50 MOTION FOR JMOL**

6

63311

**Appx0372**

must be set aside for a simple reason: there is NO evidence that Henry Chung or Deepvapes, Inc. [4] sold any infringement products.

Plaintiffs have every right to seek patent damages against Esquire Distribution as the facts in discovery clearly showed that Esquire Distribution was the ONLY party likely to be liable for reasonable royalty.

There are substantive and procedural laws that allow Plaintiffs to establish personal liability of the reasonable royalty damages on account of the sales by a non-party (Esquire Distribution): either naming Esquire Distribution as a defendant (adding into this suit, or filing a separate suit), or pleading the legal doctrine of Alter Ego and/or Piercing Corporate Veil ("AE/PCV") to prove that Henry Chung (and/or Deepvapes, Inc.) can be liable for the corporate debt of Esquire Distribution.

Amazingly, Plaintiffs chose lawlessness.

The jury engaged in an AE/PCV fact-finding by speculating about the elements of AE/PCV (no such instructions were given to the jury), basing upon the <u>lack of evidence</u> in this regard, and reached an absurd verdict that the real party selling the accused products is liability-free, while the two parties, selling zero amount of infringing products, are liable for the reasonable royalty damages assessed.

As a matter of law, Chung is entitled to a finding of no reasonable royalty judgment[5].

## VII.    THE VERDICT IS COMPLETELY SPECULATIVE

An award of speculative damages is inappropriate. *McClaran v. Plastic Indus.*, 97 F.3d 347, 362 (9th Cir. 1996).

---

[4] This motion does not seek to advance Deepvapes, Inc.'s interest. Deepvapes is not represented by counsel, nor has it made appearance in this action. The verdict against Deepvapes further illuminated the discombobulated nature of how Plaintiffs ran this case.

[5] Legally, corporate officers can be also held personally liable for inducement infringement, even without AE/PCV. However, as noted earlier, the Court expressly struck down the claims of inducement infringement (and others) in light of the speculative and weak evidence in Plaintiffs' case.

---

**DEFENDANT CHUNG'S RULE 50 MOTION FOR JMOL**

7

63311

Proving damages, in the form of a reasonable royalty is not Defendant's burden. Defendant Chung, nevertheless, testified to his layperson's view of royalty rate being 3 – 9%.

Plaintiffs have no documentary evidence probative to reasonable royalty.

Other than a "technical licensing agreement", testified to by Mr. Rado and confirmed to be NOT about 284 patent, any "reasonable royalty" proof/evidence relied upon by the jury is pure speculation at best, let alone being close to "reasonable certainty".

The 2015 Supply Agreement, the two pages admitted as Tr. Ex. 103, contended by Plaintiffs to cover the "anti-leak" technology under the 284 patent,  is the only closest thing to a documentary evidence and appeared to project a 10% rate.

Mr. Rado testified to a 40%+ royalty rate for the '284 Patent; there is NO documentary support of any sort.

Plaintiffs contended in early March that they were asking for $0.75 per piece as reasonable royalty; see ECF #49-1, paragraph 9 of counsel declaration.

As such, Plaintiffs' demands of reasonable royalty fee (outside of settlement context) run all over the place: from $0.75 per piece, to the 60% stated in the ECF #62 Damages Disclosure, to the 40% testified to by Mr. Rado, to the 10% stated in the Supply Agreement.

The completely speculative nature of the reasonable royalty damages is further shown by Plaintiffs' computed amount of $623,346.30, as they reported to the Court on 5/6/2019, in ECF #62, page 2 (item 2. Reasonable Royalty).

On 5/9/2019, three (3) days later, based upon the same amount of reported sales (note: most sales were pre-issuance sales amount), Plaintiffs urged for, and the jury gave, the amount of $863,936.10: **a whopping $240,000 increase of reasonable royalty in three (3) days**, when the underlying facts of reported sales did not change at all.

---

**DEFENDANT CHUNG'S RULE 50 MOTION FOR JMOL**

8

The jury verdict of $863,936.10 has no rational computation basis upon the discovery materials already in place and based upon Plaintiffs' last-minute, and belated, disclosure made on 5/6/2019. Rather, it is based upon the **hand-written computation argued speculatively by** Mr. Drew Sherman at closing, which is **not** evidence.

There is simply no underlying evidence for the verdict that met the "reasonable certainty" requirement stated in jury instruction No.9.

Speculative evidence, as a matter of law, cannot support such a judgment award.

## CONCLUSION

For these reasons stated above, Defendant Henry Chung, respectfully moves for Judgment as a Matter of Law on the issue that Plaintiffs have not presented evidence constituting legally sufficient proof for damages, given the liability is found on the accused products.

Alternatively, Defendant Chung moves for a new trial.

Dated: May 17, 2019

Respectfully Submitted,

/s/Jen-Feng Lee

By: _____

Jen-Feng Lee
Kenneth Tanji, Jr.
Attorneys for Defendant, Henry Chung
LT PACIFIC LAW GROUP LLP
17800 Castleton Street, Suite 560
City of Industry, CA 91748

_____

**DEFENDANT CHUNG'S RULE 50 MOTION FOR JMOL**

9

63311

**Appx0375**

**<u>PROOF OF SERVICE</u>**

The undersigned certifies that the foregoing document, **DEFENDANT HENRY CHUNG's RULE 50 MOTION FOR JUDGMENT AS A MATTER OF LAW; ALTERNATIVE MOTION FOR NEW TRIAL** was filed electronically in compliance with Local Rule 5 – 3.3 and Federal Rules of Civil Procedure.  As such, this document was served on all counsel deemed to have consented to electronic service.  Local Rule 5 – 4.1.3.All other counsel of record or per se parties not deemed to have consented to electronic service were served with a true and correct copy of the foregoing by U.S. Mail, as identified below:

NONE.

On this 17th day of May, 2019.

/s/Jen-Feng Lee_____
Jen-Feng Lee

---

**DEFENDANT CHUNG'S RULE 50 MOTION FOR JMOL**

10

63311

**Appx0376**

Dariush G. Adli, Esq. (SBN: 204959)
  adli@adlilaw.com
Drew H. Sherman, Esq. (SBN: 237045)
  drew.sherman@adlilaw.com
Joshua H. Eichenstein (SBN: 299392)
  Josh.eichenstein@adlilaw.com
ADLI LAW GROUP, P.C.
444 South Flower Street, Suite 3100
Los Angeles, California 90071
Telephone: 213-623-6546
Facsimile: 213-623-6554

Attorneys for Plaintiffs
Lubby Holdings LLC,
Vaporous Technologies, LLC

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

LUBBY HOLDINGS LLC, a Delaware limited liability company; VAPOROUS TECHNOLOGIES, INC., a Delaware corporation;

   *Plaintiffs*,

  v.

HENRY CHUNG, an individual; MING CHEN, an individual; DEEPVAPES, INC., a California Corporation d/b/a BOOM VAPORIZER; DOES 1-10, inclusive,

   *Defendants*.

Case No: 2:18-cv-00715-RGK-JC

*Honorable R. Gary Klausner*
*United States District Judge*

**PLAINTIFFS LUBBY HOLDINGS, LLC's., et. al. OPPOSITION TO DEFENDANT HENRY CHUNG'S RULE 50(b) MOTION FOR JUDGMENT AS A MATTER OF LAW; AND ALTERNATIVE MOTION FOR NEW TRIAL; DECLARATION OF DARIUSH ADLI; EXHIBITS 1-5**

ADLI LAW GROUP, P.C.
www.adlilaw.com
(213) 623-6546

PLAINTIFFS LUBBY HOLDINGS, LLC's., et. al. OPPOSITION TO DEFENDANT HENRY CHUNG'S RULE 50(b) MOTION FOR JUDGMENT AS A MATTER OF LAW; AND ALTERNATIVE MOTION FOR NEW TRIAL;

2087.202

**Appx0377**

# TABLE OF CONTENTS 1

I.    INTRODUCTION ........................................................................................ 1
II.   Legal Standard: ....................................................................................... 1
III.   Argument ................................................................................................ 2
   A.  Defendant's Renewed JMOL Motion: ............................................... 2
      1.  Lost Profits: .............................................................................. 2
      2.  Patent Marking Requirement .................................................... 3
      3.  Reasonable Royalty Damages ................................................... 5
   B.  Defendant's Remaining Arguments Are Waived for Not Bringing Them on a Rule 50(a) Motion ....................................................................... 10
IV.   Conclusion ............................................................................................ 11

# TABLE OF AUTHORITIES

**Cases**
*Castro v. Cty of L.A.*, 833 F.3d 1060, 1066 (9th Cir. 2016) ........................ 1, 3
*E.E.O.C. v. Go Daddy Software, Inc.*, 581 F.3d 951, 961 (9th Cir. 2009) ............. 1, 9
*Enovsys LLC v. AT&T Mobility LLC*, No. CV 11-5210 SS, 2015 WL 11089498, at *12 (C.D. Cal. Nov. 16, 2015), *aff'd*, 678 F. App'x 1025 (Fed. Cir. 2017) ............. 2
*Freund v. Nycomed Amersham*, 347 F.3d 752, 761 (9th Cir. 2003) ........................ 1
*Jorgensen v. Cassiday*, 320 F.3d 906, 917 (9th Cir. 2003) ................................ 6
*Juno Mfg., LLC v. Nora Lighting, Inc.*, 2015 WL 11438613 (C.D. Cal. Aug. 13, 2015) ........................................................................................................ 3
*Juno Mfg., LLC v. Nora Lighting, Inc.*, No. CV1406546RGKPJWX, 2015 WL 11438613, at *5 (C.D. Cal. Aug. 13, 2015) .......................................................... 3
*Lifshitz v. Walter Drake & Sons*, 806 F.2d 1426, 1428–29 (9th Cir.1986) ................. 1
*RePET, Inc. v. Zhao,* No. 515CV02315VAPSPX, 2018 WL 6003587, at *2 (C.D. Cal. Nov. 6, 2018) ........................................................................................ 9
*State Indus., Inc. v. Mor-Flo Indus., Inc.*, 883 F.2d 1573, 1580 (Fed. Cir. 1989) ...... 6
*Verinata Health, Inc. v. Ariosa Diagnostics, Inc.,* 329 F. Supp. 3d 1070, 1103 (N.D. Cal. 2018), order clarified, No. 12-CV-05501-SI, 2018 WL 4849681 (N.D. Cal. Oct. 4, 2018) ........................................................................................ 6

**Statutes**
35 U.S.C. §287 ........................................................................................ 3
Fed. R. Civ. P. 50 advisory committee's note (1991) ...................................... 2

ADLI LAW GROUP, P.C.
www.adlilaw.com
(213) 623-6546

2087.202

2

PLAINTIFFS LUBBY HOLDINGS, LLC's., et. al. OPPOSITION TO DEFENDANT HENRY CHUNG'S RULE 50(b) MOTION FOR JUDGMENT AS A MATTER OF LAW; AND ALTERNATIVE MOTION FOR NEW TRIAL;

## I.  <u>INTRODUCTION</u>

Plaintiffs Lubby Holdings LLC and Vaporous Technologies Inc. (hereinafter collectively as "Plaintiffs") hereby oppose Defendant Henry Chung's Rule 50(B) Motion For Judgment As A Matter Of Law; And Alternative Motion For New Trial.

## II.  <u>LEGAL STANDARD</u>

"A Rule 50(b) motion for judgment as a matter of law is not a freestanding motion, [r]ather, it is a renewed Rule 50(a) motion." *E.E.O.C. v. Go Daddy Software, Inc.*, 581 F.3d 951, 961 (9th Cir. 2009). "[A] party must make a Rule 50(a) motion for judgment as a matter of law before a case is submitted to the jury. If the judge denies or defers ruling on the motion, and if the jury then returns a verdict against the moving party, the party may renew its motion under Rule 50(b)." *Id.*  Because it is a renewed motion, a proper post-verdict Rule 50(b) motion is limited to the grounds asserted in the pre-deliberation Rule 50(a) motion. *Id.*

The purpose of this rule is twofold, "[f]irst it preserves the sufficiency of the evidence as a question of law, allowing the district court to review its initial denial of judgment as a matter of law instead of forcing it to 'engage in an impermissible reexamination of facts found by the jury.'" *Freund v. Nycomed Amersham*, 347 F.3d 752, 761 (9th Cir. 2003) *citing Lifshitz v. Walter Drake & Sons*, 806 F.2d 1426, 1428–29 (9th Cir.1986). "Second, it calls to the court's and the parties' attention any alleged deficiencies in the evidence at a time when the opposing party still has an opportunity to correct them." *Id.* at 761

In considering a Rule 50(b) motion that reasserts arguments presented in a Rule 50(a) motion, a court must uphold the jury's verdict if "substantial evidence" supports the jury's conclusion. *Castro v. Cty of L.A.*, 833 F.3d 1060, 1066 (9th Cir. 2016). Substantial evidence means "evidence adequate to support the jury's

PLAINTIFFS LUBBY HOLDINGS, LLC's., et. al. OPPOSITION TO DEFENDANT HENRY CHUNG'S RULE 50(b) MOTION FOR JUDGMENT AS A MATTER OF LAW; AND ALTERNATIVE MOTION FOR NEW TRIAL;

ADLI LAW GROUP, P.C.
www.adlilaw.com
(213) 623-6546

2087.202

conclusion, even if it is also possible to draw a contrary conclusion" from the same evidence. *Id.* (internal quotations omitted). A court should only grant a Rule 50(b) motion if, after construing all evidence in the light most favorable to the nonmoving party, the record "permits only one reasonable conclusion, and that conclusion is contrary to the jury's verdict." *Id.* (internal quotations omitted).

## III. ARGUMENT

### A. Defendant's Renewed JMOL Motion:

Defendant's renewed JMOL motion requests for judgment as a matter of law for three issues: 1) Lost Profits, 2) Patent Marking requirement, and 3) Reasonable Royalty Damages.

#### 1. Lost Profits:

Restating the analysis from Defendant's opposition to Plaintiff's 50(a) motion: the lost profits issue raised by Defendant is moot. On day 3 of the trial, the Court struck lost profits from jury instructions.

> "There are certain things that I'm going to strike from the jury instructions because there are just not specific, articulable facts to justify…Lost profits out…" Trial Transcript ("Trial Tr.") 05/09/19 at 29:12-16.
> Declaration of Dariush G. Adli ¶3 (hereinafter "Adli Decl.").

As a result of the Court striking Lost Profits from jury instructions the Plaintiffs were not awarded damages in the form of lost profits. Defendant's Rule 50(b) motion on this issue is pointless. The jury did not award Plaintiffs lost profits. The jury not awarding Plaintiffs lost profits makes this issue moot and therefore Defendant's motion should be denied. Fed. R. Civ. P. 50 advisory committee's note (1991) ("a jury verdict for the moving party "moots the issue" raised in a motion for judgment as a matter of law").

PLAINTIFFS LUBBY HOLDINGS, LLC's., et. al. OPPOSITION TO DEFENDANT HENRY CHUNG'S RULE 50(b) MOTION FOR JUDGMENT AS A MATTER OF LAW; AND ALTERNATIVE MOTION FOR NEW TRIAL;

ADLI LAW GROUP, P.C.
www.adlilaw.com
(213) 623-6546

2087.202

## 2. **Patent Marking Requirement**

Defendant's second issue on this renewed JMOL is a request to reverse the jury verdict based on patent marking requirements under 35 U.S.C. §287.  As this issue is an affirmative defense asserted by the Defendant (See Dkt. No. 23 pg. 6:19-23), the Defendant has the burden of proof on this issue. Fed Rules of Civ. Pro. 8(b). However, the Defendant did not meet this burden of proof as he presented no evidence on the issue because this issue was not before the jury.

The Defendant's Rule 50(a) motion devoted two sentences to this issue without any supporting authority. (ECF Dkt. 68). Defendant generally cites a single, unpublished case to support its argument "*Juno Mfg., LLC v. Nora Lighting, Inc*., 2015 WL 11438613 (C.D. Cal. Aug. 13, 2015)" without providing any specific citation within the opinion as to how this case applies to Defendant's position. (Def. Mot. 3:12, ECF Dkt. 81). First of all, the cited opinion is ruling on cross motions for summary judgment, not a Rule 50(b) motion. *Juno Mfg., LLC v. Nora Lighting, Inc.*, No. CV1406546RGKPJWX, 2015 WL 11438613, at *6 (C.D. Cal. Aug. 13, 2015) (granting Plaintiff's Motion for Partial Summary Judgment, Defendant's Motion for Summary Judgment, and DISMISSES Defendant's counterclaims.)

Assuming *arguendo* that the Court entertains Defendant's argument regarding patent marking, which was not made an issue during trial by the Defendant, the cited case states that a patentee may recover damages for infringement by providing actual notice, which requires "an affirmative act on the part of the patentee which informs the defendant of infringement." *Juno Mfg., LLC v. Nora Lighting, Inc.*, No. CV1406546RGKPJWX, 2015 WL 11438613, at *5 (C.D. Cal. Aug. 13, 2015).

Here the substantial evidence standard set in *Castro v. Cty of L.A.*, 833 F.3d 1060, 1066 (9th Cir. 2016) was met by Plaintiffs' evidence presentation.  The jury was presented with Trial Exhibits 101 and 102, the signed nondisclosure agreements signed by Mr. Rado and Mr. Chung in July and October of 2015. Adli Decl. ¶4, Ex.

ADLI LAW GROUP, P.C.

www.adlilaw.com

(213) 623-6546

3

2087.202

**Appx0381**

1. The jury then heard testimony that Mr. Rado provided Mr. Chung "actual notice" of the patent because the non-disclosure agreements signed by the parties related to the underlying technology in Mr. Rado's patent application which was filed in December of 2014. Furthermore, Mr. Rado also testified that he plainly told Mr. Chung he couldn't use the technology in the '284 patent but Mr. Chung proceeded to do so anyway, as shown in the below testimony:

> **Q** Mr. Rado, when you first presented Mr. Chung with a nondisclosure agreement, was the technology protected by the patent at issue at the core of that nondisclosure agreement?
> **A** It's the whole reason I told him I wouldn't tell anything.
> **MR. LEE:** Objection; legal conclusion.
> **THE COURT:** Overruled.
> **THE WITNESS:** I told him that I wouldn't disclose any information about my new technology until he signed an NDA.
> **Q** Is that the same technology that's protected by the '284 Patent?
> **A** Yes.
>
> …
> **Q** At any point did you tell Mr. Chung that the anti-leaking technology was protected by a patent application?
> **A** Before I disclosed any information, that was the very -- that was the whole premise of disclosing anything to him, you know. I told him, when I was at his booth, you know, "I design stuff." I said, "I figured out all sorts of things."
> **THE COURT:** Again, you're rambling on it. The question was did you inform him at the time that you had a patent on it.
> **THE WITNESS:** Yes, that I filed a patent on it, yes.
> **THE COURT:** That's fine.
> **BY MR. EICHENSTEIN:**
> **Q** Just to be clear, the technology protected by your patent was subject to the NDA; is that correct?
> **A** Yes.
> **Q** And you informed Mr. Chung that you had a pending patent application -- or a patent application for this technology,

ADLI LAW GROUP, P.C.
www.adlilaw.com
(213) 623-6546

4

PLAINTIFFS LUBBY HOLDINGS, LLC's., et. al. OPPOSITION TO DEFENDANT HENRY CHUNG'S RULE 50(b) MOTION FOR JUDGMENT AS A MATTER OF LAW; AND ALTERNATIVE MOTION FOR NEW TRIAL;

2087.202

**Appx0382**

correct?

**A** Multiple times.

….

**Q** Did you ever tell Mr. Chung that he could not use your patented technology?

**A** Yes.

**Q** Did Mr. Chung continue to use your patented technology after you told him?

**A** Yes.

Adli Decl. ¶5, Ex. 2. (Trial Transcript, 05/08/2019; 123:7-19; 127:10-25; 128:1-3, 9-15; 132:19-25; 133:1-9.)

At no point during the trial did the Defendant present any evidence regarding this issue. According to the trial transcripts, the jury only heard word "Marking" six times, three times in Defendant's opening statement and three times in Defendant's closing statement. As the Court correctly instructed the jury before closing statements:

"Keep in mind when the attorneys are arguing, that they are there to tell you what they think the evidence shows, but your recollection of the evidence is what controls. They aren't witnesses. They don't give testimony."

(Trial Transcript, 05/09/2019 35:17-20)

The Defendant failed to meet his burden of proof that Defendant was not on actual notice prior to infringement.   For these reasons, Defendant's motion on this issue should be denied.

### 3. Reasonable Royalty Damages

Defendant next moves for a JMOL to deny Plaintiffs reasonable royalty damages. Defendant's argument for JMOL relies on two ill-founded positions: 1) that the testimony of Plaintiff's principal, Rado, did not provide an evidentiary basis upon which the jury could rely to determine the royalty rate of a hypothetical license agreement at the time of infringement, and 2) Plaintiff's intended royalty percentages were not disclosed prior to trial (See Dkt. No. 81 pgs. 4-5).  Defendant is wrong as he

ADLI LAW GROUP, P.C.
www.adlilaw.com
(213) 623-6546

2087.202

PLAINTIFFS LUBBY HOLDINGS, LLC's., et. al. OPPOSITION TO DEFENDANT HENRY CHUNG'S RULE 50(b) MOTION FOR JUDGMENT AS A MATTER OF LAW; AND ALTERNATIVE MOTION FOR NEW TRIAL;

misapplies the law and the facts with both positions.

The Defendant's JMOL to reverse Plaintiffs' reasonable royalties award must be denied because the jury made a legally sufficient determination of royalties based on the substantial evidence presented.

### a. The Jury Was Instructed Correctly About Reasonable Royalties

First, the instruction to the jury was proper. The Federal Circuit holds that "[t]he determination of a reasonable royalty, however, is based not on the infringer's profit margin, but on what a willing licensor and licensee would bargain for at hypothetical negotiations on the date infringement started." *Verinata Health, Inc. v. Ariosa Diagnostics, Inc.,* 329 F. Supp. 3d 1070, 1103 (N.D. Cal. 2018), order clarified, No. 12-CV-05501-SI, 2018 WL 4849681 (N.D. Cal. Oct. 4, 2018) *citing State Indus., Inc. v. Mor-Flo Indus., Inc.*, 883 F.2d 1573, 1580 (Fed. Cir. 1989) (internal citations omitted).

Jury Instruction No. 11 correctly instructed the jury on reasonable royalty in accordance with the aforementioned Federal Circuit standard:

"A reasonable royalty is the amount of royalty payment that a patent holder and the alleged infringer would have agreed to in a hypothetical negotiation taking place at a time prior to when the infringement first began…" Jury Instruction No. 11. (ECF Dkt. 73).

### b. The Case for Reasonable Royalties Was Fully Heard By The Jury

A district court can overturn a jury's verdict and grant a Rule 50(a) motion only if "a party has been fully heard on an issue and there is no legally sufficient basis for a reasonable jury to find for that party on that issue." *Jorgensen v. Cassiday*, 320 F.3d 906, 917 (9th Cir. 2003).

Here the jury heard testimony from Plaintiffs' representative, Christian Rado (hereinafter "Rado") that at the time of the infringement, Plaintiffs were selling

ADLI LAW GROUP, P.C.
www.adlilaw.com
(213) 623-6546

6

2087.202

**Appx0384**

products utilizing the patent at issue for a retail price of $45 on its website, with a $5.50 cost resulting in $39.50 net profit per retail product sold.

> **A:...**when I sold it on my website for retail, it was $45.
> **Q** And so the cost was $5.50?
> **A** Yes.
> …
> **A** Those are taken from my catalog from 2016 and all of our pricing.
> **Q** So those are verified numbers?
> **A** Yes.

Adli Decl. ¶3, Ex. 6. (Trial Tr. 05/07/19 at 131:22-24; 132:1-10, 24; 133:1-7, 20-24)

The jury then heard that Plaintiffs sold 200,000 products between 2016 and 2018 containing the patent at issue. *Id.* Rado then testified regarding a hypothetical reasonable royalty negotiation about the patent in suit.

> **Q:** At the time of these infringements, at the time Mr. Chung was selling these products without authorization, for the products that are at issue here or the similar products,
> Conseal A and Conseal B, what would be the reasonable royalty you would demand for licensing your technology?
> **A: It's a hypothetical, but I'm going to say somewhere 65, 75 percent.** I mean, it's unrealistic, but at the time it wouldn't have made sense to me, you know.
> **Q** Were there any other comparable products on the market at the time?
> **A** No.
> **Q** So your product was the only product that would not leak?
> **A** Yes.
> **Q** And that's the reason you're asking for such a high number?
> **A** Yes, yes.

Adli Decl. ¶7, Ex. 4.; (Trial Tr. 05/07/19 at 135:3-18.)

The jury also heard testimony that at the time of the infringement, it was Plaintiffs' policy not to license inventions at the time because the of plaintiff's high

7

PLAINTIFFS LUBBY HOLDINGS, LLC's., et. al. OPPOSITION TO DEFENDANT HENRY CHUNG'S RULE 50(b) MOTION FOR JUDGMENT AS A MATTER OF LAW; AND ALTERNATIVE MOTION FOR NEW TRIAL;

**Appx0385**

ADLI LAW GROUP, P.C.
www.adlilaw.com
(213) 623-6546

2087.202

research and development costs and the newness of the technology.

**Q:** Now, you said back then, before this Grenco deal, you were not -- your policy was not to license your inventions, correct?
**A** Correct.
**Q** Was there a particular reason for that?
**A** My technology was new. Because I spend so much on R&D, development and patents, my products just cost more. So typically somebody is really going to have to have a strong market and a strong distribution route to utilize that. And, frankly, I didn't think there were any brands that were of that quality and level to do so, so I didn't do it.
**Q** But you were able to do it yourself?
**A** Yes.

Adli Decl. ¶8, Ex. 5.; (Trial Tr. 05/07/19 at 107:24-25; 108:1-10.)

Accordingly, the jury heard that Plaintiffs' would have only licensed the patent at a reasonable royalty rate of 65-75 percent at the time of the infringement, and that at the relevant time in question, Plaintiff received a net profit of $39.50 for retail sales of the product containing the patent-in-suit. *Id.*

Witness testimony is evidence. Fed. Rules of Civ. Pro. 43.  Further, testimony regarding patent damages (lost profits and reasonable royalties), even without any supporting documents, has been consistently recognized as being competent, satisfactory evidence to allow a jury to decide whether to award damages and the amount of damages to be awarded in a patent infringement case. *Seitz v. Envirotech Systems Worldwide Inc.*, 2008 WL 656513, *5-*6 (S.D. Tex. 2008) (denying accused infringer's motion to strike the inventor/patentee's testimony as to lost profits and reasonable royalty damages and ruling that while the inventor did not qualify as an "expert" under FRE 702 to give opinion testimony, his personal experience in running his company made him competent to give lay opinion testimony as to lost profits and a reasonable royalty); *See also Minks v. Polaris Industries, Inc.*, 2009 WL 3028994,

ADLI LAW GROUP, P.C.
www.adlilaw.com
(213) 623-6546

8

2087.202

**Appx0386**

*4 (M.D. Fla. 2009); and *Bowling v. Hasbro, Inc.*, 582 F. Supp. 2d 192, 203 (D.R.I. 2008). Thus, Mr. Rado's testimony serves as more than sufficient evidence upon which the jury could rely to determine a reasonable royalty.

On the second day of trial, the jury was presented with Exhibit 201 which showed Defendant's sales of 36,453 units of products named Conseal A and Conseal B that infringed the patent at issue between March 1, 2016 through February 1, 2018. Adli Decl. ¶9 Ex. 6. (Trial Ex. 201). Mr. Chung testified that the products on the Exhibit 201 sales chart were the infringing products:

Q What is this document?
A It's a sales summary for Esquire Distribution on Conseal A and Conseal B.
Q Is that the complete number of sales that you've done regarding Conseal A and Conseal B?
A I believe so.
....
Q My question is: The Conseal A and Conseal B referred to on this document, is that the same Conseal A and Conseal B at issue in this lawsuit? Let me ask the question a different way. The photographs I previously showed you of the Conseal A and Conseal B on your website, are these sales referring to those products?
A The number will be including this number, yes.
Q And they're the same products, the best you could tell, based on the name?
A Correct.
...
Q Who owns Esquire Distribution again?
A I do.
.....
Q Did you make the decision to sell Conseal A and Conseal B?
A Yes.

Adli Decl. ¶10, Ex. 7.; (Trial Tr. 05/08/19 at 110:10-19; 111:4-14, 19-24; 120:17-18)

Accordingly, the jury had evidence that the Defendants sold at least 36,453

PLAINTIFFS LUBBY HOLDINGS, LLC's., et. al. OPPOSITION TO DEFENDANT HENRY CHUNG'S RULE 50(b) MOTION FOR JUDGMENT AS A MATTER OF LAW; AND ALTERNATIVE MOTION FOR NEW TRIAL;

2087.202

**Appx0387**

ADLI LAW GROUP, P.C.
www.adlilaw.com
(213) 623-6546

patent infringing units per Trial Exhibit 201. Based on Mr. Rado's testimony claiming he would have offered a 65-75 percent royalty rate at the time, the jury awarded Plaintiffs a 60% royalty rate based on $39.50 profit margin for 36,453 units resulting in $863,936.10 in reasonable royalties.

With regards to Defendant's argument that this information was not disclosed before trial is a fallacy and misrepresentation to this Court.  In Plaintiffs' initial Rule 26(a)(1)(A) disclosures, the Plaintiffs listed the Person Most Knowledge from both Plaintiffs as being a person who would provide testimony regarding the "use, invention, and *revenues derived from the '284 Patent*" (See Dkt. No. 65-1 pg. 2 ¶4) (emphasis added).  Consequently, the Plaintiffs did disclose their evidence relating to reasonable royalty; the testimony of witnesses with personal knowledge is the evidence to support their damages computations.

Pursuant to standard of weighing the evidence in favor of the nonmoving party, the Court should find that the jury made a legally sufficient reasonable royalty verdict and therefore should deny Defendants motion for judgment as a matter of law on this issue.

### B. Defendant's Remaining Arguments Are Waived for Not Bringing Them on a Rule 50(a) Motion

As stated above, "[a] Rule 50(b) motion for judgment as a matter of law is not a freestanding motion, [r]ather, it is a renewed Rule 50(a) motion." *E.E.O.C. v. Go Daddy Software, Inc.*, 581 F.3d 951, 961 (9th Cir. 2009). Because it is a renewed motion, a proper post-verdict Rule 50(b) motion is limited to the grounds asserted in the pre-deliberation Rule 50(a) motion. *Id., see also RePET, Inc. v. Zhao,* No. 515CV02315VAPSPX, 2018 WL 6003587, at *2 (C.D. Cal. Nov. 6, 2018)( denying rule 50(b) motion for failing to bring arguments on pre-verdict motion).

The Defendant attempts to bring in new arguments regarding computation of damages, alter-ego/piercing the corporate veil, and that the verdict is "speculative."

10

PLAINTIFFS LUBBY HOLDINGS, LLC's., et. al. OPPOSITION TO DEFENDANT HENRY CHUNG'S RULE 50(b) MOTION FOR JUDGMENT AS A MATTER OF LAW; AND ALTERNATIVE MOTION FOR NEW TRIAL;

Appx0388

ADLI LAW GROUP, P.C.
www.adlilaw.com
(213) 623-6546

2087.202

(Def. Mot. P.6-9). None of these arguments were made in the Rule 50(a) motion nor during trial before the jury. Accordingly, pursuant to the standard set in this district that that a Rule 50(b) motion is limited to the grounds asserted in the pre-deliberation Rule 50(a) motion, the remaining issues brought by Defendant must be denied.

## IV.   **CONCLUSION**

For the reasons presented herein, Plaintiffs' request for the Court to deny Defendant's FRCP 50(b) Motion for Judgment on the Pleadings in its entirety.

Respectfully submitted:

Dated: May 22, 2019                    ADLI LAW GROUP, P.C.

By:   */s/ Dariush G. Adli*
      Dariush Adli
      Drew Sherman
      Joshua Eichenstein
      Attorneys for Plaintiff
      Lubby Holdings LLC,
      Vaporous Technologies, LLC

ADLI LAW GROUP, P.C.
www.adlilaw.com
(213) 623-6546

11

2087.202

**Appx0389**

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

HONORABLE R. GARY KLAUSNER, U.S. DISTRICT JUDGE

LUBBY HOLDINGS LLC, a Delaware )
limited liability company; VAPOROUS )
TECHNOLOGIES, INC., a Delaware )
corporation, )           Case No.
                              )        2:18-cv-00715-RGK-JC
                Plaintiffs, )
                              )           Volume 1
     vs. )            (Pages 1 - 179)
                              )
HENRY CHUNG, an individual; MING )
CHEN, an individual; DEEPVAPES, )
INC., a California corporation d/b/a )
BOOM VAPORIZER; DOES 1-10, )
inclusive, )
                              )
                Defendants. )
_____ )

REPORTER'S TRANSCRIPT OF TRIAL PROCEEDINGS
TRIAL DAY 1
9:00 A.M.
TUESDAY, MAY 7, 2019
LOS ANGELES, CALIFORNIA

_____

CAROL JEAN ZURBORG, CSR NO. 7921, CCRR, RMR
FEDERAL OFFICIAL COURT REPORTER
350 WEST 1ST STREET, SUITE 4311
LOS ANGELES, CALIFORNIA 90012-4565
(213) 894-3539

interested, he did, in fact, see that these products were being offered with his technology, his patent-pending technology. After inquiring, he found out that Mr. Chung had gone back on his word, and, in fact, he was selling this product, he was making money.  That's why you come in at the end, if you decide the patent is valid and infringed, how much damages he should receive.

So at the end of this process -- I'm almost done here -- we will be asking you to determine a few things:  that the '284 Patent has been infringed by the two products at issue here, Conseal A and Conseal B, sold by Mr. Chung; that the patent is indeed valid; and then on damages, there are two measures of damages.  The judge will provide the instructions to you.  It's either lost profits, meaning the profits Mr. Rado would have made on those products sold by Mr. Chung, the infringing product, or the patent law says at a minimum he will get a reasonable royalty.  That's the minimum.  If he qualifies for lost profits, then you give him lost profits.  If not, at least you have to give him a reasonable royalty.

Now, here's the thing.  At the time of these infringements, Mr. Rado did not license his invention.  He will manufacture and sell the products, his patented products, himself.  But under the law, you're required to imagine that Mr. Rado is sitting in a room with that imaginary licensee and they are trying to negotiate a license because that's what the

law requires.  You're required to give reasonable royalty as a minimum.

So what would those people agree to if they were sitting in a room and trying to negotiate with the patent and the licensee?  And we will show you that the rate that he would have agreed to at the time, if he was going to do that, would be 60 percent of the profits that he would have made on sale of each of those products.

In addition to that damages, we are going to ask you to find that this infringement was willful.  Well, I mean, it can't be unwillful.  The evidence will show that the infringement was willful, deliberate, purposeful.

Again, thank you very much, I invite you to participate in the rest of this process and listen and learn for yourself and make a determination.  Thank you again.

THE COURT:  Thank you very much, Counsel.

Counsel, will you care to make an opening statement at this time?

MR. LEE:  Okay.

Good morning, Your Honor.

THE COURT:  Counsel.

MR. LEE:  Good morning, members of the jury.  Again, thank you for your participation, for your civic duty.  I want to skip too much of the courtesy.  Let's get right to it.

You heard plaintiffs' attorney laying out what they want

the evidentiary burden, in civil case for you to find infringement or non-infringement, the burden is preponderance, but we do bear a higher evidentiary burden of clear and convincing. I don't want to get into that, but you will see that in the patent, in your jury instruction, but the thing is we look at their patent. We don't see this patent as valuable. The claim terms are well defined, and the elements in this personal vaporizer are obvious when you look at some other things that already exist in the market.

Even in -- even in this patent here, there's a section Background, and it talks about personal vaporizers. They have some -- typical personal vaporizer has an atomizer, heating element, battery. It is an improvement on something to the extent it's valid. And plaintiffs' counsel stated that it's the anti-leak, preventing leak. If that is not obvious in the market, then that patent enjoys the presumption of validity.

But our defense in this case, other than infringement, we are saying, and our expert will show you, that the elements are obvious. There are existing prior arts that even the patent acknowledged. And for plaintiff to make that combination and claim to have a patent, when we look at it, we have the right to say that, hey, it is not invalid.

So if the patent is not valid, when you find for the invalidity, there's no more infringement. To the extent it remains valid, then the issue will be whether our products --

last name.

THE WITNESS: My name is Christian Rado, last name is spelled R-a-d-o.

THE COURTROOM DEPUTY: Thank you.

THE COURT: Okay. You may inquire, Counsel.

**DIRECT EXAMINATION**

BY MR. ADLI:

Q    Good afternoon, Mr. Rado.

What is your current profession?

A    My current profession is I'm a vape pen designer/manufacturer.

Q    And do you have a job title?

A    Yes. I am the president and CEO and designer at Vaporous Technologies.

Q    And who owns Vaporous Technologies?

A    I do.

Q    Does anyone else share the ownership with you?

A    Yes. There are -- there's three other shareholders, but they're minority shareholders. I own the majority of the interest in the company.

Q    What is your position? Other than owner, what is your position at the company Vaporous?

A    I'm the chief designer, R&D tester, and CEO.

Q    Describe for the jury, if you would, what is your typical daily routine, if you have one.

where this came from.

Q     Are you referring to the J-Pen, that product, that increases smoke flow?

A     Yes, I'm referring to our first product, the J-Pen, yes.

Q     What is the difference -- or explain a little bit between J-Pen and comparable products that existed before.

A     So when I first started evaluating these vapor products in 2012, I purchased one.  And when I saw the idea, I thought it was a great concept.  I said, wow, this is amazing.  This is going to help so many people that are in need.  And then it wasn't even a day or two later, it broke, and I was like okay, so I bought another one.  Two days later, it broke.

So I said, okay, maybe I just didn't get a good one.  So I started doing some research.  I got on the Internet and I bought some other pens.  This other one didn't really work, and, again, it broke.  So then I started doing even more research.  I started calling people.  I started going into some stores and saying, "Hey, what's a good" -- "what's a good brand?  What's a good pen?  Like I've tried a couple of these and so far I'm seeing all these problems.  The performance is bad.  This one, everything leaked out of the bottom, and, you know, my car is all dirty.  Like all these pens have problems."  And people recommended many different types of pens.

So what ended up happening was I bought them all, and they all had the same problems:  poor performance, leakage, bad

taste.  The materials that were in them, I wouldn't -- I wouldn't give anybody something to put in their body that was made out of materials like this.  And that's when I said this has got to change.

And because myself personally, I wanted to be able to use this, and I wanted my father and my family to be able to use this for relief.  I wasn't about to give them something that in my heart and in my mind I think is poison.  So I decided that I was going to start with the background that I had from electronics and engines and designing and making things.  I knew I could -- I could figure this out, and that's what I did.

I bought all the devices that were out there.  I identified all the major problems, but I was very limited with how I could solve them at first.  And that's what we are referring to.  The first product I released in 2013 was called the J-Pen, and the J-Pen was a better version of what other people would think is already on the market.

So what I did, because I had limited manufacturing capability at the time, I had only been in contact with one factory, and they weren't able to change or weren't willing to change -- I shouldn't say weren't able to.  They weren't willing to change certain things in the product that I wanted changed, and, unfortunately, there was a cultural and a language barrier so I couldn't communicate to the correct people that I needed to communicate to.

Q    Mr. Rado, after you've had a few seconds, please tell me what you have in your hand.

A    I am holding a Pal E-cig.

Q    Would you like to hold that up for the jury to see.

Can you explain what that product is, how it works, how it function.

A    This is what most people consider a modern e-cigarette. This is not a -- this one can be refilled.  Some of the devices you cannot refill.  This one you can.  It has a removable mouthpiece.  The tank also unscrews from the battery, so there are two separate units.  And this actually holds my -- my patented technology on the bottom.  And you can tell when you see it for two reasons:  first of all, airflow, you can draw through it, but when you try to exhale through it, there won't be any reverse flow, and that's because of an energized check valve that we placed at the bottom of the device because of the main problem we would find with these devices.

Because the tank quality wasn't the best, we would have -- and people would put these in their cars and put them in areas, and what would happen is liquid would start to leak down because of poor sealing quality.  And so what would happen is when they would get down to the bottom of the atomizer, they would just leak right out of the tank.  It would leak right out of the atomizer.  It would leak all over the battery and everything.  That's completely unacceptable.

A     40 or 50 applications that are in process right now.

THE REPORTER:  One at a time.

BY MR. ADLI:

Q     40 or 50 patents that are in the process of being examined by the patent office?

A     Patents are either in process of being examined or patents that are being finalized to being sent, yes.

Q     Okay.  Tell me about your product, the products with the anti-leak technology.  Have they been successful in the market?

A     Absolutely.

Q     How many of them -- tell me about some of the successes that you've had selling that product or the way that it's been received in the market.

A     Well, for instance, one of the very first vaporizer pen companies, and probably one of the most recognizable to anybody, is a company called Grenco Science, or G Pen.

Q     Grenco?

A     Grenco Science, yes.

Grenco Science and G Pen has been on the market selling vapor pens since 2011.  Just this past year, Grenco Science, G Pen, entered into an exclusive supply agreement with me and another agreement with me to buy millions of dollars' worth of these products every quarter, this product with this patent in it.

Q     How many units are you going to produce, do you know yet?

A     Well, it's at least a million -- at least a million dollars a quarter minimum is their part of their agreement.

Q     Did you license your technology to them?

A     Yes.  They are the first group I was actually willing to license the technology to because of the volume.

Q     So let me just get that.  So before this G Pen -- or not G Pen, before this Grenco deal, you did not license your technology to others?

A     Absolutely not.

Q     But now you are licensing it, correct?

A     Yes, because of the -- because of the conditions surrounding this deal, yes.

Q     And are you receiving a royalty in return?

A     Yes.

Q     What is the rate of royalty?

A     45 percent.

Q     So you're receiving 45 percent of what number?  What's that 45 percent apply to?

A     45 percent of my cost.

Q     So if the product costs, let's say -- how much would the product cost?

A     How much will it cost Grenco or myself?

Q     Well, tell me either or both.

A     So, for instance, the one product I sell to Grenco that has this technology in it, I sell this technology to them for

roughly $12, and my cost to them is just over $7, $7 and some cent.

Q    What is the royalty rate you receive on that particular product?

A    It's supposed to be set at 45.

Q    So the 45 percent would be applied to the $12 sale?

A    Yes.

Q    Or the 12 minus 5, because you said your cost is $5.

A    No, that's something different.

Q    Their cost is $5?

A    My cost is just over 7.

Q    7, sorry.

A    Yes.

Q    And the sale price, the wholesale price is 12?

A    Yes.  12.50, actually.

Q    And the 45 percent royalty rate?

A    That's my percent, yes.

Q    Applied to what number?

A    That's what I'm saying.

Q    The difference between the $7 --

A    Yes.

        THE REPORTER:  One at a time.

BY MR. ADLI:

Q    Now, you said back then, before this Grenco deal, you were not -- your policy was not to license your inventions, correct?

Q     And what is the signature on the top of that page?

A     It's my signature.

Q     Okay.  Thank you.

A     Thank you.

Q     So after you met Mr. Chung and he signed the nondisclosure agreement, what happened next?

A     He wanted -- I disclosed -- I started telling him about the invention, and I told him that I would follow up that week with the drawings, because at the show what we had discussed, Henry said, "Wow.  With your knowledge and your understanding of these products, I can show" -- "I can take you to China and show you the other factories, and you can have these things manufactured.  It will get your costs where you actually need to get them."

     And this is one of the main things that I had been looking for because that was one of my biggest struggles.  I had no other resources in China, and I didn't speak any Mandarin, so I wasn't going to have any luck with apps.  So I looked at it as a reason I could do some business with Henry.  And so we talked that day at the show about, "Hey, what are some possibilities of us doing business together that would work?"

     And that's what we did.  We talked about putting together a -- some agreements that would define our business relationship as we were getting ready to manufacture some of these new tech products that I designed, and he was going to

show me in China who and also how to facilitate that with them.

Q    Now, I want to show you the next exhibit, Exhibit 102, which is --

Your Honor, I would like permission to publish.

If you could take a few moments and then let us know what that document that you're looking at is.

A    This is another nondisclosure agreement, second one that Henry -- Henry signed. And when he was bringing me to meet the first factory that was going to produce the product that's in question here, before we released any information to that factory, I had him also have the people at the factory sign a nondisclosure agreement as well because I wasn't going to release information to a third party without them being under some sort of binding agreement. And that's what this agreement was. That's when I met -- well, when Henry introduced me to the owners of a factory called Seego.

Q    All right. Let's look at the last page of this nondisclosure agreement. And can you identify the two signatures on that page?

A    Mr. Chung and myself.

Q    Thank you.

Let's look at the next document, which is Exhibit 104.

Is that 104?

And then I will ask you a few questions about that. This is the consulting agreement, which I believe that you're

familiar with.

Permission to publish, Your Honor.

THE COURT: Yes.

BY MR. ADLI:

Q    Would you please take a moment and identify that document that you're looking at on the screen for the jury.

A    Yes.  This is a consulting agreement, one of the two agreements that Henry and I -- business agreements that we developed together.  We crafted this agreement over a period of time, starting at the end of July until the date you see signed here, which is in October.

And this consulting agreement defined that I would engineer and consult on projects for Boom, or for Henry Chung or Esquire Distribution, customers that came to him or customers that he had, that they wanted unique products and he didn't have the ability to design and create them.  So he was going to hire me and pay me to design them, and then I would manufacture them, and we would move down the line.

Q    Let's look at the last page of that document.  Do you recognize the two signatures on that page?

A    I do.

Q    Whose signatures are there?

A    Mr. Chung's and myself.

Q    Thank you.

A    Thank you.

Q    And then the last exhibit of this kind, Exhibit 103, which is the October 2015 supply agreement.  I'm going to ask you to take a few moments and identify that document for the jury, please.

A    This is the other of the two agreements.  Notice they were signed on the same days, both signed on the 14th day of October, because we had defined a manufacturing and supply agreement, which is what this is.  And the last document was engineering consulting.

The difference here, this document, defined that Henry was going to introduce me to the factories in China.  And for him introducing me to those factories, I would allow him to buy my product, my patented pending -- or patented technology, my designs, my IP from me at a royalty 10 percent above my cost at the time.

THE COURTROOM DEPUTY:  Counsel, I'm sorry.  Were you moving that into evidence?

MR. ADLI:  I'm sorry?

THE COURTROOM DEPUTY:  Are you moving this into evidence?

THE COURT:  Nothing has been moved yet into evidence.

MR. ADLI:  At the end of the question, Your Honor, I will move all of this into evidence.

Q    Did you ever tell Mr. Chung the anti-leaking technique

that was patented or patent pending at the time?

A     Before I disclosed, before I told him anything, I said, "I can't" -- "I can't disclose this information to you because I have a patent filed on it, and I won't disclose it until we are under an agreement."

Q     Do you believe Mr. Chung understood that he was not allowed to use your technology without your permission?

A     Absolutely.

Q     Then after -- did you and Mr. Chung ever travel to China together?

A     Twice.

Q     Let's go to the first time.  What did you do then?

A     The first time we went, Henry took me to the two factories that he would be working with or that I would be working with. The one factory was Seego, and the other factory was called Sixin.

Q     Did Mr. Chung have an ownership in Seego at the time?

A     At the time I was under the impression that he held a 50 percent interest, or so he told me, but I never saw any legal documents or anything like that, so that could be hearsay.

Q     Did that first trip result in placing any orders with the Chinese manufacturer?

A     Yes.  We did place orders with the Chinese manufacturer the first time.

Q     Do you remember how many units were ordered?

A     20,000 and 20,000.

Q     Were those orders, in fact, executed, completed?

A     We got the product, but they were all defective.

Q     What do you mean "defective"?

A     They had all fallen apart inside.

Q     Why?

A     Because the wick -- so in these vapor tanks, there's a liquid tank and an atomizer.  The liquid tank holds all the fluid.

Q     Let me interrupt you.  Explain to the jury what an atomizer is because I don't think you did the first time.

A     I apologize.  In a vapor pen, a vapor pen requires three main components.  Okay.  One is a battery, two is an atomizer, and three is some sort of product that's going to go in it.  So if we take the battery away, all we have is an atomizer and an area for liquid and/or the tank.  So the tank holds all the liquid, okay, and the atomizer on the bottom is what creates the heat.

So the product has to somehow get into the heating element.  And what we have between the tank and the heating element is what's known as a wick.  And the wick basically meters the amount of liquid that can go down into the atomizer so it's not too much and not too little.  So it's important that you know what kind of product people are going to put in

these so you know what size and how dense the wick needs to be so that the right amount of liquid goes down.

And basically what happened was the wick that was in the initial batch was too small, and there was no hat on it, or what we call a wick stopper.  So when these were manufactured when they shipped, when they bounced around in shipping, all the wick fell out and was in the tank, so they were no good.  So the liquid, if somebody put liquid in it, would flow right through the atomizer.  So they were all junk.  They all had to be thrown away.

Q    And then your second trip with Mr. Chung to China, what resulted from that trip?

A    On our second trip to China, we went back after the new year ended because there were problems with the first production batch, and that first production batch just got shipped right before the new year.  So they couldn't make anything else until after we came back and the holiday was over.

So we got back to China right as the new year ended and everybody is coming back to the factory, because I had already had significant interest from many people because I was -- I had a product that was coming out that had this technology that was going to solve all these people's problems.  Brands were losing their market share because cartridges would leak out and people would never buy their product ever again.  So many

customers were eager to get my product.  So I wanted to be there right away to get the factory to make it and fix the problem as soon as possible.  So we got back midway through February when the Chinese New Year ended and got the product finalized and the first batch sent to the United States.

Q    So did those products, the 20,000, ever actually were made, ready to sell?

A    Yes -- well, the second batch that came, yes.

Q    So the second batch was fine?

A    Yes, yes.

Q    Did you sell those -- did you and Mr. Chung sell that batch of 20,000?

A    I sold mine.

Q    But did Mr. Chung sell them?

A    I don't know what he did with his.

Q    So what do you mean?  Can you explain?

A    Well, that's when the whole -- that's when our whole relationship ended.

Q    Please explain.

A    Because we went to China for the first time, we got our sample products, they came back bad.  We went back to China. This time I ordered a hundred thousand units.  He ordered 20-. I got my first 20,000, and they were going to make my other 80,000, but Henry was getting his 20,000, so -- which was going to pay for 120,000 tanks total because our agreement was Henry

UNITED STATES DISTRICT COURT

would buy the product off me and add my royalty onto it.

So when it came time for me to pay the factory for 120,000 units, and I asked Henry, "Okay, okay, well, you got 20,000 units. You know, the 10 percent royalty," and at that time the second I mentioned that and said, "Okay, how do you want to take care of this?" he immediately acted confused and acted like he didn't understand why he should -- why he would be paying me a 10 percent royalty.

And I was really confused at the time. I'm like, "This whole time we have been creating these agreements to do this. And, you know, why" -- "why would we do this?"

And he just said, "Well, it doesn't make sense for me to pay this 10 percent royalty. I'm not interested. I just won't sell the product. I'm not interested. So I'm not going to sell it, so there's no royalty."

And right. Then and there, as far as I was concerned, our business relationship was over because if he wasn't going to sell the products that he was in the relationship with me for, then there wasn't a business relationship. We weren't doing anything else. So I never received payment for those 20,000 units, and I don't know what he did with them.

Q    Did you sell your hundred thousand units?

A    Yes.

Q    Now, did Mr. Chung sell that 20,000, or you don't know?

A    I have no idea.

Q    After that episode, after that incident, there was no more business relationship or cooperation between you and Mr. Chung?

A    No more business relationship whatsoever.

Q    Of any kind?

A    No, sir.

Q    Was Mr. Chung's batch of 20,000 also using your patented technology?

A    Yes.

Q    How do you know that?

A    Because they were produced in the same batch.  It was the same product.  It just had a different look.

Q    Did Mr. Chung contribute in innovative ways, in innovation to that technology?

A    Absolutely not.

         MR. LEE:  Objection; speculation.

         THE COURT:  Sustained.

BY MR. ADLI:

Q    Now, after you sold -- after your business relationship with Mr. Chung ended, did you notice that other products using your patented technology not made or ordered by you were appearing on the market?

A    I did, several months later.

Q    Can you describe the circumstances for the jury.

A    Well, after we released this new product, we were very excited about it because, you know, it had been three years

since I started the company, and for the first time we got some of our real new technology, stuff that we had been working on to debut.  So we had something that it made us stand out.  We were different.  We had technology.  We had performance.  We had quality.  It was totally different.

So we started doing a lot of trade shows because as a young brand before that, we couldn't really stand out that well because we didn't have the ability.  Even though we had the designs and ideas, we had a hard time making some of this stuff because I didn't have all the resources for the different places that would make them.

Once we got our -- once we got everything sorted out and we had these exciting new products, we wanted to go show it to everybody.  So we did a trade show almost every month, and we did them all over the United States in areas that legislation supported it.

And what I started to see in April of that year, when I had -- at our booth we would have some printouts.  And because we were a technology company, one of the things that I would do that made us stand out and when people would come over they would see that we were different, I would have my actual 3D designs, my assemblies.  What it means is when we are making a part and designing any kind of product, it's first designed on a computer, and we have the whole product on the screen.  And then we can basically cut it in half and see what it looks like

if it's cut in half and you can see all of the components.

So for our designs of our products, I would print these what we call cut-aways out and have them on display and so people -- I could show people, "This is our technology. This is why it's different. This is why it's not going to leak. This is why it's cleaner."

And what I noticed in April of that year is two people at that show came up to my booth. The first guy said, "I already bought that. That stuff doesn't work. It leaked all over the place." And when somebody came into my booth and told me that, I was like, "First of all, I don't even know who you are, and there's no way you can have this because this is mine, and I haven't sold it to you, and it's not being sold." And so initially I didn't believe him. I just thought he was mistaken.

And then he was very adamant, "No, no, no. It's the same stuff."

I finally said, "Where did you get it?"

He said, "I got it from Henry."

And I said, "Henry who?"

And he said, "Henry Chung."

And I said, "Oh, okay."

Then later that week that gentleman brought a box into my office with -- because initially I still -- you know, I didn't believe they leaked out, and when he said they leaked and he's

sure it's the same design, I said, "It's impossible.  It's impossible if it's my design that it leaked out."

And so he said, "I'll bring them to your office."  So later that week a box showed up in my office with 20,000 products in it that were all destroyed.  Everything leaked out all over.  And I was like -- I was blown away, but it was my design that was made by somebody else, that they didn't adhere to the tolerances and measurements and things like that.  They tried to make it basically a cheaper -- a cheaper version of it using less -- lower-cost material and trying to find a way to get this product out there and get it into people's hands.  And so that was the very first time, and that was really -- that's what really started it because now I was like, okay, now they're doing this.

And then also at that same show, I met a controller for a brand called The Clear, and they had said something very similar.  They said, "You know, we bought 40,000 units of these thinking it was this technology, and it leaked," and they ended up -- I ended up starting a conversation with them, and by mid-May I was their new supplier because they actually wanted technology that worked, that didn't leak.

So by May I had already seen -- I had already seen two customers that had my exact product out there and it wasn't sold by me, and it was the exact mouthpiece and configuration and colors and everything that were the version that Henry was

having made by my supplier when he said he didn't want them anymore. So -- and both of them also said they bought them from Henry Chung, so it was pretty obvious to me.

Q   Let me -- I'm going to ask you -- I'm going to show you the patent again, Exhibit 114, and I will ask you to explain for the jury in more detail, by reference to some of the drawings, the technology that we are talking about. Okay?

A   Sure.

THE COURTROOM DEPUTY: I'm sorry, is that 101?

MR. ADLI: Yes.

THE COURT: Is it 101 or 114?

MR. ADLI: 114, 114.

THE COURT: 114. Okay.

BY MR. ADLI:

Q   This is the patent, then I'm going to show you Figure 8.

THE REPORTER: Microphone, please.

BY MR. ADLI:

Q   And if you can explain this, the best you can, whether your technology is shown in that drawing.

A   Yes, it is.

Q   Can you explain it for the jury, please.

A   Yes. Just a portion of my technology or the whole thing?

Q   Just a portion of your technology in the context of the whole thing.

A   Okay. So we are going to start with basically my

technology. You see the letter A at the bottom of the diagram, it's just above this little circle, and it has a little letter A on it. I don't know if you guys can see that. Yes. That A is referring to this -- the spring assembly and the valve. So this whole assembly down here. Traditional vape pens, okay, they only had one thing down there. They had a conductor, something that would pass electricity from the battery to the heating coil. Okay. They never had any ability to control airflow in any direction or anything like that, which is also why liquid and air could leak back out of them. So if air can go up there without any sort of valve mechanism or anything, it could easily leak back out.

In this portion of the tank we don't want anything to come out of it because that's the atomizer. Anything in the atomizer is product; it's fuel. If fuel leaks out, it's -- it can burn. It can light on fire. It can destroy people's consumer goods. So that was the main problem. We need to solve this leaking problem. But in the same token, we also need to pass electrical current in the area through this pen.

So my concept and what my utility patent is is on what's called an electrified or electronically charged valve that also acts as a one-way airflow manifold. So it's a valve that has two functions: it's both electrically conductive and passing the energy to power the coil, but it also allows the air to flow in one direction and does not allow it to flow in a second

direction.  So without this device in the pen, it would either not function, or it would leak.

Q    So that's what the reference or the number A that you showed?

A    Yes.  As somebody -- so this is -- this whole -- this whole diagram as a whole is what we consider a vapor tank, as I was explaining earlier.  There's no battery attached to that.  It's basically the same thing I'm holding in my hand now but in a slightly different geometry.

What's different between the one that's on the screen and this one is the one that's on the screen actually has two separate fluid reservoirs.  As we see looking on the picture, you see a right and a left side.  They're actually -- yes, yes.

Q    You refer to them by reference numerals, the number that we can see.

A    So the number you see, 210, is the reference for the location for the one liquid, and there is no -- I don't see a referenced location on the other one, but it's where the number 242 is.  That's the other side of the tank.  There's two tanks in here.

Q    Okay.  Let's now move on to the next drawing that I want you to comment on, which is on the next page, Figure 9.  And what do you see on that image?

A    This is just an atomizer.  So this is what -- this is what creates vapor.  So this has what we see the two round -- the

number 172 -- or number 170 are the actual wire coils.  Those are what actually gets hot, and the 172 is the wicking material in the center.  And that could be made out of ceramic or quartz, and that's a material that typically the product, which is the number 200 in this -- in this embodiment, it's using solid concentrate or solid fuel instead of liquid fuel, which is why it looks like a blob sitting on top because it's actually basically a solid fuel that would be atomized by this atomizer.

And so what this whole figure is, it shows an atomizer, which is the heating element, and my charged -- my electronically charged check valve underneath, which is the actual patented technology.  So this atomizer, when air is drawn up through it -- excuse me -- it will allow airflow through -- through the opening through the valve body, through the opening in the cup, past these coils that get hot, and it will produce vapor that comes out the top.

Now, if somebody would blow into it, the ball would go down in its seat and there would be no airflow.  So airflow would only flow in one direction on this picture.  And this valve would conduct the current to this coil to power it.  That's just what this embodiment is.  It's just an atomizer.

Q     The valve you are referring to, that's identified by reference number 292?

A     Yes.

Q    Now, let's go to the last picture that I want you to comment on, and that's Figure 11A.  What do you see on that image?

A    This is -- this is the original design of my first energized check valve ball design, ball valve design.

Q    Okay.

A    So the body is a conductive material that passes the current to the atomizer, and the inside is a -- is a one-way ball valve that only allows air and liquid flow in one direction.

Q    Okay.  Thank you.

Next, I'm going to change the topic, and this should be the last or next to the last topic that I'm going to examine you on, and that has to do with damages.

A    Okay.

Q    Now, when you sold these products on your own, I want you to describe, what was the cost of these products, if you have a number?

A    Well, I have many different kits in particular, so --

Q    We are talking about the products that are at issue in this case, the Conseal A and Conseal B.

A    Okay.  So my version of that product is basically like my cartridge cover kit, which has all the same -- all the same components:  it has a protective body, battery, the energized check valve, a tank, all the same components.  When I would

produce that kit, my cost was $5.50.  If I sold that kit wholesale at the time with the tank in it, I would sell that for $16.50.  If I sold that -- when I sold it on my website for retail, it was $45.

Q    And so the cost was $5.50?

A    Yes.

Q    The wholesale price was $16.50?

A    16.50, yes.

Q    And the retail price sold on your website was $45?

A    Yes.

Q    What is the ratio of the wholesale to retail for these products that you sold?

A    Between 35 and 40 percent, roughly 38 percent was the actual.

Q    38 percent wholesale or --

A    38 percent retail.

Q    So 38 percent retail and 62 percent --

A    Correct.

Q    -- wholesale, correct?

A    Yes.

Q    If I do my math -- and if I'm not correct, correct me, please -- you are talking at the wholesale level the profit was $11; 5.50 minus 16.50, correct?

A    Yes.

Q    And at the retail level, $45 minus 5, that's $39.50 per

unit, correct?

A    Yes, yes.

Q    Okay.

A    Those are taken from my catalog from 2016 and all of our pricing.

Q    So those are verified numbers?

A    Yes.

Q    Now, again, I just want to make sure there's no questions. The number of units that are at issue in this case that the defendant has sold without permission are the numbers that are reported somewhere in the range of 38,000, 35,000 units?

A    Uh-huh.

Q    During 2016 to 2018, my question is if those products had been manufactured and ordered by you, would you have been able to sell those products?  Would you have the ability to manufacture them and then sell them?

        MR. LEE:  Objection; hypothetical.

        THE COURT:  Well, it's speculation.  Sustained.

BY MR. ADLI:

Q    How many of these units did you sell at that time during the 2016 to 2018 time period?

A    Well, considering all my -- all my products, all my kits had this technology in it, close to 200,000 kits in that period of time.

Q    Okay.  Now, you testified earlier that at the time of

these infringements after the time you met Mr. Chung and you ordered the products, you did not license your technology to others, correct?

A    Correct.

          MR. LEE:  Objection; calls for a legal conclusion.

          THE COURT:  Overruled.

BY MR. ADLI:

Q    But as we also know, at the end of this process, the jury is required to hypothesize what would be the royalty rate that you would have agreed to if you were going to license your technology.  What would be the reasonable royalty that you would demand at that time if you were going to license that technology, the anti-leak technology?

A    It would be -- it would have been beyond significant.  It would be very significant.  I mean, the first time I have done such a thing, I only --

          THE COURT:  He is asking for a number.

     Why don't you ask the question again.

BY MR. ADLI:

Q    Go ahead, please.

          THE COURT:  Why don't you ask the question again.

          MR. ADLI:  Yes.

Q    At the time -- remember, the issue is that for the jury --

          THE COURT:  Just ask your question.  The Court will instruct the jury what they are supposed to consider, not

counsel.

BY MR. ADLI:

Q    At the time of these infringements, at the time Mr. Chung was selling these products without authorization, for the products that are at issue here or the similar products, Conseal A and Conseal B, what would be the reasonable royalty you would demand for licensing your technology?

A    It's a hypothetical, but I'm going to say somewhere 65, 75 percent.  I mean, it's unrealistic, but at the time it wouldn't have made sense to me, you know.

Q    Were there any other comparable products on the market at the time?

A    No.

Q    So your product was the only product that would not leak?

A    Yes.

Q    And that's the reason you're asking for such a high number?

A    Yes, yes.

           MR. ADLI:  I may be almost done, Your Honor.  Let me consult my colleague.

           THE COURT:  Sure.

      (Discussion off the record.)

           MR. ADLI:  No further questions, Your Honor, at this time.

           THE COURT:  Okay.  Ladies and gentlemen, it's time

for the afternoon recess.  We are going to break at this time. We will be back in 15 minutes.  Remember the admonishment not to discuss the case among yourselves or with anybody else or form or express any opinions about the matter until it's submitted to you and you retire to the jury room.  See you back in 15 minutes.

THE COURTROOM DEPUTY:  All rise.

Court is in recess.

(Recess taken from 2:44 p.m. to 2:58 p.m.)

THE COURTROOM DEPUTY:  All rise.

(In the presence of the jury.)

THE COURTROOM DEPUTY:  Thank you, you may be seated.

(Pause in proceedings.)

THE COURTROOM DEPUTY:  All rise.

This United States District Court is now in session.

Please be seated.

THE COURT:  Okay.  Let the record reflect that all of the members of the jury are in their respective seats in the jury box, and the witness is still on the witness stand, and we are on cross-examination.

MR. ADLI:  Your Honor, before we proceed to cross-examination, I would like to enter the exhibits I used with the witness into evidence, please.

THE COURT:  And you want to name the exhibits?

MR. ADLI:  Yes, Exhibit 101, 102, 103, 104 and 114.

THE COURT:  Okay.  Thank you, Counsel.

Okay.  Cross-examination?

MR. LEE:  Have those exhibits been entered?

THE COURT:  There's been no objection, Counsel.  Are you objecting?

MR. LEE:  We do have objection.

THE COURT:  What are your objections to those?

MR. LEE:  We have no objection to 114.  That's the patent.  And we have objection -- it's going to be a limited objection.  No objection as to establishing parties' prior business relationship.

THE COURT:  Okay.

MR. LEE:  Objection as to relevancy to the '284 Patent at issue because the patent was filed way after those consulting agreements were signed.

THE COURT:  Do you object it to being introduced for any other reason other than showing the prior consulting agreements --

MR. ADLI:  That is the patent at issue in this case.

THE COURT:  I'm sorry, Counsel, is that your objection?

MR. LEE:  We have no objection to establishing prior --

THE COURT:  That's what I'm saying.  Your objection is to it being used to establish the patent itself, the

validity of the objection itself?

MR. LEE:  Yes.

THE COURT:  I'm going to overrule the objection at this time subject to a motion to strike.  I may very well strike that, okay?  May or may not depending on the evidence.

(Exhibits 101, 102, 103, 104 and 114 received into evidence.)

THE COURT:  Now, Counsel, cross-examination?  Would you like to cross-examine this witness?

MR. LEE:  Oh, yes.

**CROSS-EXAMINATION**

BY MR. LEE:

Q     Good afternoon, Mr. Rado.

A     Good afternoon.

Q     You are the current president and CEO of Vaporous Technology?

A     Correct.

Q     So in your personal experience as a -- when there is corporate liability, does that mean you personally would have liability, to your understanding?

MR. ADLI:  Objection; seeks a legal conclusion.

THE COURT:  Why don't you rephrase the question, Counsel.

MR. LEE:  All right.

Q     If the corporation conducts its business and it suffers

some -- for example, there is a judgment against the corporation, do you think, as an individual running that corporation, would be responsible for that judgment?

MR. ADLI:  Objection; it seeks a hypothetical and a legal conclusion.

THE COURT:  Well, it calls for what the law is on it, and the Court will instruct the jury what the law is.  What he thinks the law is is not important.

THE WITNESS:  It would all depend on the situation.

THE COURT:  No, no, that means you don't have to answer.

THE WITNESS:  Sorry, Your Honor.

THE COURT:  If I sustain the objection, you don't answer.  If I overrule the objection, you answer.

Go ahead.

BY MR. LEE:

Q    So my question is if a corporation suffers some kind of judgment, for example, the corporation sells product that are bad causing people to be sick and incur some medical bills, the person running the corporation, should that person be responsible for paying those medical bills?  That's my question.

MR. ADLI:  Your Honor, same objection.

THE COURT:  Sustained.  It's a matter of law the Court will instruct the jury on.  Sustained.

UNITED STATES DISTRICT COURT

functionality of that technology to prevent leak during periods of nonuse. When people store their vaping product, the product could be placed in all orientation, correct?

A    The product could, yes, be stored in any orientation, but the main problem was is they are sitting on the shelf being ready for sale. When a product is leaking, it's always sitting on a shelf in the upright position. So this technology 100 percent solved the problem.

THE COURT:  That's not his question.

State the question --

And just listen to the question.

State the question again.

BY MR. LEE:

Q    For a product like this, when we are putting it in an upright position, the ball will sit at the bottom, correct?

A    Yes.

Q    That will create a natural seal when the ball is sitting at the opening, correct?

A    Yes.

Q    With the spring in place, even if you turn it other than in an upright orientation, that seal is still good, correct?

A    Yes.

Q    And that's the important feature of your invention. That spring and ball combination allows the product to be placed in any orientation without leaking, correct?

A    Yes.

Q    But when a product implementing that component, but taking away the spring, not in an upright orientation, there will be leaking, correct?

A    Could there be leaking?

Q    Could there be leaking --

THE COURT:   Without the springs.

BY MR. LEE:

Q    Without the spring, when it's placed not in an upright orientation, but you place it horizontal or even reverse it upside down, there could be leaking?

A    It's possible, very unlikely.

Q    That's right.  But with the spring, that spring will push the ball to the bottom opening there to create that seal that's intended under this patent, correct?

A    Correct, sir.

Q    When you stated you had a license agreement with Grenco Science -- how do you spell that?

A    G-r-e-n-c-o, also known as G Pen.

Q    Okay.  Oh, Grenco?

A    Correct.

Q    Was that a licensing agreement on the '284 Patent?

A    It has the technology in it, yes.  It's the product.  We didn't specifically license the actual patent number.  It was the products -- I gave them a license on the products which

hold that patent in it.

Q     There's no agreement that you can point to showing that you licensed the '284 Patent, correct?

A     That the Court has right now, no, but there is a license. I mean, we could -- I don't think it's admittable into evidence anymore, but it does exist.

Q     It's not in any of your evidence?

A     I don't know.

MR. ADLI:  Objection, Your Honor.  The witness's testimony is evidence itself.

THE COURT:  Overruled.  He indicates he doesn't know as to whether or not it's in evidence.

But you say there is one that exists.

So next question.

BY MR. LEE:

Q     When you told people you had patented technology, which patent were you talking about?

A     What are you referring to specifically, sir?

Q     You previously testified that you told other people that you have patented technology.  I want to find out which patent were you talking about.

A     Where in particular are you referring to, sir?  You said I told people.  In what context was I referring to?  Can you please remind me so I can answer your question, please?

Q     Let me ask it another way.  This '284 Patent was issued on

Go ahead, Counsel.

BY MR. LEE:

Q    So you have two patents:  one that's '284 that's newly issued, and the '792.  What are the issues in the claim scope as you, the sole inventor?  Please tell me.

A    Well, I would --

THE REPORTER:  One at a time.

MR. ADLI:  Seeking a legal conclusion.  The claim scope is --

THE COURT:  Sustained.

BY MR. LEE:

Q    As a sole inventor, can you tell me the technical difference between these two patents?

A    They are very similar.  There's some additional embodiments.  I would have to go through and read each one.  As you see, I created this first application almost five years ago, so a lot has changed since then, so I would have to literally go through each one and look at them all.  If you would like me to do that, I can do that.

Q    No, I don't need you to do that, but you, as a sole inventor, there are technical differences in the disclosure made in these two patents, correct?

A    Of course.  That's why there's two separate patents.

Q    But they are similar?

A    There's many things similar.  There's a lot of standard

UNITED STATES DISTRICT COURT

things, like all vape pens have a battery, all vape pens burn a liquid, all vape pens have something that gets hot, so --

THE COURT:  Next question.

BY MR. LEE:

Q    Okay.  When you say all vape pen have batteries, all vape pen have some elements, those are known in the industry even without consulting anyone's patents, correct?

MR. ADLI:  Objection.

THE WITNESS:  Can you say that one more time, please?

MR. ADLI:  Objection; vague.

THE COURT:  I don't understand the question.  Why don't you ask it again.

BY MR. LEE:

Q    When you say all vape pens have batteries and all vape pens have some other parts, those are generally known in the vaping industry, correct?

MR. ADLI:  Objection; vague, overbroad.

THE COURT:  Overruled.

THE WITNESS:  Yes.  You need a power source, and you need something to heat product up.

BY MR. LEE:

Q    And in terms of the 103 in terms of the business relationship that you just testified to about paying 10 percent, can you elaborate what's the 10 percent in supply

agreement 103?

MR. ADLI:  Objection; vague.

THE COURT:  Sustained.

Counsel can you state that again?  In 103, you are asking him what does the 10 percent represent?

MR. LEE:  That's correct.  I'm asking Mr. Rado to explain.  He testified that he prepared these documents.

THE COURT:  Counsel, we don't tell the jury what he testified to.  They hear it.  It's improper for an attorney to tell the jury what they think they heard or didn't hear.  The jury listens to the witnesses.  Attorneys do not tell the jury what the jury heard or didn't hear.

Now, let's go back again.  The question was on 103, what does the 10 percent represent?  You don't have a copy of 103?

THE WITNESS:  No, I don't, but I know the document quite well, sir.

THE COURT:  Then you can testify to it.

THE WITNESS:  And we are referring to the manufacturing and supply agreement, correct, Mr. Lee?  That is Document 103.  I don't have it in front of me, but I believe I know it very well.  It was signed on October 14th, 2015, and it replies -- and it basically governs how we would buy the product and sell the product.

Basically the arrangement that Henry and I had was whatever factory was making my product that Henry had

introduced me to and done some sort of communication between the factory and I, if he wanted to sell the products that I was making from that factory, he could buy them from me, and I would charge him the cost that the factory was charging me plus an additional 10 percent markup for his effort to show me the factories and do some negotiation for me.  That was basically our agreement on that document, and it was for a term of one year unless it was breached.

BY MR. LEE:

Q    Okay.  That 10 percent appears to be bilateral agreement?

A    Bilateral.

Q    Both side; is that correct?

MR. ADLI:  Objection.

THE WITNESS:  I don't understand.

THE COURT:  That agreement was part of that document?  Did you agree with somebody about that?

THE WITNESS:  About?

THE COURT:  The 10 percent.

THE WITNESS:  Yes.  I agreed I would charge him 10 percent on top of my costs.

THE COURT:  Is that agreement part of that document?

THE WITNESS:  I believe so.

THE COURT:  Okay.

BY MR. LEE:

Q    I'm asking about apparently there's a sale of Vaporous

products to Boom, and that's where you talk about 10 percent. And there's another paragraph that sells Boom products to Vaporous also 10 percent.

A    Yeah, I would never -- we just -- we just put the language in for both parties, but I would never have any need to sell any Boom products; never did, never asked.

Q    But the contract provides for bilateral?

A    Yes, it did.

Q    Okay.  Thank you.

You are testifying about issue about damages, correct?

A    Yes.

Q    Although you have the expert witness here, he's not going to testify to anything regarding to damages, correct?

THE COURT:  If you know.

THE WITNESS:  I don't know.  It's up to my counsel.

BY MR. LEE:

Q    And there are many different kind of vaping products out there, correct?

A    Yes.

Q    Are you aware of any market demand for your patented invention?

MR. ADLI:  Objection; vague.

THE COURT:  Overruled.

MR. ADLI:  Foundation.

THE COURT:  Overruled.

THE WITNESS:  Absolutely.

BY MR. LEE:

Q    Did you have any soliciting literature or correspondence to show that?

A    Soliciting literature?  Somebody sending me something? Can you be more specific?  People sending me --

Q    Are you saying that people want your technology?

A    Well, don't my sales speak for themselves?

Q    Okay.

THE COURT:  The answer is "yes"?

THE WITNESS:  Yes, sir.

BY MR. LEE:

Q    But without your patented technology, vaping products still can be used by many consumers, correct?

MR. ADLI:  Objection; vague.

THE COURT:  Overruled.

THE WITNESS:  Yes.

BY MR. LEE:

Q    Even though other products have leaking issues, consumers continue to use those leaking products, correct?

A    Some of them.

Q    How many design patents do you have, just to the best of your recollection?

A    Design patents or utility, sir?

Q    Design.

A    Because we are speaking about a utility patent here.

Q    I know.  You previously testified that you have various pending application and patents issued to your name.  You also mentioned design patent.

A    I have at least four.  I may even have closer to eight. I'm not sure.  I don't have the current -- what we call our IP portfolio, which is updated almost monthly, which every month there's things added to it.

Q    Okay.  But you know what is a design patent?

A    Yes, I do.

Q    There are roughly four to eight design patents issued to your name?

A    I believe so, yes.

Q    Are those design patents related to vaping products?

A    All of them are related to vaping products.

        MR. LEE:  I have nothing further.

        THE COURT:  Redirect in that area, if there is any.

**REDIRECT EXAMINATION**

BY MR. ADLI:

Q    I don't have too many questions.  The one question that caught my attention when counsel was asking you was about the 10 percent deal that you had with Mr. Chung.  Was it a particular reason that you were having that deal, making that deal with Mr. Chung at that time?

A    Yes.  The only reason I did any deal close to giving --

selling my product for 10 percent above my cost was because at the time I associated a significant value on him showing me some of the factories in China, and once I got there, I was able to do it all myself and meet additional factories and other people.  But I initially put a lot of value on that, and that's why I was willing to do this deal at the time.

Q    Aside from the deal that you had with Mr. Chung, the business deal you had with Mr. Chung, did you license your technology, any of your vape technology, to anybody else during that time period?

A    No.

Q    During the time period between 2016 and 2018, when these sales were taking place, did you license your patented technology to anybody else?

A    No.

Q    Or your patent-pending technology to anybody else?

A    No.

MR. ADLI:  Thank you very much.

THE COURT:  Any recross in that area?

MR. LEE:  No, Your Honor.

THE COURT:  Okay.  You may step down.

THE WITNESS:  Thank you, Your Honor.

THE COURT:  Next witness?

MR. ADLI:  Your Honor, plaintiffs move to call Mr. Andreas Brekke has a witness, next witness.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

HONORABLE R. GARY KLAUSNER, U.S. DISTRICT JUDGE

LUBBY HOLDINGS LLC, a Delaware )
limited liability company; VAPOROUS )
TECHNOLOGIES, INC., a Delaware )
corporation, )                         Case No.
                                     )        2:18-cv-00715-RGK-JC
                    Plaintiffs, )
                                     )              Volume 2
        vs. )                              (Pages 1 - 227)
                                     )
HENRY CHUNG, an individual; MING )
CHEN, an individual; DEEPVAPES, )
INC., a California corporation d/b/a )
BOOM VAPORIZER; DOES 1-10, )
inclusive, )
                                     )
                    Defendants. )
_____ )

REPORTER'S TRANSCRIPT OF TRIAL PROCEEDINGS
TRIAL DAY 2
8:36 A.M.
WEDNESDAY, MAY 8, 2019
LOS ANGELES, CALIFORNIA

_____

CAROL JEAN ZURBORG, CSR NO. 7921, CCRR, RMR
FEDERAL OFFICIAL COURT REPORTER
350 WEST 1ST STREET, SUITE 4311
LOS ANGELES, CALIFORNIA 90012-4565
(213) 894-3539

UNITED STATES DISTRICT COURT

check valve to the right of that, that has point of contact with the wire which goes down and makes contact with the battery again. And then at the top you can see where it says "bottom of wall of bowl," that would be the white part that holds the heating element.

Q    And that completes Claim 1 of the '284 Patent.

Are all the elements of Claim 1 of the '284 Patent present in the Conseal B product?

A    In my opinion they are.

Q    Are all of the elements of Claim 1 of the '284 Patent in the Conseal B product?

A    In my opinion they are.

Q    In your opinion does the Conseal B product infringe the '284 Patent?

THE COURT:  That's a jury question, Counsel.  The ultimate issue of whether or not it infringes or not is for the jury to decide.  The witness can't testify.

MR. ADLI:  Your Honor, the witness -- it is an opinion.  He is an expert.  In his opinion --

THE COURT:  Not as to a matter of law.  Whether or not it infringed or not is a matter of law.  The jury has to make that determination.  He can testify why he thinks it infringes, but he can't testify whether or not there is infringement or not, otherwise he's taking it away from the jury.  He is telling the jury what the jury has to decide.  He

can't do that.

Next question.

The ultimate issue of whether or not it's infringed or not is a jury issue.  You can testify to that.  You can tell why you think it might infringe, but you can't make that ultimate decision yourself.

Okay.  Next question.

BY MR. ADLI:

Q    Let's move on to Claim 2 of the '284 Patent.  And I'm going to read that.

"The personal vaporizer as in Claim 1" -- so this is a dependent claim, depending on Claim 1 -- "wherein the heating element has a first connection and a second connection, the first connection extending through the first wire hole and contacting the conductive shell, and the second connection is extending through the second wire hole and the channel and the space away from the conductive shell."

Do you see that?

A    I do.

Q    And that's all for the Claim 2.

And does -- are these elements of Claim 2 of the '284 Patent present in the Conseal B device?

A    Yes.

Q    And let's move on to the graphic that you see in front of you.

And can you explain to us what you see there.

A     Yes.  Here you see the atomizer module again, which is the outer layer; the heating element, which is the wick on the inside with the coils wrapping around it all the way in the middle.  You see the bowl, the white part which lies around that encompassing that.  On the bottom you see, pointing out to the atomizer module itself at another angle, the first wire connection which leads to the conductive shell.

You see the channel which goes from the second wire connection, correct, and out to the grounded portion.  You see the insulation; the filter assembly, which lies between the atomizer module and the conductive shell along the wire here.  You see -- yeah, the contact point on the conductive shell itself.  And the significance with this is, I guess, there's many ways to do this, but this is the same way it was done in Mr. Rado's product.

Q     Are all these elements of Claim 2 of the '284 Patent present in the Conseal B product?

A     Yes.

Q     Are all the elements of Claim 2 of the '284 Patent present in the Conseal A product?

A     Yes.

Q     The next claim that is being asserted in this case is Claim 6 of the '284 Patent.  I'm going to read that to you.  That's also a very short claim.  It's a dependent claim.

"The personal vaporizer as in Claim 2, wherein the check valve is part of the atomizer module."

Do you see that?

A    Yes.

Q    Are those elements of Claim 6 of the '284 Patent present in the Conseal B device?

A    Yes.  Absolutely, in my opinion, they are.

Q    And can you explain to the jury what you see on the screen in front of you.

A    Yes.  Here, again, the atomizer module, the filter in between that, and the check valve itself, and you can see that the check valve is a part of the atomizer module assembly itself, and it's an important part playing a function in it. On the lower part you see the atomizer module; again, the check valve with the insulator housing surrounding it.  What looks like that skirt surrounding there is insulation.  On the top you see the cap of the check valve.  On the bottom you see the conductive shell again on the lower portion of it.

Q    I think I may have asked this question, but I'm going to ask it again just for completeness.  Are all of the elements of Claim 6 of the '284 Patent present in the Conseal B device?

A    In my opinion they are.

Q    Are all of the elements of Claim 6 of the '284 Patent present in the Conseal A device?

A    In my opinion they are.

THE COURT: If you know.

THE WITNESS: If I know of?

BY MR. ADLI:

Q    Do you know of any personal vaporizers that do not use the technology of the '284 Patent and do not leak?

A    Yes, one that uses another patent Mr. Rado has for anti-leak purposes, but that's the only one I know of that does not leak.

Q    But other than Mr. Rado's technology, do you know of any others patents or any other vaporizers that do not leak?

A    No.

Q    I want to focus on the innovative part of this invention, which is -- can you describe for the jury what that innovative part is?

A    It was very innovative, basically allowing you to have a sealing structure which prevents leaking, which was causing a lot of problems. Leading electricity through that sealing structure at the same time caused even a larger problem. We are talking about very, very small products, and what's a huge problem in space in these small products, almost none, we are talking about diameters which are a few millimeters. So being able to come up with an innovative solution which not only solves one problem, but solved two problems in the confines of space, was truly an innovation in that area, I believe.

Q    To your knowledge were any other vaporizer products using

the energized check valve that the invention uses?

A     No.

Q     I have asked this question I believe a few times, but I will ask it again.  Did you examine the Conseal A and the Conseal B products for the purpose of providing an opinion in this case?

A     I did.

Q     Does the Conseal A and the Conseal B products use the check valve -- the charged check valve of the '284 Patent?

A     Yes.

Q     Let me show you the patent.

      I'm only going back to this question because I don't want there to be any confusion.  Looking at this patent, the face of the patent, in your understanding what is the effective filing date of the patent application?

            THE COURT:  This is '284?

            MR. ADLI:  '284 Patent.

            MR. LEE:  Objection; calling for legal conclusion.

            THE COURT:  Overruled.

            THE WITNESS:  Are you referring to the December 30th, 2015?

BY MR. ADLI:

Q     Below that.

A     Oh, I mean December 30th, 2014 of the provisional application.  In my -- in my experience --

when the valve is there, it prevents the leakage.

MR. ADLI: Okay. Thank you.

THE COURT: You may step down, sir. Thank you very much.

Next witness?

MR. EICHENSTEIN: Your Honor, plaintiffs would like to call Henry Chung to the stand, please.

THE COURT: Okay. Step right there to be sworn in.

**HENRY CHUNG, PLAINTIFFS' WITNESS, WAS SWORN**

THE WITNESS: I do.

THE COURTROOM DEPUTY: Thank you. You may be seated.

THE WITNESS: Hello, hello.

THE COURTROOM DEPUTY: You can adjust that as you need to.

Could you please state your full name, and spell your last name.

THE WITNESS: Henry Chung, C-h-u-n-g.

THE COURTROOM DEPUTY: Thank you.

THE COURT: You may inquire, Counsel.

**DIRECT EXAMINATION**

BY MR. EICHENSTEIN:

Q    Good day, Mr. Chung.

Good day, ladies and gentlemen.

Could you please state what business you're in, sir.

A       I'm in wholesale design manufacture of vaporizer.

Q       Are you familiar with the Conseal A product in this case?

A       I do.

Q       How are you familiar with that product?

A       I design the product.

Q       You designed it?

A       Correct.

Q       How did you design it?  Can you walk us through the process, please.

        MR. LEE:  Objection; vague.

        THE COURT:  Sustained.

BY MR. EICHENSTEIN:

Q       What is the first step in designing the Conseal A product?

A       I don't quite understand your question.

        THE COURT:  You designed the product, didn't you?

        THE WITNESS:  Correct.

        THE COURT:  How did you start to design it?

        THE WITNESS:  You mean when do I think of idea?

BY MR. EICHENSTEIN:

Q       What was the first thing you did in designing the Conseal A product?

A       I tried to make the atomizer to be concealed, meaning hidden right next to the battery.

Q       And approximately -- can you give us the month and year of when that happened?

A      I honestly don't recall.

THE COURT:  Do you know what year it was?

THE WITNESS:  I design many different things, so the whole kit, I don't remember.

THE COURT:  I don't know if you're saying you don't recall the month, the year or either one of them.  That's okay if you don't recall.

THE WITNESS:  I don't recall.

THE COURT:  Okay.

BY MR. EICHENSTEIN:

Q      Can you describe the inner workings of the Conseal A product that you designed?

A      The main thing about the Conseal A and Conseal B, the main reason I designed it, it was about magnetic connections, where at that time none of the battery is connected with a magnetic connections, mostly is through what they call a 5-10 threading.

Q      I'm sorry, I didn't understand the last portion of your answer.

A      At the time I think of Conseal A and Conseal B, it is mostly how the atomizer connected with the battery, okay, because I designed magnetic connections, and at that time most atomizer and the battery was going through threading, meaning you had to put the atomizer onto the battery through a 5-10 threading.

Q      Did you design the conductive -- I'm sorry, the conductive

check valve that is in the Conseal A product?

A     On the atomizer -- on the atomizer portion, I started designing that since 2013 using my own patent.

Q     Which patent is that?

A     Patent dated -- I think I submitted it in March of 2014, and I was working with my attorney during the end of March '13, and I provided a sample to him.

Q     And what was the function of your 2013 patent?

A     You mean '811 and '812 Patent?

Q     The one you're referring to, yes.

A     At the time when people vaporizing, the liquid could be harsh.  I tried to create a way to scrub the vapor and scrub the air that goes in so they can come up with a cleaner and smoother vapor.

Q     So would it be fair to classify your patent as something that would improve the fueling of air going into the user's mouth; is that correct?

A     That's correct.

Q     So that has nothing to do with the leaking; would that be correct?

A     Correct.

Q     So your patent has nothing to do with anti-leaking technology?

A     No.

Q     No?  Can you clarify your answer?  No, it has nothing to

do with it?

THE COURT:  Does it have anything to do with leaking?

THE WITNESS:  Majority of people, when they design atomizers, they try to make sure it doesn't leak.  It is a challenge for people.  On the real practice, it can --

BY MR. EICHENSTEIN:

Q    I'm sorry to interrupt.  It's a yes-or-no question.

THE COURT:  It's not necessarily a yes-or-no question, Counsel, but why don't you ask it again because he's not answering what you asked.

BY MR. EICHENSTEIN:

Q    I'm asking if your patent had anything to do with anti-leaking technology.

A    When I designed atomizer -- I don't know how to answer that question because when I designed the atomizer --

THE COURT:  He is not asking about your design.  He is talking about your patent.  Did you patent anything that deals with anti-leaking technology?

THE WITNESS:  Generally patent is legal matter.  I'm really not quite familiar with that.  That's why I hire attorney for.

BY MR. EICHENSTEIN:

Q    So as an inventor, claim inventor, you can't describe the function of your invention?

A    As a claim inventor, I can claim the inventions which I described to my attorney.

Q    So I just want to make sure we have your testimony clear. I asked if your patent has anything to do with anti-leaking technology, and you have not said "yes" or "no."  I would like to know if that's a "yes" or "no."

A    I have using a ball to stop the reservoir that contains liquids, yes.

Q    Is that in your patent?

A    Yes.

Q    So does it have anything to do with anti-leaking technology?

A    Once again, I think you are asking me a legal matter.  I don't know how to answer.  I have to refer to my attorney.

Q    Anti-leaking is not a law, sir.  I'm asking if your patent has anything to do with anti-leaking technology.

A    You are asking about patent, not anti-leaking.

Q    We can move on to another question.

     Did you design the Conseal B product?

A    Correct.

Q    What is the difference between Conseal A and Conseal B?

A    The way it look, the battery size.

Q    When was the first time you saw the product that you are now calling Conseal A and Conseal B?

A    Majority of sales done through my company.  I can't quite

agreement?

A      Basically it was at the convention.  He came to my booth.  Okay.  He told me he has follow my products for the past couple years, and he invited me to his booth to take a look at his product.  He also mentioned to me that he is being C and C all the materials in his shop in Torrance, that he is lacking a manufacturer, manufacturer capabilities, that he would like to work with me.  He signed the confidential agreement.  My understanding is to each other because at the time I indicate I also have patent applications that's pending.

Q      This isn't the question.

       This is a question for Your Honor.  As a housekeeping matter, am I allowed to call another witness for impeachment purposes?

            THE COURT:  I don't understand the question, Counsel.

            MR. EICHENSTEIN:  As impeachment evidence, may I call --

            THE COURT:  We will deal with it at the next break.

            MR. EICHENSTEIN:  Okay.  Your Honor.

            THE COURT:  You can't impeach your own witness, if that's what you're asking.

            MR. EICHENSTEIN:  Okay.

Q      Did you sell the Conseal A and Conseal B products?

A      My company does.

Q     You didn't sell them?

A     All of the sales go through my Esquire Distribution.

Q     Are you familiar with the website boomvaporizer.com?

A     That was host by Esquire Distribution.

Q     Can you clarify your answer?  I didn't understand it.

A     I don't personally run that website.  My company does.

Q     I would like to introduce --

          THE COURT:  Let me just ask you a question.  Your company, are you the sole owner of the company?

          THE WITNESS:  Correct.

          THE COURT:  So when the company sells it, you are selling it through the company?

          THE WITNESS:  Correct.

          THE COURT:  Counsel.

          MR. EICHENSTEIN:  I would like to introduce Exhibit 109 into the record.

          THE COURT:  Okay.  It will be received, 109.

     (Exhibit 109 received into evidence.)

BY MR. EICHENSTEIN:

Q     Do you see the document on the screen?

A     Correct.

Q     Can you confirm that it says the contact information for boomvaporizer.com is named Henry Chung?

A     Correct.

Q     Is -- what is the address 596 Vista Rambla, Walnut,

California?

A    That's my home address.

Q    What is the phone number 626-759-7800?

A    That's the business telephone address -- phone number.

Q    What is vapor.zone@ymail.com?

A    That's my e-mail address I use for business.

Q    Did you register boomvaporizer.com in your own name?

A    Yes.

Q    Are you listed as the registrant, admin, and tech contact for the website?

A    Yes.

Q    No other questions on this particular item.

Did you advertise -- does boomvaporizer.com sell the Conseal A product?

A    Yes.

Q    The same Conseal A product at issue in this case?

A    Correct.

MR. EICHENSTEIN:  Just to confirm, I would like to enter 107 into the record.

Q    Is this the first page of boomvaporizer.com at one particular time?

A    I believe so.

THE COURT:  Are you moving that into evidence?

MR. EICHENSTEIN:  Yes, Your Honor.

THE COURT:  It will be received.

(Exhibit 107 received into evidence.)

BY MR. EICHENSTEIN:

Q    Can you confirm, it says Conseal A on the front page of your website?

A    Yes.

Q    On the second page, is that a sales page for the Conseal A product on your website?

A    Correct.

Q    Is that $15, the price that you sold it for on your website?

A    Correct.

Q    Is this a true copy, a correct copy of a Conseal B sales item on your website?

A    Correct.

Q    Did you sell a Conseal B on your website for $15?

A    Honestly, I don't change the price.  It goes up and down. I don't believe it's at $15 right now, but at that time, yes.

Q    Do you own the Conseal name as a trademark or anything like that?

A    No.

Q    Do you -- did you ever file any trademark applications for Conseal?

A    Yes, I did.

        MR. LEE:  Objection; relevancy.

        THE COURT:  Overruled.

THE WITNESS: I just want to say my company carries over 80 different products, so --

THE COURT: Okay.

BY MR. EICHENSTEIN:

Q The trademark information I have is in your personal name, that's why I'm asking you these questions, not in your company's name.

Do you recall filing the Conseal trademark in your personal name?

A My attorney handled the applications.

MR. LEE: Objection; legal conclusion.

THE COURT: Next question.

BY MR. EICHENSTEIN:

Q Did you personally promote the sale of the Conseal A and Conseal B products?

A All of the promotions is done through the company.

THE COURT: And you own the company?

THE WITNESS: Yes, I own the company.

MR. EICHENSTEIN: I would like to enter into the record Exhibit 110.

Q Do you have a Facebook page?

THE COURT: It will be received.

(Exhibit 110 received into evidence.)

THE WITNESS: My Facebook was managed by my company. I don't really use them.

nondisclosure agreement.

A    The trade show was in three days.  It was in July.

Q    And -- let's see here.  Did you make a deal to purchase Mr. Rado's products containing the anti-leaking technology at any point?

A    It is very long story.  Should I start at the beginning?

Q    No.  I'm simply asking you a simple question.  At any point have you ever made a deal with Mr. Rado to purchase his products containing anti-leaking technology that you intended to sell?

            MR. LEE:  Objection; vague.

            THE COURT:  Overruled.

        That means you can answer.

            THE WITNESS:  Oh, sorry.

            THE COURT:  That's okay.

            THE WITNESS:  The company did purchase one products one time.

BY MR. EICHENSTEIN:

Q    Aside from purchasing products, I'm talking about a supply agreement.  Did you enter into a supply agreement with Mr. Rado?

A    Correct.

Q    And was that supply agreement regarding him selling you his vaporizers containing the anti-leak technology?

A    Actually, no, it's actually on both sides.

Q     Did Mr. Rado purchase any products from you?

A     No.

Q     But you purchased products from Mr. Rado?

A     Correct.

Q     At any point did you tell Mr. Rado you would stop selling his products?

A     You mean the product I purchased from him?

Q     Or products containing his technology.

A     He asked me to wait until his patent -- my patent to show up.

Q     Whose patent are we talking about?

A     My patent.

Q     Yours?

A     Yes, and we talk.

Q     He asked you to wait for your patent to show up?  Is that what you said?

A     Correct.

Q     So Mr. Rado's products --

A     We had a dispute back, you know, at the end, and the dispute is whether this is the products follow his patent or my patent.  And he told me I did not have a patent at that time; I only have a thought, an application.  That enabled me to enforce the supply agreement.  I need to wait until my patent gets approved otherwise he won't recognize it as my design.

Q     Your design?

A    Correct.

MR. EICHENSTEIN:  I would like to introduce 109, and before I do --

Q    Do you own -- are you connected to the e-mails that andmaythevaporbewithyou.com?

A    Which one?

Q    Maythevaporbewithyou.com, are you connected to e-mails associated with that?

A    I believe that's company e-mail, no.

THE COURT:  I'm sorry, that's what?

THE WITNESS:  That's -- that's a company e-mail.

BY MR. EICHENSTEIN:

Q    Whose company?

A    Esquire Distribution.

Q    Who owns Esquire Distribution?

A    I do.

Q    So you are connected to maythevaporbewithyou.com?

A    Yes.

Q    Thank you for answering my question.

I would like to introduce 109.

THE COURT:  It will be received.

BY MR. EICHENSTEIN:

Q    Can you see number 2 in the e-mail that says "Have your mark on the packaging showing it was designed by Vaporous Technologies"?  Do you see that?

A    This e-mail was done by one of my sales, Brian.

Q    And what was this e-mail regarding?

A    It's regarding a dispute.

Q    A dispute?

A    Yes, between me and the plaintiff.

Q    I don't see anything in this e-mail that indicates there was a dispute.  You had a dispute in February 2016?

A    That's when everything get started.

Q    Did you ever travel to China with Mr. Rado?

A    Yes, I did take him to China twice.

Q    When did you take him to China?

A    I believe it's around end of 2015, beginning of 2016.

Q    And what was the purpose of those trips?

A    We were going there to produce products.  We tried to work together.

Q    Did you say "work together"?  I don't understand your answer.

A    Yes.  We tried to work on the products we create together.

Q    What products did you create together?

A    Specifically the atomizer we have in question.

Q    The atomizer you have in question, you claim you worked on together?

A    Correct.

Q    Regarding the provisional patent that was filed in December 30th, 2014, before you two met, is that what you're

MR. ADLI:  I'm saying add the three minutes to our time, and then we will take lunch earlier.

MR. EICHENSTEIN:  I found the exhibit, Your Honor.

THE COURT:  I'm sorry?

MR. EICHENSTEIN:  I found the exhibit, Your Honor.

THE COURT:  Okay.

MR. EICHENSTEIN:  I would like to introduce Defendant's Exhibit 201.

THE COURT:  Okay.  It will be received.

(Exhibit 201 received into evidence.)

BY MR. EICHENSTEIN:

Q    Are you familiar with this document?

A    Yes.

Q    What is this document?

A    It's a sales summary for Esquire Distribution on Conseal A and Conseal B.

Q    Is that the complete number of sales that you've done regarding Conseal A and Conseal B?

A    I believe so.

Q    When you say you believe so, does that mean you're certain or you're uncertain?

THE COURT:  Well, he's answered to the best of his ability.  He believes so.

BY MR. EICHENSTEIN:

Q    Is this the same Conseal A and Conseal B that is in this

lawsuit?

A    Are you saying I have different Conseal A and Conseal B? I don't understand the question.

Q    My question is:  The Conseal A and Conseal B referred to on this document, is that the same Conseal A and Conseal B at issue in this lawsuit?  Let me ask the question a different way.

The photographs I previously showed you of the Conseal A and Conseal B on your website, are these sales referring to those products?

A    The number will be including this number, yes.

Q    And they're the same products, the best you could tell, based on the name?

A    Correct.

Q    The second page of your sales is this.  Are you familiar with this document?

A    It's sales number for Esquire Distribution for Conseal A and Conseal B.

Q    Who owns Esquire Distribution again?

A    I do.

Q    And are these the same Conseal A and Conseal B at issue in this case that you were shown the photographs of that were on your website and on your Facebook page?

A    I believe so.

THE COURT:  Okay.  Ladies and gentlemen, we are

public --

A     That he show it to me.

Q     That he showed to you.

It's your contention that something that Mr. Rado was displaying to the public was also protected by the nondisclosure?

            MR. LEE:  Objection; assumes fact.

            THE COURT:  Overruled.

Is that your understanding?

            THE WITNESS:  My understanding, that's why he show me.

BY MR. EICHENSTEIN:

Q     So it's your understanding that Mr. Rado was displaying something to the public that he also wanted you not to disclose?

A     Yes.

Q     Does that make sense to you?

            THE COURT:  That's argumentative, Counsel.

            MR. EICHENSTEIN:  Okay.

Q     When did you first become aware of the technology at issue in the '284 Patent?

A     You mean this particular patent?

Q     The technology protected by the patent.

            MR. LEE:  Objection; calling for legal conclusion.

            THE COURT:  The technology involved in this patent.

THE WITNESS:  I believe the day I was served.

BY MR. EICHENSTEIN:

Q    The day you were served -- I just want to make sure I understood.  The day you were served is the day you became familiar with the technology at issue in this patent?  Is that what you said?

A    Correct.

MR. LEE:  Objection; misstating testimony.

THE COURT:  Overruled.

BY MR. EICHENSTEIN:

Q    I just want to clarify that that's your answer because earlier we heard --

THE COURT:  He said "yes."

MR. EICHENSTEIN:  Okay.

Q    You own Esquire Distribution, do you not?

A    Correct.

Q    Does anyone else own it?

A    Just me.

Q    Who makes the decisions on products sold by Esquire Distribution?

A    Can you say that question one more time?

THE COURT:  It's a pretty easy question.  Do you decide what's sold and what's not sold?

THE WITNESS:  We always sold -- we do a lot of trading, so I guess no.  A lot of time we buy what a customer

want.

BY MR. EICHENSTEIN:

Q    And how do you know what the customer wants?

A    They tell me what they want.

Q    And then who decides to sell that product?

A    We see we can purchase from China and try and sell it to them because we are an importing company as well.

Q    So who makes the decision?

A    Sometimes it's me; sometimes it's the salesperson who take care of the customer.

Q    You have salespeople on staff at Esquire Distribution?

A    Correct.

Q    What are the names of your salespeople?

A    Brian Nguy, N-g-u-y last name.

Q    Do you have to approve suggestions made by Brian?

A    Not necessarily.

Q    Did you make the decision to sell Conseal A and Conseal B?

A    Yes.

Q    Are you familiar with the company -- the vaporizer company called The Clear?

A    No.

Q    Have you ever -- are you familiar with a person going by the name David Spar?

A    No, not that I know of.

Q    Is it possible that Esquire Distribution sold 40,000 units

UNITED STATES DISTRICT COURT

And would you please restate your name for the record, and spell your last name?

THE WITNESS:  My name is Christian Rado, R-a-d-o.

THE COURTROOM DEPUTY:  Thank you.

THE COURT:  Counsel, you may inquire.

**DIRECT EXAMINATION**

BY MR. EICHENSTEIN:

Q    Mr. Rado, when you first presented Mr. Chung with a nondisclosure agreement, was the technology protected by the patent at issue at the core of that nondisclosure agreement?

A    It's the whole reason I told him I wouldn't tell anything.

MR. LEE:  Objection; legal conclusion.

THE COURT:  Overruled.

THE WITNESS:  I told him that I wouldn't disclose any information about my new technology until he signed an NDA.

BY MR. EICHENSTEIN:

Q    Is that the same technology that's protected by the '284 Patent?

A    Yes.

Q    Are you familiar with the battery in the Conseal A and Conseal B products?

A    I am.

Q    How are you familiar with that battery?

A    I'm familiar with the whole product because the first trade show that Henry and I did together where our booths were

UNITED STATES DISTRICT COURT

back to back, where we were showing the product for the first time at the trade show in March, the beginning of March, I believe it was March 10th, and at that trade show, the actual inventor of that product, his name is Justin Braun, who was the CEO of Vape Holdings at the time and the owner of Hive, showed me that product, and the brand was called Revival.

Q    When you say "that product," what are you referring to?

A    I'm referring to the product that Henry Chung refers to as Conseal A and B that he invented.

Q    Who invented?

A    Well, Justin Braun and Joytech in China did.

Q    Just to clarify and make sure of your understanding, are you saying that at a trade show the Conseal A and Conseal B product was labeled something else and sold by someone else?

A    The first time I ever saw that product was at the trade show March 10th, 2016.  And I'm actually the one that showed it to Henry for the first time.

        THE COURT:  You are talking about the Conseal product you showed to Henry?

        THE WITNESS:  The product that he now calls the Conseal, it was made by another company, and he copied it and took it.  He actually took the one that Justin Braun gave me and said, "Oh, this is great.  I'm going to do this."

        THE COURT:  And, Counsel, that's speculation.  It will be stricken.

MR. EICHENSTEIN:  Okay, Your Honor.

Q   Are you familiar with the battery of that particular product you are referring to?

A   Absolutely.  It's the same -- it's the battery that was handed to me at the March trade show that had the magnetic connection and the cartridge hidden inside that was made by Revival.

THE COURT:  Just answer the question.  You don't have to embellish on it.

THE WITNESS:  I'm sorry, sir.

THE COURT:  If they want further information, they will ask you questions.

He indicated when he first saw it and that he's familiar with it.

BY MR. EICHENSTEIN:

Q   Do you believe Mr. Chung invented the battery?

A   I know he didn't.

Q   How do you know that?

A   Because the inventor of the battery showed it to me and told me, and I showed it to Henry for the first time.

Q   Just to reiterate, it is your understanding that the nondisclosure agreement was bilateral; that you were supposed to --

A   He had no technology to show me.  I was just disclosing technology to him.

THE COURT: That is not an answer to the question.

THE WITNESS: No, sir.

THE COURT: Listen to the question.

THE WITNESS: No.

BY MR. EICHENSTEIN:

Q   Did Mr. Chung have technology to show you that he wanted to protect by the nondisclosure agreement?

A   Not that I was aware of.

Q   Are you the inventor of the energized check valve?

A   Absolutely.

Q   Are you aware of any other products that contained an energized check valve?

A   I don't know of any other product category in anything that has an energized check valve in it, to my knowledge. I've never seen anything like that before, and I still, to this day, don't know of another one.

THE COURT: Next question.

BY MR. EICHENSTEIN:

Q   Is it important that the check valve was energized?

A   It would not work. If it was not energized, the cartridge would not work.

Q   So just to be clear, an energized check valve is the only way the product -- for the nonleaking technology to work; is that correct?

A   Correct.

UNITED STATES DISTRICT COURT

Q    Why would it not work?

A    It wouldn't be able to pass the electrical energy from the battery to the heating element.  That's the secondary function of the energized check valve.

Q    Did Mr. Chung collaborate with you on any designs?

A    No.

Q    Did you sell any products manufactured or designed by Mr. Henry Chung?

A    No.

Q    At any point did you tell Mr. Chung that the anti-leaking technology was protected by a patent application?

A    Before I disclosed any information, that was the very -- that was the whole premise of disclosing anything to him, you know.  I told him, when I was at his booth, you know, "I design stuff."  I said, "I figured out all sorts of things."

          THE COURT:  Again, you're rambling on it.  The question was did you inform him at the time that you had a patent on it.

          THE WITNESS:  Yes, that I filed a patent on it, yes.

          THE COURT:  That's fine.

BY MR. EICHENSTEIN:

Q    Just to be clear, the technology protected by your patent was subject to the NDA; is that correct?

A    Yes.

Q    And you informed Mr. Chung that you had a pending patent

application -- or a patent application for this technology, correct?

A    Multiple times.

Q    Do you believe Mr. Chung understood that he could not use this technology without your permission?

            THE COURT:  That's speculation.

            MR. LEE:  Objection.

            THE COURT:  That's speculative, Counsel.

BY MR. EICHENSTEIN:

Q    Did you ever tell Mr. Chung that he could not use your patented technology?

A    Yes.

Q    Did Mr. Chung continue to use your patented technology after you told him?

A    Yes.

Q    Do you believe Mr. Chung understood --

            THE COURT:  Counsel, I know where you're going on this.  It's speculative.  You are asking for him to speculate.

BY MR. EICHENSTEIN:

Q    Are you familiar with a company called The Clear?

A    Yes.

Q    How are you familiar with that company?

A    They were a customer of mine.

Q    And have you ever -- let me strike that.

      Are you aware if Conseal A or Conseal B were ever sold to

the company called The Clear?

A     Yes.

Q     How are you aware of that?

A     Because one of -- the controller of the company, David Spar, told me that he bought 40,000 of these units thinking they were my technology, and it wasn't, and it all fell apart and leaked.  And shortly after that, he was my customer.

Q     And why did it leak if it was your technology?

A     Because it wasn't -- it wasn't manufactured to the same specifications in my design.  People basically found ways to make the components cheaper.

THE COURT:  Counsel, you are asking for hearsay on this, what somebody may have told him.  Hearsay is not admissible.  So the answer to the last two questions will be stricken.  You can call those witnesses, if you want, but you can't ask him what somebody told him.

BY MR. EICHENSTEIN:

Q     Did you act on any information given to you by Mr. David Spar?

A     I'm not sure I understand your question.

Q     Sure.  When you were informed that The Clear purchased 40,000 units of Conseal A and Conseal B, did you -- did you do anything regarding that information?

A     Yes.

Q     What did you do?

A    I filed a suit against Mr. Chung for breach of contract and what we had interpreted as fraud.

Q    Has Mr. Chung ever filed any lawsuits against you?

A    He has.  He filed a patent infringement suit against me.

Q    Is that case resolved?

A    That case is resolved.

Q    How did it get resolved?

THE COURT:  Counsel, you know that's an improper question.  It's been resolved.  Next question.

BY MR. EICHENSTEIN:

Q    Was there a ruling on that case that you're aware of?

MR. LEE:  Objection --

THE WITNESS:  No infringement.

THE COURT:  Sustained.

MR. EICHENSTEIN:  Your Honor, he brought it up in his opening argument.

THE COURT:  It's sustained, Counsel.  Next question.

MR. EICHENSTEIN:  No further questions of this witness.  I would like to call another witness.

THE COURT:  You are running out of time.  You can call as many witnesses as you want, you can call whatever witnesses you want, but be careful of that.

Any cross-examination?

MR. LEE:  One short question.

THE COURT:  Sure.

**CROSS-EXAMINATION**

BY MR. LEE:

Q    Mr. Rado, do you believe that Conseal A and Conseal B accused in this patent were -- that sold by Esquire Distribution were actually made by Justin Braun?

A    They were designed by Joytech, and Justin Braun was the brand that was partnering with Joytech on that project.

Q    And how did you form that belief you just said?

A    Justin Braun actually handed me the product, was in our booth with Henry, gave me the product as the CEO from that company, and told me they were getting ready to release this. Which if you look, there is a video that they released in February of 2016 with that product release --

Q    Okay.  Thank you.

A    -- before he ever saw it.  Thank you.

        THE COURT:  Okay.  Any redirect in that area?

        MR. EICHENSTEIN:  Yes.

**REDIRECT EXAMINATION**

BY MR. EICHENSTEIN:

Q    The product shown by Mr. Braun to you, did that contain the energized check valve?

A    Did not contain the energized check valve.  It was the battery and atomizer, or I would have had to bring --

Q    So when you're referring to the product being a prior design that wasn't yours, you're not referring to the energized

check valve?

A    No, just the battery.

Q    The battery.

And you're not claiming ownership of the battery?

A    No.  I was just referring to the battery and the magnetic connection.

MR. EICHENSTEIN:  No further questions.

THE COURT:  Anything in that area?

MR. LEE:  No.

THE COURT:  You may step town.  Thank you.

Your next witness?

MR. EICHENSTEIN:  I would like to recall Mr. Brekke to the stand.

THE COURT:  Counsel, you are recalling him to the stand.  So he's already testified, so it's for a very limited purpose only.

THE COURTROOM DEPUTY:  I will remind you, you are still under oath.

**ANDREAS BREKKE, PLAINTIFFS' WITNESS, WAS PREVIOUSLY SWORN**

**DIRECT EXAMINATION**

BY MR. EICHENSTEIN:

Q    Just to clarify, have you ever reviewed the Conseal A and Conseal B products?

A    Yes, I have.

Q    Do those products contain an energized check valve?

A     They do.

Q     Would the product work without an energized check valve?

A     Would it work without?

Q     Yeah.

A     No.  There would be nothing to lead the electricity from the first pole up into the heating element.

Q     Is the energized check valve, in your opinion, protected by the '284 Patent?

A     Yes.

        MR. EICHENSTEIN:  No further questions.

        THE WITNESS:  Thank you.

        THE COURT:  Counsel, any questions in that area?

        MR. LEE:  No.

        THE COURT:  You may step down.  Thank you very much.

    Next witness?

        MR. ADLI:  Your Honor, plaintiffs close.

        THE COURT:  I'm sorry?

        MR. ADLI:  We close our case.

        THE COURT:  So plaintiff rests at this time?

        MR. ADLI:  We rest at this time, yes.

        THE COURT:  Defense?

        MR. LEE:  Your Honor, as I indicated earlier, we will make --

        THE COURT:  Make a motion.

        MR. LEE:  We will make a motion and file it

tomorrow.

THE COURT: Ladies and gentlemen, we are going to do something that's a little bit trying. I'm going to excuse you but only about two or three minutes because I've got to talk to counsel. Go out in the hallway. You will still get your afternoon recess. Just go out in the hallway for two or three minutes, and we will call you right back.

THE COURTROOM DEPUTY: All rise.

THE COURT: Don't go too far because it will only be a couple of minutes.

(Outside the presence of the jury.)

THE COURT: Okay. You may have seats.

The record will reflect the jurors have left the courtroom.

You wish to make a motion, Counsel?

MR. LEE: Yes, Rule 50(a) motion.

THE COURT: That motion -- Counsel, I'm going to allow you to make that motion, and you can make it in writing, and the defense can respond to it. So I will be taking it under submission. You can reserve that motion.

MR. LEE: Okay.

THE COURT: I do have a question, though. One defendant has not been mentioned at all, Ming Chen. So the Court at this time will dismiss Ming Chen on its own motion because he hasn't been mentioned yet.

You didn't believe me, did you?  I told you it was only a minute or two.  Are you ready to go?

The plaintiff has rested at this time.  At this time the defense has an opportunity to present their defense.

Do you wish to proceed on that?

MR. LEE:  Yes.

THE COURT:  And you want to call your first witness?

MR. LEE:  Yeah.  We will call Mr. Henry Chung.

THE COURTROOM DEPUTY:  I will remind you, you are still under oath at this time.  Thank you.

**HENRY CHUNG, DEFENSE WITNESS, WAS PREVIOUSLY SWORN**

THE COURT:  Okay.  You may inquire, Counsel.

**DIRECT EXAMINATION**

BY MR. LEE:

Q    Good afternoon, Mr. Chung.

A    Good afternoon.

Q    You have been called before, but here I will like to have you briefly introduce yourself, your general background, your education to the jury.

MR. SHERMAN:  Objection; narrative, compound.

THE COURT:  Sustained -- excuse me, overruled.

THE WITNESS:  Good afternoon everyone.  My name is Henry Chung, last name is C-h-u-n-g.  I was born in Indiana when my father attend the University of Purdue.  And I was raised in Taiwan when my father work as a professor while in

university.  I came back to -- I came back to United States when I was 18.

The reason I came to United States is because -- excuse me.  When I was young, my father want me to pursue academic. My whole family, they are all professors.  I have seven uncles; they hold various different degrees.  And when I was young, I didn't want to pursue that as a career, so I came to United States on my own, and I attended University of New Mexico.  I got a finance degree with a minor in economics.

After that, I start working at the bank.  And after that, I started my own company, and I started my own company with my wife.

THE COURT:  Is that this company you're talking about?

THE WITNESS:  It's called Esquire Property Trading at the time, and then later on I switch to Esquire Distribution.

THE COURT:  Okay.  Counsel, next question.

BY MR. LEE:

Q    Can you briefly tell me your work experience and then your journey into invention innovation in the relevant field.

THE COURT:  That's compound.  One question at a time.

BY MR. LEE:

Q    Can you tell me how you went from your finance-related

**UNITED STATES DISTRICT COURT**

work to the vaporizing line of business?

A    I was arranged marry with my wife, and our marriage counselor decided we need to have something in common, so we start a business.  And at that time I have a friend that wanted to quit smoking so asked me to buy electronic cigarettes for him.  And that was back in 2010, 2011.  So I found one and gave to him and study the vaporizer and e-cigarettes at the time, and I decided to go into this business.

    And so back in 2011, 2012 I started importing e-cigarettes/vaporizers.  And I went to various trade shows.  Starting in 2012 and '13, I started to design my own different vaporizers.

        THE COURT:  Next question.

BY MR. LEE:

Q    For your own design and your invention, did you try to file some patent application?

        MR. SHERMAN:  Objection; leading.

        THE COURT:  Overruled.

        THE WITNESS:  I did file a couple patents in the past.  I have -- I have chances to design a lot of different vaporizers.  Not everything I design I have put a patent for, just different patents involved and -- but I started back in 2013, I believe.

BY MR. LEE:

Q    Showing you Exhibit 202.  You previously testified to

'811 Patent.  Do you recognize this document?

A     Yes.

Q     Can you tell me about this invention in this document?

A     Sure.

        MR. SHERMAN:  Vague.  Objection; vague.

        THE COURT:  Sustained.

    Do you know whose patent this is?

        THE WITNESS:  Yes.  It's mine.

        THE COURT:  Okay.  And question, Counsel.

BY MR. LEE:

Q     Can you briefly -- very briefly tell me what the technology embodied in this '811 Patent?

A     I submit it in 2014.  The part that start selling in the market I believe in February or March of 2014.  I build this one in China back in 2013.  It's about putting the bowl area into the atomizer.

        MR. LEE:  Move to admit Exhibit 203 -- 202.

        THE COURT:  Be received.

    (Exhibit 202, page 1 received into evidence.)

BY MR. LEE:

Q     Showing you Exhibit 204.

        THE COURT:  Counsel, when I say it's received, the entire document is not received.  The first page -- whatever has been put up and testified to has been received.

        MR. LEE:  Okay.  Thank you.

Q     Do you remember when those pictures were taken?

          MR. SHERMAN:  Objection; leading.

          THE COURT:  Overruled.

          THE WITNESS:  It was around end of 2013, beginning of 2014.  I don't remember the specific date.

          MR. LEE:  I move to admit Exhibit 206.

          MR. SHERMAN:  Objection; foundation, authenticity.

          THE COURT:  Are you talking all 28 pages?

          MR. LEE:  All 29 pages.

          THE COURT:  They are not relevant, Counsel.  If you have a multiple-page document -- I shouldn't have to tell you how to present documents, but if you have a multiple-page document, only those pages that have been referred to and explained in the testimony can be received.  You just don't say, "I've got a thousand page document.  I want the whole thing received."  You have to -- if it's not in front of the jury as far as testimony being given, it's not relevant.  So the answer is it will be denied.  The entire document will not be received at this time unless you make it relevant by discussing certain pages.

BY MR. LEE:

Q     Let's look at page 1, 206-1.  I put D-206-1.

          THE COURT:  Okay.

BY MR. LEE:

Q     For -1, can you tell me what that is?

A      Those are the products that I sold that contains ball bearing.

Q      That's your own product?

A      Yes, that's my patent and my design.

          MR. SHERMAN:  Move to strike everything after "yes."

          THE COURT:  Overruled.

BY MR. LEE:

Q      When was -1 photo taken?

A      I believe it's in the beginning of 2014.

          MR. SHERMAN:  Objection; foundation, hearsay.

          THE COURT:  Overruled.

          THE WITNESS:  It was taken at the time when I discussed my patent application with my attorney -- patent attorney Clement Shinn.

BY MR. LEE:

Q      Where was -1 taken?

A      It was at his office.

          THE COURT:  What does it depict?

          THE WITNESS:  I'm sorry?

          THE COURT:  You said it before, but what does it depict, the first page?

          THE WITNESS:  The first page, that was the product. That's a picture of the product I have for the patent that I submitted.

          THE COURT:  Okay.

MR. LEE:  I move to admit -1.

THE COURT:  1 will be received.

(Exhibit 206-1 received into evidence.)

BY MR. LEE:

Q    For 22, what does it depict?

A    This is every component of the tank I develop at that time.

Q    When was that -2 taken?

A    It was at beginning of 2014.

Q    Where was it taken?

A    It was at Clement Shinn's office.

MR. LEE:  Move to admit -2.

MR. ADLI:  Your Honor, if I may, relevance.

THE COURT:  Counsel, one person -- one attorney from each side can handle one witness.  We can't have multiple attorneys making objections.  If he wishes to make an objection, that's fine, on this witness.

Next question.

MR. LEE:  I move to admit -2.

THE COURT:  Received.

(Exhibit 206-2 received into evidence.)

BY MR. LEE:

Q    For -3, what does this depict?

A    It was -- it was a photo of every parts and components.

THE COURT:  How is that different from -2?

THE WITNESS:  I believe they are the same.

THE COURT:  Then it's repetitive.  It will not be received.

BY MR. LEE:

Q    -4, what does this picture depict?

A    It was -- it was a photo taken by my attorney, Clement Shinn, for the patent.

THE COURT:  What does it depict?

THE WITNESS:  Oh, the components of the atomizer, scrubber patent I have developed.

BY MR. LEE:

Q    For your product?

THE COURT:  And how is that distinguished from -1 and -2?

THE WITNESS:  It's the same, the other one shows a ball bearing, and this one doesn't.

THE COURT:  Okay.  Next question.

MR. LEE:  Admit.

THE COURT:  Yes, 4 will be admitted.

(Exhibit 206-4 received into evidence.)

BY MR. LEE:

Q    -5 what does this picture depict?

A    It was the components of my '811 Patent that was taken by my attorney Clement Shinn at his office.

Q    Around what time?

A    Early September 2014, while I submit my application.

MR. LEE:  Move to admit.

THE COURT:  What's unique about it?  Why is it different than -3?

THE WITNESS:  The third one shows three components I sell separately.

THE COURT:  Does -2 show three components?

THE WITNESS:  No.  The -2 shows --

THE COURT:  What's the difference between this and -2?  What's unique about this picture?

THE WITNESS:  I think the fifth and the second are identical.

THE COURT:  Are the same?

THE WITNESS:  I believe so.

THE COURT:  Yes.  Then it's repetitive, and it will not be received.

BY MR. LEE:

Q    Just to save time, the rest of the pictures depict the same product at the time when these pictures were taken?

A    Correct.

MR. LEE:  So we will just admit the first -1, -2 and --

THE COURT:  -4.

MR. LEE:  -4 and we can move on.

THE COURT:  Will be received.

THE COURT:  Next question.

MR. LEE:  All right.

Q    To the extent you know, as a person in that vaping market, have you detected any market demand for plaintiff's '284 Patent?

MR. SHERMAN:  Objection; foundation.

THE COURT:  Overruled.

THE WITNESS:  Majority of the products in the market doesn't leak.

THE COURT:  No, the question --

State the question just the way you did.

MR. LEE:  Okay.

THE COURT:  Then we will have you answer it.

BY MR. LEE:

Q    As a person operating in the vaping market, have you detected any demand for the technology embodied in the '284 Patent?

A    Are you referring them leaking?

THE REPORTER:  I'm sorry, I didn't understand that.

THE WITNESS:  The plaintiff's patent is -- he has a seal, seal the tank, okay, so customer --

THE COURT:  I'm sorry.  That's not responsive to the question.  He just asked if you noticed any demand for the product.

BY MR. LEE:

Q    For the product that implemented plaintiff's '284 Patent.

THE COURT:  Have you noticed any demand?

THE WITNESS:  No.

BY MR. LEE:

Q    All right.  To the extent you have not sat in prior questioning, tell me your version of your run-in with Mr. Christian Rado.

MR. SHERMAN:  Narrative.

THE COURT:  Sustained.

BY MR. LEE:

Q    When did you first meet Mr. Rado?

A    I believe it's July of 2015, during the trade show in Las Vegas.

Q    What did you guys talk about?

A    He came to my booth.  He told me he has been following my work for the past year.  Back in 2014, I create a technology called neurotechnology.  It was a fast heating element that really catch the attention of the market, but then he told me there was some -- there's a failure for the product, that it wasn't perfect.  And so inventor to inventor, designer to designer, we started talking about products.

THE COURT:  Next question.

BY MR. LEE:

Q    At that time were you ever informed that Mr. Rado has some kind of patented invention?

What was your understanding of that agreement?

THE WITNESS:  My understanding from my salesperson Brian was it has his trademark.  Vaporous Technologies was his trademark, so we are paying for the technology.

BY MR. LEE:

Q    Branding?

A    Branding of the Vaporous Technologies, which is a trademark.

Q    As a person operating in the vaping industry, and you also have your own patent, if people are talking about paying royalty, reasonable royalty, what would be your layperson's view of whether something -- what range would be reasonable?

A    Honestly, I believe 5 percent is the industry standard, but anywhere from 3 to 10 percent.

THE COURT:  Okay.

MR. LEE:  I have nothing further.

THE COURT:  Okay.  Cross-examination?

MR. SHERMAN:  Thank you, Your Honor.

**CROSS-EXAMINATION**

BY MR. SHERMAN:

Q    Good afternoon, Mr. Chung.

What was your degree at the University of New Mexico for?

A    Finance.

Q    Finance.

And do you have any graduate degrees?

A       The energized valve --

Q       Simply yes or no.

            THE COURT:  No, he can answer the question.

        But answer the question that was asked.

BY MR. SHERMAN:

Q       Before you met Mr. Rado, did you come across a vape with an energized check valve?

A       No.

Q       Okay.  And since your meeting with Mr. Rado, excluding any products that you sell, have you come across any other vapes that have an energized check valve?

A       So you're asking me if I seen anything in the market that has an energized check valve not produced by me?

Q       Or produced by Mr. Rado.

A       In United States or outside?

Q       Let's say in the United States.

A       Not that I know of.

Q       But you now produce products with an energized check valve, correct?

A       No.

Q       No, you don't?

A       No.

Q       Do you sell products with an energized check valve?

A       No.

Q       Do you import products that have an energized check valve?

made my point.

It was in 2015 at some point, though, that Mr. Rado told you about the patented technology, correct, that it was -- he did have a patent pending?

A    It was in October 2015.

Q    But in 2015 is when he told you, yes?

A    October 2015, that's when we signed the supplier agreement --

Q    Okay.

A    -- and consulting agreement and nondisclosure agreement at that time.

Q    The second nondisclosure agreement, correct?

A    Correct.

Q    The company that distributed Conseal A and Conseal B, what's the name of that company?

A    Esquire Distribution.

Q    Which is different from the first company that you formed with your wife you were talking about before, right?

A    Correct.

Q    Okay.  Are you the sole share -- is it a corporation?

A    Correct.

Q    You are the sole shareholder?

A    Correct.

Q    You're the sole director of the board?

A    I believe so.

Q     Are you the only officer?  Well, let me strike that.

      Are you the president?

A     It was an S Corp. corporation.

Q     Are you the president of that corporation?

A     I believe so.

Q     Are you the treasurer?

A     We have multiple staff at the time.

Q     My questions are:  You the treasurer of that corporation?

A     I don't know.  I wasn't doing the book.

Q     Okay.  Does that corporation have a company credit card?

            MR. LEE:  Objection; relevancy.

            THE COURT:  Sustained.

            THE WITNESS:  I --

            THE COURT:  That means you don't answer the question.

      Ask your next question.

BY MR. SHERMAN:

Q     Are you the sole decision maker of that corporation?  Let me rephrase.

      Do all final decisions come down to you in that corporation?

A     Not necessarily.

Q     Who else gets to make decisions in that corporation?

A     Depends on the type of decisions, but it's -- we have people designated in each area, such as the sales, book,

finance, collections.

Q     Who made the decision whether to sell Conseal A or Conseal B?

A     I don't believe that company was -- Esquire Property Trading was selling Conseal A and Conseal B.

Q     It wasn't?

A     I don't know, but I don't believe.  I think Esquire Distribution is the one.

Q     That's who I have been talking about, Esquire Distribution, the one that you are the sole shareholder of, right?

A     Yes.

Q     Did you make the decision to sell Conseal A and Conseal B through Esquire Distribution?

A     Yes.

Q     And Conseal A and Conseal B are your designs?

A     Correct.

Q     Okay.  Are there patents -- are any of your patents contained in Conseal A and Conseal B?

A     I was following my own design and patent.

Q     Okay.  And are those patents in the name -- are they owned currently by Esquire or you?

A     By me.

Q     Do you have a licensing agreement between you and Esquire?

A     No.

UNITED STATES DISTRICT COURT

Appx0851

MR. LEE:  Objection; calling for legal conclusion.

THE COURT:  Sustained.

BY MR. SHERMAN:

Q    Did you ever -- did you ever sign a licensing agreement with Esquire Distribution for your patents, for the use of your patents?

MR. LEE:  Objection; calling for legal conclusion.

THE COURT:  Sustained -- oh, no, overruled.

Were you the sole owner of Esquire?

THE WITNESS:  Yes.

THE COURT:  So you would have been selling it to yourself, then, correct?

THE WITNESS:  To the company.

BY MR. SHERMAN:

Q    And was there any sort of -- did you have any written licensing agreement between Esquire and yourself for the use of the patents, your patents?

A    I think my attorney draw something, but I don't know.

Q    You don't know, or you don't think?

A    I don't think because I asked my attorney to change the name of the patent, okay, and for my own personal, to Esquire Property Trading.  Esquire Property Trading was going to be a holding company for all the patents.  Esquire Distribution is going to be the buy and selling or importing party.  And only reason I changed to Esquire Property Trading to Esquire

Distribution, because Esquire Property Trading sounds like a real estate company.  I was a real estate when I was in college.

MR. SHERMAN:  Move to strike, Your Honor.

THE COURT:  It will be stricken.

BY MR. SHERMAN:

Q    Who owns all your patents?  Is it you personally under your name?

A    Right now it's under my name.

Q    Have any of the patents ever not been in your name?

MR. LEE:  Objection.

THE COURT:  I guess I don't understand the question.

MR. SHERMAN:  I will rephrase.

THE COURT:  I assume there's a lot of patents not in his name.

BY MR. SHERMAN:

Q    I am asking the ones that you were the inventor of, the one that you filed for patents, did you ever assign any of those patents to any of your corporations -- to any of your businesses?

A    You mean change the name to my business?

Q    No, no, no, no, assign the ownership of the patent to the business.

MR. LEE:  Objection; calling for a legal conclusion.

THE COURT:  Overruled.

UNITED STATES DISTRICT COURT

You may answer, if you know.

THE WITNESS: I don't know.

THE COURT: Counsel, you may want to save some time for cross-examination.

MR. SHERMAN: How much time do I have left, Your Honor?

THE COURT: 20 minutes.

MR. SHERMAN: 20 minutes. Thank you.

Q   The -- the patent technology that's in Conseal A and Conseal B, when did you invent, allegedly, that technology?

A   I believe the application was submitted in March 2014.

Q   Okay. And has that technology been used in any other vape products of yours?

A   Multiple.

Q   When was the first one?

A   You say when?

Q   Yeah, when.

A   I believe it's right around the same time in 2014.

Q   You -- you started selling a product with your patented technology before the patent issued?

A   Correct.

Q   Okay. And did you ever file a trademark for Conseal A?

MR. LEE: Objection; relevancy.

THE COURT: Sustained.

MR. SHERMAN: No further questions at this time. I

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

HONORABLE R. GARY KLAUSNER, U.S. DISTRICT JUDGE

LUBBY HOLDINGS LLC, a Delaware )
limited liability company; VAPOROUS )
TECHNOLOGIES, INC., a Delaware )
corporation, )           Case No.
                                    )    2:18-cv-00715-RGK-JC
            Plaintiffs, )
                                    )           Volume 3
     vs. )           (Pages 1 - 85)
                                    )
HENRY CHUNG, an individual; MING )
CHEN, an individual; DEEPVAPES, )
INC., a California corporation d/b/a )
BOOM VAPORIZER; DOES 1-10, )
inclusive, )
                                    )
            Defendants. )
_____ )

REPORTER'S TRANSCRIPT OF TRIAL PROCEEDINGS
TRIAL DAY 3
8:31 A.M.
THURSDAY, MAY 9, 2019
LOS ANGELES, CALIFORNIA

_____

CAROL JEAN ZURBORG, CSR NO. 7921, CCRR, RMR
FEDERAL OFFICIAL COURT REPORTER
350 WEST 1ST STREET, SUITE 4311
LOS ANGELES, CALIFORNIA 90012-4565
(213) 894-3539

UNITED STATES DISTRICT COURT

defendants sold --

THE COURT: No. You can ask if they have evidence to show and then name what particular defendant you are talking about, not just "defendants" in general.

BY MR. LEE:

Q Do you have any evidence to show that DeepVapes, Inc. sold some infringing products that caused you to lose some finance -- revenue?

A I believe we presented all of our evidence. Haven't we?

Q Recently did plaintiff make a demand of reasonable royalty amount of $795,765?

MR. ADLI: Objection, Your Honor, to the extent it reveals settlement communications.

THE COURT: I'm sorry?

MR. ADLI: To the extent it reveals settlement communications, the $795,000 that they are talking about.

THE COURT: Why don't you restate the question, Counsel.

BY MR. LEE:

Q Did recently plaintiff make a demand of -- I'm sorry, reasonable royalty compensation in the amount of $623,000 -- 346 -- 620 --

THE COURT: This is a demand you say is made before trial?

MR. LEE: Correct.

THE COURT:  Sustained.  Improper question, Counsel.

BY MR. LEE:

Q     In this case when plaintiff is demanding damages, when did plaintiffs start to count the damages period?

MR. ADLI:  Objection; it seeks a legal conclusion from a lay witness, Your Honor.

THE COURT:  Overruled.

THE WITNESS:  Can you repeat the question, please?

BY MR. LEE:

Q     When plaintiffs asked for monetary compensation, what is the date that you start counting?

A     From the filing date of my patent, sir.

Q     Okay.  And you say filing date of patent --

THE COURT:  Counsel, you've got two minutes left. Use them wisely.

MR. LEE:  Okay.

Q     Your filing date of patent, did you count this date or the earlier date?

A     The December 30th, 2014, sir --

Q     Okay.

A     -- as I stated in earlier testimony.

THE COURT:  There is no question pending.

Next question.

BY MR. LEE:

Q     Your demand for reasonable royalty is on the whole

Q    Do you agree with that conclusion?

A    I do not.

Q    Referring to Exhibit C of the export report that was testified to yesterday, would you explain your position?

A    This is Mr. Chung's Conseal product, and you can see from the side, clearly from the side view where they are showing on the picture on the left where it says "atomizer module" and it has the tank, you can see from the side the tank where the valve sits in it, and we turn it from the bottom.

And as you see on the right picture, you can see the valve, you can see the ball inside of it, which is the bottom of the cartridge connected to the atomizer module which goes into the battery, which is exactly my patent, my invention, which is an energized check valve.

Q    Would that product, Conseal A or Conseal B, work without a charged check valve?

A    Absolutely not.  If that valve was not energized, it would not work, the cartridge would not work at all.

Q    How come?

A    Because it would not conduct electrical energy through the valve to the heating element to turn on the device.

MR. ADLI:  Thank you, Mr. Rado.  No further -- also, one more question, sorry.

Q    Yesterday you heard testimony of Mr. Wakalopulos --

A    Yes.

(Outside the presence of the jury.)

THE COURT: The jurors have left the courtroom. You can take a seat.

I'm going to be talking to you a little bit about the instructions. You can have seats.

I've got to tell you, since 1974, what is that? 45 years I have been on the bench, hundreds of cases, been on the federal bench for 17 years, hundreds of cases, I have never had a case that is this discombobulated and all over the map and as poorly presented on both sides, never seen anything even close to being as poorly presented as in this particular case.

There are certain things that I'm going to strike from the jury instructions because there are just not specific, articulable facts to justify. Contributory infringement out. Induced infringement out. Willfulness out. Equivalence out. Lost profits out. Obviousness as a defense, out.

No evidence has -- not any credible, articulable facts have been presented to justify an instruction on any of those elements or for the jury to come back with a finding on any of those elements. The only thing that's left in this case -- and make sure in your argument you only pertain to these areas -- and that is -- and I don't even know if this has been proved, to tell you the truth, because this has been so disjointed and the evidence being presented is not very specific at all and it's all over the place.

But I'm still going to let this part go to the jury, and basically that's what this case is about, whether or not there's direct infringement or not, what the reasonable royalties would be if there was direct infringement, and is the patent invalid based on prior art.  Those are the only three areas that we are going to be arguing to.

In your argument, make sure you don't, particularly in a case like this, because not only has the case been very poorly presented --

Counsel, have a seat.

The jury instructions I have asked for time and time again have been abominable.  You have given me jury instructions that don't pertain to what's come down in this case.  You have given me preliminary jury instructions in a final jury instructions, and the final jury instructions you haven't given me the instructions that we need for this particular case.

It's just been embarrassing, and it's been very difficult to even sit through this case, but it's even been worse to try to put together the jury instructions that have been presented. We asked you for clean instructions.  Didn't get clean instructions.  Still have the names of the attorneys on the instructions.  Some instructions have not been included.  It's just all over the place.

So I don't want you referring to or saying that the judge is going to instruct you this way or that way.  You can argue

Now, Exhibit 202, which is in evidence, which is the sales sheet of the defendant's sales of the accused products, it's roughly about 36,000 --

Your Honor, can we use the Elmo for --

THE COURT: Sure.

MR. SHERMAN: Thank you.

So you're going to be asked to make a decision on the reasonable royalty rate. Okay? Royalty rate we talked about in terms of percentages, but you're going to have to come up with just a lump sum number, and you're going to have to do a little math, but I'm going to help you out right now. I'm going to do a little math for you. The amount of the accused products that are at issue are 36,453. That is on the Exhibit 202, which you will have to look at once you go back in that jury room, that shows all the accused products sold by the defendant.

Remember, our expert, the only evidence in the record, said that those products contained each one of the claims of the '284 Patent being asserted by the plaintiff. It infringes. So each one of those 36,453 units infringe.

Now, you also heard testimony from Mr. Rado about how much those products are sold at the retail level. He said $45, and he said that his cost is $5.50 per product. My math, I'm not a mathematician, but I think my math is it's a profit margin of $39.50 per product at the retail level. Now, that's what you

are going to go off of when you talk about royalty.

Just in general terms when I think of royalty, I think of a percentage of the net profit which is what that number is, the $39.50.  So that's what you're going to use to then do another calculation.  Now is where the royalty rate comes into play, what percentage.  You heard the testimony of Mr. Rado saying he currently has a deal that is active with a company that he's getting 45 percent of the net profits.  Okay. 45 percent of that $39.50 number.

But keep in mind this:  you also heard him say he agreed to that royalty rate because they are buying a million dollars' worth of product per quarter, $4 million a year.  36,000 units and change does not equate to $4 million a year, not even close.  So logic, right, logic and common sense -- I know you have to go on the evidence in the record, but at a certain point you are allowed to use your common sense.  The common sense tells you that if you're going to do a deal with someone that's not going to buy $4 million a year worth of profit, and you are giving that deal 45 percent, you've got to raise the percentage.  It's just common sense.  It's common business.

And you actually heard Mr. Rado say that at the time of the infringement, he wouldn't have licensed the technology.  He didn't want to.  He wouldn't have, to anybody.  And he said if he was, it was going to be an outrageous number, hundred percent, 90 percent.  Nobody is going to do a deal like that.

This is what you have to do.  You have to go back there -- it's a hypothetical negotiation given all these factors.

He said he wouldn't do it, but you've got to figure he would at some point.  There would be some grounds to give, and at some point they would meet in the middle, 40 percent, 90 percent.  We are saying that 60 percent is the royalty rate that they would have come to an agreement on, that hypothetical agreement at that time, because, remember, at the time he didn't want to license the technology; and number two, 36,000 units does not equate to $4 million a year.  Therefore, you've got to go above the 45 percent.

So if you take the 36,453 units, multiplied by the profit at the retail level of $39.50, you get $1,439,893.50.  I used a calculator on this, so I'm trusting that is an accurate number because I didn't do the longhand multiplication.  But then you have to take the 60 percent royalty rate.  40 percent of that number would go to Mr. Chung, and 60 percent to the plaintiffs.

When you multiply that number by 60 percent -- it's a 9 -- yes, $863,936.10.  And that is what we ask you to put down in that little line when you go back into the jury room.  And there's going to be an instruction on reasonable royalty, and you're going to have to put a number.  That's the number we ask you to put, once again, because of the fact that in the real world right now, he has the deal at 45 percent, but it's $4 million a year worth of product, 36,000 units is not going

to equate to that. Logic tells us you have to go up from there.

THE COURT: You've got about three minutes.

MR. SHERMAN: Thank you, Your Honor.

I just want to point to a couple more things here. There's an instruction you're going to see on credibility of witnesses. You can go on the evidence -- you have to use the evidence that is in the record, which is testimony and the documents that you're going to get back there, and the memory you have of the testimony. But what you're allowed to do, you don't have to believe all the testimony that was given by anybody.

What I would encourage you to do is think about the manner of the testimony. The plaintiff, Mr. Rado, when he gave his testimony, in my opinion it was direct. It was straightforward. He knew what he was talking about. He never hesitated on his answers. He remembered everything, all the questions he could remember. Mr. Chung, on the other hand, when he was testifying, he couldn't remember things. He was -- you know, he was slow in his answers. He was kind of contradicting himself left and right.

When I talk to my kids and something has happened and I ask my kids, and if they start contradicting themselves, if they are not giving the answers necessarily as quickly as they should, if it doesn't make sense, then I know I've got to ask

by the infringement. A patent owner must prove infringement of the claims of the patent -- excuse me. The patent owner must prove infringement of the claims of the patent and the damages.

I will instruct you on the rules that you must follow in deciding whether or not the plaintiff has proved that the defendant infringed on one or more of the asserted claims in the Patent '284. To prove infringement of any claim, the plaintiff must persuade you that it is more likely than not that the defendant had infringed on the claim.

In order to prove direct infringement by literal infringement, the plaintiff must prove by a preponderance of the evidence, i.e., that it is more likely than not, that the defendant made, used, sold, offered for sale within or imported into the United States a product that meets all of the requirements of the claim and did so without the permission of the plaintiff during the time of the '284 Patent was enforced.

You must compare the infringing product with each and every one of the requirements of the claim to determine whether all of the requirements of the claim were met. You must determine separately for each asserted claim whether or not there was infringement. There is one exception to this rule, and that is if you find that a claim on which the other claim depends does not infringe, you cannot find infringement on the dependent claim that refers directly or indirectly to the independent claim.

On the other hand, if you find that an independent claim has been infringed, you must still decide separately whether the product meets additional requirements of any claim that depends on the independent claim; thus, whether those claims have also been infringed.

A dependent claim includes all of the requirements of any of the claims to which it refers, plus additional requirements of its own.

I'm sorry.  Just a second.

On the issue of damages, if you find that the defendant infringed any valid claim of the '284 Patent, you must consider what amount of damages to award to the plaintiff.

I will now instruct you about the measure of damages.  By instructing you on damages, I'm not suggesting which party should win this case or any issue involved.  If you find that the defendant have not infringed on any valid claim of the patent, then the plaintiff is not entitled to any type of damages.  The damages you award must be adequate to compensate the plaintiff for infringement.  They are not meant to punish the infringer.  Your award of damages, if you reach that issue, should put the plaintiff in approximately the same financial position that it would have been in had the infringement not occurred.

Plaintiff has a burden of establishing the amount of its damages by a preponderance of the evidence.  In other words,

78

or anything so she can get ahold of you.  We will be in recess.

MR. LEE:  Your Honor?

THE COURT:  Yes.

MR. LEE:  We do have an objection on the jury instruction on the point of Section 287, notice and marking.

THE COURT:  Counsel, your objection is noted for the record.

MR. LEE:  Thank you, Your Honor.

THE COURT:  Overruled.

THE COURTROOM DEPUTY:  All rise.

Court is in recess.

(Recess taken from 11:04 a.m. to 1:21 p.m.)

THE COURTROOM DEPUTY:  All rise.

(In the presence of the jury.)

THE COURTROOM DEPUTY:  You may be seated.

(Pause in proceedings.)

THE COURTROOM DEPUTY:  All rise.

This United States District Court is now in session.

Please be seated.

THE COURT:  Okay.  First of all, let the record reflect that all of the members of the jury are in their respective seats in the jury box.

My understanding is -- I have a note here -- you have reached a verdict; is that correct?

JUROR NO. 1:  Yes.

<u>SUPPLY AGREEMENT</u>

THIS SUPPLY AGREEMENT (this "<u>Agreement</u>") is entered into as of the _14_ day of _october_ , 2015 (the "<u>Effective Date</u>"), by and between BOOM ENGINEERING **[NEED FORMAL NAME]**, a _Esque Distributer inc_ ("<u>Boom</u>") having a business address of _300 Lemon creek #A walnut 91789_ and VAPOROUS TECHNOLOGIES, LLC, a Pennsylvania limited liability company ("<u>Vaporous</u>"), having a business address at 2170 W. 190th Street, Torrance, CA 90504.

<u>RECITALS</u>

WHEREAS, Vaporous and Boom are engaged in the business of designing and manufacturing certain products;

WHEREAS, the parties seek to enter into this Agreement to purchase certain products from each other;

NOW THEREFORE, in consideration of the mutual benefits provided hereunder and intending to be legally bound, Boom and Vaporous hereby agree as follows:

1.      <u>Term</u>. The term of this Agreement (the "<u>Term</u>") shall commence on the Effective Date and shall continue for _1_ year. Upon the expiration of the _1_ year period, this Agreement shall continue in effect until it is terminated by either Boom or Vaporous after providing _1_ days written notice of termination to the other party.

2.      <u>Boom Obligations</u>. Boom shall source/identify a manufacturer (as deemed acceptable by Vaporous, the "<u>Manufacturer</u>") to manufacture certain Vaporous products to the specifications and tolerances as required by Vaporous. Vaporous will have a direct manufacturing contract with the Manufacturer.

3.      <u>Sale of Vaporous Products to Boom</u>. At Boom's request, Vaporous shall cause the Manufacturer to manufacture certain mutually agreed upon products containing Vaporous technology/patents to the specifications and tolerances specified by Boom and agreed to by Vaporous. The exact products to be sold by Vaporous to Boom pursuant to this Agreement shall be determined mutually by the parties, from time to time, as determined in their respective sole and absolute discretion. **[DOES IT MAKE MORE SENSE TO ATTACH A SCHEDULE TO IDENTIFY THE ACTUAL PRODUCTS???]** Vaporous shall sell such products to Boom at cost plus 10% (the "<u>Vaporous Product Purchase Price</u>"). Boom shall pay the cost portion of the Vaporous Product Purchase Price "COD" and the 10% portion of the Vaporous Product Purchase Price shall be paid in the month after such product is sold. Monthly sales shall be reported and the 10% portion of the Vaporous Purchase Price shall be paid on or before the 15th day of each month and Vaporous shall have customary audit rights. The 10% portion of the Vaporous Product Purchase Price shall be reviewed on an annual basis to determine if an adjustment is appropriate considering the market price of similar products, but any adjustment shall be in the

{C0446168 1 }

sole and absolute discretion of Vaporous.

Notwithstanding anything to the contrary, if the Manufacturer cannot manufacture Vaporous products in the capacities collectively sought by Vaporous and Boom, then absent a separate agreement between the parties, Vaporous shall instruct the Manufacturer to manufacture their respective pro-rata share of the manufacturer's capacity. For purposes of example only, absent separate agreement between the parties, if Vaporous orders 750 units and Boom orders 500 units of a product incorporating the Patents, but the manufacturer's maximum capacity is 1000 units, then Vaporous shall receive 600 units and Boom shall receive 400 units.

4.    Sale of Boom Products to Vaporous. At Vaporous' request, Boom shall cause the Manufacturer to manufacture certain mutually agreed upon products containing Boom technology/patents to the specifications and tolerances specified by Vaporous and agreed to by Boom. The exact products to be sold by Boom to Vaporous pursuant to this Agreement shall be determined mutually by the parties, from time to time, as determined in their respective sole and absolute discretion. **[DOES IT MAKE MORE SENSE TO ATTACH A SCHEDULE TO IDENTIFY THE ACTUAL PRODUCTS???]** Boom shall sell such products to Vaporous at cost plus 10% (the "Boom Product Purchase Price"). Vaporous shall pay the cost portion of the Boom Product Purchase Price COD and the 10% portion of the Boom Product Purchase Price shall be paid in the month after such product is sold. Monthly sales shall be reported and the 10% portion of the Boom Purchase Price shall be paid on or before the 15th day of each month and Boom shall have customary audit rights. The 10% portion of the Boom Product Purchase Price shall be reviewed on an annual basis to determine if an adjustment is appropriate considering the market price of similar products, but any adjustment shall be in the sole and absolute discretion of Boom.

5.    Retention of Records/Audit/Cost of Audit. Both parties agrees that for the purpose of verifying and auditing the 10% portion of the Vaporous Product Purchase Price and the Boom Product Purchase Price, the books and records of each party shall be made available, upon two (2) business days notice, for inspection and examination by a requesting party and its representatives and agents (including a certified public account) during regular business hours. Each party agrees to fully cooperate with and assist the requesting party and its representatives and agents in connection with the requesting party's rights under this Section. Each party agrees to maintain all records, insofar as they pertain to the terms of the Vaporous Product Purchase Price, the Vaporous Product Purchase Price and this Agreement, for a period of five (5) years from the date of creation of such records. Each party will pay the costs of the audit unless the audit discloses that other party has overstated the respective cost by 2% or more, in which case the party who overstated the cost will pay all of the other party's costs of the audit together with all additional monies shown to be due.

6.    Minimum Wholesale Prices. Vaporous and Boom, respectively, shall ensure the enforcement of the other party's minimum wholesale price and a minimum advertised price. Each party shall be liable to the other in the event such party fails to enforce the other party's minimum wholesale price and minimum advertised price.

{C0446168.1 }

-2-

Appx1002

7.    Shipment. The products sold hereunder shall be shipped to the stated point of shipment FOB. The purchaser of such product (the "Buyer") shall be responsible for the cost of shipping, insuring, unloading, and storing the purchased products and shall be responsible for any loss or damage including delay and loss of use which may arise after delivery on board at the point of shipment.

8.    Purchase Orders. Each party shall issue purchase orders (collectively, "Purchase Orders") for all products ordered under this Agreement. All Purchase Orders shall be in writing and are subject to acceptance by a duly authorized representative of the receiving party. Purchase Orders may only be changed, rescheduled or cancelled, in whole or in part, with written approval of the receiving party. The parties agree that any conflict or inconsistency between the terms of this Agreement and any Purchase Order shall be resolved in favor of this Agreement.

9.    Acceptance. Products purchased pursuant to this Agreement shall be subject to inspection and testing by the other party. Unless otherwise specified in the Purchase Order, final inspection and acceptance of any product by the purchaser shall be at the purchaser's facility. Each party reserves the right to reject product that does not conform to the specifications and quality requirements set forth in the Purchase Order, provided notice of such rejection is given within three (3) business days of receipt of such product. If a purchaser rejects product for non-conformance in accordance with this Section, the purchaser will return or arrange for the return of defective or non-conforming product to the seller and shall provide a written description of such defect or non-conformance.

10.    Delivery Interval. Each party shall exert its respective commercially reasonable efforts to cause the timely delivery of the product as set forth in the applicable Purchase Order, but shall not be liable for any loss, damage or delay whether direct, indirect or consequential, including loss of use or profit caused by fire, theft, civil or military authority, insurrection, riot, strikes, acts of war, shortages of materials in the marketplace, delays in transportation, acts of GOD or any other cause beyond the control of the other party.

11.    Warranty of Boom. [INSERT ANY WARRANTY TERMS OF BOOM]

12.    Warranty of Vaporous. [INSERT ANY WARRANTY TERMS OF VAPOROUS]

13.    Limitation of Liability. In no event shall either party to this Agreement be liable to the other for any consequential, treble or punitive damages in connection with any cause of action pertaining to this transaction. A purchaser's sole and exclusive remedy against a seller for any action pertaining to this transaction shall be for the repair or replacement of the product.

14.    Authorship and Interpretation. This Agreement shall not be construed more strictly against one party merely by virtue of the fact that this Agreement may have been or has been prepared by one party or the other, it being recognized that each party has contributed

[C0446168.1]

-3-

Appx1003

substantially and materially to the preparation of this Agreement and each party acknowledges and waives any claim contesting the existence or the adequacy of the consideration given by the other party.

15. _Relationship of the Parties_. The parties shall not be construed, deemed or held accountable as joint venturer or partner of the other party by virtue of this Agreement and neither party shall have any authority to bind or obligate the other.

16. _Governing Law_. This Agreement and the Purchase Orders will be governed by and construed in accordance with the laws of the State of California without reference to its laws regarding choice of law. The United Nations Convention on Contracts for the International Sale of Goods shall not apply to this Agreement or the Purchase Orders.

17. _Entire Agreement_. This Agreement contains the entire agreement between the parties hereto with respect to the transactions contemplated hereby and supersedes and cancels all prior agreements.

18. _Amendments_. This Agreement may not be modified except in a written instrument executed by each of the parties hereto.

19. _Successors and Assigns_. This Agreement shall inure to the benefit of and be binding upon Boom and the Consultant, and their respective successors and assigns, _provided however_, that this Agreement shall not be assigned by either party without the prior written consent of the other party, which consent may be withheld for any or no reason whatsoever.

20. _Execution in Counterparts_. This Agreement may be executed in two or more counterparts, each of which shall be deemed an original but all of which together shall constitute one agreement. This Agreement may be executed by facsimile or email, and such facsimile or email signature shall be treated as an original signature.

21. _Notices_. Any notices to be given under this Agreement by either party to the other may be effected either by personal delivery in writing or by registered, certified or overnight mail addressed to the respective party at the address appearing in the introductory paragraph, or to such other address provided in writing hereinafter.

22. _Legal Construction_. In case any one or more of the provisions contained in this Agreement shall for any reason be held invalid, illegal, or unenforceable in any respect, the invalidity, illegality or unenforceability shall not affect any other provision of this Agreement and this Agreement shall be construed as if the invalid, illegal or unenforceable provision had never been contained in it.

IN WITNESS WHEREOF, Boom and the Consultant hereby execute this Agreement as of the day and year first written above.

{C0446168.1 }

-4-

**Appx1004**

WITNESS/ATTEST:

_____

_____

BOOM ENGINEERING

By: _____

Name: *Henry Chung*

Title: *CEO*

VAPOROUS TECHNOLOGIES, LLC

By: _____

Christian Rado, Managing Member

{C0446168.1}

CONSULTING AGREEMENT

THIS CONSULTING AGREEMENT (this "Agreement") is entered into as of the _14_ day of _october_, 2015 (the "Effective Date"), by and between BOOM ENGINEERING [NEED FORMAL NAME], a _Esquire distribution inc_ ("Boom") having a business address of _300 Lemon creek dr #A Walnut, 91789_ and VAPOROUS TECHNOLOGIES, LLC, a Pennsylvania limited liability company (the "Consultant"), having a business address at 2170 W. 190th Street, Torrance, CA 90504.

RECITALS

WHEREAS, the Consultant has obtained the knowledge and experience necessary to provide professional reengineering, design and consulting services (the "Vaporous Services");

WHEREAS, Boom seeks to engage the Consultant to provide the Vaporous Services;

NOW THEREFORE, in consideration of the mutual benefits provided hereunder and intending to be legally bound, Boom and the Consultant hereby agree as follows:

1.    Consulting Period.  The term of the consulting arrangement provided for herein (the "Consulting Period") shall commence on the Effective Date and shall continue until this Agreement is terminated by either Boom or the Consultant after providing written notice of termination to the other party.

2.    Consulting Services.  During the Consulting Period, the Consultant shall provide Boom the Vaporous Services.  Notwithstanding anything to the contrary, Vaporous will have the right to accept or decline any request for Vaporous Services.

3.    Payments.

3.1    Consulting Fee.

3.1.1    For Vaporous Services provided in connection with the development of Boom's customers' products (the "Customer Product"), Boom will charge its customers certain set menu prices for each development service as mutually agreed by Boom, its customer and Vaporous.  Vaporous will receive 90% of the gross revenue received by Boom from its customer and Boom will retain the remaining 10%. If: (i) the Customer Product goes into production with Boom or its insiders/affiliates, then Vaporous and Boom will equally split the Net Profit from such sales.  Risk of non-payment by the customer shall be on Boom, or (ii) Boom or its insiders/affiliates receives consideration from any third party for the production of the Customer Product (the "Third Party

{C0446162 1 }



Appx1012

Appx1013

https://www.boomvaporizer.com/conseal-a



BOOM VAPORIZER

DRY HERB VAPORIZER    CONCENTRATE & OIL VAPORIZER    ATOMIZER    ACCESSORIES    CLEARANCE    STORE LOCATOR

⌂  Conseal A

Model ConSeal A    Availability 2-3 Days

BOOM Vaporizer
# Conseal A

## $15.00

★ ★ ★ ★ ★    1 reviews    Write a review

⬚Brand:    Conseal A: The smallest oil battery on the market.

## Color*

--- Please Select ---    ▼

QTY    1 ⌄

🛒 SHOP NOW!

♡ ADD TO WISHLIST    ⚖ ADD TO COMPARE

< >

Appx1014









Model ConSeal B    Availability In Stock

BOOM Vaporizer

# Conseal B

## $15.00

★ ★ ★ ★ ★    0 reviews    Write a review

Brand:    ConSeal B: Cannabis Oil Portable Vaporizer

## Color*

--- Please Select ---    ▼

## QTY    1 ⇕

🛒 SHOP NOW!

Appx1015








Model ConSeal B     Availability In Stock

BOOM Vaporizer

# Conseal B

## $15.00

☆ ☆ ☆ ☆ ☆   0 reviews    Write a review

⬚Brand:    ConSeal B: Cannabis Oil Portable Vaporizer

## Color*

— Please Select —       ▼

QTY    1 ⌃⌄


🛒 SHOP NOW!


BOOM
VAPORIZER

   

### INFORMATION

Affiliate Terms

Shipping and Returns

Privacy Policy

Terms & Conditions

Wholesale

FAQs

### COLLABORATE

Contact Us

Affiliates

Site Map

### MY ACCOUNT

My Account

Order History

Newsletter

### CONTACT US

Address: 377 Lemon Ave. Walnut - CA 91789

Phone: +1 909-468-0899

E-mail:

Sales@maythevaporbewithyou.com

Authorize.Net
Click

*Showing results for: BOOMVAPORIZER.COM*

Original Query: www.boomvaporizer.com

# Contact Information

## Registrant Contact
Name: Henry Chung
Organization:
Mailing Address: 596 Vista Rambla, Walnut California 91789 US
Phone: +1.6267597800
Ext:
Fax:
Fax Ext:
Email:vapor.zone@ymail.com

## Admin Contact
Name: Henry Chung
Organization:
Mailing Address: 596 Vista Rambla, Walnut California 91789 US
Phone: +1.6267597800
Ext:
Fax:
Fax Ext:
Email:vapor.zone@ymail.com

## Tech Contact
Name: Henry Chung
Organization:
Mailing Address: 596 Vista Rambla, Walnut California 91789 US
Phone: +1.6267597800
Ext:
Fax:
Fax Ext:
Email:vapor.zone@ymail.com



US009750284B2

# (12) United States Patent
## Rado

(10) **Patent No.:** **US 9,750,284 B2**
(45) **Date of Patent:** **Sep. 5, 2017**

(54) **PERSONAL VAPORIZER**

(71) Applicant: **Lubby Holdings, LLC**, Torrance, CA (US)

(72) Inventor: **J. Christian Rado**, Torrance, CA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **15/253,664**

(22) Filed: **Aug. 31, 2016**

(65) **Prior Publication Data**

US 2016/0366945 A1      Dec. 22, 2016

### Related U.S. Application Data

(63) Continuation of application No. 14/985,389, filed on Dec. 30, 2015.

(60) Provisional application No. 62/098,197, filed on Dec. 30, 2014, provisional application No. 62/190,942, filed on Jul. 10, 2015.

(51) **Int. Cl.**
| | |
|---|---|
| *A24F 47/00* | (2006.01) |
| *F22B 1/28* | (2006.01) |
| *H05B 3/46* | (2006.01) |

(52) **U.S. Cl.**
CPC ............ *A24F 47/008* (2013.01); *F22B 1/284* (2013.01); *H05B 3/46* (2013.01); *H05B 2203/016* (2013.01); *H05B 2203/021* (2013.01)

(58) **Field of Classification Search**
CPC ....... B05B 9/002; B05B 11/0002; H05B 3/46; H05B 2203/016; H05B 2203/021; F22B 1/284; A61M 15/00; A61M 15/06; A24F 47/002; A24F 47/008
USPC ................... 239/13, 135–136; 137/511–512; 392/395, 396–398, 401, 403–404
See application file for complete search history.

(56) **References Cited**

#### U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 2,104,266 | A | 1/1938 | McCormick | |
| 3,200,819 | A | 8/1965 | Gilbert | |
| 3,725,990 | A * | 4/1973 | Petersen | B21D 22/26 |
| | | | | 137/539 |
| 4,947,874 | A | 8/1990 | Brooks et al. | |
| 5,353,834 | A * | 10/1994 | Schmitt | B60T 8/341 |
| | | | | 137/539.5 |
| 7,832,410 | B2 | 11/2010 | Hon | |
| 8,156,944 | B2 | 4/2012 | Han | |
| 8,186,209 | B2 * | 5/2012 | Wang | B60C 23/0408 |
| | | | | 340/442 |
| 8,365,742 | B2 | 2/2013 | Hon | |
| 8,375,957 | B2 | 2/2013 | Hon | |
| 8,393,331 | B2 | 3/2013 | Hon | |
| 8,794,231 | B2 | 8/2014 | Thorens et al. | |
| 8,915,254 | B2 | 12/2014 | Monsees et al. | |

(Continued)

#### OTHER PUBLICATIONS

Office Action from USPTO dated Feb. 24, 2017 for related U.S. Appl. No. 14/985,389.

*Primary Examiner* — Dana Ross
*Assistant Examiner* — James Sims, III
(74) *Attorney, Agent, or Firm* — Klein, O'Neill & Singh, LLP

(57) **ABSTRACT**

A personal vaporizer is configured to be usable both for non-liquid vaporizing media and for liquid vaporizing media. In some embodiments an electrically conductive check valve blocks vaporizing media from leaking out of air intake apertures during periods of nonuse, and delivers electric power to a heating element during use. In some embodiments, no wick structures extend into a fluid chamber, but a wick extends from a wick holder downstream of the fluid chamber to a vaporizing chamber.

**20 Claims, 20 Drawing Sheets**





*FIG. 8*



*FIG. 9*



FIG. 11A

FIG. 11B

# PERSONAL VAPORIZER

## CROSS-REFERENCE TO RELATED APPLICATION

This application is a continuation of U.S. application Ser. No. 14/985,389, which was filed Dec. 30, 2015, which application claims priority to U.S. Provisional Application Nos. 62/098,197, filed Dec. 30, 2014, and 62/190,942, filed Jul. 10, 2015. The entirety of each of the priority applications is hereby v-incorporated by reference.

## BACKGROUND

The present disclosure relates to the field of personal vaporizers

Personal vaporizers are handheld devices that vaporize a vaporizing medium such as a liquid solution or a wax. The vapor is then inhaled by its user. A typical personal vaporizer has an atomizer having a heating element that selectively heats the medium in order to produce the vapor. A rechargeable battery is also typically employed for powering the atomizer.

Personal vaporizers for vaporizing liquid media typically include a fluid chamber that holds the liquid, and a wick that communicates liquid from the chamber to the atomizer. The liquid solution typically includes chemicals such as one or more of propylene glycol, glycerin, polyethylene glycol 400, and an alcohol. Extracted flavorings can also be included in the fluid. Electronic cigarettes are a type of personal vaporizer, and use a liquid solution that includes tobacco-derived nicotine. Personal vaporizers also can be used with liquid solutions that include one or more of various essential oils, including cannabis oil.

Personal vaporizers for vaporizing wax media typically include a bowl- or cup-shaped structure at the atomizer into which wax media can be placed. Such personal vaporizers typically do not include a fluid chamber, but instead typically include a detachable mouthpiece that can be removed to provide access to the atomizer cup.

Personal vaporizers typically include an air path so that vaporized media can be mixed with air and delivered to the user. Thus, air holes are formed in and through various structures of each vaporizer. However, in certain conditions, such as during periods of nonuse, vaporizing media may leak from the air holes.

Further, for some types of personal vaporizers it is desired to keep the profile, such as the cross-sectional area, of the vaporizer as small as possible. However, it is also desired to maximize vapor delivery. Maximizing such vapor delivery entails maximizing the lumen size of a vapor delivery tube from a vaporization chamber to the mouthpiece, while simultaneously maximizing the cross-sectional area of the wick(s) that deliver vaporizing liquid from a tank to the vaporizing chamber. The considerations of reducing device profile while simultaneously maximizing the cross-sectional area dedicated to both the vapor delivery tube and the wick(s) are often competing.

## SUMMARY

There is a need in the art for a personal vaporizer that can simultaneously accommodate both liquid and wax media. There is a further need in the art for a personal vaporizer that will resist leaking, particularly during periods of nonuse. There is a still further need in the art for a personal vaporizer that can maximize both liquid delivery to the vaporizing chamber and vapor delivery from the vaporizing chamber to the mouthpiece while minimizing the cross-sectional profile of the device.

In accordance with one embodiment, the present specification provides a personal vaporizer, comprising: an atomizer module comprising a bowl and a coil arranged in or adjacent the bowl, the bowl configured to accept a wax having an essential oil; a battery assembly, the atomizer module connectable to the battery assembly so that actuation of the battery delivers electrical energy to the coil, causing the coil to heat and vaporize a wax that may be in the bowl; and a tank module selectively attachable to the atomizer module so that the atomizer module is disposed between the tank module and the battery assembly, the tank module comprising a fluid tank configured to contain a vaporizing liquid therewithin, and to deliver a portion of the vaporizing liquid to a vaporizing chamber adjacent the coil; wherein a wax placed in the atomizer module bowl and a vaporizing liquid from the fluid module can be simultaneously vaporized by the coil so as to form a combined vapor by simultaneously vaporizing both the wax and the vaporizing liquid.

In accordance with another embodiment, the present specification provides a personal vaporizer, comprising: a tube comprising a fluid chamber and a vapor passage extending through the fluid chamber; an atomizer module comprising a bowl having an upper edge, a coil being arranged in or adjacent the bowl, the bowl being configured to accept a vaporizing solution inside the tank; a check valve comprising an insulator housing, a conductive shell inside the insulator housing, and a sealing mechanism inside the conductive shell, the sealing mechanism providing a seal inside the conductive shell; and a battery assembly, the atomizer module connectable to the battery assembly through the check valve so that actuation of the battery delivers electrical energy to the coil, causing the coil to heat and vaporize the vaporizing solution.

Some embodiments additionally comprise one or more slots formed through a side wall of the bowl.

In additional embodiments, the sealing mechanism comprises a ball and a spring.

In further embodiments, the bowl has a first wire hole and a second wire hole extending through a bottom wall of the bowl and a second channel extending transversely from the second wire hole. In some such embodiments, the coil is a heating element having a first connection and a second connection, the first connection extending through the first wire hole and contacting the conductive shell, and the second connection extending through the second wire hole and the channel and spaced away from the conductive shell.

In accordance with another embodiment, the present specification provides a personal vaporizer, comprising: an atomizer module comprising a bowl and a heat element arranged in or adjacent the bowl, a vaporizing chamber defined in the bowl adjacent the heat element; a tank module selectively attachable to the atomizer module, the tank module comprising a fluid tank configured to contain a vaporizing liquid therewithin, the fluid tank comprising a bottom wall having at least one fluid delivery hole extending therethrough; a wick holder supporting a wick and defining a fluid receiver, the fluid receiver in communication with the at least one fluid delivery hole, the wick configured to communicate vaporizing fluid from the fluid receiver to the vaporizing chamber; and a vapor tube extending through the fluid chamber and defining a vapor passage that is separated from the fluid in the fluid chamber; wherein vapor from the vaporizing chamber is directed through the vapor passage.

In some embodiments, a cross-sectional area of the wick is greater than a cross-sectional area of the vapor passage.

In further embodiments, a combined cross-sectional area of all of the at least one fluid delivery holes is less than a cross-sectional area of the vapor passage.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is a perspective view of a battery assembly for use in some embodiments;

FIG. 2 is a side view of the battery assembly of FIG. 1;

FIG. 3 is a side view of a vaporizing structure and mouthpiece in accordance with one embodiment;

FIG. 4 is a side view of a personal vaporizer comprising the vaporizing structure of FIG. 3 attached to the battery assembly of FIG. 1;

FIG. 5 is a side view of an embodiment of a personal vaporizer having a modular construction;

FIG. 6 is an exploded view of the personal vaporizer of FIG. 5;

FIG. 7 is a perspective view of a vaporizing structure in accordance with another embodiment;

FIG. 8 is a cross-sectional view taken along lines 8-8 of FIG. 7;

FIG. 9 is a close-up view of the atomizer module of the structure of FIG. 8, depicting a wax media disposed in an atomizer cup;

FIG. 10A is a perspective view of an atomizer cup according to one embodiment;

FIG. 10B is a bottom view of the atomizer cup of FIG. 10A;

FIG. 10C is a top view of the atomizer cup of FIG. 10A;

FIG. 11A is a perspective view of a check valve according to one embodiment;

FIG. 11B is an exploded view of the check valve of FIG. 11A;

FIG. 12 is a cross-sectional view taken along line 12-12 of FIG. 7;

FIG. 13 is a side view of another embodiment of a personal vaporizer;

FIG. 14 is an exploded view of mouthpiece, tank and atomizer modules of the personal vaporizer of FIG. 13;

FIG. 15 is a cross-sectional view taken along lines 15-15 of FIG. 14, except that the tank and atomizer modules are shown connected to one another;

FIG. 16 is an exploded view of another embodiment of a check valve;

FIG. 17 is a close up view of an atomizer module portion of the structure depicted in FIG. 15;

FIG. 18 is a perspective view of another embodiment of an atomizer cup;

FIG. 19 is a partially cutaway perspective view of the atomizer of FIG. 14;

FIG. 20 is an exploded view of the tank module of FIG. 14;

FIG. 21A is a perspective view of a transfer member of the tank module of FIG. 14;

FIG. 21B is a cross-sectional view taken along line 21B-21B of FIG. 21A;

FIG. 22A is a perspective view of an embodiment of a wick holder;

FIG. 22B is a cross-sectional view taken along line 22B-22B of FIG. 22A; and

FIG. 23 is an exploded view of the mouthpiece embodiment of FIG. 14.

## DESCRIPTION

With initial reference to FIGS. 1 and 2, an embodiment of a battery assembly 20, or battery pack, for a personal

vaporizer is illustrated. Certain features of the illustrated battery assembly 20 are typical of battery assemblies currently available on the market. For example, the battery assembly 20 may include a rechargeable battery, such as a lithium-ion battery, enclosed within a battery casing 22. The battery casing 22 may include an elongated body 24 that extends from a base or distal end 26 to a top or proximal end 28. An electronic controller may also be included within the casing 22 to control voltage, current, timing and the like. A button 29 may be provided for selectively actuating electricity delivery from the battery 20 to the atomizer. In some embodiments, the button 29 can include a light that indicates when power is being delivered.

With continued reference to FIGS. 1 and 2, at and adjacent the proximal end 28 of the battery assembly 20, the battery casing 22 defines a mount boss 30. The mount boss 30 includes connecting structures for connecting vaporizing structures, such as atomizers and fluid chambers, to the battery. The elongated body 24 is disposed distally of the mount boss 30. In some embodiments, the body 24 may include a decorative coating or sleeve that is configured to enhance the look of the vaporizer. For example, the body 24 may come in many different colors and/or have one or more unique and aesthetically pleasing surface treatments. Some embodiments may include a decorative sleeve that is selectively removable.

In the illustrated embodiment, the battery assembly mount boss 30 comprises an externally threaded portion 32 adjacent the decorative body 24. Preferably, the externally threaded portion 32 has a diameter somewhat smaller than a diameter of the decorative body 24. An extension 34 extends in a proximal direction from the externally threaded portion 32, preferably terminating in a top or proximal surface 36. As best shown in FIG. 2, the extension 34 preferably is tubular, defining a mount cavity 40 therewithin and having internal threads 42. Preferably, a diameter of the tubular extension 34 is less than the diameter of the externally threaded portion 32. A battery contact 44 is disposed within the tubular extension 34 at the base of the mount cavity 40. As shown, preferably a plurality of air intake slots 46 are formed in the extension at and adjacent the top surface.

As noted above, one or more vaporizing structures are attachable to the battery mount boss 30. Such vaporizing structures typically include an atomizer and a fluid chamber, which can be provided as separate pieces or combined as a single structure. The vaporizing structures can be of various styles, sizes, and configurations. For example, in some embodiments, the atomizer and fluid chamber are provided as one prefabricated cartridge. In some embodiments, such cartridges are disposable. In some embodiments, the fluid chamber is refillable so that the cartridges are reusable. In other embodiments, the atomizer and fluid chamber are separately formed and selectively attachable and detachable from one another.

Vaporizing structures can also be attached to the battery assembly 20 in various ways. In some embodiments, an atomizer can threadingly engage the external threads 32 of the battery mount boss 30. In other embodiments, an atomizer may threadingly engage the internal threads 42 of the mount cavity extension 40. Preferably, a pin or other elongated contact extends into the mount cavity 40 to engage the battery contact 44 so as to communicate power from the battery 20 to the atomizer. Additional embodiments can employ non-threaded connection structures such as detents, friction fits, J-locks, and the like.

With reference next to FIG. 3, one embodiment of a cartridge 50 is illustrated. Such a cartridge 50 can be

19

What is claimed is:

1. A personal vaporizer, comprising:

a tank module comprising a fluid chamber and a vapor passage extending through the fluid chamber, the fluid chamber configured to contain a vaporizing solution;

an atomizer module comprising a bowl having an upper edge and an air aperture, a heating element arranged in or adjacent the bowl, the bowl configured to accept vaporizing solution received from the fluid chamber;

a check valve comprising an insulator housing, a conductive shell inside the insulator housing, and a sealing mechanism inside the conductive shell, the conductive shell having an air inlet and an air outlet, an intake air flow path defined through the conductive shell from the air inlet to the air outlet, the sealing mechanism providing a seal inside the conductive shell, the seal interposed in the intake air flow path, the check valve arranged so that that the air outlet communicates with the bowl air aperture and the conductive shell is electrically connected to the heating element; and

a battery assembly, the heating element connectable to the battery assembly through the check valve so that actuation of the battery delivers electrical energy to the heating element, causing the heating element to heat and vaporize the vaporizing solution;

wherein the bowl has a first wire hole and a second wire hole extending through a bottom wall of the bowl and a channel extending transversely from the second wire hole.

2. The personal vaporizer as in claim 1, wherein the heating element has a first connection and a second connection, the first connection extending through the first wire hole and contacting the conductive shell, and the second connection extending through the second wire hole and the channel and spaced away from the conductive shell.

3. The personal vaporizer as in claim 2, wherein the first connector comprises a first conductive wire and the second connector comprises a second conductive wire.

4. The personal vaporizer as in claim 3, wherein the atomizer module comprises a housing that is electrically conductive, and the second conductive wire contacts the atomizer module housing.

5. The personal vaporizer as in claim 4, wherein the check valve is interposed between the atomizer module and the battery assembly so that the atomizer module housing overlaps the check valve, and wherein the insulator housing is interposed between the conductive shell and the atomizer module housing.

6. The personal vaporizer as in claim 2, wherein the check valve is part of the atomizer module.

7. The personal vaporizer as in claim 6, wherein the tank module is releasably connected to the atomizer module.

8. The personal vaporizer as in claim 2, additionally comprising one or more slots formed through a side wall of the bowl.

9. The personal vaporizer as in claim 2, wherein the sealing mechanism comprises a ball and a spring.

10. An atomizer for a personal vaporizer, comprising:

a housing having a distal end and a proximal end, the housing comprising an electrically conductive material, the distal end configured to be attachable to a first pole of a battery so that the distal end electrically communicates with the battery;

an atomizer bowl arranged within the housing, the atomizer bowl comprising a side wall and a bottom wall, the atomizer bowl configured to receive vaporizing media;

20

a heating element disposed at least partially within the atomizer bowl, the heating element having a first wire end portion and a second wire end portion, the heating element configured to produce heat when electric energy is applied across the first wire end portion and the second wire end portion;

a check valve having a valve body, a proximal outlet, a distal inlet, and a sealing structure interposed in an air flow path between the distal inlet and the proximal outlet, the valve body extending from a distal end to a proximal end and defining an electrically conductive flow path from the distal end to the proximal end, the sealing structure configured to accommodate air flow therethrough along the air flow path in a distal-to-proximal direction, but to resist air flow therethrough in a proximal-to-distal direction;

wherein the first wire end portion is in electrical communication with the proximal end of the valve body and the second wire end portion is in electrical communication with the housing.

11. The atomizer as in claim 10, wherein the atomizer bowl is nonconductive and the atomizer bowl has a first hole aligned with the valve body and a second hole aligned with the housing, and wherein the first wire end portion extends through the first hole and into contact with the valve body, and the second wire end portion extends through the second hole and into contact with the housing.

12. The atomizer as in claim 11, wherein the bottom wall of the atomizer bowl has an aperture aligned with the heating element, and the proximal outlet of the check valve is aligned with the bowl aperture.

13. The atomizer as in claim 12, wherein the atomizer has a longitudinal axis, and the second hole of the atomizer bowl is spaced farther from the axis than is the first hole of the atomizer bowl.

14. The atomizer as in claim 13, additionally comprising an insulator between the valve body and the housing.

15. The atomizer as in claim 13, wherein the heating element comprises a wire coil.

16. The atomizer as in claim 10, wherein the sealing mechanism comprises a ball and a valve seat.

17. The atomizer as in claim 16, wherein the ball is biased toward engagement with the valve seat.

18. The atomizer as in claim 10, additionally comprising a tank disposed proximal of the atomizer bowl, the tank configured to contain a liquid vaporizing media therewithin and to deliver the liquid vaporizing media to the atomizer bowl.

19. The atomizer as in claim 10 in combination with a tank module formed separately from the atomizer, a distal end of the tank module being selectively attachable to a proximal end of the atomizer, the tank module comprising a tank configured to contain a liquid vaporizing media therewithin and a wicking structure configured to deliver the liquid vaporizing media to the atomizer bowl.

20. The atomizer as in claim 10, wherein the distal end of the valve body is configured to be attachable to a second pole of the battery so that the distal end of the valve body electrically communicates with the battery, and an electric circuit is established from the second pole of the battery through the valve body, through the heating element, through the housing, and to the first pole of the battery.

* * * * *

# Esquire Distribution Inc..
## Sales by Item Summary
### March 1, 2016 through February 1, 2018

| | Mar 1, '16 - Feb 1, 18 | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | Qty | Amount | % of Sales | Avg Price | COGS | Avg COGS | Gross Margin | Gross Margin % |
| Conseal A Kit Black (Automatic ) | 8,123.00 | 38,368.25 | 5.05% | 4.72 | 28,367.24 | 3.49 | 10,001.01 | 26.07% |
| Conseal A2 Black | 3,871.00 | 21,856.39 | 2.88% | 5.65 | 13,676.40 | 3.53 | 8,179.99 | 37.43% |
| Conseal A2 Red | 878.00 | 5,535.41 | 0.73% | 6.30 | 3,082.81 | 3.51 | 2,452.60 | 44.31% |
| Conseal B Kit Black (Basic) | 15,777.00 | 72,552.30 | 9.54% | 4.60 | 58,523.82 | 3.71 | 14,028.48 | 19.34% |
| Conseal B Kit Blue | 1,662.00 | 6,898.50 | 0.91% | 4.15 | 5,817.00 | 3.50 | 1,081.50 | 15.68% |
| Conseal B Kit Green (Green) | 1,993.00 | 7,579.00 | 1.0% | 3.80 | 6,975.50 | 3.50 | 603.50 | 7.96% |
| Conseal B Kit Red | 2,412.00 | 6,610.50 | 0.87% | 2.74 | 7,898.03 | 3.27 | -1,287.53 | -19.48% |
| Conseal B Kit Silver | 1,737.00 | 7,546.00 | 0.99% | 4.34 | 6,079.50 | 3.50 | 1,466.50 | 19.43% |

Appx1053

CONFIDENTIAL
(FOR ATTORNEYS EYS ONLY)

## Esquire Distribution Inc..
## Sales by Item Summary
September 6, 2017 through February 1, 2018

| | Qty | Amount | % of Sales | Avg Price | COGS | Avg COGS |
|---|---|---|---|---|---|---|
| | | | | Sep 6, '17 - Feb 1, 18 | | |
| Conseal A Kit  Black (Automatic  ) | 729.00 | 4,144.00 | 0.4% | 5.68 | 2,396.02 | 3.29 |
| Conseal A2 Black | 2,437.00 | 13,946.39 | 1.2% | 5.72 | 8,657.40 | 3.55 |
| Conseal A2 Red | 663.00 | 3,937.91 | 0.3% | 5.94 | 2,330.31 | 3.51 |
| Conseal B Kit  Black (Basic) | 1,884.00 | 7,561.00 | 0.7% | 4.01 | 6,594.00 | 3.50 |
| Conseal B Kit  Blue | 727.00 | 2,970.00 | 0.3% | 4.09 | 2,544.50 | 3.50 |
| Conseal B Kit  Green (Green) | 724.00 | 2,771.00 | 0.2% | 3.83 | 2,534.00 | 3.50 |
| Conseal B Kit  Red | 701.00 | 2,802.00 | 0.2% | 4.00 | 2,418.43 | 3.45 |
| Conseal B Kit  Silver | 824.00 | 3,151.00 | 0.3% | 3.82 | 2,884.00 | 3.50 |

Appx1054



US009380811B2

(12) **United States Patent**
Chung

(10) **Patent No.:** **US 9,380,811 B2**
(45) **Date of Patent:** **Jul. 5, 2016**

(54) **WET SCRUBBING ELECTRONIC CIGARETTE**

(71) Applicant: **Henry Chung**, Walnut, CA (US)

(72) Inventor: **Henry Chung**, Walnut, CA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 381 days.

(21) Appl. No.: **14/203,870**

(22) Filed: **Mar. 11, 2014**

(65) **Prior Publication Data**

US 2015/0257444 A1      Sep. 17, 2015

(51) **Int. Cl.**
*A24F 47/00*      (2006.01)
*A24F 1/30*      (2006.01)

(52) **U.S. Cl.**
CPC ............... *A24F 47/008* (2013.01); *A24F 1/30* (2013.01)

(58) **Field of Classification Search**
CPC ........ A24F 47/008; A24F 13/04; A24F 1/02; A24F 1/14
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 2012/0000478 A1* | 1/2012 | Wagenhals | A24F 13/04 131/329 |
| 2012/0199572 A1* | 8/2012 | Shen | A61M 11/041 219/438 |
| 2013/0192620 A1* | 8/2013 | Tucker | H01C 17/00 131/329 |
| 2015/0122275 A1* | 5/2015 | Wu | A24F 47/008 131/329 |

* cited by examiner

*Primary Examiner* — Michael H Wilson
*Assistant Examiner* — Eric Yaary
(74) *Attorney, Agent, or Firm* — Clement Cheng

(57) **ABSTRACT**

The present invention removes particles entrained within a flow of vapor and cools vapor passing through a wet scrubbing section of an electronic cigarette. The wet scrubbing electronic cigarette includes an atomizer section having a battery section connection for connection to a battery section. The atomizer section has an atomizer heating section. A wet scrubbing section has a mouthpiece, a water chamber in fluid communication with the mouthpiece. The water chamber provides for scrubbing of incoming airflow. A tubular air passage assembly is held within the water chamber. The tubular air passage assembly is in fluid communication with the water chamber. A battery section powers the atomizer section.

**10 Claims, 5 Drawing Sheets**

42



**Appx1055**



US009380812B2

(12) **United States Patent**
Chung

(10) **Patent No.:** **US 9,380,812 B2**
(45) **Date of Patent:** *Jul. 5, 2016

(54) **WET SCRUBBING ELECTRONIC CIGARETTE**

(71) Applicant: **Henry Chung**, Walnut, CA (US)

(72) Inventor: **Henry Chung**, Walnut, CA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 353 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **14/243,782**

(22) Filed: **Apr. 2, 2014**

(65) **Prior Publication Data**

US 2015/0257446 A1 Sep. 17, 2015

**Related U.S. Application Data**

(63) Continuation-in-part of application No. 14/203,870, filed on Mar. 11, 2014.

(51) **Int. Cl.**
| | |
|---|---|
| *A24F 47/00* | (2006.01) |
| *A24F 1/28* | (2006.01) |
| *A24F 1/02* | (2006.01) |
| *A24F 1/30* | (2006.01) |

(52) **U.S. Cl.**
CPC ................. *A24F 47/008* (2013.01); *A24F 1/02* (2013.01); *A24F 1/28* (2013.01); *A24F 1/30* (2013.01)

(58) **Field of Classification Search**
CPC ......... A24F 47/008; A24F 13/04; A24F 1/02; A24F 1/14
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 2012/0000478 A1* | 1/2012 | Wagenhals | ............... | A24F 13/04 131/329 |
| 2012/0199572 A1* | 8/2012 | Shen | .................... | A61M 11/041 219/438 |
| 2013/0192620 A1* | 8/2013 | Tucker | ................... | H01C 17/00 131/329 |
| 2015/0122275 A1* | 5/2015 | Wu | ........................ | A24F 47/008 131/329 |

* cited by examiner

*Primary Examiner* — Michael H Wilson
*Assistant Examiner* — Eric Yaary
(74) *Attorney, Agent, or Firm* — Clement Cheng

(57) **ABSTRACT**

The present invention removes particles entrained within a flow of vapor and cools vapor passing through a wet scrubbing section of an electronic cigarette. The wet scrubbing electronic cigarette includes an atomizer section having a battery section connection for connection to a battery section. The atomizer section has an atomizer heating section. A wet scrubbing section has a mouthpiece, a water chamber in fluid communication with the mouthpiece. The water chamber provides for scrubbing of incoming airflow. A tubular air passage assembly is held within the water chamber. The tubular air passage assembly is in fluid communication with the water chamber. A battery section powers the atomizer section.

**10 Claims, 6 Drawing Sheets**

**42**



Jen-Feng Lee, SBN 204328
jflee@ltpacificlaw.com
Kenneth K. Tanji, Jr., SBN 162273
ktanji@ltpacificlaw.com
**LT Pacific Law Group, LLP**
17800 Castleton Street, #560
City of Industry, CA 91748
T: 626-810-7200
F: 626-810-7300

Attorneys for Defendant
Henry Chung

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LUBBY HOLDINGS LLC, a Delaware limited liability company; VAPOROUS TECHNOLOGIES, INC., a Delaware corporation<br><br>Plaintiffs,<br><br>v.<br><br>HENRY CHUNG, an individual; MING CHEN, an individual; DEEPVAVES, INC., a California Corporation d/b/a BOOM VAPORIZER; DOES 1-10, inclusive,<br><br>Defendants. | Case No.:2:18-cv-00715-RGK-JL<br><br>**Memorandum of Points and Authorities ISO Defendant Chung's Rule 59(a) Motion For A New Trial**<br><br>Date:   7/8/2019<br>Time:   9:00 am<br>Ctrm:   850, Roybal Building<br><br>**Hon. R. Gary Klausner** |

TO THE HONORABLE COURT, THE PARTIES AND THEIR

RESPECTIVE ATTORNEYS OF RECORD:

_____

Memorandum of Points and Authorities ISO Chung's Rule 59(a) Motion For A New Trial

1

18.63331

Defendant HENRY CHUNG ("Defendant") respectfully moves the Court, per F.R.Civ.P. Rule 59(a) for an order to vacate the judgment entered on 5/9/2019 and set a new trial.

The grounds for Defendant's request for relief are (a) the verdict is against the clear weight of evidence; and (b) prejudicial misconducts by opposing counsel at trial.

## I. The Verdict Is Against The Clear Weight of Evidence

The court may set aside the verdict if it is against the clear weight of the evidence. *Molski v. MJ Cable*, 481 F.3d 724 (9th Cir. 2007).

"[T]he district judge had the right, and indeed the duty, to weigh the evidence as he saw it, and to set aside the verdict of the jury, even though supported by substantial evidence, where, in his conscientious opinion, the verdict is contrary to the clear weight of the evidence, or … to prevent, in the sound discretion of the trial judge, a miscarriage of justice." *Murphy v. City of Long Beach*, 914 F.2d 183, 187 (9th Cir. 1990).

### a. No Evidence That Chung Sold Any Accused Products To Be Liable

The accused products (Conseal A and Conseal B; "Accused Products" collectively) were sold by Esquire Distribution, Inc. (a corporation 100% owned by Defendant Chung), as shown in the 2 sheets of sales report admitted as evidence Exhibit 201[1]:

Sheet 1: 3/1/2016 – 2/1/2018 (36,453 units; $166,946.35)

Sheet 2: 9/6/2017 – 2/1/2018 (8,689 units; $41,284.30)

There is NO evidence of Henry Chung or Deepvapes, Inc. selling any Accused Products.

---

[1] The 284 Patent was issued on 9/5/2017. There was no infringement before patent issuance. Sheet 2 shows sales of potential infringing products after 9/5/2017.

---

Memorandum of Points and Authorities ISO Chung's Rule 59(a) Motion For A New Trial

2

18.63331

**Appx1080**

This motion is not made to advance Deepvapes, Inc.'s interest, but the fact that the jury found Deepvapes, Inc. to be liable for the $863,936.10 ($863k) amount serves to show that such verdict is against the clear weight of the evidence.

It appears that the jury engaged in some form of Alter Ego / Piercing Corporate Veil ("AE/PCV") finding to reach the verdict when there were no such triable AE/PCV triable issues presented by the parties.

In the LR 16 Contentions of Fact and Law filed by Plaintiffs on 2/25/2019, ECF #35, no issue of AE/PCV was presented. In the Final Pretrial Conference Order jointly filed on 3/7/2019, ECF #40-1, no issue of AE/PCV was presented.

The jury is probably under the wrong impression that the mere fact of sole ownership of a corporation (with respect to the relationship between Henry Chung and Esquire Distribution) is sufficient for AE/PCV[2]. This is certainly NOT the law (but is implicitly pushed to the jury by Plaintiffs' counsel).

"[W]here a third party seeks to hold the sole shareholder liable for the wrongdoing of the corporation, an alter ego theory is the appropriate way to determine whether the shareholder is liable." *Leek v. Cooper*, 194 C.A.4th 399, 409 (2011).

It is a two-prong test for the court to disregard the corporate formality when reaching the AE/PCV determination: (1) unity of interest between the corporate entity and the charged individual(s), and; (2) the failure to disregard the corporate formality would result in grave injustice. *Mesler v. Bragg Management,* 39 Cal. 3d 290 (1985).

---

[2] The trail evidence also established that Henry Chung did certain product promotion activities for Esquire Distribution. The nature, however, is not different from Christian Rado similarly conducting business activities for the benefit of Plaintiffs.

---

Alter ego "is an extreme remedy, sparingly used". *Sonora Diamond Corp. v. Superior Court*, 83 C.A.4th 523, 526 (2000). "The standards for the application of alter ego principles are high, and the imposition of alter ego liability … is to be exercised reluctantly and cautiously." *Mesler*, at 306.

The factors for considering AE/PCV include the "commingling of funds and assets, identical directors and officers, and use of one as a mere shell or conduit for the affairs of the other". *Troyk v. Farmers Group*, 171 C.A.4th 1305, 1342 (2009).

The scant trial evidence provided NOTHING that would rise up to the level of "unity of interest" between Chung/Deepvapes and Esquire Distribution.

As explained in the currently-filed Rule 59(e) motion (as well as other filings related to section 287 "notice/marking" requirement), the low amount of damages, roughly $200 if royalty rate was 10%, would hardly allow anyone to claim injustice where there is NO issue of collectability, especially in light of the fact that Defendant made settlement offer of $10,000 in February 2019, to avoid going through trial. See ¶1 in Counsel Declaration.

Furthermore, there is nothing to show that Esquire Distribution was formed to "perpetuate a fraud, circumvent a statute, or accomplish some other wrongful or inequitable purpose", *Troyk*, at 1341.

The verdict reached by the jury went beyond what can be supported by the evidence when the lawlessness of the AE/PCV reasoning/finding was mixed in and impermissibly urged by Plaintiffs' counsel.

**b. No Evidence to Support the Royalty Demand On The Whole Product**

_____

As expressly admitted in the 284 Patent, the invention related to some added novelty portion that provided the "anti-leak" features (during trial, Plaintiffs gave a new term: "energized (check) valve").

The 284 Patent did not teach everything related to the making and practicing of a personal vaporizer. The BACKGROUND section of the 284 Patent, at 1:15 – 58, admitted to the existence of many present-art vaporizers and components, such as the fluid chamber, atomizer, battery, air path, etc.

The 284 Patent added a specific incremental value, as Plaintiffs repeatedly testified to, of the "anti-leak" feature (the "energized (check) valve").

To obtain reasonable royalty compensation on the whole product (instead of on certain portions of a product), the "patentee must prove that the patent–related feature is the 'basis for consumer demand'." *Lucent Technologies v. Gateway*, 580 F.3d 1301, 1336 (Fed. Cir. 2009).

The reasonable royalty must be based upon the incremental value that the patented invention adds to the end products. *Exmark v. Briggs Stratton*, 879 F.3d 1332, 1348 (Fed. Cir. 2018). The patentee "must in every case give evidence tending to separate or apportion" … damages between the patented feature and the unpatented features. *Power Integrations v. Fairchild Semiconductor*, 904 F.3d 965, 977 (Fed. Cir. 2018).

Licenses relied on by the patentee in providing damages must be sufficiently comparable to the hypothetical license at issue in suit. *Uniloc USA v. Microsoft*, 632 F.3d 1292, 1316 (Fed. Cir. 2011).

There is NO evidence to show that Plaintiffs complied with any of these requirements. See ¶2 in Counsel Declaration for the complete lack of evidence in Plaintiffs' document production.

_____

Actions speak louder than words. Plaintiffs' words (in testimony) of the value of the 284 Patent (the 45% royalty) and a licensing deal "that is active with a company" (as urged by Plaintiffs' counsel) are betrayed by their action: the lack of any actionable documents thereof.

The lack of documentary evidence did not stop Plaintiffs from offering wild and speculative damages computation in the form of reasonable royalty. There are essentially four (4) modes of reasonable royalty calculations attributable to Plaintiffs (lack of) evidence:

October, 2015: **$16,694.63** = $166,946.35 x 10%.[3]

2/20/2019 (around date of mediation): **$27,339.75** = 36,453 units x $0.75/unit[4].

5/6/2019: **$623,346.30** = [$45 - $16.50] x 60% x 36,453.

5/9/2019: **$863,936.10** = [$45 - $5.50] x 60% x 36,453.

Throughout the trial testimony and the scant amount of evidence admitted, there is NO evidentiary basis to show that the 284 Patent has a reasonable royalty of 45% to support the testimony that there is "a deal that is active with a company that he's getting 45 percent of the net profits", at 63:6-8 of Day 3 transcript.

In other word, besides Plaintiffs' speculative trial testimony and Plaintiffs counsel's misleading statements, there is NO evidence to support any reasonable royalty demand.

Finally, to the extent there is any support for the claimed 45% rate, both the 5/6/2019 and 5/9/2019 calculations are in fact a form of lost profit computation:

---

[3] Parties agreed to a mutual 10% rate ("10% portion of the Vaporous Product Purchase Price" and "10% portion of the Boom Product Purchase Price") during the time in 2015 when they signed certain NDA, Supply Agreement and Consulting Agreement.

[4] The $0.75 was initially made during the 2/20/2019 mediation (not admissible). Said demand was later made by phone. See section I.f of Defendant's ECF #49 filing.

_____

Memorandum of Points and Authorities ISO Chung's Rule 59(a) Motion For A New Trial

6

18.63331

Plaintiffs were asking to recoup the profit margin it could have made had they sold 36,453 units, at the $45 price, where they could have obtained the 60% profit.

Both the $623k and the $863k amounts are in fact lost profit calculation in violation of the Court's order.

## II. Prejudicial Misconduct By Opposing Counsel At Trial

Generally, misconduct by trial counsel results in a new trial if the "flavor of misconduct sufficiently permeate[s] an entire proceeding to provide conviction that the jury was influenced by passion and prejudice in reaching its verdict". *Hemmings v. Tidyman*, 285 F.3d 1174, 1192 (9th Cir. 2002).

1. Plaintiffs' counsel Mr. Adli made false statements to the Court, as basis for his objection, that the computation of the reasonable royalty figure $623,346.30 (filed to the Court on 5/6/2019) was made in settlement context. See ¶3 in Counsel Declaration.

Plaintiffs' false statement prevented Defendant from asking/arguing about how Plaintiffs reached the ultimate calculation of the $623k number on 5/6/2019, but somehow the unchanged evidence (the sales information Defendant provided) gave them a whopping increase of $240,000 in three (3) days, to reach the $863k award.

2. On 5/3/2019, the Court ordered (in ECF #61) Plaintiffs to provide "their computation of damages" by 5/6/2019. Plaintiffs reported to the Court that their reasonable royalty computation would be $623,346.30. Defense counsel sent a reminder email to Plaintiffs' counsel, urging Plaintiffs to comply with Rule 11 for the damages disclosure. As it turned out, Plaintiffs' $623,346.30 computation was not serious and essentially a false statement, as the same

"evidence" at trial would boost that reasonable royalty computation by $240,000. If Plaintiffs' reporting of the $623,346.30 figure is not for the proper purpose of complying with their damages disclosure obligation (and Rule 11 obligation) based upon the "evidence", what other improper purpose does it serve? See ¶4 in Counsel Declaration.

3. Plaintiffs' counsel gave misleading statement, at 63:6-8 of Day 3 transcript, that there is a basis for the 284 Patent reasonable royalty where "he currently has a deal that is active with a company that he's getting 45 percent of the net profits". Throughout the trial testimony and the scant amount of evidence admitted, there is NO such evidentiary basis to show that the 284 Patent has a reasonable royalty of 45% of the net profit. Mr. Rado in fact confirmed Defense Counsel's asking, at 147: 22-25 of Day 1 transcript, that the "licensing deal" is not related to the 284 Patent. The jury was misled by such statement despite the jury instructions expressly stated that attorney argument is not evidence.

4. Plaintiffs used an undefined claim term "energized valve" or "energized check valve" to mislead the jury and demonized Defendant. This term did not exist in the 284 Patent. This term did not exist in Plaintiffs expert's report or any other prior documentation, including the NDA documents in 2015. Within defendant's camp, no one heard of this term before trial. It is apparent that Defendant Chung and expert were "educated" to know what this new term meant during the trial. See ¶5 in Counsel Declaration. Plaintiffs' citation of Chung's testimony (lines 1 – 4, Page 11 of 17, ECF #93-1) conveniently omitted the part that Chung learned about this term during trial. See end of ¶5 in Counsel Declaration.

_____

5. There is no infringement before a patent is issued. However, Plaintiffs' counsel, gave misleading argument the "each one of those 36,453 units infringe", at 62:20 of Day 3 transcript. The jury in fact followed such misstatement of law and used those 36,453 units as basis to reach the $863,396.10 amount. Plaintiffs counsel's argument in fact contracted Mr. Rado's testimony, at 149:3-11 of Day 1 transcript, that the 284 Patent is patented on 9/5/2017 and that he would not "say it was patented" before that date.

**CONCLUSION**

Due to incorrect jury instruction and misrepresentations by Plaintiffs' counsel, the jury reached the reasonable royalty award of $863,936.10, against Henry Chung and Deepvapes, Inc.

As explained herein, the jury verdict is against the clear weight of evidence where Defendant Chung sold ZERO amount of Accused Products. The fact that even Deepvapes, Inc. was found to be liable for the $860k of reasonable royalty attests to the error of this verdict that requires a new trial to achieve justice.

Plaintiffs implicitly pushed for AE/PCV finding, impermissibly elevating the jury's role into the equitable realm, while no facts were admitted to prove the unity of interest, or that the Esquire Distribution was formed to commit fraudulent acts to justify the extreme remedy of piercing the corporate veil.

Finally, Plaintiffs counsel's misconducts at trial caused the jury to render a verdict not supported by the evidence. Plaintiffs' counsel intentionally obscured the earlier, and just as unreliable, calculation of $623k based upon the same (lack of) evidence. Plaintiffs counsel's act of urging the jury to find patent infringement even on the pre-issuance sales, which the jury did so, directly contradicted the jury

18.63331

instruction and the law. Such act is further evidence that the verdict is the result of influence by the misconducts.

The Court is respectfully requested to grant a new trial per Rule 59(a).

LT PACIFIC LAW GROUP LLP

DATED: June 6, 2019

By: /s/ Jen-Feng Lee

Jen-Feng Lee
Kenneth K. Tanji, Jr.
17800 Castleton Street, #560
City of Industry, CA 91748
T: 626-810-7200
Attorneys for Defendant, HENRY CHUNG

---

**Appx1088**

Jen-Feng Lee, SBN 204328
jflee@ltpacificlaw.com
Kenneth K. Tanji, Jr., SBN 162273
ktanji@ltpacificlaw.com
**LT Pacific Law Group, LLP**
17800 Castleton Street, #560
City of Industry, CA 91748
T: 626-810-7200
F: 626-810-7300

Attorneys for Defendant
HENRY CHUNG

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LUBBY HOLDINGS LLC, a Delaware limited liability company; VAPOROUS TECHNOLOGIES, INC., a Delaware corporation; | No.   2:18-cv-00715-RGK-JC |
| | **Declaration by Defense Counsel** ISO HENRY CHUNG'S **Rule 59(a) Motion for A New Trial** |
| Plaintiffs, | |
| vs. | |
| HENRY CHUNG, an individual; MING CHEN, an individual; DEEPVAPES, INC., a California Corporation d/b/a BOOM VAPORIZER; DOES 1-10, inclusive, | **Hon. R. Gary Klausner** |
| Defendants. | |

My name is Jen-Feng Lee. I generally go by Jeff Lee. I made the following statements based upon my personal knowledge. If called as a witness, I will testify competently and truthfully to the best of my knowledge.

_____

**Counsel Declaration ISO Chung's Rule 59(a) Motion For A New Trial**

63311

1

**Appx1089**

1. In a mediation hosted by Mediator Alan Kindred on 2/20/2019, Defendant Chung offered $10,000 to Plaintiffs, even though this amount was substantially higher than Plaintiff's provable damages. Plaintiffs refused and demanded settlement amount of over $100,000.

2. By close of discovery, Plaintiffs produced a total of 35 pages. Among the 35 pages, there was NO document to show any of Plaintiffs' sales revenue, profit margin, price erosion, or reduction in sales. There was NO licensing negotiation or agreement based upon the 284 Patent, or any licensing agreement of any (comparable) patent.  There was No document any consumer demand for the 284 Patent's "anti-leak" feature or any marketing literature to show heightened consumer appreciation of vaporizing products if the teachings in the 284 Patent were included/added to the products.

Some specific places of <u>LACK of documentary evidence</u> are noted below:

5/7/2019, Tr. 106:15-16

> Q   What is the rate of royalty?
>
> A   45 percent.

5/7/2019, Tr. 147:22-25

> Q   Was that a licensing agreement on the '284 Patent?
>
> A   … It's the product. We didn't specifically license the actual patent number.

3. In day 3 of the trial, I tried to ask Christian Rado about the basis and computation of the damages claims ($795,765 and $623,346.30) reported to Court on 5/6/2019, filed in ECF #62. Plaintiffs counsel Adli objected on the ground that it "reveals settlement communication" and the Court sustained the objection (pages 19 – 20, Day 3 transcript). These basis, computations and demands were NEVER produced during discovery, and never brought up during any prior settlement communication. I lost the opportunity to

---

**Counsel Declaration ISO Chung's Rule 59(a) Motion For A New Trial**

2

63311

**Appx1090**

cross-examine Christian Rado why, based upon the same sales report, the reasonable royalty was $623,346.30 (and as later argued by Drew Sherman in closing argument, ballooning up to $863,936.10).

4. Before Plaintiffs served their Damages Disclosure on 5/6/2019 (ECF #62), I sent an email reminder (dated 5/3/2019, 10:48 PM) that Plaintiffs' computation of damages should be warranted by existing law and not for any improper purpose; in other words, Rule 11 compliant. The email is attached herein as Exhibit A.

5. The "**energized valve**". In dealing with this infringement case, I became familiar with the general scope and teachings of the 284 patent. There is no "energized valve" or "energized check valve" term in the 284 patent. This term did not appear in Brekke's expert report or any earlier documents (including the Non-Disclosure Agreement in 2015). It is puzzling to me what this term was when Plaintiffs started to use this term at trial. It is my understanding that Defense expert Mr. Wakalopulos and Defendant Chung, via the "education" of the trial came to know what the "energized (check) valve" could mean. This is shown in Day 2 transcript, 169:25 – 170:1:

> Q   Do you know what an energized check valve is?
>
> A   No, not until today.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Dated: June 6, 2019                    Executed at: Industry, California

                                              /s/Jen-Feng Lee

                                       By:   _____

                                              Jen-Feng (Jeff) Lee

---

**Counsel Declaration ISO Chung's Rule 59(a) Motion For A New Trial**

3

**Appx1091**

63311

# Exhibit A

Exhibit A

**From:** Jeff Lee [mailto:**jflee@ltpacificlaw.com**]
**Sent:** Friday, May 3, 2019 10:48 PM
**To:** **adli@adlilaw.com**; **drew.sherman@adlilaw.com**; Josh Eichenstein
(**josh.eichenstein@adlilaw.com**)
**Cc:** 'Kenneth Tanji, Jr.' (**ktanji@ltpacificlaw.com**); **dhsu@ltpacificlaw.com**
**Subject:** FW: Activity in Case 2:18-cv-00715-RGK-JC Lubby Holdings LLC et al v. Henry Chung et al Minutes
of In Chambers Order/Directive - no proceeding held

Counsel,

As a friendly reminder, the Plaintiffs' computation of damages should be warranted by existing law and not for
any improper purpose.

With the upcoming trial on the next day, there is no meaningful chance of potential enforcement under the
federal rules, in light of the severe delay of the required disclosure.

On Monday 5/6, I look forward to receiving the rule-compliant damages disclosure, supported by the
discovery production in this case.

 Best.

 Jeff Lee

 **From:** **cacd_ecfmail@cacd.uscourts.gov** [mailto:**cacd_ecfmail@cacd.uscourts.gov**]
**Sent:** Friday, May 3, 2019 3:49 PM
**To:** **ecfnef@cacd.uscourts.gov**
**Subject:** Activity in Case 2:18-cv-00715-RGK-JC Lubby Holdings LLC et al v. Henry Chung et al Minutes of In Chambers
Order/Directive - no proceeding held

 This is an automatic e-mail message generated by the CM/ECF system. Please DO NOT RESPOND to this e-mail
because the mail box is unattended.
***NOTE TO PUBLIC ACCESS USERS*** Judicial Conference of the United States policy permits attorneys of record and
parties in a case (including pro se litigants) to receive one free electronic copy of all documents filed electronically, if
receipt is required by law or directed by the filer. PACER access fees apply to all other users. To avoid later charges,
download a copy of each document during this first viewing. However, if the referenced document is a transcript, the
free copy and 30 page limit do not apply.

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**Notice of Electronic Filing**

The following transaction was entered on 5/3/2019 at 3:48 PM PDT and filed on 5/3/2019

Exhibit E                                                                                            p**1**

**Appx1093**

**Case Name:**         Lubby Holdings LLC et al v. Henry Chung et al

**Case Number:**     **2:18-cv-00715-RGK-JC**

**Filer:**

**Document Number:** **61**

**Docket Text:**
**MINUTE ORDER (IN CHAMBERS) Order Re: Defendant Henry Chung's Brief re: Damages Disclosure and Sanctions (DE 49); Plaintiff Lubby Holdings, LLC.'s Requested Brief Regarding Plaintiffs' Request for Rule 37 Sanctions Against Defendants for Listing Undisclosed Documents as Exhibits for Trial (DE 50) by Judge R. Gary Klausner. The Court has read and considered both patties' briefs. Plaintiffs are ordered to serve the Defendants and the Court their computation of damages by Monday, May 6th, 2018 at 10 a.m. Failure to do so will result in possible sanctions under Federal Rule of Civil Procedure ("Rule") 37. The Court denies Plaintiffs' request for Rule 37 sections against Defendants. IT IS SO ORDERED. (lom)**

**2:18-cv-00715-RGK-JC Notice has been electronically mailed to:**

Joshua H Eichenstein     **josh.eichenstein@adlilaw.com**, **docketing@adlilaw.com**, **6766862420@filings.docketbird.com**

Alan M Kindred     **echoe@leechtishman.com**, **akindred@leechtishman.com**, **ipdocket@leechtishman.com**, **litdocket@leechtishman.com**

Drew Harris Sherman     **6064599420@filings.docketbird.com**, **docketing@adlilaw.com**, **drew.sherman@adlilaw.com**

Dariush G Adli     **4494126420@filings.docketbird.com**, **litigation@adlilaw.com**, **9501161420@filings.docketbird.com**, **adli@adlilaw.com**, **docketing@adlilaw.com**

Jen-Feng Lee     **jflee@ipfirm.us**, **jflnbacer@gmail.com**, **dhsu@ipfirm.us**, **jflee@ltpacificlaw.com**

Kenneth K Tanji     **ktanji@yahoo.com**, **dhsu@ltpacificlaw.com**, **ktanji@ltpacificlaw.com**, **jflee@ltpacificlaw.com**

**2:18-cv-00715-RGK-JC Notice has been delivered by First Class U. S. Mail or by other means <u>BY THE FILER</u> to :**

Exhibit E                                                                                                                        p**2**

**Appx1094**

Jen-Feng Lee, SBN 204328
jflee@ltpacificlaw.com
Kenneth K. Tanji, Jr., SBN 162273
ktanji@ltpacificlaw.com
**LT Pacific Law Group, LLP**
17800 Castleton Street, #560
City of Industry, CA 91748
T: 626-810-7200
F: 626-810-7300

Attorneys for Defendant
Henry Chung

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LUBBY HOLDINGS LLC, a Delaware limited liability company; VAPOROUS TECHNOLOGIES, INC., a Delaware corporation <br><br> Plaintiffs, <br><br> v. <br><br> HENRY CHUNG, an individual; MING CHEN, an individual; DEEPVAVES, INC., a California Corporation d/b/a BOOM VAPORIZER; DOES 1-10, inclusive, <br><br> Defendants. | Case No.:2:18-cv-00715-RGK-JL <br><br> **Memorandum of Points of Authorities, ISO Defendant Chung's Rule 59(e) Motion to Alter or Amend a Judgment** <br><br> Date:   7/8/2019 <br> Time:   9:00 am <br> Ctrm:   850, Roybal Building <br><br><br> **Hon. R. Gary Klausner** |

_____

Defendant's Rule 59(e) Motion to Alter or Amend a Judgment

18.63331

1

**Appx1098**

TO THE HONORABLE COURT, THE PARTIES AND THEIR

RESPECTIVE ATTORNEYS OF RECORD:

Defendant HENRY CHUNG ("Defendant") respectfully moves the Court, per F.R.Civ.P. Rule 59(e) for an order to alter or amend the judgment entered on 5/9/2019.

The ground for Defendant's request for relief is the court's commission of some manifest error of law or fact justifies the grant of a Rule 59(e) motion. *Turner v. Burlington Northern Santa Fe R.R.*, 338 F.3d 1058, 1063 (9th Cir. 2003).

### I.     The 35 U.S.C. §287 Compliance

35 U.S.C. §287 provides that a patent plaintiff is not entitled to damages unless it satisfies the "notice/marking" requirement.

The marking is done by, per sub (a) of section 287, 'fixing thereon the word "patent" or the abbreviation "pat." together with the number of the patent', on the product, product packaging or "an address of a posting on the Internet, accessible to the public without charge for accessing the address".

Filing of an action for infringement shall constitute such notice.

### II.     No Admitted Evidence to Show Plaintiffs Complied with Section 287

The 9,275,284 Patent  ("284 Patent") was filed on 8/31/2016 and was granted as a U.S. patent on 9/5/2017.

This case was filed on 1/26/2018, asserting the 284 Patent, titled "Personal Vaporizer".

The sales record of the Accused Products (sold by Esquire Distribution, a corporation 100% owned by Defendant Chung) is admitted as Exhibit 201:

Sheet 1: 3/1/2016 – 2/1/2018 (36,453 units; $166,946.35)

Sheet 2: 9/6/2017 – 2/1/2018 (8,689 units; $41,284.30)

There is no admitted evidence to show that Plaintiffs complied with the section 287 requirement. As such, Plaintiffs can only claim patent damages, in the form of reasonable royalty, starting from 1/26/2018, the complaint filing date, until 2/1/2018, when the accused products  (Conseal A and Conseal B; collectively, "Accused Products") ceased to be sold (by Esquire Distribution).

As such, Defendant calculated, and reported to the Court, the provable damages of about 408 pieces, during the 7-day period between 1/26/2018 and 2/1/2018, having a total dollar amount of roughly $1,986.46.

Assuming a 10% royalty, Plaintiffs would get $198 as reasonable royalty compensation. See ¶1 in Counsel Declaration, and filed ECF #63, ¶A.6.

### III.   Manifest Error Re Section 287 "notice/marking" Requirement

The legal requirement on section 287 limitation on a patent plaintiff's damages recovery is not disputed.

This Court is well aware of this section 287 requirement, including the 2 cases cited to the Court in Defendant's ECF #63-5, where the pertinent part of the 2 cases were highlighted.

*Juno Manufacturin*g, 2015 wl 11438613  (as Ex. D-1 in #63-5)

*In re Katz Interactive Call Processing*, 2009 wl 8635982 (as Ex. D-2 in #63-5)

For the Court's convenience, the 2 cited cases filed in ECF #63-5 are re-attached herein as Exhibit A, as explained in ¶2 of Counsel Declaration.

At trial, the Court deleted many of the proposed jury instructions and gave a set (which is NOT a stipulated set, as Plaintiffs' counsel falsely stated, at line 23, Page 11 of 17, ECF #93-1) of jury instructions that did NOT contain the section 287's "notice/marking" requirement.

---

Defendant's Rule 59(e) Motion to Alter or Amend a Judgment

18.63331

3

**Appx1100**

Defense counsel made an objection to such lack of the section 287 instruction on the record.

## IV.  The Verdict Is Not Supported by The Evidence

The jury, on 5/9/2019, awarded a reasonable royalty of $863,936.10.

The jury failed to limit Plaintiffs' damages recover until after the filing of the instant action, which only allows up to 7 days of sales (from 1/26/2018 to 2/1/2018).

The jury further impermissibly counted the pre-issuance sales as infringing, due to Plaintiffs counsel's misleading statement (this point is addressed in the Prejudicial Misconduct portion of a concurrently-filed Rule 59(a) motion).

## V.  Plaintiffs Counsel's Ignorance, or Intentional Act to Mislead

During the meet-and-confer phone conference on 5/29/2019 (5 days after the written points and authorities were emailed to Plaintiffs' counsel on 5/24/2019), Plaintiffs' counsel Mr. Drew Sherman admitted that he does not know this section 287 point of law. See ¶3 in Counsel Declaration.

This section 287 is a critical issue of this case. Despite repeated mentions to Plaintiffs' counsel before and after the trial, it is unthinkable for Plaintiffs' counsel to admit that he does not know this legal point, especially since this is the core legal issue for the Rule 59(e) discussion.

Even in Plaintiffs' separately submitted jury instruction, filed as ECF #45 on 3/18/2019, Plaintiffs made the statement that Plaintiffs "has the burden of establishing that it substantially complied with the marking requirement", at lines 12 – 13, Page 6 of 17, ECF #45.

---

**Appx1101**

Amazingly, Plaintiffs took the ridiculous position that it is Defendant's burden to prove this section 287 "notice/marking" requirement; see lines 5 – 7, Page 5 of 14, ECF #85.

Plaintiffs firm, the ADLI Law Group, in fact knew that it is the plaintiff's burden to satisfy the section 287 "notice/marking" requirement in representing a client in an earlier case in this same Court, *QBAS v. Sports Dimension*, 2:15-cv-7483-SJO-RAO; see the case attached in Defendant's Request for Judicial Notice, filed as ECF #88 on 5/23/2019.

This mistake on the law has only two explanations: either Plaintiffs counsel is ignorant or is intent on misleading the Court.

## CONCLUSION

Due to the manifest error of incorrect jury instruction regarding section 287 "notice/marking", and misrepresentations by Plaintiffs' counsel, the jury failed to limit the damages award by counting ONLY the seven (7) days of sales.

Plaintiffs' evidence, the lack thereof, consists of only speculative and not-reliable testimony re royalty percentage without any documentation proof. Defendant's pre-trial calculation, as sated in section I of this motion, is a more credible amount.

The Court is respectfully requested to alter or amend the judgment in a way that's consistent with the patent damages requirement as supported by the evidence, the lack thereof, in the case.

---

LT PACIFIC LAW GROUP LLP

DATED: June 6, 2019

By: /s/ Jen-Feng Lee

      Jen-Feng Lee
      Kenneth K. Tanji, Jr.
      17800 Castleton Street, #560
      City of Industry, CA 91748
      T: 626-810-7200
      Attorneys for Defendant, HENRY
      CHUNG

# DECLARATION

DECLARATION

My name is Jen-Feng Lee. I generally go by Jeff Lee. I made the following statements based upon my personal knowledge. If called as a witness, I will testify competently and truthfully to the best of my knowledge.

1. By close of discovery, it was clear to me Plaintiffs can only recover a maximum of 7 days' sales of the accused products, due to the failure to satisfy the section 287 "notice/marking" requirement. A calculation was done to show that, the 7 day's sales (from 1/26/2018 to 2/1/2018) would have a total dollar amount of roughly $1,986.46.  Assuming a 10% royalty, the reasonable royalty award would be **$198.64**; also see filed ECF #63, ¶A.6.

2. **Exhibit A** shows the laws on the §287 "notice/patent marking" compliance where Defendant previously filed to the Court as Exhibit D, ECF #63-5.

   D-1: pages 4 – 5, this Court explained the essence of Constructive and Actual Notices.

   D-2: page 20, this Court explained "notice" is not the existence or ownership of a patent, but must be the specific charge of "infringement".

3. In my phone conference on or about 11 am, 5/29/2019, with Plaintiffs' counsel, Mr. Drew Sherman admitted that he does not know the legal point that a patent plaintiff must satisfy the section 287 "notice/marking" requirement. This fact is ironic further in the context where one of the issues specifically identified for the meet-and-confer is about Rule 59(e) for manifest legal error on the lack of jury instruction related to section 287.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Dated:  June 6, 2019                              Executed at: Industry, California

                                                              By:  /s/Jen-Feng Lee
                                                                    Jen-Feng (Jeff) Lee

_____

**Counsel Declaration ISO CHUNG'S Rule 59(e) Motion to Alter/Amend a Judgment**

63311                                                          1

# Exhibit A

Exhibit A

# Exhibit D-1

**Exhibit D-1**

**Appx1107**

**Juno Manufacturing, LLC v. Nora Lighting, Inc., Not Reported in Fed. Supp. (2015)**

2015 WL 11438613

For the above reasons, the Court rejects Nora's request to construe the "whereby" clause at the end of Claim 1 to require that the score and break aperture both contribute to the selective fracturing. Since that forms the basis for Nora's only argument that its products did not literally infringe Claim 1 of the '419 Patent, the Court finds that the accused products literally infringe Claim 1. Thus, the Court **GRANTS** Plaintiff's Motion for Partial Summary Judgment as to infringement of Claim 1.

#### B. Plaintiff Failed to Provide the Required Notice

In its own motion, Nora asserts that Juno failed to provide proper notice of the '419 Patent, and is therefore barred from recovering damages for patent infringement. The requisite notice can be actual or constructive. The parties' arguments focus primarily on the latter.

##### 1. *Constructive Notice*

The standard for constructive notice is set forth in 35 U.S.C. § 287(a). That section provides that notice to the public that a "patented article" is patented may be provided "by fixing thereon the word 'patent' or the abbreviation 'pat.', together with the number of the patent...." 35 U.S.C. § 287(a). [1] "[W]hen, from the character of the article, this can not be done," notice may be given "by fixing to [the patented article], or to the package wherein one or more of them is contained, a label containing a like notice." *Id.* If the patentee failed to provide constructive notice, "no damages shall be recovered by the patentee in any action for infringement" unless the patentee provided actual notice, in which case the patentee may recover damages only for infringement occurring after actual notice was provided. *Id.*

It is undisputed that Juno never fixed the words "patent" or "pat." along with the patent number to any of its bar hangers, either directly (such as by stamping them) or by applying labels. (*See* Pl.'s Stmt. Disputed Facts ("SDF"), Nos. 22, 26, ECF No. 59-1; Stauner Decl. ¶ 6.) Instead, beginning in November 2009, Juno began applying labels containing this information to one of two locations on its light fixture products: (1) the junction box, and (2) the inside of the light fixture housing. (Pl.'s SDF, Nos. 23-24; Stauner Decl., ¶ 6.)

**\*5** Yet even assuming the character of the article renders use of a label proper—and Juno does submit evidence to that effect—Juno does not demonstrate that the light fixture product as a whole qualifies as the "patented article" for purposes of the fixation requirement. To the contrary, the Second Circuit's opinion in *Lichtenstein v. Phipps*, 168 F. 61 (2d Cir. 1909), indicates that "patented article" refers to the individual patented component, rather than the broader unpatented product of which the component is a part. The plaintiff in *Lichtenstein* held a patent in the design of a hatband. *Id.* at 61. However, the plaintiff did not affix notice of the patent to the hatband, but instead to the lining on the inside of the hat. *Id.* at 62. The court held that this did not comply with a prior version of the statute at issue, which required that "the notice shall be affixed on the patented article." *Id.* The court reasoned that "[t]here was nothing to show whether the hat itself, the design of the hat, the lining, or the design of the band was patented." *Id.*

Similarly here, placing a label containing the '419 Patent number on the junction box or inside the light fixture housing did not indicate which component of the light fixture was patented. The most natural assumption would be that the patent number applied to the component to which the label was affixed, though that assumption would have been wrong. Thus, the Court finds that, as in *Lichtenstein*, fixing the label to a component of the product other than the one which is patented does not comply with the constructive notice provision of 35 U.S.C. § 287(a).

Juno cites two cases for the proposition that a discretionary or "rule of reason" analysis applies. However, the courts in those cases applied a more flexible analysis to the question of whether a patentee properly engaged in the alternative method of providing notice by affixing a label rather than marking the patented article directly. As explained above, the Court has assumed for the sake of argument that Juno was entitled to use a label here. Neither of the cited opinions address whether the label was properly located on the "patented article," as opposed to an alternative location, and therefore neither case governs the present inquiry. *See Sessions v. Romadka*, 145 U.S. 29, 49-50 (1892) ("[I]n a doubtful case, something must be left to the judgment of the patentee, who appears in this case to have complied with the alternative provision of the act, in affixing a label to the packages...."); *Global Traffic Techs. LLC v. Morgan,*

Juno Manufacturing, LLC v. Nora Lighting, Inc., Not Reported in Fed. Supp. (2015)
2015 WL 11438613

Nos. 2014-1537, 2014-1566, 2015 WL 3513416, at *8-9 (Fed. Cir. June 4, 2015) (unpublished) ("[W]hen a patentee marks the packaging rather than the article, the district court should evaluate the specific character of the article at issue.").

Therefore, Juno failed to provide constructive notice of the '419 Patent.

2. *Actual Notice*

Alternatively, a patentee may provide actual notice, which requires "an affirmative act on the part of the patentee which informs the defendant of infringement." *Lans v. Digital Equipment Corp.*, 252 F.3d 1320, 1327-28 (Fed. Cir. 2001) (internal quotation marks omitted). Such notice may be provided by filing an action for patent infringement. 35 U.S.C. § 287(a).

Juno does not contest Nora's assertion that it did not receive actual notice until Juno filed the present action on August 20, 2014. Juno Lighting's filing of the prior action on February 11, 2013 did not provide actual notice because Juno Lighting is not the patent owner. (Pl.'s SDF, No. 4 (Juno Manufacturing, LLC owned the patent rights); *Lans*, 252 F.3d at 1327 ("[N]otice from someone closely associated with the patentee does not satisfy § 287(a).").) It is undisputed that the '419 Patent expired on March 28, 2014, prior to the filing of the present action. (Pl.'s SDF, No. 13; Morseburg Decl. ¶ 2.) Thus, Juno did not provide Nora with actual notice during any period of Nora's infringing activity.

Because Juno did not provide actual or constructive notice of the '419 Patent, it may not recover damages for infringement. *See* 35 U.S.C. § 287(a). Therefore, the Court **GRANTS** Defendant's Motion for Summary Judgment. Since the Court grants Defendant's motion on this ground, it need not reach Defendant's alternative argument that damages are barred by the doctrine of laches.

**C. Defendant's Counterclaims**

**\*6** In its motion, Defendant concedes that the resolution of Plaintiff's claim also resolves the issues raised by Defendant's counterclaims, as there "will no longer be any case or controversy between the parties." (Def.'s Mot., 1:16-18, 16:9-11.) Therefore, the Court **DISMISSES** Defendant's counterclaims.

**V. CONCLUSION**

For the foregoing reasons, the Court **GRANTS** Plaintiff's Motion for Partial Summary Judgment, **GRANTS** Defendant's Motion for Summary Judgment, and **DISMISSES** Defendant's counterclaims.

The parties are hereby ordered to file a joint proposed judgment consistent with this Order within ten (10) days.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2015 WL 11438613

Footnotes

1     In lieu of the patent number, the patentee may provide "an address of a posting on the Internet...." 35 U.S.C. § 287(a). However, this alternative is not relevant here.

---

**End of Document**          © 2019 Thomson Reuters. No claim to original U.S. Government Works.

# Exhibit D-2

**Exhibit D-2**

In re Katz Interactive Call Processing Patent Litigation, Not Reported in F.Supp.2d (2009)
2009 WL 8635982

Katz argues that the Court should not grant summary judgment because "those systems may be infringed by Katz's unselected claims." (Katz Opp'n to AOL Mot. for Summ. J. at p. 28.) To survive AOL's motion, Katz has the burden of identifying some evidence that would allow a jury to conclude that Katz should be awarded damages. Here, Katz does not even argue that it is entitled to damages. Accordingly, this Court GRANTS AOL's motion for summary judgment and finds that Katz may not recover damages for any non-TEI Member Services.

### 2. Damages Before April 2004 and After the Expiration of the Patents

The accused TEI Member Services were not launched until April 2004 [6] and the remaining claims asserted against AOL expired on July 10, 2005 or December 20, 2005. As a result, AOL seeks a ruling that Katz may not recover damages for any activity prior to April 2004 and after the expiration of the patents.

In response, Katz argues that the " 'unselected' claims may give rise to damages in this period." (Katz Opp'n to AOL Mot. for Summ. J. at p. 28.) Katz raises two arguments in support of this position. First, Katz points out that the Court limited the number of claims it could assert. As a result, Katz argues that its due process rights would be violated if it were not allowed to collect damages for the entire term of its patent portfolio. Katz's argument might make sense if this Court only allowed Katz to select a representative sample of claims. That is not the case. This Court's limits were intended to prevent litigation of duplicative claims. It was not intended to curtail any of Katz's rights, nor were the limits absolute. This Court specifically invited Katz to file a motion to exceed the limits, provided Katz could justify each additional claim. Katz could have sought to add claims by explaining that they covered the same accused services, but had different terms. Katz did not do so. Accordingly, this Court rejects Katz's due process argument.

**\*17**  Second, Katz argues that there is sufficient evidence to suggest that in a hypothetical negotiation, the parties would have agreed to a portfolio license that included all of Katz's patents. However, Katz frames the negotiation incorrectly. The hypothetical negotiation can only concern the patents currently at issue. When that assumption is made, Katz's argument collapses.

Based on the foregoing, this Court GRANTS AOL's motion and finds that Katz may not recover damages for any activity prior to April 2004 and after the expiration of the asserted patents.

### 3. Notice Under 35 U.S.C. § 287

Under 35 U.S.C. § 287(a), a patentee making, offering for sale, or selling a patented article may not recover damages unless it has complied with the statute's marking requirements or until it has provided the infringer with actual notice of infringement. AOL argues that Katz failed to mark, and did not provide actual notice to AOL until September 1, 2006, when it filed the current lawsuit. Since the asserted patents all expired prior to that date, AOL concludes that Katz many not recover any damages.

Katz does not contend that it marked. Instead, Katz argues that beginning in August 2002, it did provide actual notice to AOL through a series of communications that offered to license the Katz patents. (Ex. 9 to Tcheng Decl. in Opp'n to AOL Mot. for Summ. J.) [7] As a threshold matter, the parties disagree on the level of specificity § 287(a) requires. Citing to *Amsted Indust. Inc. v. Buckeye Steel Castings Co.,* 24 F.3d 178 (Fed.Cir.1994), AOL argues that actual notice requires identifying a specific accused service. In *Amsted,* the Federal Circuit stated:

> For purposes of section 287(a), notice must be of "the infringement," not merely notice of the patent's existence or ownership. Actual notice requires the affirmative communication of a specific charge of infringement by a specific accused product or device. *Id.* at 187.

In contrast, Katz relies on *T.D. Williamson, Inc. v. Laymon,* 723 F.Supp. 587, 606 (N.D.Okla.1989) to argue that actual notice may be given before the act of infringement has taken place by merely providing notice of the patent number. However, *T.D. Williamson* does not stand for the proposition that providing a patent number by itself is sufficient notice. In *T.D. Williamson,* the notice letters warned of the specific proposed use that would constitute infringement, and the district court stated that there was "no possibility ... for confusion by the defendants about which devices [the patentee's] letters intended to cover." *Id.*

Here, Katz's correspondence lists the patents in the Katz portfolio (including the patents now being asserted)

Dariush G. Adli, Esq. (SBN: 204959)
  adli@adlilaw.com
Drew H. Sherman, Esq. (SBN: 237045)
  drew.sherman@adlilaw.com
Joshua H. Eichenstein, Esq. (SBN: 299392)
  josh.eichenstein@adlilaw.com
ADLI LAW GROUP, P.C.
444 South Flower Street, Suite 3100
Los Angeles, California 90071
Telephone: 213-623-6546
Facsimile: 213-623-6554

Attorneys for Plaintiffs
Lubby Holdings LLC,
Vaporous Technologies, LLC

ADLI LAW GROUP, P.C.
www.adlilaw.com
(213) 623-6546

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LUBBY HOLDINGS LLC, a Delaware limited liability company; VAPOROUS TECHNOLOGIES, INC., a Delaware corporation;<br><br>　　　　　*Plaintiffs*,<br><br>　　v.<br><br>HENRY CHUNG, an individual; MING CHEN, an individual; DEEPVAPES, INC., a California Corporation d/b/a BOOM VAPORIZER; DOES 1-10, inclusive,<br><br>　　　　　*Defendants*. | Case No: 2:18-cv-00715-RGK-JC<br><br>*Honorable R. Gary Klausner*<br>*United States District Judge*<br><br>**PLAINTIFFS LUBBY HOLDINGS, LLC and VAPOROUS TECHNOLOGIES, INC.'S OPPOSITION TO DEFENDANT HENRY CHUNG'S RULE 59(e) MOTION TO ALTER OR AMEND A JUDGMENT**<br><br>**Hearing: July 8, 2019**<br>**Time: 9:00 am**<br>**Courtroom: 850** |

2087.204

## **TABLE OF CONTENTS**

I. INTRODUCTION ................................................................................................ 1

II. LEGAL STANDARD ........................................................................................ 2

III. ARGUMENT ..................................................................................................... 3

    A. Defendant's Issue with Notice Under Section 287 Could Have and Should Have Been Raised Before Entry of Judgment ............................ 3

    B. The Evidence at Trial Demonstrated Defendant Did Have the Requisite Notice for Plaintiff to Recover Damages for Patent Infringement ........................................................................................... 5

    C. Defendants Claim of Plaintiffs' Counsel's Ignorance or Intentional Deceit is Pure Unnecessary Speculation ............................. 8

IV. CONCLUSION .................................................................................................. 9

ADLI LAW GROUP, P.C.
www.adlilaw.com
(213) 623-6546

2087.204

## <u>TABLE OF AUTHORITIES</u>

**<u>Cases</u>**

*389 Orange St. Partners v. Arnold*
    179 F.3d 656 (9th Cir. 1999)...............................................................................3

*Carroll v. Nakatani*
    342 F.3d 934 (9th Cir. 2003)...............................................................................2

*Exxon Shipping Co. v. Baker*
    554 U.S. 471 (2008) ............................................................................................2

*In re Oak Park Calabasas Condo. Ass'n*
    302 B.R. 682 (Bankr. C.D. Cal. 2003).................................................................3

*In re Wahlin*
    2011 WL 1063196 (Bankr. D. Idaho 2011) ........................................................3

*Kona Enters. v. Estate of Bishop*
    229 F.3d 877 (9th Cir. 2000)...............................................................................2

*McDowell v. Calderon*
    197 F.3d 1253 (9th Cir. 1999).............................................................................2

*Oto v. Metro. Life Ins. Co.*
    224 F.3d 601 (7th Cir. 2000)...............................................................................3

*Red.com, Inc. v. Jinni Tech Ltd.*
    2017 WL 8223610 (C.D. Cal. 2017)...................................................................2

*Rupert v. Bond*
    2015 WL 78739 (N.D. Cal. 2015)........................................................................3

*Talent Mobile Dev., Inc. v. Headios Grp.*,
    2019 WL 468807 (C.D. Cal. 2019)......................................................................4

*Turner v. Burlington Northern Santa Fe R.R.*
    338 F.3d 1058 (9th Cir. 2003).............................................................................2

**<u>Statutes</u>**

35 U.S.C. § 287.................................................................................................1, 3, 4, 7

**<u>Rules</u>**

Fed.R.Civ.P. 59(e) ..............................................................................................1, 2, 7

ADLI LAW GROUP, P.C.
www.adlilaw.com
(213) 623-6546

2087.204

TABLE OF AUTHORITIES

**Appx1114**

## MEMORANDUM OF POINTS AND AUTHORITIES

Plaintiffs' Lubby Holdings LLC and Vaporous Technologies, Inc. (collectively "Plaintiffs") submit this Opposition to Defendant Henry Chung's ("Defendant's") Rule 59(e) Motion ("Motion") to Alter or Amend a Judgment.

## I.    INTRODUCTION

Defendant has not shown that the Court should alter or amend its judgment on the verdict ordering payment to Plaintiffs of $863,936.10 from Defendants based on their infringement of Plaintiffs' 9,750,284 patent (hereinafter the "'284 Patent"). Defendant's paltry Motion amounts to nothing more than a disagreement with the final decision and a last-gasp effort to relitigate issues the Court and the Jury have already addressed on the merits after a three-day jury trial.  The four disorganized pages of the Motion boil down to one even more disorganized argument: Defendant's apparent allegation that there was no admitted evidence to show Plaintiff complied with Section 287 "notice/marking" requirement.   Defendant also throws in an argument claiming Plaintiff's counsel is ignorant of the law, based on pure speculation and incorrect assumptions by Defendant's counsel, Mr. Jen-Feng Lee.

Yet, though completely erroneous, none of these grounds support the Motion. Defendant's Motion under Rule 59(e) claims that the Motion is necessary to correct a purported manifest error of law or fact accepted by the Court at trial (See Dkt. No. 101-001 pg. 2:6-8).  But the Motion only argues that there was allegedly no evidence regarding marking admitted into the record and that Plaintiff somehow misled the Court.  Though completely specious, neither of these grounds goes to this Court employing a manifestly erroneous statement of law, or making a finding of a manifestly erroneous fact.  As such, the Motion is completely frivolous and has no application to the arguments put forth by the Defendant,

In addition, Defendant's Motion is based on arguments that were or should have been presented to the Court prior to entry of judgment.  To say the least, these latest challenges are insufficient for the Court to take the highly unusual and

ADLI LAW GROUP, P.C.
www.adlilaw.com
(213) 623-6546

2087.204

1

extraordinary remedy of altering or amending the judgment. As explained in this Opposition, there has been no commission of a manifest error of fact or law in the verdict and judgment for Plaintiffs against the infringing Defendants. Defendant thus cannot and has not established any basis for the Court to alter or amend the judgment. Accordingly, Defendant's Rule 59(e) motion should be denied, and this Court should award Plaintiffs attorney's fees for having to oppose this frivolous and unwarranted motion.

## II. LEGAL STANDARD

A "Rule 59(e) motion is an extraordinary remedy, to be used sparingly in the interests of finality and conservation of judicial resources." *Wood v. Ryan*, 759 F.3d 1117, 1121 (9th Cir. 2014), *cert. denied*, —— U.S. —— (2014). Rule 59(e) permits courts to use their discretion to alter or amend a judgment only under "highly unusual circumstances." *Red.com, Inc. v. Jinni Tech Ltd.*, 2017 WL 8223610, at *2 (C.D. Cal. 2017) (citing *Carroll v. Nakatani*, 342 F.3d 934, 945 (9th Cir. 2003) (emphasizing the importance of "interests of finality and conservation of judicial resources")). In *McDowell v. Calderon*, the Ninth Circuit set forth four independent grounds upon which a motion to amend a judgment under Rule 59(e) may be granted: (1) the motion is "necessary to correct manifest errors of law or fact upon which the judgment is based"; (2) the Court is presented with "newly discovered or previously unavailable" evidence; (3) the motion is necessary to prevent "manifest injustice"; or (4) there has been "an intervening change in controlling law." *Turner v. Burlington Northern Santa Fe R.R.*, 338 F.3d 1058, 1063 (9th Cir. 2003) (citing *McDowell v. Calderon*, 197 F.3d 1253, 1255 n.1 (9th Cir. 1999)). Rule 59(e) is a remedy "to be used sparingly." *See*, *Kona Enters. v. Estate of Bishop*, 229 F.3d 877, 890 (9th Cir. 2000) (citation omitted). A Rule 59(e) motion "may not be used to relitigate old matters, or to raise arguments or present evidence that could have been raised prior to the entry of judgment." *See*, *Exxon Shipping Co. v. Baker*, 554 U.S. 471, 485 n.5 (2008)

ADLI LAW GROUP, P.C.
www.adlilaw.com
(213) 623-6546

2

PLAINTIFFS LUBBY HOLDINGS, LLC and VAPOROUS TECHNOLOGIES, INC.'S OPPOSITION TO DEFENDANT HENRY CHUNG'S RULE 59(e) MOTION TO ALTER OR AMEND A JUDGMENT

Appx1116

2087.204

(quoting 11 C. Wright & A. Miller, Federal Practice and Procedure § 2810.1, pp. 127–128 (2d ed. 1995)).  Raising a claim for the first time on a Rule 59(e) motion is "simply too little, too late." *389 Orange St. Partners v. Arnold*, 179 F.3d 656, 665 (9th Cir. 1999).

Under Rule 59(e), a manifest error of law is not merely one in which the party disagrees with the Court, but instead is the "wholesale disregard, misapplication, or failure to recognize controlling precedent on the part of the court." *Rupert v. Bond*, No. 12-CV-05292, 2015 WL 78739, at *2 (N.D. Cal. 2015) (quoting *Oto v. Metro. Life Ins. Co.*, 224 F.3d 601, 606 (7th Cir. 2000) ("A manifest error is not demonstrated by the disappointment of the losing party.")), appeal filed, No. 15-15831 (9th Cir. Apr. 24, 2015).  A manifest error of fact is also not to be taken lightly.  Typically, a manifest error of fact might include, for example, a court's decision that materially relied upon an exhibit that was never offered or admitted into evidence. *See*, *In re Wahlin*, No. 10-20479, 2011 WL 1063196, at *3 (Bankr. D. Idaho 2011); *see also*, *In re Oak Park Calabasas Condo. Ass'n*, 302 B.R. 682, 683 (Bankr. C.D. Cal. 2003) (manifest error is one that is "plain and indisputable, and that amounts to a complete disregard of the controlling law or the credible evidence in the record.") (citing Black's Law Dictionary).

### III.    ARGUMENT

The Motion is frivolous and without legal or evidentiary merit as the arguments put forward by Defendant in the Motion do not argue the requirements for a Rule 59(e) motion: a manifest error of law or fact.

**A.    Defendant's Issue with Notice Under Section 287 Could Have and Should Have Been Raised Before Entry of Judgment**

Unsurprisingly, Defendant's Motion is devoid of any evidence that Defendant raised the issue of section 287 notice prior to entry of judgment.  This is because no such evidence exists.  Defendant failed to substantively raise his "notice/marking"

3

PLAINTIFFS LUBBY HOLDINGS, LLC and VAPOROUS TECHNOLOGIES, INC.'S OPPOSITION TO DEFENDANT HENRY CHUNG'S RULE 59(e) MOTION TO ALTER OR AMEND A JUDGMENT

Appx1117

ADLI LAW GROUP, P.C.
www.adlilaw.com
(213) 623-6546

2087.204

issue until now, well after entry of judgment.  Defendant fails to point to any document, hearing, or other source indicating Defendant timely objected to the issue.  Instead, all Defendant includes as "proof" for this Motion is a pair of excerpts from two cases on patent law, hardly useful for assessing the applicability of Rule 59(e) to the facts of this case.

Defendant further claims "the Court deleted many of the proposed jury instructions and gave a set… that did [not] contain the section 287's 'notice/marking' requirement" (Motion at p. 3:23-25), but Defendant does not provide any evidence whatsoever in his Motion that Defendant ever raised the issue of notice before or when jury instructions were finalized.  Counsel for Defendant had every opportunity prior to the finalization of jury instructions to object, to raise the issue, and yet Defendant's motion is devoid of evidence of any such efforts.  Accordingly, Defendant's claimed issue with "notice/marking" under section 287 could have been raised before entry of judgment *Talent Mobile Dev., Inc. v. Headios Grp.*, 2019 WL 468807, at *5 (C.D. Cal. 2019).

In *Talent Mobile Dev.*, the defendants moved, *inter alia*, post-trial under Rule 59(e) to amend the judgment claiming it was a manifest error of law for the trial court to not instruct the jury on apportionment of liability between the entity defendant and its officers. *Id*.  The Rule 59(e) motion was denied as the trial court found that the defendants knew about and consented to the jury instructions and verdict form's omission of apportionment prior to trial. *Id*.  The trial court reasoned that the defendants consented to the lack of apportionment because they never objected or raised the issue about apportionment until the post-trial phase of the litigation. *Id*.

Like the defendants in *Talent Mobile Dev.*, the Defendant in the case at bar knew about the purported marking issue but never raised it at trial (same with his Alter Ego argument in his Rule 59(a) motion).  Accordingly, as the trial court in *Talent Mobile Dev.* did, this Court, too, should deny the Defendant's Motion.

PLAINTIFFS LUBBY HOLDINGS, LLC and VAPOROUS TECHNOLOGIES, INC.'S OPPOSITION TO DEFENDANT HENRY CHUNG'S RULE 59(e) MOTION TO ALTER OR AMEND A JUDGMENT

Appx1118

ADLI LAW GROUP, P.C.
www.adlilaw.com
(213) 623-6546

2087.204

The alleged marking issue also ***should*** have been raised by Defendant prior to entry of judgment, considering this is a case that litigated patent infringement and provided Defendant with ample opportunity to raise the issue of notice.  If Defendant believes proof of notice evidence was lacking and that the Court made such a "manifest error", Defendant should have evidence that he previously addressed the issue to the Court.  Moreover, Defendant's woven-in assertion that the reasonable royalty amount should only be $198 has already been litigated.  (*See*, Dkt. 85-001 at pp. 1-2 and accompanying exhibits.)  Defendant's Rule 59(e) Motion should be denied for Defendant's failure to raise what should have been addressed before entry of judgment.

**B.     The Evidence at Trial Demonstrated Defendant Did Have the Requisite Notice for Plaintiff to Recover Damages for Patent Infringement**

Defendant's Motion should be dismissed for Defendant's failure to raise the issue, but the Motion should also be dismissed because there is not a lack of evidence concerning notice.  The section 287 notice requirement that Defendant is so hung up on has in fact been satisfied in this case, because Defendant had notice long before this action was even filed.  The evidence at trial demonstrated as much.  Section 287 provides that damages for infringement are recoverable even without marking the article, upon "proof that the infringer was notified of the infringement and continued to infringe thereafter".  35 U.S.C. § 287.

In this case, there was testimony at trial that Defendant signed a nondisclosure agreement ("NDA") in 2015, with the protected technology at issue constituting the reason for the NDA in the first place.  First, Mr. Chung himself testified that he signed the NDA in 2015 and that the NDA directly related to the technology at issue in this case.

ADLI LAW GROUP, P.C.

www.adlilaw.com
(213) 623-6546

2087.204

5

PLAINTIFFS LUBBY HOLDINGS, LLC and VAPOROUS TECHNOLOGIES, INC.'S OPPOSITION TO
DEFENDANT HENRY CHUNG'S RULE 59(e) MOTION TO ALTER OR AMEND A JUDGMENT

**Appx1119**

Mr. Chung testified as follows:

**CROSS-EXAMINATION BY PLAINTIFFS OF MR. CHUNG**

Q It was in 2015 at some point, though, that Mr. Rado told you about the patented technology, correct, that it was – he did have a patent pending?

A It was in October 2015.

Q But in 2015 is when he told you, yes?

A October 2015, that's when we signed the supplier agreement --

Q Okay.

A -- and consulting agreement and nondisclosure agreement at that time.

Declaration of Drew H. Sherman (hereinafter "Sherman Decl.") at ¶ 4, Ex. 1; Trial Transcript ("Trial Tr.") 05/08/19, 173:2-11.

**DIRECT EXAMINATION BY PLAINTIFFS OF MR. CHUNG**

Q Did you sign a nondisclosure agreement given to you by Mr. Rado?

A I did.

Sherman Decl. at ¶ 4, Ex. 1; Trial Tr. 05/08/19, 92:22-24.

It is clear from his own testimony that Mr. Chung had notice.  Mr. Christian Rado also testified as to the notice Defendant had of the protected technology, resulting from the executed NDA:

**DIRECT EXAMINATION BY PLAINTIFFS OF MR. RADO**

**BY MR. EICHENSTEIN:**

Q Mr. Rado, when you first presented Mr. Chung with a nondisclosure agreement, was the technology protected by the patent at issue at the core of that nondisclosure agreement?

ADLI LAW GROUP, P.C.
www.adlilaw.com
(213) 623-6546

2087.204

6

PLAINTIFFS LUBBY HOLDINGS, LLC and VAPOROUS TECHNOLOGIES, INC.'S OPPOSITION TO DEFENDANT HENRY CHUNG'S RULE 59(e) MOTION TO ALTER OR AMEND A JUDGMENT

**Appx1120**

**A** It's the whole reason I told him I wouldn't tell anything.

**MR. LEE:** Objection; legal conclusion.

**THE COURT:** Overruled.

**THE WITNESS:** I told him that I wouldn't disclose any information about my new technology until he signed an NDA.

**BY MR. EICHENSTEIN:**

**Q** Is that the same technology that's protected by the '284 Patent?

**A** Yes.

Sherman Decl. at ¶ 4, Ex. 1; Trial Tr. 05/08/19, 123:7-19.

The trial testimony clearly demonstrates Defendant has had notice since 2015. Trial Exhibit 201 calculates the sales record of Defendant's infringing products going back to March 1, 2016 all the way through February 1, 2018. Accordingly, Defendant has had ample notice of the protected technology at issue in this case for the time period used to calculate damages.

Moreover, the evidence supports the finding that Plaintiffs are entitled to recover for all 36,453 units at issue, because the date range for the sales record of the accused products (March 1, 2016 through February 1, 2018) includes a significant number of dates after the issuance of the '284 (September 5, 2017). Defendant could have provided an accounting, but without it, the jury was well within its discretion to presume all sales presented in the evidence occurred after the date of Patent issuance. In turn, this Court properly entered final judgment.

As such, Defendant's Rule 59(e) Motion should be preliminarily denied for Defendant's failure to timely raise the alleged notice issues, but it should also be denied because the evidence at trial satisfies the finding that Defendant clearly had notice required for a patent infringement case. There is no legitimate basis to claim manifest error. Defendant's Motion is simply unwarranted and must be denied.

ADLI LAW GROUP, P.C.
www.adlilaw.com
(213) 623-6546

2087.204

PLAINTIFFS LUBBY HOLDINGS, LLC and VAPOROUS TECHNOLOGIES, INC.'S OPPOSITION TO DEFENDANT HENRY CHUNG'S RULE 59(e) MOTION TO ALTER OR AMEND A JUDGMENT

**C.** **Defendants Claim of Plaintiffs' Counsel's Ignorance or Intentional Deceit is Pure Unnecessary Speculation**

Defendant ends his four-page post-trial charade by claiming, with no legitimate support whatsoever, that Plaintiffs' counsel, Mr. Drew Sherman, somehow intentionally mislead Defendant's counsel in the meet and confer process. (*See*, Motion at p. 4:14-5:11.) First, this argument is so fallacious, it hardly deserves much mention beyond the fact that it is false, unsupported, and a clear "hail-mary" attempt by Defense counsel to try to attack the integrity of his victorious opposing counsel— Mr. Lee is clearly out of ideas. Defendant's counsel appears to have twisted Mr. Sherman's words during the meet and confer process, because Mr. Sherman made clear to Defendant's counsel that Mr. Sherman did not see how ***Defense counsel*** could reach such an improper conclusion as to the applicability of the relevant patent infringement law. (Sherman Decl. at ¶ 3.) Mr. Sherman's point to Mr. Lee is only further substantiated by the terribly unsupported Rule 59(e) Motion that Defendant now forces everyone to waste time considering. Mr. Lee states he made "repeated mentions to Plaintiffs' counsel before and after trial" regarding section 287 yet includes nothing of the sort in this Motion. Ultimately, much like the rest of Defendant's Rule 59(e) Motion, this Court should not waste its time with this unsupported and abhorrent claim regarding Plaintiffs' counsel. Defendant's Motion must be denied.

ADLI LAW GROUP, P.C.
www.adlilaw.com
(213) 623-6546

2087.204

8

## IV.   <u>CONCLUSION</u>

For the foregoing reasons, Plaintiffs respectfully request the Court deny Defendant's Rule 59(e) post-trial motion.

Dated: June 17, 2019                    ADLI LAW GROUP, P.C.

By: */s/ Dariush G. Adli*
         Dariush G. Adli
         Drew H. Sherman
         Joshua H. Eichenstein
         Attorneys for Plaintiffs

ADLI LAW GROUP, P.C.
www.adlilaw.com
(213) 623-6546

2087.204

9

PLAINTIFFS LUBBY HOLDINGS, LLC and VAPOROUS TECHNOLOGIES, INC.'S OPPOSITION TO DEFENDANT HENRY CHUNG'S RULE 59(e) MOTION TO ALTER OR AMEND A JUDGMENT

**Appx1123**

Dariush G. Adli, Esq. (SBN: 204959)
  adli@adlilaw.com
Drew H. Sherman, Esq. (SBN: 237045)
  drew.sherman@adlilaw.com
Joshua H. Eichenstein (SBN: 299392)
  josh.eichenstein@adlilaw.com
ADLI LAW GROUP, P.C.
444 South Flower Street, Suite 3100
Los Angeles, California 90071
Telephone: 213-623-6546
Facsimile: 213-623-6554

Attorneys for Plaintiffs
Lubby Holdings LLC,
Vaporous Technologies, LLC

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| LUBBY HOLDINGS LLC, a Delaware limited liability company; VAPOROUS TECHNOLOGIES, INC., a Delaware corporation; <br><br> *Plaintiffs*, <br><br> v. <br><br> HENRY CHUNG, an individual; MING CHEN, an individual; DEEPVAPES, INC., a California Corporation d/b/a BOOM VAPORIZER; DOES 1-10, inclusive, <br><br> *Defendants*. | Case No: 2:18-cv-00715-RGK-JC <br><br> *Honorable R. Gary Klausner* <br> *United States District Judge* <br><br> **PLAINTIFFS LUBBY HOLDINGS, LLC and VAPOROUS TECHNOLOGIES, INC.'S OPPOSITION TO DEFENDANT HENRY CHUNG'S RULE 59(a) MOTION FOR A NEW TRIAL** <br><br> **Hearing: July 8, 2019** <br> **Time: 9:00 am** <br> **Courtroom: 850** |

ADLI LAW GROUP, P.C.
www.adlilaw.com
(213) 623-6546

2087.204

# **TABLE OF CONTENTS**

I.      INTRODUCTION ...........................................................................................1

II.     LEGAL STANDARD .....................................................................................2

III.    ARGUMENT ..................................................................................................3

     A.      The Evidence Clearly Supports the Verdict ...........................................3

         1.      Defendant waived his right to argue the jury instructions as a basis for a new trial. ..............................................................3

         2.      The evidence establishes Mr. Chung's liability. ........................4

         3.      Royalty Damages Correctly Apply to the Whole Product ...........7

     B.      Defendant's Claims of Misconduct by Plaintiffs' Counsel Are Meritless ..........................................................................................10

IV.     CONCLUSION .............................................................................................15

ADLI LAW GROUP, P.C.

www.adlilaw.com

(213) 623-6546

2087.204

TABLE OF CONTENTS

**Appx1125**

# TABLE OF AUTHORITIES

## Cases

*Bird v. Glacier Electric Coop. Inc.*,

255 F.3d 1136 (9th Cir. 2001)..................................................................10

*Cooper v. Firestone Tire & Rubber Co.*,

945 F.2d 1103 (9th Cir.1991)..................................................................11

*Crowley v. Epicept Corp.*,

883 F.3d 739 (9th Cir. 2018)....................................................................3

*E.E.O.C. v. Pape Lift, Inc.*

115 F.3d 676 (9th Cir. 1997)....................................................................2

*Hemmings v. Tidyman*,

285 F.3d 1174 (9th Cir. 2002)................................................................10

*International Mfg. Co. v. Landon Inc.*

336 F.2d 723 (9th Cir. 1964)................................................................6, 7

*Johnson v. Paradise Valley Unified Sch. Dist.*

251 F.3d 1222 (9th Cir. 2001)..................................................................2

*Kaiser Steel Corp. v. Frank Coluccio Constr. Co.*,

785 F.2d 656 (9th Cir.1986)....................................................................10

*Molski v. M.J. Cable, Inc.*

481 F.3d 724 (9th Cir. 2007)....................................................................2

*Moses v. Union Pac. R.R.*,

64 F.3d 413 (8th Cir.1995)......................................................................10

*Passantino v. Johnson & Johnson Consumer Prods.*

212 F.3d 493 (9th Cir. 2000)....................................................................2

*Pavao v. Pagay*

307 F.3d 915 (9th Cir. 2002)....................................................................2

*Puerto Rico Aqueduct & Sewer Auth. v. Constructora Lluch, Inc.*,

169 F.3d 68 (1st Cir.1999) ......................................................................11

*Sanchez v. City of Santa Ana*

915 F.2d 424 (9th Cir. 1990)....................................................................2

*Smith v. Kmart Corp.*,

177 F.3d 19 (1st Cir.1999)......................................................................10

ADLI LAW GROUP, P.C.
www.adlilaw.com
(213) 623-6546

2087.204

TABLE OF AUTHORITIES

**Appx1126**

*Turnbull v. American Broadcasting Companies*
No. CV 03-3554 SJO (FMOx), 2005 WL 6054964 (C.D. Cal. 2005)..............2

*United States v. Kaplan*,
836 F.3d 1199 (9th Cir. 2016)...............................................................................3

*United States v. Perez*,
116 F.3d 840 (9th Cir. 1997)(en banc)..............................................................3

**Rules**

Fed.R.Civ.P. 59(a) ........................................................................2, 3, 7, 14

ADLI LAW GROUP, P.C.

www.adlilaw.com

(213) 623-6546

2087.204

2

PLAINTIFFS LUBBY HOLDINGS, LLC and VAPOROUS TECHNOLOGIES, INC.'S OPPOSITION TO
DEFENDANT HENRY CHUNG'S RULE 59(a) MOTION FOR A NEW TRIAL

Appx1127

## MEMORANDUM OF POINTS AND AUTHORITIES

Plaintiffs' Lubby Holdings LLC and Vaporous Technologies, Inc. (collectively "Plaintiffs") submit this Opposition to Defendant Henry Chung's ("Defendant's") Rule 59(a) Motion ("Motion") For a New Trial.

## I.   INTRODUCTION

Defendant has failed to demonstrate that a new trial should be granted in this case whereby the jury's verdict found Defendants liable to Plaintiffs for $863,936.10 based on Defendants' infringement of Plaintiffs' 9,750,284 patent (hereinafter the "'284 Patent").

The verdict is more than adequately supported by the evidence presented to the jury in this case. Plaintiffs presented evidence demonstrating Mr. Chung admitted to selling Conseal A and Conseal B (the "Accused Products"). Further, Defendant failed to object or take any issue with the jury instructions or verdict form relating to Defendant's potential personal liability. Defendant also uses the wrong law in his Motion, as an alter ego/piercing the corporate veil analysis is not the appropriate standard for finding personal liability in this patent infringement context.

Furthermore, Plaintiffs are entitled to a royalty figure based on the entire product at issue, because the patent applies to the product in such a way that the product will not work without the patented technology, thereby rendering the patented technology essential to proper use of the entire product. Plaintiffs reasonably calculated the royalty damages and properly presented them to the jury. Defendant does not articulate any authority whatsoever that supports the claim that Plaintiffs calculated damages improperly, despite the overwhelming evidence justifying the damages amount the jury ultimately arrived at. Lastly, Defendant's claims of misconduct by Plaintiffs' counsel are plainly false.

As explained in this Opposition, here Defendant fails to provide any substantiation that the verdict is contrary to the clear weight of the evidence, is based on false or perjurious evidence, or that a miscarriage of justice has occurred.

ADLI LAW GROUP, P.C.
www.adlilaw.com
(213) 623-6546

2087.204

1

Defendant thus cannot, and has not, established any legitimate basis for the Court to grant a new trial. Accordingly, Defendant's Rule 59(a) motion should be denied.

## II.   LEGAL STANDARD

Rule 59(a) provides that that a new trial may be granted after a jury trial "for any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed.R.Civ.P. 59(a)(1)(A). A new trial is proper **only if** "'the verdict is contrary to the clear weight of the evidence, is based upon false or perjurious evidence, or to prevent a miscarriage of justice.'" *Molski v. M.J. Cable, Inc.*, 481 F.3d 724, 729 (9th Cir. 2007) (quoting *Passantino v. Johnson & Johnson Consumer Prods.*, 212 F.3d 493, 510 n.15 (9th Cir. 2000)). "[A] new trial may be granted 'only if the verdict is against the great weight of the evidence or it is quite clear that the jury has reached a seriously erroneous result'". *Turnbull v. American Broadcasting Companies*, No. CV 03-3554 SJO (FMOx), 2005 WL 6054964, at *2 (C.D. Cal. 2005) (quoting *E.E.O.C. v. Pape Lift, Inc.*, 115 F.3d 676, 680 (9th Cir. 1997).

A jury's verdict must be upheld if it is supported by substantial evidence, which is evidence adequate to support the jury's conclusion, even if it is also possible to draw a contrary conclusion. *Pavao v. Pagay*, 307 F.3d 915, 918 (9th Cir. 2002). "[A]lthough the court should review the record as a whole, it must disregard evidence favorable to the moving party that the jury is not required to believe and may not substitute its view of the evidence for that of the jury." *Johnson v. Paradise Valley Unified Sch. Dist.*, 251 F.3d 1222, 1227 (9th Cir. 2001) (internal quotations omitted).

When considering the adequacy of jury instructions, "[a]n appellate court reviewing a trial court's instructions to the jury will consider them as a whole." 12 Moore's Federal Practice § 61.08; *see also*, *Sanchez v. City of Santa Ana*, 915 F.2d 424, 432 (9th Cir. 1990). "Failure to give the jury a particular instruction will constitute harmless error if the jury was sufficiently informed by the instructions that were given. Failure to give a proposed instruction is not reversible error unless the

ADLI LAW GROUP, P.C.
www.adlilaw.com
(213) 623-6546

2087.204

2

PLAINTIFFS LUBBY HOLDINGS, LLC and VAPOROUS TECHNOLOGIES, INC.'S OPPOSITION TO DEFENDANT HENRY CHUNG'S RULE 59(a) MOTION FOR A NEW TRIAL

**Appx1129**

instructions that are given mislead the jury or give the jury an inadequate impression of the law.  Erroneous instructions will also be harmless error if, in light of the jury's verdict, they were irrelevant." *See*, 12 Moore's Federal Practice § 61.08, *supra*.

Challenges to jury instructions may be waived, however.  "'Waiver of a jury instruction occurs when a party considers 'the controlling law, or omitted element, and, in spite of being aware of the applicable law, proposed or accepted a flawed instruction.'" *Crowley v. Epicept Corp.*, 883 F.3d 739, 748 (9th Cir. 2018) (quoting *United States v. Kaplan*, 836 F.3d 1199, 1217 (9th Cir. 2016) (quoting *United States v. Perez*, 116 F.3d 840, 845 (9th Cir. 1997)(en banc))).

## III.   ARGUMENT

### A.   The Evidence Clearly Supports the Verdict

Defendant's erratic Rule 59(a) Motion attempts to argue that the jury's verdict in this case is somehow against the clear weight of evidence.  However, the Motion ignores the fact that Defendant waived his right to use faulty jury instructions as a basis for a new trial, and the Motion relies entirely on unsubstantiated arguments that do not consider the overwhelming evidence supporting the jury's verdict.

#### 1. Defendant waived his right to argue the jury instructions as a basis for a new trial.

In *Crowley*, non-FDA approved drug patent owners and assignors of the rights to the patents brought an action against the defendant, the assignees of the patents, for breach of contract, fraud, and recession based on a contract that obligated the defendant to turn the patents into FDA approved drugs.  After a jury trial in which the jury found for the defendant-assignee, the plaintiffs moved for a new trial under FRCP 59(a), claiming that the jury instructions were incorrect and incomplete.  The trial court denied the plaintiffs' post-trial motion and the plaintiffs appealed.

In affirming the trial court's denial of the plaintiffs' motion for a new trial, the Ninth Circuit held that the plaintiffs had abandoned their argument that the jury

ADLI LAW GROUP, P.C.
www.adlilaw.com
(213) 623-6546

3

PLAINTIFFS LUBBY HOLDINGS, LLC and VAPOROUS TECHNOLOGIES, INC.'S OPPOSITION TO DEFENDANT HENRY CHUNG'S RULE 59(a) MOTION FOR A NEW TRIAL

**Appx1130**

2087.204

received improper or incorrect instructions as a basis for a motion for a new trial. *Id*. The appellate court reasoned that, since the plaintiffs appeared and participated in the final pre-trial conference, which included discussions regarding the jury instructions in dispute by plaintiffs' motion for a new trial, and those jury instructions had been agreed upon by all parties, without objection by the plaintiffs, as the proper jury instructions, then the plaintiffs waived their right to argue the jury instructions were erroneous. *Id*. at 748-750.  The Ninth Circuit found that the plaintiffs' failure to require an instruction on a preliminary issue, which plaintiffs claimed was missing from the jury instructions, was forfeited because of the plaintiffs' failure to address the issue with the trial court at the final pre-trial conference. *Id*.

Just as with the plaintiffs in *Crowley*, the Defendant in the case at bar has waived any arguments regarding the propriety of the jury instructions, especially regarding any "alter ego" instruction.  Here, the Defendant knew that the instructions did not include an alter ego instruction and that the instructions on liability and damages would allow the jury to hand down an award against Defendant, personally. Yet, Defendant, like the plaintiffs in *Crowley*, never objected to the jury instructions on any alter ego ground, nor did the Defendant propose any instruction relating to alter ego or "piercing the corporate veil."  Hence, just as the plaintiffs in *Crowley* did, in this action, the Defendant cannot now use missing or incorrect jury instructions as a basis for a motion for a new trial when Defendant previously agreed to the same jury instructions he now claims were faulty.

### 2.  The evidence establishes Mr. Chung's liability.

Defendant argues there is no evidence that Henry Chung sold any of the Accused Products.  As Defendant's Motion claims:

> "The accused products (Conseal A and Conseal B; "Accused
> Products" collectively) were sold by Esquire Distribution, Inc. (a
> corporation 100% owned by Defendant Chung), as shown in the

ADLI LAW GROUP, P.C.
www.adlilaw.com
(213) 623-6546

2087.204

4

PLAINTIFFS LUBBY HOLDINGS, LLC and VAPOROUS TECHNOLOGIES, INC.'S OPPOSITION TO
DEFENDANT HENRY CHUNG'S RULE 59(a) MOTION FOR A NEW TRIAL

**Appx1131**

> 2 sheets of sales report admitted as evidence Exhibit 201
>
> …
>
> There is NO evidence of Henry Chung or Deepvapes, Inc. selling any Accused Products."

(*See*, Motion at 2:18-26.)

Defendant's argument here is as weak as a house of cards.

To begin, the referenced document Defendant uses to solidify his position here does not foreclose the jury finding that Defendant sold the accused products. Defendant laid no foundation for Exhibit 107, nor was the document ever authenticated. Defendant solicited any evidence that Exhibit 107 was an accurate document or how Exhibit 107 was prepared. Defendant could have supported Exhibit 107 with invoices, receipts, or purchase orders for the accused products in order to demonstrate that Esquire Distribution made the sales (since it would have been from these documents that Exhibit 107 was created). But that was never done. The words placed in the header of a document manufactured for a litigation does not make that document gospel. The jury is free to determine the veracity any document in the record of a case as it sees fit. Dkt. No. 73, Instructions 1-3. The jury did not have to believe the document.

Next, there was evidence before the jury that the Defendant sold the accused products. In fact, Defendant himself testified that he did sell the accused products. Declaration of Dariush Adli ¶ 3 (hereinafter "Adli Decl."), Ex. 1; Trial Transcript ("Trial Tr.") 05/08/19, 93:24-94:13, 95:18-96:20;119:15-18; and 120:17-18.

The trial testimony clearly demonstrates that Mr. Chung sold the Accused Products. He admits he did. Defendant's claim that there is no evidence that he sold the Accused Products is unfounded.

To apparently try and drive home this errant claim, Defendant launches into an analysis of alter ego/piercing the corporate veil ("AE/PCV"), arguing there was no

ADLI LAW GROUP, P.C.
www.adlilaw.com
(213) 623-6546

**Appx1132**

2087.204

such issue of AE/PCV ever presented prior to the trial.  (*See*, Motion at 3:5-4:23.) Defendant thus claims, "the jury is probably under the wrong impression that the mere fact of sole ownership of a corporation (with respect to the relationship between Henry Chung and Esquire Distribution) is sufficient for AE/PCV." (*Id*.)

The reason this issue was never raised is because this alter ego and piercing the corporate veil analysis is not even the correct standard by which personal liability from patent infringement was found in the context of this case.  An individual is subject to personal liability for patent infringement if he is the "moving, active, conscious force behind [the] infringement." *International Mfg. Co. v. Landon Inc.*, 336 F.2d 723, 728 (9th Cir. 1964).  Such an individual is said to be "in personal control" of the company, acting "as its guiding spirit and the active directing hand and in full charge of its operations." *Id*.

In *International Mfg. Co.*, a patentee sued a company, International, for patent infringement.  *Id*. at 723.  The patentee also sued the company's sole stockholder, president, and alleged alter ego, Rodolfo, on the same grounds.  *Id*.  The district court found both the company and Rodolfo had infringed the patents through the manufacture and sale of an infringing product.  *Id*. at 728.  On appeal to the Ninth Circuit, Rodolfo, construing the award of damages against him as predicated solely on the theory that International was his alter ego, argued that the facts did not establish a basis for applying alter ego to the case.  *Id*.  However, the Ninth Circuit affirmed the district court's reasoning that Rodolfo was correctly held personally liable for the patent infringement of the company, because:

> "Rodolfo was in personal control of international and acted as its guiding spirit and the active directing hand in full charge of its operations. In pertinent findings of fact, it was additionally found that Rodolfo '* * * directed the manufacture and sale of the accused International Manufacturing Co., Inc. skim filter.'

PLAINTIFFS LUBBY HOLDINGS, LLC and VAPOROUS TECHNOLOGIES, INC.'S OPPOSITION TO DEFENDANT HENRY CHUNG'S RULE 59(a) MOTION FOR A NEW TRIAL

**Appx1133**

ADLI LAW GROUP, P.C.
www.adlilaw.com
(213) 623-6546

2087.204

…

> Rodolfo was the moving, active conscious force behind International's infringement… he is therefore subject to personal liability without regard to whether International is his alter ego."

*Id.* at 728-729.

Thus, the Ninth Circuit clearly established: "whoever actively induces infringement of a patent shall be liable as an infringer." *Id.* at 729.

As in *International Mfg. Co.*, so here, Mr. Chung was the moving, active, conscious force behind Esquire Distribution. He admitted as much. *See*, Trial Tr. 05/08/19, *supra*, at 93:24-94:13; 95:18-96:20; 119:15-120:18. The jury was presented with plenty of support for finding Mr. Chung personally liable under the appropriate standard. Accordingly, Defendant's contention is meritless. Defendant's alter ego analysis (*see*, Motion at 3:5-4:24) is thus moot, because Mr. Chung is liable under the true test for personal liability in this context as accentuated in *International Mfg. Co*. As a result, Defendant's Rule 59(a) Motion should be denied because the evidence at trial overwhelming supports the jury's finding that Mr. Chung was the moving force behind the infringement and thus personally liable.

**3.      Royalty Damages Correctly Apply to the Whole Product**

Defendant's Motion seeks to convince the Court that the '284 Patent "did not teach everything related to the making and practicing of a personal vaporizer." (*See*, Motion at 5:1-6.) Defendant argues the '284 Patent only "added a specific incremental value" through the energized check valve "feature" and should therefore only entitle Plaintiffs to obtain royalty compensation for the energized check valve portion of the vaporizer rather than the entire product. (*Id*. at 5:8-27.) However, the jury was provided with sufficient evidence at trial that the patent-protected technology is essential to the operation of the entire vaporizer.

For example, Mr. Christian Rado, the inventor of the technology, testified that

ADLI LAW GROUP, P.C.
www.adlilaw.com
(213) 623-6546

7

PLAINTIFFS LUBBY HOLDINGS, LLC and VAPOROUS TECHNOLOGIES, INC.'S OPPOSITION TO DEFENDANT HENRY CHUNG'S RULE 59(a) MOTION FOR A NEW TRIAL

**Appx1134**

2087.204

the energized nature of the check valve is the only proper way for the entire product to work, because without it, the product's nonleaking technology would not work. As Mr. Rado testified:

### DIRECT EXAMINATION BY PLAINTIFFS OF MR. RADO

**Q** Are you the inventor of the energized check valve?

**A** Absolutely.

**Q** Are you aware of any other products that contained an energized check valve?

**A** I don't know of any other product category in anything that has an energized check valve in it, to my knowledge. I've never seen anything like that before, and I still, to this day, don't know of another one.

**THE COURT:** Next question.

**BY MR. EICHENSTEIN:**

**Q** Is it important that the check valve was energized?

**A** It would not work. If it was not energized, the cartridge would not work.

**Q** So just to be clear, an energized check valve is the only way the product -- for the nonleaking technology to work; is that correct?

**A** Correct.

**Q** Why would it not work?

**A** It wouldn't be able to pass the electrical energy from the battery to the heating element. That's the secondary function of the energized check valve.

Adli Decl. at ¶ 4, Ex. 2; Trial Tr. 05/08/19, 126:9-127:4.

Plaintiffs' expert, Mr. Andreas Brekke, supplemented this testimony with his

ADLI LAW GROUP, P.C.
www.adlilaw.com
(213) 623-6546

8

PLAINTIFFS LUBBY HOLDINGS, LLC and VAPOROUS TECHNOLOGIES, INC.'S OPPOSITION TO DEFENDANT HENRY CHUNG'S RULE 59(a) MOTION FOR A NEW TRIAL

2087.204

Appx1135

own testimony that the product would not work without the energized check valve. Mr. Brekke testified as follows:

### DIRECT EXAMINATION BY PLAINTIFFS OF MR. BREKKE

**BY MR. EICHENSTEIN:**

Q Just to clarify, have you ever reviewed the Conseal A and Conseal B products?

A Yes, I have.

Q Do those products contain an energized check valve?

A They do.

Q Would the product work without an energized check valve?

A Would it work without?

Q Yeah.

A No. There would be nothing to lead the electricity from the first pole up into the heating element.

Q Is the energized check valve, in your opinion, protected by the '284 Patent?

A Yes.

Adli Decl. at ¶ 4, Ex. 2; Trial Tr. 05/08/19, 132:21-133:9.

Defendant even testifies that he had never seem the energized valve prior to his dealings with the Plaintiffs and after his dealings with the Plaintiffs, the only other business to incorporate the energized check valve was the Defendant. *Id.* The Defendant failed to present evidence that the '284 Patent was not the driving force behind the demand for it. The only evidence in the record for the jury to rely on stated that the technology in the '284 Patent changed the industry. As his Honor admonished the jury from the start, the jury could only rely on evidence in the record. Dkt. No. 73, Jury Instructions 1-3.

Plaintiffs presented the jury with more than sufficient evidence that the entire

ADLI LAW GROUP, P.C.
www.adlilaw.com
(213) 623-6546

2087.204

9

PLAINTIFFS LUBBY HOLDINGS, LLC and VAPOROUS TECHNOLOGIES, INC.'S OPPOSITION TO DEFENDANT HENRY CHUNG'S RULE 59(a) MOTION FOR A NEW TRIAL

Appx1136

product would not work without the patented technology, thus entitling Plaintiff to the $863,936.10 royalty amount the jury awarded.  Defendant does not present any authority for the notion that Plaintiffs improperly calculated damages or unjustly conveyed the figures to the jury.  Defendant's claims to the contrary are simply erroneous and unsupported.

**B.      Defendant's Claims of Misconduct by Plaintiffs' Counsel Are Meritless**

Defendant ends his motion by claiming five alleged instances of misconduct by Plaintiffs' counsel sufficiently permeated the proceedings and jury to warrant a new trial.  Defendant is again mistaken.  Indeed, the case law on which Defendant relies in making this argument supports the Plaintiffs and defeats the Defendant's own position.

In *Hemmings v. Tidyman*, 285 F.3d 1174 (9th Cir. 2002), the Ninth Circuit affirmed a trial court's denial of a motion for a new trial based on prejudicial misconduct by trial counsel in the closing argument.  In so finding, the appellate court stated that the federal courts erect a "high threshold" to claims of improper closing arguments in civil cases raised for the first time after trial. *Kaiser Steel Corp. v. Frank Coluccio Constr. Co.,*785 F.2d 656, 658 (9th Cir.1986). The threshold which must be met to grant a new trial because of prejudicial misconduct is when the trial court commits plain error and "where the integrity or fundamental fairness of the proceedings in the trial court is called into serious question." *Bird v. Glacier Electric Coop. Inc.,* 255 F.3d 1136, 1148 (9th Cir. 2001). A plain error review requires: (1) an error, (2) the error is plain or obvious, (3) the error was prejudicial or effects substantial rights, and (4) review is necessary to prevent a miscarriage of justice. *See Smith v. Kmart Corp.,* 177 F.3d 19, 25 (1st Cir.1999) "[T]he burden of making a 'concrete showing of prejudice' resulting from improper closing argument falls upon appellant." *Moses v. Union Pac. R.R.,* 64 F.3d 413, 418 (8th Cir.1995). In evaluating the likelihood of prejudice from the comments, a court of review will

ADLI LAW GROUP, P.C.
www.adlilaw.com
(213) 623-6546

2087.204

10

PLAINTIFFS LUBBY HOLDINGS, LLC and VAPOROUS TECHNOLOGIES, INC.'S OPPOSITION TO DEFENDANT HENRY CHUNG'S RULE 59(a) MOTION FOR A NEW TRIAL

**Appx1137**

consider "the totality of circumstances, including the nature of the comments, their frequency, their possible relevancy to the real issues before the jury, the manner in which the parties and the court treated the comments, the strength of the case, and the verdict itself." *Puerto Rico Aqueduct & Sewer Auth. v. Constructora Lluch, Inc.,* 169 F.3d 68, 82 (1st Cir.1999); *see also Cooper v. Firestone Tire & Rubber Co.,* 945 F.2d 1103, 1107 (9th Cir.1991) (declining to find reversible error where "the alleged misconduct occurred only in the argument phase of the trial ... the remarks were isolated rather than persistent, ... most of counsel's comments were not objected to at trial and appellants did not move for a mistrial at the end of the argument").

Defendant first claims Plaintiffs' counsel, Dr. Dariush G. Adli, made false statements to the Court that the $623,346.30 figure "was made in settlement context." (*See*, Motion at 7:13-21.)  Plaintiffs will not go into the weeds on this unsupported allegation, other than to state Defendant provides no proof that any statement was false.  To the contrary, the Court informed Defendant's counsel, Mr. Jen-Feng Lee, that the question regarding the $623,000 figure concerns a demand made prior to trial and is therefore an improper question.  Mr. Lee *admitted* the amount concerns a demand made before trial:

**DIRECT EXAMINATION BY DEFENDANT OF MR. RADO**

BY MR. LEE:

**Q** Did recently plaintiff make a demand of -- I'm sorry,

reasonable royalty compensation in the amount of $623,000 --

346 -- 620 --

**THE COURT:** This is a demand you say is made before trial?

**MR. LEE:** Correct.

**THE COURT:** Sustained. Improper question, Counsel.

Adli Decl. at ¶ 5, Ex. 3; Trial Tr. 05/09/19, 19:19-20:1.

Accordingly, Defendant has failed to establish that Dr. Adli has provided any

11

PLAINTIFFS LUBBY HOLDINGS, LLC and VAPOROUS TECHNOLOGIES, INC.'S OPPOSITION TO DEFENDANT HENRY CHUNG'S RULE 59(a) MOTION FOR A NEW TRIAL

**Appx1138**

ADLI LAW GROUP, P.C.
www.adlilaw.com
(213) 623-6546

2087.204

false testimony.

Relatedly, Defendant's second allegation of improper conduct apparently rising to the level of necessitating a new trial, is that the associated "computation of damages" was "essentially a false statement" because Plaintiffs ended up being awarded more than that amount. (*See*, Motion at 7:22-8:5.) Defendant fails to provide authority contradicting Plaintiffs' method to arriving at the appropriate figure. Calculating damages is a careful and arduous process, especially with infringement as severe as Defendants'.  Plaintiffs complied with procedure.

Defendant's third attack on Plaintiffs' counsel is a false claim that Plaintiffs' counsel allegedly misled the jury regarding the basis for the reasonable royalty for the '284 Patent, arguing: "Throughout the trial testimony and the scant amount of evidence admitted, there is NO such evidentiary basis to show that the 284 Patent has a reasonable royalty of 45% of the net profit." (*See*, Motion at 8:10-12.)  Thus, Defendant claims Plaintiffs' counsel provided a misleading statement on Day 3 of the trial when Mr. Drew Sherman stated: "You heard the testimony of Mr. Rado saying he currently has a deal that is active with a company that he's getting 45 percent of the net profits." (*Id*. at 6-10.)

Defendant claims there was no evidence presented that Mr. Rado is receiving a 45% rate of royalty.  However, Mr. Rado testified he is:

### DIRECT EXAMINATION BY PLAINTIFFS OF MR. RADO

**Q** So let me just get that. So before this G Pen - or not G Pen, before this Grenco deal, you did not license your technology to others?

**A** Absolutely not.

**Q** But now you are licensing it, correct?

**A** Yes, because of the -- because of the conditions surrounding this deal, yes.

12

PLAINTIFFS LUBBY HOLDINGS, LLC and VAPOROUS TECHNOLOGIES, INC.'S OPPOSITION TO DEFENDANT HENRY CHUNG'S RULE 59(a) MOTION FOR A NEW TRIAL

Appx1139

ADLI LAW GROUP, P.C.
www.adlilaw.com
(213) 623-6546

2087.204

ADLI LAW GROUP, P.C.
www.adlilaw.com
(213) 623-6546

**Q** And are you receiving a royalty in return?

**A** Yes.

**Q** What is the rate of royalty?

**A** 45 percent.

**Q** So you're receiving 45 percent of what number? What's that 45 percent apply to?

**A** 45 percent of my cost.

Adli Decl. at ¶ 6, Ex. 4; Trial Tr. 05/07/19, 106:6-19.

Defendant claims that because Mr. Rado later testified that the license is in the products containing the '284 Patent rather than a license in the patent itself, Plaintiffs misled the jury about the reasonable royalty applicable in this case. (*See*, Motion at 8:7-16.) As established above, the jury was presented with adequate evidence that the product does not work without the patented technology, therefore allowing the royalty figure to apply to the entirety of the product. Thus, when the product is licensed, the 45% Mr. Rado testified to receiving is directly relevant to the reasonable rate of royalty for determining damages in this case, since the product cannot function without the patented technology. Defendant presents no authority to the contrary. Thus, Mr. Sherman's statement to the jury that Mr. Rado testified to receiving 45% is not misleading in the slightest. The jury had all the information it needed to connect the dots that Defendant's counsel apparently cannot.

In his fourth issue with Plaintiffs' counsel, Defendant argues Plaintiffs used and relied on an undefined term, "energized check valve", which Defendant claims was not used until trial, when Mr. Chung first allegedly learned about the term. (*See*, Motion at 8:17-27.) As Defendant argues: "This term did not exist in… any… prior documentation. (*Id.* at 8:19-20.) Defendant does not provide any authority conveying that Plaintiffs improperly relied on an "undefined term". Defendant tries to claim he did not know the check valve in the '284 Patent was energized until trial, but case

13

PLAINTIFFS LUBBY HOLDINGS, LLC and VAPOROUS TECHNOLOGIES, INC.'S OPPOSITION TO DEFENDANT HENRY CHUNG'S RULE 59(a) MOTION FOR A NEW TRIAL

**Appx1140**

2087.204

documents, including the operative First Amended Complaint (Dkt. 20), prove otherwise. The Patent application attached to the First Amended Complaint contains the description of, and reference to, the energized check valve in several places in the application, including the following language:

"**[0083]** An electric circuit is defined from the first pole of the battery through the ***electrically conductive check valve* 144** to the first wire portion **192**, through the coil **170** to the second wire portion **194**, and from the second wire portion through the atomizer module housing **146** to the second pole of the battery. When the circuit is ***energized***, electric current is applied across the heating element coil, which quickly generates heat to vaporize media within the vaporizing chamber."

(Dkt. 20, Ex. A, at p. 46.) (Emphasis added.)

The energized claim is also referenced throughout the body of the First Amended Complaint, including in the section regarding Claim 1 of the '284 Patent and Claim 10 of the '284 Patent. (*Id*. at ¶¶ 34(d), 35(c), 42, 43, 45, and at Figs. 3, 7, and 11 thereto.)

The energized check valve was not suddenly thrusted on Defendant at trial. Defendant had the knowledge of all the terminology relevant to the '284 Patent from the outset. That Defendant chose to focus on the ball and spring aspects of the sealing mechanism instead of the key issue at trial, which was the energized check valve, is Defendant's mistake alone. Such a mistake does not warrant a new trial. Defendant had the opportunities to dispute the energized check valve allegations including at trial. Defendant did not. Instead, Plaintiffs provided the jury with evidence of the energized check valve to make informed determinations as to liability and damages. Accordingly, the jury was not misled by the language, and Plaintiffs did not "demonize" Defendant, as he claims.

PLAINTIFFS LUBBY HOLDINGS, LLC and VAPOROUS TECHNOLOGIES, INC.'S OPPOSITION TO DEFENDANT HENRY CHUNG'S RULE 59(a) MOTION FOR A NEW TRIAL

Appx1141

ADLI LAW GROUP, P.C.
www.adlilaw.com
(213) 623-6546

2087.204

Defendant's fifth and final allegation against Plaintiffs' counsel's conduct is that counsel misled the jury that each of the 36,453 units at issue infringe when, according to Defendant, "[t]here is no infringement before a patent is issued." (*See,* Motion at 9:1-9.) Like every other argument before it, this final argument from Defendant is asserted with no supporting authority whatsoever. The key here though is that the 36,453 infringing units, admitted as Trial Exhibit 201, are not broken down by exact date of sale, but rather by a date range: March 1, 2016 through February 1, 2018. The date range includes a significant number of dates occurring after September 5, 2017, the date the '284 Patent was issued. Defendant failed to ever provide an accounting of when the sales took place within the date range. Accordingly, the jury is entitled to make a presumption that all the infringing sales occurred after the '284 Patent was issued on September 5, 2017. Thus, Defendant's claim that Plaintiffs misled the jury with the 36,453 infringing unit figure, is meritless.

## IV. CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request the Court deny Defendant's Rule 59(a) Motion for a New Trial.

Dated: June 17, 2019      ADLI LAW GROUP, P.C.

By: */s/ Dariush G. Adli*
     Dariush G. Adli
     Drew H. Sherman
     Joshua H. Eichenstein
     Attorneys for Plaintiff
     Lubby Holdings LLC,
     Vaporous Technologies, LLC

ADLI LAW GROUP, P.C.
www.adlilaw.com
(213) 623-6546

2087.204

15

PLAINTIFFS LUBBY HOLDINGS, LLC and VAPOROUS TECHNOLOGIES, INC.'S OPPOSITION TO DEFENDANT HENRY CHUNG'S RULE 59(a) MOTION FOR A NEW TRIAL

Appx1142

Jen-Feng Lee, SBN 204328
jflee@ltpacificlaw.com
Kenneth K. Tanji, Jr., SBN 162273
ktanji@ltpacificlaw.com
**LT Pacific Law Group, LLP**
17800 Castleton Street, #560
City of Industry, CA 91748
T: 626-810-7200
F: 626-810-7300

Attorneys for Defendant
Henry Chung

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

LUBBY HOLDINGS LLC, a
Delaware limited liability company;
VAPOROUS TECHNOLOGIES,
INC., a Delaware corporation

           Plaintiffs,

      v.

HENRY CHUNG, an individual; MING
CHEN, an individual; DEEPVAVES, INC.,
a California Corporation d/b/a BOOM
VAPORIZER; DOES 1-10, inclusive,

           Defendants.

Case No.:2:18-cv-00715-RGK-JL

**Reply to Plaintiffs' Opposition to
Defendant Chung's Rule 59(a)
Motion For A New Trial**

Date:   7/8/2019
Time:   9:00 am
Ctrm:   850, Roybal Building

**Hon. R. Gary Klausner**

    TO THE HONORABLE COURT, THE PARTIES AND THEIR

RESPECTIVE ATTORNEYS OF RECORD:

---

**Appx1181**

## I.   The Verdict Is Against The Clear Weight of Evidence

### a.  No Evidence That Chung Sold Any Accused Products To Be Liable

The admitted evidence Exhibit 201, showing amount of products sold by Esquire Distribution:

Sheet 1: 3/1/2016 – 2/1/2018 (36,453 units; $166,946.35 revenue)

Sheet 2: 9/6/2017 – 2/1/2018 (8,689 units; $41,284.30 revenue)

A jury's verdict must be upheld if it is supported by substantial evidence. *Pavao v. Pagay,* 307 F.3d 915, 918 (9th Cir. 2002).

This is not a case of "substantial evidence". This is a case of NO evidence.

There is NO evidence to show that Deepvapes, Inc. sold anything[1].

There is NO evidence to show that Defendant Chung sold even one unit of the Accused Product. (Chung testified that he did not sell the products, his company does; at 93:24 – 94:2 of 5/8/2019 transcript).

The verdict against Chung appeared to be derived from the extreme remedy of Alter Ego / Piercing Corporate Veil ("AE/PCV") finding without any evidence. (Defendant will not rehash the arguments in the opening brief.)

Plaintiffs tried to do an end-run of the AE/PCV finding by citing to the *International Mfg. Co. v. Landon*, 336 F.2d 723 (9th Cir. 2002) case. The *International Mfg* case did allow the finding of personal liability without proving AE/PCV, underline only if such personal liability is established under underline section 271(b): inducement.

Defendant Chung in fact addressed this section 271(b) inducement liability, in footnote 5 of the Rule 50(b) JMOL filing, ECF #81.

---

[1] As already noted in the opening brief and a separate notice ECF #106, the mention of Deepvapes is to show the lack of evidence in the verdict, not to advance Deepvapes' interest when Deepvapes did not appear in this case.

During the trial, the Court expressly disallowed the inducement liability finding, and removed that part of the jury instruction submitted by Plaintiffs as No. 17 in ECF #44, filed on 3/18/2019.

This is yet another act of Plaintiffs expressly defying the Court's order.

**b.  No Evidence to Support the Royalty Demand On The Whole Product**

Defendant Chung had his own patents for vaping products.

Defendant Chung designed the accused product. (Chung testified, "I design the product" when asked about the accused product, at 87:5 of Day 2 transcript).

To the extent the accused products really benefited from the touted "anti-leak" feature of the 284 Patent, Plaintiffs are only allowed to reap the benefit of the incremental value contributed by the 284 Patent. (As already noted earlier, the Accused Products in fact will leak when placed in a non-vertical orientation during "periods of nonuse").

Other than the speculative testimony, Plaintiffs had NO document to back up the touted high value of the 284 Patent,

Finally, to the extent there is any support for the 45% rate (again, no document to support 284 Patent's claimed 45% rate), both the 5/6/2019 and 5/9/2019 calculations are in fact **a form of lost profit** computation: Plaintiffs were asking to recoup the profit margin **it could have made** had they sold 36,453 units, at the $45 price, where they could have obtained the 60% profit.

This point of <u>mistaken Lost Profit</u> calculation can be further explained per jury instruction No. 11 at trial, which defined the reasonable royalty to be "the amount of royalty payment that a patent holder and the alleged infringer would have agreed to in a hypothetical negotiation taking place at a time prior to when the infringement first began".

_____

Defendant Chung's Reply ISO Rule 59(a) Motion For A New Trial

3

18.63331

**Appx1183**

In this case, the evidence showed that the average sales price for the 36,453 unit is $4.85[2] per unit.

The jury calculated the average royalty amount (based upon the verdict) for the 36,453 units is $23.70 per unit.

In other words, through Plaintiffs counsel's urging and the limited amount of evidence presented, the jury reached a verdict of a reasonable royalty agreement where an infringer would pay to the patent owner $23.70 per unit when each unit is sold for $4.58.

Not counting all the costs of a unit product, each sales transaction creates a net loss of $19.12 per unit.

Is this an agreement the alleged infringer would have agreed to, per the jury instruction?

## II.   Prejudicial Misconduct By Opposing Counsel At Trial

Defendant responds selectively to certain erroneous points raised by Plaintiffs.

1. Plaintiffs' counsel Mr. Adli made false statements to the Court, as basis for his objection, that the computation of the reasonable royalty figure $623,346.30 was made in settlement context.

The $623k amount was certainly a **demand** (made on 5/6/2019) and Defense counsel admitted as such.

The issue presented in the opening brief is that said $623k demand was NEVER made in any settlement context as Mr. Adli represented to the Court, which led to the Court granting the objection.

---

[2] Defendant is not conceding that all the 36,453 units are proper basis for damages calculation. See other discussions on pre-issuance and section 287.

Defendant Chung's Reply ISO Rule 59(a) Motion For A New Trial

18.63331

4

**Appx1184**

The $623k demand is critical to the issue of damages computation: why the same documentation evidence (the lack thereof, to be clear) would produce a wildly different calculation with a boost of $240k? Defendant lost the opportunity to cross-examine Plaintiffs due to Plaintiffs counsel's false statement to the Court.

Plaintiffs' simply would not come clean and chose to double down on committing more misconduct.

2. There is no infringement before a patent is issued. Jury Instruction No. 5 (ECF #77) expressly provided the owner of a patent has the right to sue for infringement <u>after patents are granted</u>. As such, the Plaintiffs counsel's urging that "each one of those 36,453 units infringe" (the majority of the 36,453 units were sold BEFORE the 284 Patent was granted; see sheets 1 and 2 in admitted Exhibit 201, referenced in lines 6 – 7, page 3 herein), caused the jury to erroneously award damages on the part of sales that are not-infringing.

3. Mr. Rado testified to a "45%" royalty. But the trial record is clear, as pointed out in the opening brief: there is no evidence of a 284 Patent licensing agreement with a 45% royalty rate. If there was such as high royalty rate (for such a valuable patent), an agreement would be in place, and there would not be any speculative numbers of 10%, $0.75 per piece, or the wild-swinging amount of $620k or $860k for the reasonable royalty demand.

4. Defendant will not repeat the fact of Defense counsel, Defendant Chung and defense expert learning of the term "energized valve" or "energized check valve", in relation to the 284 Patent disclosure, for the first time during trial.

///

///

///

_____

Defendant Chung's Reply ISO Rule 59(a) Motion For A New Trial

18.63331

5

**Appx1185**

## CONCLUSION

As explained, the jury verdict is against the clear weight of evidence where Defendant Chung sold ZERO amount of Accused Products. The fact that even Deepvapes, Inc. was found to be liable for the $860k of reasonable royalty attests to the error of this verdict that requires a new trial to achieve justice.

Plaintiffs counsel doubled down on their false statements and incorrect legal arguments, including the fact that they urged the jury to find infringement on the products sold BEFORE the patent was granted and the ridiculous "reasonable royalty" of net loss (not counting costs) of $19.12 per unit sold that an alleged infringer would have agreed to.

The Court is respectfully requested to grant a new trial per Rule 59(a).

LT PACIFIC LAW GROUP LLP

DATED: June 24, 2019

By: /s/ Jen-Feng Lee
Jen-Feng Lee
Attorneys for Defendant
HENRY CHUNG

---

Defendant Chung's Reply ISO Rule 59(a) Motion For A New Trial

18.63331

6

**Appx1186**

Jen-Feng Lee, SBN 204328
jflee@ltpacificlaw.com
Kenneth K. Tanji, Jr., SBN 162273
ktanji@ltpacificlaw.com
**LT Pacific Law Group, LLP**
17800 Castleton Street, #560
City of Industry, CA 91748
T: 626-810-7200
F: 626-810-7300

Attorneys for Defendant
Henry Chung

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LUBBY HOLDINGS LLC, a Delaware limited liability company; VAPOROUS TECHNOLOGIES, INC., a Delaware corporation<br><br>Plaintiffs,<br><br>v.<br><br>HENRY CHUNG, an individual; MING CHEN, an individual; DEEPVAVES, INC., a California Corporation d/b/a BOOM VAPORIZER; DOES 1-10, inclusive,<br><br>Defendants. | Case No.:2:18-cv-00715-RGK-JL<br><br>**Reply to Plaintiffs' Opposition to Defendant Chung's Rule 59(e) Motion to Alter or Amend a Judgment**<br><br>Date:   7/8/2019<br>Time:   9:00 am<br>Ctrm:   850, Roybal Building<br><br><br>**Hon. R. Gary Klausner** |

---

Defendant's Reply ISO Rule 59(e) Motion to Alter or Amend a Judgment

18.63331

## I.     The Integrity and Credibility of our Patent Jurisprudence

One hundred minus one is zero, as a saying goes regarding people's faith in the judicial system. If one case out of one hundred goes wrong, people will have zero faith, instead of having 99% confidence level.

This is not a brand new legal point: Patent damages must comply with 35 U.S.C. §287. Proving damages is a patent plaintiff's burden, including the burden of proving compliance with section 287.

The verdict of $863,936.10 is not warranted under the law because Plaintiffs failed to satisfy the section 287 requirement. The verdict is not warranted further due to the notice/marking instruction was not given to the jury.

Defendant maintains his faith to the credibility and integrity of our judicial system and our patent jurisprudence.

## II.     Plaintiffs Were Aware of the Section 287 Issues

Defendant Chung propounded discovery on the section 287 issue. See **Exhibits B** and **C.**

Plaintiffs failed their burden, as shown in Defense Counsel Declaration. The fact clearly established that there is NO evidence to show that (1) Plaintiffs marked the patent number, or (2) Plaintiffs gave notice of specific charge of infringement, not the mere existence of ownership (Plaintiffs came to own the 287 patent after 9/5/2017). The laws are noted and applied by this Court in the *Juno Manufacturing* and *In re Katz* cases cited in the Opening brief.

The fact of Plaintiffs' counsel not "patent barred" is irrelevant (see ¶4 in Drew H. Sherman Declaration). This case is pending in a U.S. District Court where patent

---

Defendant's Reply ISO Rule 59(e) Motion to Alter or Amend a Judgment

2

18.63331

bar/license is not needed for litigation purpose. The key issue is the lack of the needed legal knowledge that caused the waste of judicial resources.

As already noted, Plaintiffs simply cannot claim ignorance of (or tried to mis-state) the law regarding section 287, when the discovery requests expressly asked about the section 287 issue, in addition to the fact that Plaintiffs' counsel knew about such requirement in the earlier *QBAS v. Sports Dimensions* case cited in Defendant's Request For Judicial Notice, filed as ECF #88-1.

### III.  **Plaintiffs Misstated The Records: Defendant Raised the Issue Multiple Times**

In addition to propounding discovery (to which Plaintiffs provided no document), Defendant raised the section §287 issue multiple times.

Defendant put in the requisite jury instruction in ECF #43; see paragraph 5 in Counsel Declaration.

Upon given the set of jury instructions, Defense Counsel timely put in the objection on this issue; see paragraph 6 in Counsel Declaration.

Plaintiffs' statements of no evidence of Defendant "ever raised the issue" (at 4:9 of Opposition, ECF #107) and the "alleged marking issue also should have been raised" are simply incorrect.

### CONCLUSION

It is puzzling why Plaintiffs would choose to try a case with extremely limited damages (see more detailed explanations in Defendant's Opposition to Plaintiffs' Motion for Attorney Fees, filed as ECF #98).

_____

It is clear as day that the lack of jury instruction re section 287 as well as the proof (by Plaintiffs) to satisfy the section 287 requirement led to an unjust verdict.

The relief for amending the judgment is respectfully requested.

LT PACIFIC LAW GROUP LLP

DATED: June 24, 2019

By: /s/ Jen-Feng Lee
Jen-Feng Lee
Attorneys for Defendant
HENRY CHUNG

---

Defendant's Reply ISO Rule 59(e) Motion to Alter or Amend a Judgment

18.63331

4

**Appx1191**

Jen-Feng Lee, SBN 204328
jflee@ltpacificlaw.com
Kenneth K. Tanji, Jr., SBN 162273
ktanji@ltpacificlaw.com
**LT Pacific Law Group, LLP**
17800 Castleton Street, #560
City of Industry, CA 91748
T: 626-810-7200
F: 626-810-7300

Attorneys for Defendant
Henry Chung

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LUBBY HOLDINGS LLC, a Delaware limited liability company; VAPOROUS TECHNOLOGIES, INC., a Delaware corporation<br><br>Plaintiffs,<br><br>v.<br><br>HENRY CHUNG, an individual; MING CHEN, an individual; DEEPVAVES, INC., a California Corporation d/b/a BOOM VAPORIZER; DOES 1-10, inclusive,<br><br>Defendants. | Case No.:2:18-cv-00715-RGK-JL<br><br>**Defendant HENRY CHUNG's Notice of Appeal to Court of Appeals for the Federal Circuit** |

_____

**Henry Chung's Notice of Appeal to the Federal Circuit**

18.63331

1

**Appx1210**

Come now Defendant HENRY CHUNG, and gives this Notice of Appeal to United States Court of Appeals for the Federal Circuit, for the Order/Judgment entered in this action, as identified below:

   1. Judgment On the Verdict entered on May 9, 2019, ECF Dkt. #76.
   2. Order affirming the ECF #76 Judgment, denying Defendant's JMOL Rule 50 motion, entered on June 17, 2019, ECF Dkt. #105.
   3. Order affirming the ECF #76 Judgment, denying Defendant's Rule 59(a) and Rule 59(e) motions, entered on July 12, 2019, ECF Dkt. #115.

Dated:   August 12, 2019                     Respectfully Submitted,


                                             /s/Jen-Feng Lee

                                             Jen-Feng (Jeff) Lee, SBN 204328
                                             Kenneth K. Tanji, Jr. SBN 162273
                                             **LT Pacific Law Group LLP**
                                             17800 Castleton Street, Ste. 560
                                             Industry, CA 91748
                                             T: 626-810-7200
                                             F: 626-810-7300

                                             Attorney for Defendant
                                                     Henry Chung

---

**Henry Chung's Notice of Appeal to the Federal Circuit**

18.63331                                          2


**Appx1211**

## PROOF OF SERVICE

The undersigned certifies that the foregoing document, **DEFENDANT Henry Chung's Notice of Appeal to Court of Appeals for the Federal Circuit**, was served via electronic means to the recipient(s) identified below:

Dariush G. Adli, Esq.
adli@adlilaw.com
Drew H. Sherman, Esq.
drew.sherman@adlilaw.com
ADLI LAW GROUP, P.C.
444 South Flower Street, Suite 3100
Los Angeles, CA 90071
T: 213-623-6546

Attorneys for Plaintiffs
        Lubby Holdings LLC
        Vaporous Technologies, LLC

On this 12th Day of August, 2019.

/s/Jen-Feng Lee_____
Jen-Feng Lee

---

**Henry Chung's Notice of Appeal to the Federal Circuit**

18.63331                                                                3

Dariush G. Adli, Esq. (SBN: 204959)
  adli@adlilaw.com
Drew H. Sherman, Esq. (SBN: 237045)
  drew.sherman@adlilaw.com
ADLI LAW GROUP, PC
444 South Flower St., Suite 3100
Los Angeles, California 90071
Telephone: (213) 623-6546
Attorneys for Plaintiffs

ADLI LAW GROUP, P.C.
(213) 623-6546

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LUBBY HOLDINGS LLC, a Delaware limited liability company; VAPOROUS TECHNOLOGIES, INC., a Delaware corporation; <br><br> *Plaintiffs,* <br><br> vs. <br><br> HENRY CHUNG, an individual; MING CHEN, an individual; DEEPVAPES, INC., a California Corporation d/b/a BOOM VAPORIZER; DOES 1-10, inclusive, <br><br> *Defendants.* | Case No: 2:18-cv-00715-RGK-JC <br><br> **PLAINTIFFS' RESPONSES TO DEFENDANT HENRY CHUNG'S INTERROGATORIES** <br><br> Complaint Filed:   January 26, 2018 |

PLAINTIFFS responds as follows:

At least Vaporous Pal Tank Kit and Vaporous J-Pen series practice the claims of the '284 Patent. Person with most knowledge to these product is Christian Rado.

**INTERROGATORY NO. 6:**

Please fully explain all your basis, reasoning and legal/factual if you contend that Plaintiffs have complied with the requirement of 35 U.S.C. 287 related to patent marking requirement.

**RESPONSE O INTERROGATORY NO. 6:**

PLAINTIFFS incorporate their General Objections above as if set forth fully herein. PLAINTIFFS further object to this Interrogatory on the grounds that it contains discrete subparts contrary to Fed. R. Civ. P. 33(a) and thus, consists of multiple interrogatories. PLAINTIFFS further object to this Interrogatory to the extent that it seeks information protected by the attorney-client privilege and/or work product doctrine. PLAINTIFFS further object to this Interrogatory on the grounds that it is premature. PLAINTIFFS further object to this Interrogatory on the grounds that it seeks expert disclosure prior to the time set by Rule 26 of the Federal Rules of Civil Procedure and the Scheduling Order in this case. PLAINTIFFS also object on the grounds that the request seeks all persons who are knowledgable regarding the response and not just those under DEFENDANT'S control.

Subject to and without waiving the foregoing or general objections, PLAINTIFFS responds as follows:

**INTERROGATORY NO. 7:**

Please fully explain all your basis, reasoning and legal/factual support, including information or materials by expert(s), related to any non-speculative damages compensation you seek to recovery from Defendant. Such response should include any basis of your sought recovery, including, but not limited to reasonable royalty, lost profit, unjust enrichment, etc.

**RESPONSE TO INTERROGATORY NO. 7:**

ADLI LAW GROUP, P.C.
www.adlilaw.com
(213) 623-6546

PLAINTIFFS' RESPONSES TO DEFENDANT HENRY CHUNG'S INTERROGATORIES

2087.204

**Appx1222**

PLAINTIFFS incorporate their General Objections above as if set forth fully herein. PLAINTIFFS further object to this Interrogatory on the grounds that it contains discrete subparts contrary to Fed. R. Civ. P. 33(a) and thus, consists of multiple interrogatories. PLAINTIFFS further object to this Interrogatory to the extent that it seeks information protected by the attorney-client privilege and/or work product doctrine. PLAINTIFFS further object to this Interrogatory on the grounds that it is premature. PLAINTIFFS further object to this Interrogatory on the grounds that it seeks expert disclosure prior to the time set by Rule 26 of the Federal Rules of Civil Procedure and the Scheduling Order in this case. PLAINTIFFS also object on the grounds that the request seeks all persons who are knowledgable regarding the response and not just those under DEFENDANT'S control.

Subject to and without waiving the foregoing or general objections, PLAINTIFFS responds as follows:

PLAINTIFFS await the progress of further discovery to produce responsive answers.

**INTERROGATORY NO. 8:**

Please fully explain all your basis, reasoning and legal/factual support, including information or documents by expert(s), regarding your statement of "Defendants actively, knowingly, and intentionally induced, and continue to actively, knowingly, and intentionally induce, use or incorporation, of one or more claims of the '2814 Patent", as alleged in paragraph 52 of the FAC.

**RESPONSE TO INTERROGATORY NO. 8:**

PLAINTIFFS incorporate their General Objections above as if set forth fully herein. PLAINTIFFS further object to this Interrogatory on the grounds that it contains discrete subparts contrary to Fed. R. Civ. P. 33(a) and thus, consists of multiple interrogatories. PLAINTIFFS further object to this Interrogatory to the extent that it seeks information protected by the attorney-client privilege and/or work product doctrine. PLAINTIFFS further object to this Interrogatory on the grounds that

ADLI LAW GROUP, P.C.
www.adlilaw.com
(213) 623-6546

11

2087.204

Appx1223

Jen-Feng Lee, SBN 204328
jflee@ltpacificlaw.com
Kenneth K. Tanji, Jr., SBN 162273
ktanji@ltpacificlaw.com
**LT Pacific Law Group, LLP**
17800 Castleton Street, #560
City of Industry, CA 91748
T: 626-810-7200
F: 626-810-7300

Attorneys for Defendant
HENRY CHUNG

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LUBBY HOLDINGS LLC, a Delaware limited liability company; VAPOROUS TECHNOLOGIES, INC., a Delaware corporation;<br><br>      Plaintiffs,<br><br> vs.<br><br>HENRY CHUNG, an individual; MING CHEN, an individual; DEEPVAPES, INC., a California Corporation d/b/a BOOM VAPORIZER; DOES 1-10, inclusive,<br><br>      Defendants. | No.   2:18-cv-00715-RGK-JC<br><br>**Declaration by Defense Counsel** ISO HENRY CHUNG'S OBJECTION TO PLAINTIFFS' COMPUTATION OF DAMAGES, FILED AS ECF #62 |

  My name is Jen-Feng Lee. I generally go by Jeff Lee. I made the following statements based upon my personal knowledge. If called as a witness, I will testify competently and truthfully to the best of my knowledge.

_____

**Declaration by Defense Counsel ISO CHUNG'S Objection to Plaintiffs' Computation of Damages, ECF 62**

**Appx1227**

1. **Exhibit A** shows sales summary of accused products after 284 Patent was issued. The sales period has 149 days, from 9/5/2017 to 2/1/2018. (* The was no possible infringement before 284 Patent was issued on 9/5/2017. The accused products ceased to be sold after 2/1/2018. *) The sales activity in the 149 days resulted in the sales of 8,689 units, having dollar amount of $42,284.30.

2. **Exhibit B** shows Plaintiffs' discovery responses re the compliance with 35 U.S.C. §287 notice (aka "patent marking").

   B-1: Plaintiffs said nothing about the notice/patent marking issue in their served response (2-months late); see No. 6.

   B-2: Plaintiffs stated their "online store references US Patent protection with each product", in No. 6 of Supplemental Response to Interrogatories (without asserting any objection) served on 12/12/2018.

3. **Exhibit C** shows Plaintiff's "compliance" with §287. This is the only evidence, among the 35 pages produced by Plaintiffs, that is relevant to the "notice/patent marking" inquiry under section 287. At the lower-right corner of the screen shot, a vague but still discernable "US and International Patents Pending" announcement can be seen.

4. **Exhibit D** shows the laws on the §287 "notice/patent marking" compliance.

   D-1: pages 4 – 5, this Court explained the essence of Constructive and Actual Notices.

   D-2: page 20, this Court explained "notice" is not the existence or ownership of a patent, but must be the specific charge of "infringement".

5. **Exhibit E** shows my reminder email (5/3/2019 night time) to Plaintiffs' counsel that their computation of damages should be warranted by existing law and not for any improper purpose, and the damages disclosure should be supported by the discovery production in this case.

_____

**Declaration by Defense Counsel ISO CHUNG'S Objection to Plaintiffs' Computation of Damages, ECF 62**

**Appx1228**

6.   The "Sales of 287-complaint Period", in this case, consisted of the **seven (7)** days of sales from January 26, 2018 (after the date the complaint was filed) to February 1, 2018 (the date accused products ceased to be sold).

7.   By simple mathematical calculation, the sales quantity of the accused products, for the 7 days of the "Sales of 287-compliant Period" would be

   a.   The total units of "infringing products" would be 408.

   b.   The total "infringing" dollar amount of $1,986.46.

8.   To the extent Plaintiffs can prove infringement, they can only seek compensation from the 408 "infringing" units, having total sales amount of $1,986.46, based upon the mathematical calculation stated herein.

Dated: May 6, 2019                    Executed at: Industry, California

                                                    /s/Jen-Feng Lee
                                          By:   _____
                                                    Jen-Feng (Jeff) Lee

---

**Declaration by Defense Counsel ISO CHUNG'S Objection to Plaintiffs' Computation of Damages, ECF 62**

63311                                            3

# Exhibit C

Exhibit C

Appx1257



LUbby -P. 026

**Appx1258**

Dariush G. Adli, Esq. (SBN: 204959)
  adli@adlilaw.com
Drew H. Sherman, Esq. (SBN: 237045)
  drew.sherman@adlilaw.com
Joshua H. Eichenstein (SBN: 299392)
  Josh.eichenstein@adlilaw.com
ADLI LAW GROUP, P.C.
444 South Flower Street, Suite 3100
Los Angeles, California 90071
Telephone: 213-623-6546
Facsimile: 213-623-6554

Attorneys for Plaintiffs
Lubby Holdings LLC,
Vaporous Technologies, LLC

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| LUBBY HOLDINGS LLC, a Delaware limited liability company; VAPOROUS TECHNOLOGIES, INC., a Delaware corporation;<br><br>            *Plaintiffs*,<br><br>    v.<br><br>HENRY CHUNG, an individual; MING CHEN, an individual; DEEPVAPES, INC., a California Corporation d/b/a BOOM VAPORIZER; DOES 1-10, inclusive,<br><br>            *Defendants*. | Case No.<br><br>**PLAINTIFFS' COMPLAINT AGAINST DEFENDANTS FOR PATENT INFRINGEMENT**<br><br>**JURY TRIAL DEMANDED** |

ADLI LAW GROUP, P.C.
www.adlilaw.com
(213) 623-6546

2087.202

PLAINTIFF'S COMPLAINT AGAINST DEFENDANTS FOR PATENT INFRINGEMENT

**Appx1267**

continue to contribute to the use or incorporation of one or more claims of the '284 Patent by third parties, including Defendants' customers, of one or more claims of the '284 patent under 35 U.S.C. § 271(c), by selling and/or offering for sale in the United States and/or importing into the United States the Accused Products knowing that those products constitute a material part of the inventions of the '284 patent, knowing that those products are especially made or adapted to use or incorporate of one or more claims of the '284 Patent, and knowing that the Accused Products are not staple articles of commerce suitable for a substantial use other than described herein.

25.     Plaintiff has been and continues to be damaged by Defendants' use or incorporation of one or more claims of the '284 Patent in the Accused Products.

26.     Since having knowledge of the '284 patent, Defendants knew or should have known that, without taking a license to the '284 Patent, their actions continue to be unlawful. Therefore, Defendants' infringement has been and will continue to be willful.

27.     Defendants' conduct in infringing the '284 patent renders this case exceptional within the meaning of 35 U.S.C. § 285.

### **COUNT I – INFRINGEMENT OF U.S. PATENT NO 9,750,284**

28.     The allegations contained in paragraphs 1-27 above are repeated and realleged as if fully set forth herein.

29.     Plaintiffs are the owners, assignees, and owner of the right, title, and interest in and to the '284 patent, now and for the entire period of and relevant to the Defendants' to the use or incorporation of one or more claims of the '284 Patent in te the Accused Products, including the right to assert all causes of action arising under said patent and the right to any remedies for infringement of it.

30.     Defendants are, and have been, on notice of the '284 patent since before this lawsuit was filed.

31.     Defendants have directly infringed and/or indirectly infringed, literally and/or under the doctrine of equivalents, the '284 patent under 35 U.S.C. § 271.

ADLI LAW GROUP, P.C.
(213) 623-6546

6

2087.202

**Appx1273**

Jen-Feng Lee, SBN 204328
jflee@ltpacificlaw.com
Kenneth K. Tanji, Jr., SBN 162273
ktanji@ltpacificlaw.com
**LT Pacific Law Group, LLP**
17800 Castleton Street, #560
City of Industry, CA 91748
T: 626-810-7200
F: 626-810-7300

Attorneys for Defendant
HENRY CHUNG

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LUBBY HOLDINGS LLC, a Delaware limited liability company; VAPOROUS TECHNOLOGIES, INC., a Delaware corporation; | No.   2:18-cv-00715-RGK-JC |
| Plaintiffs, | **DEFENDANT'S NOTICE OF INTERESTED PARTIES (LR 7.1 – 1)** |
| vs. | |
| HENRY CHUNG, an individual; MING CHEN, an individual; DEEPVAPES, INC., a California Corporation d/b/a BOOM VAPORIZER; DOES 1-10, inclusive, | |
| Defendants. | |

_____

**LR 7.1-1 Notice of Interested Parties**

1

63311

**Appx1314**

TO THE HONORABLE COURT, THE PARTIES AND THEIR RESPECTIVE ATTORNEYS OF RECORD:

The undersigned, counsel of record for Defendant Henry Chung, certifies that the following listed parties have a direct, pecuniary interest in the outcome of this case. These representations are made to enable the Court to evaluate possible disqualification or recusal.

1. Plaintiff -  LUBBY HOLDINGS LLC, a Delaware business entity;

VAPOROUS TECHNOLOGIES, INC., a Delaware business entity;

Christian Rado, an individual owning substantial shares of the two above-listed corporate entities;

2. Defendant – Henry Chung

DATED: April 4, 2018          LT PACIFIC LAW GROUP LLP


By: /s/ Jen-Feng Lee
    Jen-Feng Lee
    Attorneys for Defendant
    HENRY CHUNG

_____

**LR 7.1-1 Notice of Interested Parties**
2

63311

Dariush G. Adli, Esq. (SBN: 204959)
  adli@adlilaw.com
Drew H. Sherman, Esq. (SBN: 237045)
  drew.sherman@adlilaw.com
Joshua H. Eichenstein (SBN: 299392)
  Josh.eichenstein@adlilaw.com
ADLI LAW GROUP, P.C.
444 South Flower Street, Suite 3100
Los Angeles, California 90071
Telephone: 213-623-6546
Facsimile: 213-623-6554

Attorneys for Plaintiffs
Lubby Holdings LLC,
Vaporous Technologies, LLC

ADLI LAW GROUP, P.C.
www.adlilaw.com
(213) 623-6546

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LUBBY HOLDINGS LLC, a Delaware limited liability company; VAPOROUS TECHNOLOGIES, INC., a Delaware corporation;<br><br>   *Plaintiffs*,<br><br>  v.<br><br>HENRY CHUNG, an individual; MING CHEN, an individual; DEEPVAPES, INC., a California Corporation d/b/a BOOM VAPORIZER; DOES 1-10, inclusive,<br><br>   *Defendants*. | Case No: 2:18-cv-00715-RGK-JC<br><br>*Honorable R. Gary Klausner*<br>*United States District Judge*<br><br>**JOINT JURY INSTRUCTIONS**<br><br>**Pretrial Conference:**<br>**March 18, 2019 at 09:00 AM**<br><br>**Jury Trial Date:**<br>**April 2, 2019 at 09:00 AM** |

2087.202

**Appx1317**

**Jury Instruction 10.**
**Claims and Defenses**

To help you follow the evidence, I will give you a brief summary of the positions of the parties:

Plaintiffs Lubby Holdings LLC ("Lubby") is the exclusive owner of U.S. Patent No. 9,750,284 ("the '284 patent") which it entitled "PERSONAL VAPORIZER" and covers vaporizers. Plaintiff Vaporous Technologies Inc. ("Vaporous") (collectively referred to as "Plaintiffs") is the non-exclusive licensee of the '284 patent.

Plaintiffs assert that Defendants HENRY CHUNG ("Chung"), an individual; MING CHEN ("Chen"), an individual; DEEPVAPES, INC., a California Corporation d/b/a BOOM VAPORIZER ("Boom") infringe the '284 patent by willfully applying protected IP in the '284 Patent in the design, manufacture, and sale of Conseal A and Conseal B vaporizer products.  The plaintiff has the burden of proving these claims. Defendants deny those claims.

Source Ninth Circuit Model Civil Jury Instructions – 1.5 (2017 Edition).

PROPOSED BY:  _____

GIVEN AS PROPOSED  _____

GIVEN AS MODIFIED  _____

GIVEN ON COURT'S OWN MOTION  _____

REFUSED  _____

WITHDRAWN  _____

13

2087.202

**Appx1333**

Jen-Feng Lee, SBN 204328
jflee@ltpacificlaw.com
Kenneth K. Tanji, Jr., SBN 162273
ktanji@ltpacificlaw.com
**LT Pacific Law Group, LLP**
17800 Castleton Street, #560
City of Industry, CA 91748
T: 626-810-7200
F: 626-810-7300

Attorneys for Defendant
Henry Chung

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

LUBBY HOLDINGS LLC, a
Delaware limited liability company;
VAPOROUS TECHNOLOGIES,
INC., a Delaware corporation

        Plaintiffs,

      v.

HENRY CHUNG, an individual; MING
CHEN, an individual; DEEPVAVES, INC.,
a California Corporation d/b/a BOOM
VAPORIZER; DOES 1-10, inclusive,

        Defendants.

Case No.:2:18-cv-00715-RGK-JL

**Opposition to Plaintiffs' Motion
for Attorney Fees per Section 285
(ECF #93)**

Date:   6/24/2019
Time:  9:00 am
Ctrm:  850, Roybal Building

**Hon. R. Gary Klausner**

_____

Defendant's Opposition to Plaintiff's Motion for Fees per Section 285 (ECF #93)

18.63331

1

**Appx1379**

TO THE HONORABLE COURT, THE PARTIES AND THEIR RESPECTIVE ATTORNEYS OF RECORD:

Defendant HENRY CHUNG ("Defendant") respectfully gives this opposition to Plaintiffs' Motion for Attorney Fees (ECF #93) pursuant to 35 U.S.C. §285.

## I.  This Case Has Limited Damages

This case was filed on 1/26/2018, asserting Christian Rado's 9,275,284 patent ("284 Patent"), titled "Personal Vaporizer". The 284 Patent was filed on 8/31/2016[1] and was granted as a U.S. patent on 9/5/2017.

Defendant ceased selling the accused products (Conseal A and Conseal B; collectively, "Accused Products") after 2/1/2018. During discovery, Defendant Chung produced sales records of the Accused Products (sold by Esquire Distribution, a corporation 100% owned by Defendant Chung). The evidence is admitted as Exhibit 201:

> Sheet 1: all sales, 3/1/2016 – 2/1/2018 (36,453 units; $166,946.35)
>
> Sheet 2: post-issuance sales, 9/6/2017 – 2/1/2018.

During discovery, Defense counsel, mindful of the section 287 issue, searched for evidence of Plaintiffs' compliance of the section 287 "notice/marking" requirement and did not find any evidence in this regard. By close of discovery (1/4/2019), Plaintiffs in fact produced no evidence (among the grand total of 35 pages produced) to show that they complied with the section 287 requirement.

---

[1] Plaintiffs made vague and misleading statements about the 284 Patent's early priority date of 12/30/2014, when a provisional application was filed. However, there is no assertable patent right until a patent is granted, as expressly provided in Jury Instruction No. 5. As will be explained later, Plaintiffs impermissibly counted all sales (sheet 1, Exhibit 201) of the accused products to mislead the jury. The section 287 "notice/marking" requirement will be addressed separately.

Defendant's Opposition to Plaintiff's Motion for Fees per Section 285 (ECF #93)

2

18.63331

As such, Defendant calculated, and reported to the Court, the provable damages of about 408 pieces, during the 7-day period between 1/26/2018 and 2/1/2018 (starting from the day the patent complaint was filed, pursuant to the provision of 35 U.S.C. §287), with a total dollar amount of roughly $1,986.46. Assuming a 10% royalty, Plaintiffs would get $198 as reasonable royalty compensation. See ¶1 in Counsel Declaration, and filed ECF #63, ¶A.6.

It was crystal clear that Plaintiffs purpose of pursuing the infringement case was not for legitimate purpose of stopping infringement and recouping economic loss.

There is no need to "stop infringement" where there was no more sales of accused product after 2/1/2018, 7 days after the suit was filed.

There is no justifiable goal of recouping economic loss, when the legal expenses in a patent case greatly outweigh the monetary recovery of a few hundred dollars.

Defendant engaged in repeated meet-and-confers, in February and March of this year, seeking to pin down Plaintiffs' damages disclosure (so that Plaintiffs would face up to the true fact of this low damages case), to no avail. This finally led to damages disclosure briefing in ECF ##49 – 55, culminating with the Court's ordering Plaintiffs to cure their violation.

Defendant, in good faith, offered $10,000 to Plaintiffs in the mediation hosted by Mr. Alan Kindred on 2/20/2019.  Plaintiffs refused the $10,000 offer and demanded more than $100,000.  Defendant was forced to spend more legal fees on a low damages case. See ¶2 in Counsel Declaration.

.

## II.  Plaintiffs ran a less than half-baked case

Plaintiffs' Initial Disclosure was late by more than three (3) months, without any justification. See ¶3 in Counsel Declaration.

---

Defendant's Opposition to Plaintiff's Motion for Fees per Section 285 (ECF #93)

3

Despite the Court's specific order re jury trial for the timing of [35 day before trial: Plaintiff serving jury instructions], [28 day: Defendant serving objections and additional jury instructions], and [21 day: Plaintiff serving objections to Defendant's instruction], Plaintiffs defied such order by 17 days' delay.

5. Plaintiffs defied the Court's order and were late by 2 days when providing objections to Defendant's additional jury instruction. See ¶6 in Counsel Declaration.

6. Plaintiffs filed Proposed Vior Dire questions ("Voir Dire") on 4/30/2019 (ECF #58). This was in direct violation of the Court's Order for Jury Trial, ECF #28, which provided that "Counsel may, but need not, submit brief proposed voir dire questions seven (7) days before the Pretrial Conference. Plaintiffs defied the Court's Order by 50 days' delay.

7. Plaintiffs' statement of Defendant "refused to engage in any reasonable negotiation for resolution before taking the case to trial" (lines 8 – 9, Page 11 of 17, ECF #93-1) is contrary to the facts. Defendant made a settlement offer higher than Plaintiffs' provable damages, as explained earlier.

8. Plaintiffs' counsel Mr. Adli made false statements to the Court, as basis for his objection, that the computation of the reasonable royalty figure $623,346.30 was made in settlement context. See ¶7 in Counsel Declaration.

9. There is NO infringement before a patent is issued. But Plaintiffs' counsel nevertheless falsely stated that "each one of those 36,543 units infringe" (62:20 of Day 3 Transcript). Only the sheet 2 of Exhibit 201, reporting sales between 9/6/2017 and 2/1/2018, contains infringing units.

10. Plaintiffs' counsel made the ridiculous legal proposition, at lines 5 – 7, Page 5 of 14, ECF #85, that the section 287 notice/marking requirement is Defendant's burden to prove. Such ridiculous legal proposition is further contradicted by a

_____

Defendant's Opposition to Plaintiff's Motion for Fees per Section 285 (ECF #93)

8

18.63331

prior case litigated by the same ADLI firm, *QBAS v. Sports Dimensions*, as reported to Court in Defendant's Request for Judicial Notice filed as ECF #88.

11. Plaintiffs counsel's statement that 'Mr. Rado provided Mr. Chung "actual notice" of the patent because the non-disclosure agreements" (lines 1 – 2, Page 6 of 14, ECF #85) is another false statement. There is NO possibility for anyone to receive actual notice of the patent in 2015 (time of signing the non-disclosure agreements) when the patent was not even filed[4].

12. Plaintiffs counsel made misrepresentation that the set of jury instruction is the "stipulated jury instructions" (line 23, Page 11 of 17, ECF #93-1). The trial record is clear: Plaintiffs and Defendant did not reach an agreement on a joint jury instruction set (Defendant had no delay; Plaintiffs' repeated delays were noted in earlier sections). The Court deleted various instructions and gave a limited set where the damages instructions on section 287 "notice/marking" were not included, as Defense counsel objected to on the record.

13. Plaintiffs' counsel gave misleading statement, at 63:6-8 of Day 3 transcript, that there is a basis for the 284 Patent reasonable royalty where "he currently has a deal that is active with a company that he's getting 45 percent of the net profits". Throughout the trial testimony and the scant amount of evidence admitted, there is NO such evidentiary basis to show that the 284 Patent has a reasonable royalty of 45% of the net profit. (Defendant is not expected to prove the negative. Also, the jury was misled by such statement despite the jury instructions expressly stated that attorney argument is not evidence.)

---

[4] Plaintiffs claimed priority date of a 12/30/2014 provisional filing. However, said 2014 provisional filing was not in evidence and there is no admissible information to show whether the scope of the 284 patent claim is the same as the 2014 provisional filing. The claimed 2014 priority date is also not relevant as the question specifically asked for patent, not any application(s) prior to issuance into a patent.

Defendant's Opposition to Plaintiff's Motion for Fees per Section 285 (ECF #93)

18.63331

9

## B.    The Number of Affirmative Defenses

Amazingly, Plaintiffs faulted Defendant's asserting nine (9) affirmative defenses in the filed Answer but only tried the Invalidity/Obviousness to the jury. Defendant's assertion of 9 affirmative defenses is the very model of NOT exceptional, especially when Defendant made it clear in the LR 16 Memorandum of Contention of Fact and Law (ECF #38) that only two affirmative defenses would be contested: Invalidity and Patent Misuse.

Plaintiffs' hypocrisy cannot be any louder when they pled twelve (12) affirmative defenses in an earlier case between the same two opposing camps. See ¶9 in Counsel Declaration.

## C.    Defense Expert on Invalidity

There is no dispute that Defendant's expert did not carry the day to prove invalidity. However, as explained, in response to Plaintiffs' hiring a freebie expert, there is nothing wrong in Defendant's strategy to spend some money in a low damages case to hopefully achieve a forever peace if the invalidity defense panned out.

## D.    Other "False" Testimony

Putting a label of "false" testimony on Defendant Chung's testimony does not make it false. In the juror's mind, they gave overall higher weight to Plaintiffs testimony, under the misguided law and misrepresentations made by Plaintiffs' counsel and rendered the ridiculous verdict.

## VIII.    Some Outstanding Absurdity Points

### A.    Plaintiffs counsel's ignorance in the section 287 issues

During a phone conference on 5/20/2019, around 11 am, on the issue of section 287 "notice/marking", Plaintiffs' counsel made express admission that he does not know about this point of law, when the meet-and-confer was exactly on this point: the

_____

Defendant's Opposition to Plaintiff's Motion for Fees per Section 285 (ECF #93)

18.63331                                                       12

**Appx1392**

manifest error about the undisputed facts of Plaintiffs' failure to satisfy the section 287 "notice/marking" requirement, as part of a patent plaintiff's burden to prove damages. See ¶10 in Counsel Declaration.

**B.      Plaintiffs' purely wild speculation on damages**

As pointed out earlier, 3 days made a great difference, a speculative difference, in reasonable royalty damages:

5/6/2019: ($45 - $16.50) x 60% x 36,453 = $623,346.30.

5/9/2019: ($45 - $5.50)  x 60%  x 36,453 = $863,936.10.

How did Plaintiffs increase their recovery by $240,000 in 3 days?

**C.      $330,713 attorney fees and $9,198.47 costs**

As stated earlier, this is a do-nothing case. In fact, the tasks done by Plaintiffs' counsel were late, wasteful, violating litigation rules and defying the Court's orders.

No discovery motion; no claim construction; no dispositive motion; using a freebie expert, no documents to support any claimed damages.

In a case where Plaintiffs failed to satisfy the section 287 "notice/marking" requirement (with only 7 days' of Esquire Distribution's reported sales), Defendant was unable to avoid the trial despite making a settlement offer that is substantially higher than Plaintiffs' provable damages.

The amount of legal expenses poured into this do-nothing action is absurd.

**D.      Plaintiffs intentionally misled the jury re damages accrual**

There is NO infringement before 9/5/2017 when the patent was granted. However, Plaintiffs' counsel had no qualm misstating the law by pointing to the 36,453 units (sales period between 3/1/2016 and 2/1/2018) and claimed that all those were infringing.

---

Defendant's Opposition to Plaintiff's Motion for Fees per Section 285 (ECF #93)

18.63331                                              13

**Appx1393**

Jen-Feng Lee, SBN 204328
jflee@ltpacificlaw.com
Kenneth K. Tanji, Jr., SBN 162273
ktanji@ltpacificlaw.com
**LT Pacific Law Group, LLP**
17800 Castleton Street, #560
City of Industry, CA 91748
T: 626-810-7200
F: 626-810-7300

Attorneys for Defendant
HENRY CHUNG

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LUBBY HOLDINGS LLC, a Delaware limited liability company; VAPOROUS TECHNOLOGIES, INC., a Delaware corporation;<br><br>                 Plaintiffs,<br><br>     vs.<br><br>HENRY CHUNG, an individual; MING CHEN, an individual; DEEPVAPES, INC., a California Corporation d/b/a BOOM VAPORIZER; DOES 1-10, inclusive,<br><br>                 Defendants. | No.   2:18-cv-00715-RGK-JC<br><br>**Declaration by Defense Counsel** ISO HENRY CHUNG'S **OPPOSITION TO PLAINTIFFS' SECTION 285 MOTION** FOR ATTORNEY FEES, FILED AS ECF #93 |

   My name is Jen-Feng Lee. I generally go by Jeff Lee. I made the following statements based upon my personal knowledge. If called as a witness, I will testify competently and truthfully to the best of my knowledge.

_____

**Declaration by Defense Counsel ISO CHUNG'S Opposition to Plaintiff's Section 285 Motion (ECF 93)**

63311

1

**Appx1397**

1. By close of discovery, it was clear to me Plaintiffs can only recover a maximum of 7 days' sales of the accused products, due to the failure to satisfy the section 287 "notice/marking" requirement. A calculation was done to show that, the 7 day's sales (from 1/26/2018 to 2/1/2018) would have a total dollar amount of roughly $1,986.46.  Assuming a 10% royalty, the reasonable royalty award would be **$198.64**; also see filed ECF #63, ¶A.6.

2. In a mediation hosted by Mediator Alan Kindred on 2/20/2019, Defendant Chung offered $10,000 to Plaintiffs, even though this amount was substantially higher than Plaintiff's provable damages. Plaintiffs refused and demanded settlement amount of over $100,000.

3. Plaintiffs' Initial Disclosure was late by more than three (3) months: Defendant served the Rule 26(a) Initial Disclosure on 8/2/2018; Plaintiffs served on 11/8/2018.

4. Plaintiffs' Discovery responses were late by more than two (2) months: Plaintiffs served belated responses on 11/11/2018, more than 2 months after the original due date of 9/1/2018 (email service agreed by parties; no more 3-day mail extension). Substantial amount of discovery meet and confer took place between parties before Plaintiffs finally agreed to re-served responses, waiving the objections due to their belated response. Attorney fees, on both sides, needlessly got spent on Plaintiffs' unjustified delay.

5. No deposition was arranged. To cover up for their own lack of diligence, Plaintiffs made up false fact about how I responded to the deposition notice of Henry Chung: "Mr. Lee responded to Plaintiffs' notice by informing my office that Mr. Chung could not sit for a deposition until after the close of discovery", as stated (under penalty of perjury) in ¶24 of the delayed Drew Sherman declaration (ECF #55). I filed an objection (ECF #56, 4/1/2019) to point out such falsity; see paragraph II.2 of ECF #56.

_____

**Declaration by Defense Counsel ISO CHUNG'S Opposition to Plaintiff's Section 285 Motion (ECF 93)**

6. Plaintiffs were late by two (2) days, without justification, in providing objections to Defendant's additional proposed jury instruction.

    a. At 12:35 pm, 3/13/2019, Plaintiffs counsel emailed: "We will provide you any objections to your proposed instructions later today". This did not happen.

    b. At 9:03 am, 3/14/2019, Plaintiffs belatedly, without justification, provided the objections. This was two (2) days later than the Court-ordered date of 3/12/2019, which was 21 days before then then-trial date of 4/2/2019).

7. In day 3 of the trial, I tried to ask Christian Rado about the basis and computation of the damages claims ($795,765 and $623,346.30) reported to Court on 5/6/2019, filed in ECF #62. Plaintiffs counsel Adli objected on the ground that it "reveals settlement communication" and the Court sustained the objection (pages 19 – 20, Day 3 transcript). These basis, computations and demands were NEVER produced during discovery, and never brought up during any prior settlement communication. I lost the opportunity to cross-examine Christian Rado why, based upon the same sales report, the reasonable royalty was $623,346.30 (and as later argued by Drew Sherman in closing argument, ballooning up to $863,936.10).

8. The "**energized valve**". In dealing with this infringement case, I became familiar with the general scope and teachings of the 284 patent. <u>There is no "energized valve" or "energized check valve" term in the 284 patent</u>. This term did not appear in Brekke's expert report or any earlier documents (including the Non-Disclosure Agreement in 2015). It is puzzling to me what this term was when Plaintiffs started to use this term at trial. It is my understanding that Defense expert Mr. Wakalopulos and Defendant Chung, via the "education" of the trial came to know what the "energized (check) valve" could mean. This is shown in Day 2 transcript, 169:25 – 170:1:

_____

**Declaration by Defense Counsel ISO CHUNG'S Opposition to Plaintiff's Section 285 Motion (ECF 93)**

Q   Do you know what an energized check valve is?

A   No, not until today.

9.   I represented Henry Chung in a prior lawsuit against Christian Rado and Vaporous Technologies, asserting Henry Chung's 9,380,812 patent (also related to vaping technology), case number 16-cv-8586-RSWL-PLA, in Central District of California. ADLI law group filed Answer (on 1/17/2017, ECF #16), asserting twelve (12) affirmative defenses.

10. In my phone conference on or about 11 am, 5/29/2019, with Plaintiffs' counsel, Mr. Drew Sherman admitted that he does not know the legal point that a patent plaintiff must satisfy the section 287 "notice/marking" requirement. This fact is ironic further in the context where one of the issues specifically identified for the meet-and-confer is about Rule 59(e) for manifest legal error on the lack of jury instruction related to section 287.

11. There is no refusal to engage in meet and confer, as Plaintiffs counsel stated. In my reading of the local rule 54-7 and based upon my experience in other federal litigations, the timing for filing the attorney fee motion would be after the resolution of certain post-trial motions, so that there is a "final order" and for properly determine the prevailing party status, when all triable issues are resolved. With the additional uncertainty of the Patent Misuse issue, I think the current motion is premature. However, the Court ruled on my Request for Guidance (ECF #83), rendering the timing dispute moot for the current fee motion, filed as ECF #93.

///

///

///

_____

**Declaration by Defense Counsel ISO CHUNG'S Opposition to Plaintiff's Section 285 Motion (ECF 93)**

63311

4

**Appx1400**

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.


Dated: May 3, 2019                              Executed at: Industry, California


                                                          /s/Jen-Feng Lee

                                            By: _____

                                                      Jen-Feng (Jeff) Lee

_____

**Declaration by Defense Counsel ISO CHUNG'S Opposition to Plaintiff's Section 285 Motion (ECF 93)**

63311                                                        5


**Appx1401**

Jen-Feng Lee, SBN 204328
jflee@ltpacificlaw.com
Kenneth K. Tanji, Jr., SBN 162273
ktanji@ltpacificlaw.com
**LT Pacific Law Group, LLP**
17800 Castleton Street, #560
City of Industry, CA 91748
T: 626-810-7200
F: 626-810-7300

Attorneys for Defendant
HENRY CHUNG

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LUBBY HOLDINGS LLC, a Delaware limited liability company; VAPOROUS TECHNOLOGIES, INC., a Delaware corporation;<br><br>                    Plaintiffs,<br><br>    vs.<br><br>HENRY CHUNG, an individual; MING CHEN, an individual; DEEPVAPES, INC., a California Corporation d/b/a BOOM VAPORIZER; DOES 1-10, inclusive,<br><br>                    Defendants. | No.   2:18-cv-00715-RGK-JC<br><br>DEFENDANT HENRY CHUNG'S NOTICE RE DEEPVAPES, INC. |

---

**DEFENDANT CHUNG'S NOTICE RE DEEPVAPES**

63311                                                                       1

**Appx1402**

TO THE HONORABLE COURT, THE PARTIES AND THEIR RESPECTIVE ATTORNEYS OF RECORD:

In Defendant Chung's Rule 50 JMOL and post-trial filings (collectively "Post-Trial Filings"), Defendant alluded to the Deepvapes, Inc.'s liability of the $863,936.10 amount, as reflected in the Judgment on the Verdict for the Plaintiffs, ECF Dkt. #76.

Defendant Chung's Post-Trial Filings did <u>not</u> make arguments <u>on behalf of all Defendants</u>, as the Court noted in footnote 1 of the ECF # 105 Order.

As already noted in Defendant Chung's Rule 50 JMOL (ECF #81) filing, at footnote 4 (page 7), Defendant Chung does not seek to advance Deepvape's interest. Deepvapes is not represented by counsel, nor has it made appearance in this action.

Respectfully Submitted,
LT PACIFIC LAW GROUP LLP

Dated: June 17, 2019

By: /s/Jen-Feng Lee
_____
Jen-Feng (Jeff) Lee
Kenneth Tanji, Jr.
Attorneys for Defendant, Henry Chung

---

**DEFENDANT CHUNG'S NOTICE RE DEEPVAPES**

63311

2